```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/12/16
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x
                                   :
UNITED STATES OF AMERICA           :     **SEALED INDICTMENT**
                                   :
         - v. -                    :     S5 15 Cr. 536 (PGG)
                                   :
OMAR AMANAT,                       :
                                   :
         Defendant.                :
                                   :
- - - - - - - - - - - - - - - - - x

## COUNT ONE

**(Conspiracy To Commit Wire Fraud: Maiden Capital Investors)**

The Grand Jury charges:

### RELEVANT PERSONS AND ENTITIES

1. At all times relevant to this Indictment, OMAR AMANAT, the defendant, was a self-described entrepreneur, filmmaker and investor in media, finance and technology companies.

2. At various times relevant to this Indictment, OMAR AMANAT, the defendant, raised money for Enable Invest Ltd. ("Enable"), an investment company based in Dubai and managed by an individual not named as a defendant herein ("Individual-1"). Certain United States-based bank accounts and entities were affiliated with Enable, including a trading account (the "U.S. Enable Trading Account") and two bank accounts ("U.S. Enable Account-1" and "U.S. Enable Account-2," collectively, "U.S. Enable Accounts").

3. At all times relevant to this Indictment, KIT digital, Inc. ("KITD") was a provider of end-to-end video asset management software and related services, with a focus on Internet Protocol-based interactive media, headquartered in Prague, Czech Republic and New York, New York.

4. At all times relevant to this Indictment, Kaleil Isaza Tuzman ("Tuzman") was the Chairman of the Board of Directors and Chief Executive Officer ("CEO") of KITD and Robin Smyth ("Smyth") was the Chief Financial Officer ("CFO"). At various times relevant to this Information, KITD maintained a U.S.-based bank account (the "KITD Bank Account").

5. From in or about May 2008 to on or about August 12, 2009, KITD's common stock was traded on the OTC Bulletin Board, which is an electronic quotation system for over-the-counter securities that are not listed on a national securities exchange. Beginning on or about August 13, 2009, KITD's common stock was traded on the NASDAQ.

6. On or about November 21, 2012, after an internal investigation led by KITD's audit committee, KITD announced to the investing public that KITD had discovered various errors and irregularities in its historical financial statements and that it would have to issue restated financial statements. In or about December 2012, KITD's stock was delisted from NASDAQ. KITD subsequently declared bankruptcy.

7. From in or about October 2006 to in or about June 2012, Stephen E. Maiden ("Maiden") operated the Maiden Capital Opportunity Fund (the "Maiden Fund") in North Carolina through his investment advisory firm, Maiden Capital LLC ("Maiden Capital"). At all times relevant to this Indictment, Maiden Capital maintained an account at a bank located in North Carolina (the "Maiden Capital Account").

8. At various times relevant to this Indictment, OMAR AMANAT, the defendant, Tuzman, Individual-1, and Maiden, through the Maiden Fund, were each investors in a privately held special purpose investment vehicle (the "KIT SPIV"), which was controlled by Tuzman and invested in KITD.

**OVERVIEW OF THE SCHEME TO DEFRAUD MAIDEN CAPITAL INVESTORS**

9. Between in or about February 2009 and in or about June 2012, OMAR AMANAT, the defendant, devised and carried out a scheme to hide the fact that investments by Maiden Capital clients in Enable, including investments AMANAT had solicited with false and misleading representations, had been lost. To facilitate the scheme, Maiden, with the knowledge and approval of AMANAT, generated fictitious client account statements that failed to disclose the Enable losses. In addition, AMANAT wired hundreds of thousands of dollars to the Maiden Capital Account to support Maiden Capital, including to allow Maiden to repay investors whose redemption requests could not be forestalled and

thus to continue to keep secret from Maiden investors the Enable losses.

## AMANAT SOLICITS INVESTMENTS FOR ENABLE

10. In or about the summer of 2008, OMAR AMANAT, the defendant, introduced Maiden to Tuzman as a potential investor in the KIT SPIV. As a result of AMANAT's introduction, in or about June 2008, Maiden invested approximately $1 million from the Maiden Fund into the KIT SPIV.

11. In or before July 2008, OMAR AMANAT, the defendant, solicited Tuzman, on behalf of KITD, to invest in Enable. In or about August 2008, KITD invested approximately $6.5 million in Enable. The majority of these funds were deposited into the U.S. Enable Trading Account. Maiden subsequently learned that Tuzman had redirected the funds from Maiden Capital's investment in the KIT SPIV into Enable, as part of KITD's $6.5 million investment, without MAIDEN's permission or authorization.

12. The U.S. Enable Trading Account was opened in approximately June 2008. Between June 2008 and September 2008, in excess of $7 million was deposited into the U.S. Enable Trading Account, including more than $5.5 million from the $6.5 million KITD investment. In July, August and September 2008, the U.S. Enable Trading Account realized losses every month and, in total, incurred trading losses in excess of $5.5 million.

13. Despite the trading losses sustained in the U.S. Enable Trading Account, Individual-1 represented to Maiden that Enable's returns were positive. For example, on or about October 11, 2008, Individual-1 sent an email to Maiden in which Individual-1 stated that Enable "ha[s] been making good profits . . . trading has been smooth and profitable - no huge profits, but with the markets [] going psychotic these days, I am happy to be taking things safe." In truth and in fact, by September 30, 2008, the U.S. Enable Trading Account contained less than $113,000.

14. In or about November 2008, OMAR AMANAT, the defendant, who was, by that time, well aware that Enable had incurred losses and was unable to meet redemptions, sought an additional $2 million from Maiden, purportedly for the purpose of investing in Enable. Specifically, on or about November 8, 2008, AMANAT asked Maiden to make a "$2 million short term (anticipated to be no more than one week) investment into Enable." AMANAT indicated that Enable would hold the cash as "show money" to induce other investments and then would be returned. In reality, AMANAT instead intended to misappropriate Maiden's investment to pay redemptions to Enable investors, thereby concealing the Enable losses.

15. At the behest of OMAR AMANAT, the defendant, Maiden, between November 10, 2008 and November 18, 2008, wired a total

5

of $2 million from the Maiden Capital Account to U.S. Enable Account-1. Maiden Capital's investment in Enable was never deposited into the U.S. Enable Trading Account. Instead, AMANAT, contrary to his representations to Maiden, misappropriated a majority of Maiden Capital's funds for his own purposes, including to meet an Enable redemption demand made by Tuzman on behalf of KITD, which had also incurred losses in Enable. Specifically:

a. On or about November 10, 2008, the same day on which Maiden wired $1 million to U.S. Enable Account-1, AMANAT caused approximately $650,000 of these funds to be wired to the KITD Bank Account. The next day, Tuzman emailed Individual-1 to acknowledge receipt of the $650,000 wire and stated that KITD was "still waiting for the $400,000" wire that had purportedly been sent a week earlier.

b. On or about November 12, 2008, the same day on which Maiden wired $500,000 to Enable Account-1, AMANAT caused $400,000 of these funds to be wired to the KITD Bank Account.

c. On or about December 1 and 2, 2008, shortly after Maiden wired a total of another $500,000 to U.S. Enable Account-1, AMANAT caused approximately $442,000 to be wired to the KITD Bank Account.

## MAIDEN LEARNS OF THE ENABLE LOSSES

16. In or about February 2009, on a telephone call in which OMAR AMANAT, the defendant, Tuzman and Individual-1 participated, Maiden learned that Enable was insolvent and that the Maiden Fund's investment in Enable had been lost. Following this call, Maiden spoke directly with AMANAT, including to express concern that the Enable losses could cause Maiden Capital to collapse. AMANAT reassured Maiden that a solution would be reached to cover up the Enable losses. Shortly thereafter, with AMANAT's knowledge and approval, Maiden began generating fictitious client statements that failed to disclose the Enable losses and were distributed to Maiden Capital investors. Thereafter, on several occasions between 2009 and 2012, AMANAT and Maiden had conversations concerning the fact that Maiden had not disclosed the Enable losses to Maiden Capital investors.

17. Between 2009 and 2011, OMAR AMANAT, the defendant, Maiden, Tuzman, and others, discussed solutions to hide the Enable losses from both investors in Maiden Capital and KITD shareholders. One proposed solution involved AMANAT and Tuzman providing Maiden with shares in the KIT SPIV, which Maiden Capital could then record in the Maiden Fund in place of the Enable investment.

## AMANAT LOANS MONEY TO MAIDEN CAPITAL TO PREVENT DISCOVERY OF THE FRAUD BY MAIDEN CAPITAL INVESTORS

18. In or about April 2011, Maiden received a redemption request from a Maiden Capital investor ("Investor-1") for several hundred thousand dollars. Maiden told OMAR AMANAT, the defendant, about the redemption request, and that Maiden Capital did not have sufficient funds to meet the redemption. In an attempt to conceal the Enable losses from Maiden Capital's investors, on or about June 2, 2011, AMANAT and Maiden entered into a loan agreement (the "June 2011 Loan Agreement") pursuant to which AMANAT agreed to lend up to $1.25 million to Maiden Capital. Under the terms of the June 2011 Loan Agreement, AMANAT required that Maiden provide AMANAT with a schedule listing the assets held by the Maiden Fund (the "Maiden Fund Schedule"). The Maiden Fund Schedule reflected a cash balance of zero and listed less than $250,000 in saleable securities, apart from Maiden's ostensible stake in KITD entities. The Maiden Capital Schedule also reflected that Maiden continued to mark the Maiden Fund's Enable investment as worth in excess of $2.5 million. In truth and in fact, AMANAT, Maiden and Tuzman had known for more than two years that Maiden Capital's Enable investment was worthless.

19. To ensure that Maiden used the funds loaned by OMAR AMANAT, the defendant, to repay investors whose redemption

8

requests could not be forestalled, AMANAT also required that Maiden resign as the managing member of Maiden Capital. To further exert control over Maiden, AMANAT installed his wife as the managing member of Maiden Capital.

20. On or about June 2, 2011, after the June 2011 Loan Agreement had been executed, OMAR AMANAT, the defendant, wired $250,000 from U.S. Enable Account-2 to the Maiden Capital Account. The same day, Maiden Capital wired $250,000 to Investor-1 in partial satisfaction of Investor-1's redemption request.

21. Between on or about June 6, 2011 and on or about December 23, 2011, OMAR AMANAT, the defendant, wired additional funds from U.S. Enable Account-2 to the Maiden Capital Account for the purpose of preventing Maiden Capital from collapsing and exposing the Enable losses.

22. In or about July 2011, during the period when OMAR AMANAT, the defendant, was wiring funds to Maiden Capital, AMANAT, Maiden, Tuzman, and others met in Manhattan in part to discuss the Enable losses. In a text message on the day of the meeting, AMANAT instructed Maiden to demand that Tuzman contribute to a settlement for Maiden's investors, directing Maiden, "[b]e aggressive today: say it doesn't matter who did what. Paint a stark nightmare scenario if your fund goes under . . . Madoff like trustee is appointed—he will quickly realize

9

all money was lost in KIT Digital and everyone here will be sued. Securities laws violations have occurred. Criminal behavior jail time. Bottom line: fund needs to be made whole or ship will sink."

## THE CONSPIRACY

23. From in or about February 2009 through in or about June 2012, in the Southern District of New York and elsewhere, OMAR AMANAT, the defendant, and others known and unknown, willfully and knowingly, combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

### Object Of The Conspiracy

24. It was a part and an object of the conspiracy that OMAR AMANAT, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

10

## COUNT TWO

### (Wire Fraud)

The Grand Jury further charges:

25. The allegations contained in paragraphs 1 through 22 are repeated and realleged as though fully set forth herein.

26. From in or about February 2009 through in or about June 2012, in the Southern District of New York and elsewhere, OMAR AMANAT, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, AMANAT and others schemed to defraud Maiden Capital investors by causing Maiden to make material misrepresentations and to omit material facts to Maiden Capital investors about the status of their investments and by wiring hundreds of thousands of dollars to Maiden Capital in order to pay certain redemptions and forestall Maiden Capital's collapse.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE

### (Aiding and Abetting Investment Adviser Fraud)

The Grand Jury further charges:

27. The allegations contained in paragraphs 1 through 22 are repeated and realleged as though fully set forth herein.

### BACKGROUND ON INVESTMENT ADVISORY FIRMS

28. Maiden Capital, which was an unregistered investment advisory firm, managed portfolios of securities and provided advice on investments for clients. Maiden was the managing member of Maiden Capital and ran the Maiden Fund. Compensation took different forms but typically included a fee based on total assets under management and additional performance-based returns. Pursuant to investment advisory agreements, clients empowered Maiden Capital and Maiden to make investment decisions on their behalf. Maiden, in turn, was obligated to make such decisions based on the best interests of his clients.

29. As described herein, OMAR AMANAT, the defendant, aided and abetted Maiden's fraud on Maiden Capital's investment advisory clients. Rather than disclose the Enable losses to investors in the Maiden Fund, as he was legally obligated to do, Maiden concealed the Enable losses, thereby acting in his own self interest and the interests of AMANAT, his close associate, who did not want the Enable losses to be exposed. By providing Maiden with capital contributions to meet redemption requests,

among other things, knowing that Maiden's investors had been lied to by Maiden about the Enable losses and the status of their investments, AMANAT assisted Maiden in carrying out his fraudulent scheme and helped Maiden to succeed in covering up the losses for over three years.

## Statutory Allegation

30. From in or about February 2009 through in or about June 2012, in the Southern District of New York and elsewhere, OMAR AMANAT, the defendant, willfully and knowingly aided and abetted an investment advisor who used the mails and other means and instrumentalities of interstate commerce, directly and indirectly, (a) to employ a device, scheme, and artifice to defraud clients and prospective clients; (b) to engage in a transaction, practice, and course of business which operated as a fraud and deceit upon clients and prospective clients; and (c) to engage in an act, practice, and course of business which was fraudulent, deceptive, and manipulative, to wit, AMANAT aided and abetted fraud by Maiden, an investment advisor, in which Maiden made false and materially omissive statements to investors about the status of their investments and the payment of redemptions.

(Title 15, United States Code, Sections 80b-6 and 80b-17; Title 18, United States Code, Section 2.)

13

## COUNT FOUR

**(Conspiracy To Commit Securities Fraud: Market Manipulation)**

The Grand Jury further charges:

31. The allegations contained in paragraphs 1 through 22 and 28 through 29 are repeated and realleged as though fully set forth herein.

### OVERVIEW OF THE MARKET MANIPULATION SCHEME

32. Between in or about December 2008 and in or about September 2011, OMAR AMANAT, the defendant, Tuzman, Maiden, and others, engaged in efforts to artificially inflate the share price and trading volume of KITD shares. During this time period, during which KITD shares traded on the OTC Bulletin Board and on the NASDAQ, Maiden, at AMANAT and Tuzman's behest, purchased and sold shares of KITD through the Maiden Fund, at times for the purpose of manipulating the stock price and at times for the purpose of creating the illusion of greater volume in the trading for KITD shares.

33. To facilitate the manipulation of KITD shares, OMAR AMANAT, the defendant, Tuzman and a co-conspirator not named as a defendant herein ("CC-1") agreed to compensate Maiden in several ways, including by making investments in, and loaning money to, Maiden Capital, which agreement AMANAT and Tuzman partially fulfilled.

14

## THE WRITTEN AGREEMENT TO MANIPULATE THE MARKET IN KITD SHARES

34. In or about December 2008, OMAR AMANAT, the defendant, Tuzman and Maiden entered into a written agreement (the "Agreement") in which Maiden agreed to purchase at least $400,000 of common stock in KITD in the open market over the next 30 days through Maiden Capital and to hold it for at least 90 days. Maiden also agreed that he would not seek to redeem Maiden Capital's investments in the KIT SPIV or Enable. Because OMAR AMANAT, the defendant, and Tuzman knew, as of at least December 2008, that Enable had suffered significant losses, this agreement was valuable to both AMANAT and Tuzman. In return, AMANAT agreed to assign a portion of his interest in the KIT SPIV to Maiden Capital. For his part, Tuzman agreed to, among other things, make efforts to induce KITD to retain Maiden Capital to provide various services, and to assign to Maiden Capital a portion of Tuzman's interest in the KIT SPIV. In a second agreement between AMANAT and Tuzman, signed the same day, AMANAT further agreed to facilitate purchases of KITD in open market trading.

35. Shortly after entering into the Agreement, Maiden fulfilled his commitment by acquiring over $400,000 worth of KITD shares through Maiden Capital.

## AMANAT AND TUZMAN INDUCE MAIDEN TO CONTINUE TO MANIPULATE KITD STOCK PRICE

36.  Notwithstanding the fact that Maiden had fulfilled his obligations under the Agreement, OMAR AMANAT, the defendant, and Tuzman induced Maiden to continue to manipulate KITD's stock price based in part on representations that Maiden's continued support of KITD's stock price would facilitate Maiden Capital being repaid, thereby permitting Maiden to hide the Enable losses from Maiden Capital investors.

37.  To this end, using in part KITD funds provided by Tuzman and Tuzman's own funds, between February 2009 and September 2011, with the knowledge and approval of Tuzman and OMAR AMANAT, the defendant, Maiden continued to manipulate KITD's stock price, purchasing in excess of $2 million of KITD shares through Maiden Capital.

## THE CONSPIRACY

38.  From in or about December 2008 through in or about September 2011, in the Southern District of New York and elsewhere, OMAR AMANAT, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated and agreed together and with each other to commit an offense against the United States, namely, fraud in connection with the purchase and sale of securities issued by KITD, in violation of Title 15, United States Code, Sections

78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## Object Of The Conspiracy

39. It was a part and object of the conspiracy that OMAR AMANAT, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon any person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

## Overt Acts

40. In furtherance of the conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

   a. On or about December 31, 2008, OMAR AMANAT, the defendant, Tuzman, and Maiden executed an agreement pursuant to which Maiden agreed that Maiden Capital would buy at least $400,000 of KITD common stock.

   b. Between in or about January 2009 and in or about February 2009, Maiden purchased over $400,000 of KITD common stock through Maiden Capital.

   c. In or about March 2011, Maiden bought and sold KITD shares in an effort to artificially inflate the price of KITD shares.

   d. In or about July 2011, AMANAT met with Maiden, Tuzman, and others in Manhattan in part to discuss the losses sustained in Enable.

(Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATION

41. As a result of committing one or more of the foregoing offenses alleged in Counts One through Four of this Indictment, OMAR AMANAT, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property,

real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses.

## Substitute Asset Provision

42. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value;

    e.    or has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981;
Title 28, United States Code, Section 2461.)

_____
FOREPERSON

*Preet Bharara*
PREET BHARARA
United States Attorney

19

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

v.

**OMAR AMANAT,**

Defendant.

---

**SEALED INDICTMENT**

S5 15 Cr. 536 (PGG)

(18 U.S.C. §§ 2, 371, 1343, & 1349;
15 U.S.C. §§ 80b-6 and 80b-17.)

PREET BHARARA
United States Attorney

*Deputy* / Foreperson

---

8/12/16: Sealed Indictment, S5 15cr.536(PGG) returned. Arrest Warrant issued.

Maas, J.