UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                          :
UNITED STATES OF AMERICA
                                                          :
          - v. -                                              S8 15 Cr. 536 (PGG)
                                                          :
KALEIL ISAZA TUZMAN and
OMAR AMANT,                                                :

                    Defendants.                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


**THE GOVERNMENT'S OPPOSITION TO THE DEFENDANTS' RULE 29 MOTIONS
FOR JUDGMENTS OF ACQUITTAL AND RULE 33 MOTIONS FOR NEW TRIALS**


GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Damian Williams
Andrea M. Griswold
Joshua A. Naftalis
Assistant United States Attorneys
          – Of Counsel –

## **TABLE OF CONTENTS**

BACKGROUND ................................................................................................... 2

ARGUMENT ....................................................................................................... 3

    I.     APPLICABLE LEGAL STANDARDS ................................................. 3

          A.  Rule 29 .................................................................................... 3

          B.  Rule 33 .................................................................................... 5

    II.    A RATIONAL JURY COULD CONCLUDE THAT AMANAT WAS GUILTY OF DEFRAUDING MAIDEN CAPITAL INVESTORS ................................. 6

    III.   THE GOVERNMENT ADDUCED SUFFICIENT EVIDENCE THAT OMAR AMANAT INTENDED TO MANIPULATE KIT DIGITAL STOCK ................... 13

    IV.   THE GOVERNMENT PROVED UP INSTERSTATE WIRES IN FURTHERANCE OF THE SCHEME CHARGED IN COUNTS ONE AND TWO AND VENUE IN THE SOUTHERN DISTRICT OF NEW YORK ...................................... 15

    V.    THE COURT PROPERLY ADMITTED THE EXPERT TESTIMONY OF SPECIAL AGENT JOEL DECAPUA .................................................. 19

    VI.   AMANAT HAS FAILED TO SHOW THAT A JUROR WAS BIASED BECAUSE OF PRIOR CONNECTIONS TO TSA AND NEW YORK CITY CORRECTIONS DEPARTMENT ........................................................................ 22

    VII.  THE GOVERNMENT'S REBUTTAL SUMMATION WAS PROPER AND DID NOT PREJUDICE AMANAT ..................................................... 26

          A.  Applicable Law .................................................................... 26

          B.  The Government's Reference to Amanat as the "Owner" of Maiden Capital was Proper and Based on the Record ............................. 28

          C.  The Government Did Not Develop a New Wire Fraud Theory In Rebuttal... 31

    VIII. THE EVIDENCE WAS SUFFICIENT FOR THE JURY TO CONCLUDE THAT THE MARKET MANIPULATION CONSPIRACY CONTINUED PAST AUGUST 12, 2010 AND ACCORDINGLY COUNT FOUR WAS NOT TIME BARRED.... 32

    IX.   THE COURT SHOULD DENY ISAZA TUZMAN'S RULE 29 MOTION WITH RESPECT TO THE WIRE FRAUD CONSPIRACY CHARGED IN COUNT FIVE ......................................................................... 39

i

X.   CONTRARY TO ISAZA TUZMAN'S CLAIMS, THE GOVERNMENT DID  NOT COMMIT "PERVASIVE MISCONDUCT" ........................................................... 42

    A.  The Government's Summations Were Proper ................................................. 42

        1.  The Government Did Not Intentionally Mischaracterize Professor Ferrell's Testimony ................................................................................. 42

        2.  The Government Did Not Falsely Imply Isaza Tuzman Received Criminal Fraud Proceeds ......................................................................... 44

        3.  The Government Did Not Make Arguments From Facts Outside the Trial Record ............................................................................................... 46

        4.  The Government Did Not Improperly Bolster or Burden Shift ............. 48

        5.  The Government Did Not Invite the Jury to Convict Based on His Position Within KIT Digital or Otherwise Use Inflammatory Rhetoric . 50

    B.  Because There Was No Error, Much Less Prejudicial Error, Isaza Tuzman Is Not Entitled to a New Trial ...................................................................... 52

    C.  The Cooperating Witnesses Did Not Commit Perjury ................................... 54

XI.  THE INTRODUCTION OF EVIDENCE OF AMANAT'S FABRICATION OF EVIDENCE DOES NOT WARRANT A NEW TRIAL FOR ISAZA TUZMAN ... 59

XII.  ISAZA TUZMAN'S CLAIMS OF "OTHER ERRORS" ARE MERITLESS ......... 62

CONCLUSION ................................................................................................................. 63

# TABLE OF AUTHORITIES

## **Cases**

*City of Richmond* v. *Madison Mgmt. Grp., Inc.*, 918 F.2d 438 (4th Cir.1990)............................ 24

*Compare Rodriguez* v. *Vance*, No. 12 Civ. 5418 (LAP), 2015 WL 5172899 (S.D.N.Y. Sept. 3, 2015).................................................................................................................................... 25

*Conteh* v. *United States*, 226 F. Supp. 2d 514 (S.D.N.Y. 2002).................................................. 55

*DiCarlo* v. *United States*, 6 F.2d 364 (2d Cir. 1925).................................................................. 27

*Jackson* v. *Virginia*, 443 U.S. 307 (1979).............................................................................. 4, 6

*Johnson* v. *Hill*, 274 F.2d 110 (8th Cir.1960)............................................................................ 24

*McDonough Power Equipment, Inc.* v. *Greenwood*, 464 U.S. 548 (1984) ............................ 23, 24

*Brown* v. *United States*, 411 U.S. 223 (1973)............................................................................ 23

*Romero* v. *United States*, 28 F.3d 267 (2d Cir. 1994) ................................................................. 5

*United States* v. *Agrawal*, 726 F.3d 235 (2d Cir. 2013) ............................................................ 60

*United States* v. *Agurs*, 427 U.S. 97 (1976)............................................................................. 55

*United States* v. *Arias-Javier*, 392 F. App'x 896 (2d Cir. 2010).................................................. 27

*United States* v. *Autuori*, 212 F.3d 105 (2d Cir. 2000)............................................................ 4, 5

*United States* v. *Bangiyev*, 2008 WL 4240005 (E.D.N.Y. Sept. 12, 2008) .................................. 25

*United States* v. *Berger*, 224 F.3d 107 (2d Cir. 2000).................................................................. 37

*United States* v. *Binday*, 804 F.3d 558 (2d Cir. 2015)................................................................. 41

*United States* v. *Bonventre*, 646 F. App'x 73 (2d Cir. 2016) ................................................. 28, 43

*United States* v. *Borelli*, 336 F.2d 376 (2d Cir. 1964)................................................................. 37

*United States* v. *Botti*, 711 F.3d 299 (2d Cir. 2013) ................................................................. 61

*United States* v. *Caputo*, 808 F.2d 963 (2d Cir. 1987) ................................................................ 26

*United States* v. *Caracappa*, 614 F.3d 30 (2d Cir. 2010) ........................................................ 28

*United States* v. *Cean*, 2014 WL 1653200 (S.D.N.Y. Apr. 24, 2014) ..................................... 25

*United States* v. *Colombo*, 869 F.2d 149 (2d Cir. 1989) ......................................................... 25

*United States* v. *Coplan*, 703 F.3d 46 (2d Cir. 2012) ............................................................. 26

*United States* v. *Cromitie,* 727 F.3d 194 (2013) ..................................................................... 55

*United States* v. *Crowley*, 318 F.3d 401 (2d Cir. 2003) ............................................................ 3

*United States* v. *Desena*, 287 F.3d 170 (2d Cir. 2002) ........................................................... 10

*United States* v. *DiNome*, 86 F.3d 277 (2d Cir. 1996) ............................................................ 41

*United States* v. *Dunnigan*, 507 U.S. 87 (1993) ..................................................................... 54

*United States* v. *Eppolito*, 543 F.3d 25 (2d Cir. 2008) ............................................................. 4

*United States* v. *Espaillet*, 380 F.3d 713 (2d Cir. 2004) ..................................................... 4, 41

*United States* v. *Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) .............................................. 27, 48

*United States* v. *Ferguson*, 246 F.3d 129 (2d Cir. 2001) .......................................................... 5

*United States* v. *Gambino*, 59 F.3d 353 (2d Cir. 1995) ............................................................ 5

*United States* v. *Greenfield*, 44 F.3d 1141 (2d Cir. 1995) ...................................................... 37

*United States* v. *Greer*, 285 F.3d 158 (2d Cir. 2002 ............................................................... 24

*United States* v. *Guadagna*, 183 F.3d 122 (2d Cir. 1999) .................................................... 4, 5

*United States* v. *Helmsley*, 985 F.2d 1202 (2d Cir.1993) ....................................................... 55

*United States* v. *James*, 239 F.3d 120 (2d Cir. 2000) .............................................................. 5

*United States* v. *Josephberg*, 562 F.3d 478 (2d Cir. 2009) ................................................ 54, 56

*United States* v. *Kozeny*, 667 F.3d 122 (2d Cir. 2011) .......................................................... 3, 5

*United States* v. *Lee*, 723 F.3d 134 (2d Cir. 2013) .................................................................. 3

*United States* v. *Levis*, 488 F. App'x 481, 2012 WL 2914118 (2d Cir. 2012) ........................... 41

*United States* v. *Ling Guang*, 511 F.3d 110 (2d Cir. 2007)................................................. 59

*United States* v. *Marcus*, 560 U.S. 258 (2010) ..................................................... 61

*United States* v. *Marji*, 158 F.3d 60 (2d Cir. 1998)............................................... 25

*United States* v. *Marrale*, 695 F.2d 658 (2d Cir. 1982)......................................... 26

*United States* v. *McDermott*, 245 F.3d 133 (2d Cir. 2001)..................................... 5

*United States* v. *Mi Sun Cho*, 713 F.3d 716 (2d Cir. 2013) .................................. 3

*United States* v. *Modica*, 663 F.2d 1173 (2d Cir. 1981)........................................ 53

*United States* v. *Monteleone*, 257 F.3d 210 (2d Cir. 2001) .......................... 54, 55, 58

*United States* v. *Morales*, 185 F.3d 74 (2d Cir. 1999).......................................... 25

*United States* v. *Nerlinger*, 862 F.2d 967 (2d Cir. 1988)...................................... 37

*United States* v. *Ogando*, 547 F.3d 102 (2d Cir. 2008) ........................................ 4

*United States* v. *Olano*, 507 U.S. 725 (1993) ..................................................... 61

*United States* v. *Persico*, 645 F.3d 85 (2d Cir. 2011).......................................... 4

*United States* v. *Potter*, 463 F.3d 9 (1st Cir. 2006) ............................................ 49

*United States* v. *Quinones*, 511 F.3d 289 (2d Cir. 2007)...................................... 61

*United States* v. *Riley*, 90 F. Supp. 3d 176 (S.D.N.Y. 2015).............................. 19, 62

*United States* v. *Sanchez*, 969 F.2d 1409 (2d Cir. 1992)..................................... 5, 58

*United States* v. *Sattar*, 395 F. Supp. 2d 66 (S.D.N.Y 2005) .............................. 25

*United States* v. *Sessa*, 2011 WL 256330, at *44 (E.D.N.Y. 2011) ........................ 55

*United States* v. *Shaoul*, 41 F.3d 811 (2d Cir. 1994)....................................... 24, 25

*United States* v. *Shareef*, 190 F.3d 71 (2d Cir.1999)........................................... 27

*United States* v. *Stewart*, 317 F. Supp. 2d 432 (S.D.N.Y. 2004).......................... 23, 25

*United States* v. *Sweig*, 441 F.3d 114 (2d Cir. 1971)........................................... 62

*United States* v. *Tagliaferri*, No. 15-536, 2015 WL 2342712 (2d Cir. May 4, 2016) ................. 41

*United States* v. *Temple*, 447 F.3d 130 (2d Cir. 2006) ............................................................ 4, 5

*United States* v. *Tocco*, 135 F.3d 116, 130 (2d Cir. 1998) ......................................................... 26

*United States* v. *Torres*, 128 F.3d 38 (2d Cir.1997) ................................................................ 24

*United States* v. *Valle*, 807 F.3d 508 (2d Cir. 2015)................................................................. 7

*United States* v. *Wallach*, 935 F.2d 445 (2d Cir. 1991 ......................................................... 55, 59

*United States* v. *Wexler*, 79 F.2d 526 (2d Cir. 1935)................................................................ 27

*United States* v. *Zayac*, 765 F.3d 112 (2d Cir. 2014) ................................................................ 4

*United States* v. *Zichettello*, 208 F.3d 72 (2d Cir. 2000) ......................................................... 54

The Government respectfully submits this memorandum of law in opposition to Kaleil Isaza Tuzman's and Omar Amanat's motions for judgments of acquittal or new trials, pursuant to Federal Rules of Criminal Procedure 29 and 33. Isaza Tuzman and Amanat claim that they have met their high burden of demonstrating that their convictions were not supported by sufficient evidence or constitute a miscarriage of justice by raising a variety of arguments and by arguing the "essential unfairness" of their trial.

Isaza Tuzman argues that (a) there was insufficient evidence to support his conviction on the market manipulation conspiracy charged in Count Four because no overt act was proven after August 12, 2010 (Isaza Tuzman Br. at 2-25); (b) the Government's "theory" with respect to the wire fraud conspiracy charged in Count Five was insufficient as a matter of law (Isaza Tuzman Br. at 25-33); (c) the Government engaged in "pervasive misconduct" during its summations and by relying on, and failing to correct, "perjured" testimony (Isaza Tuzman Br. at 33-59); (d) Isaza Tuzman was prejudiced by Amanat's offering fabricated evidence during trial, and the Court erred by not severing their trials (Isaza Tuzman Br. at 59-64); and (e) "other errors" warrant a new trial (Isaza Tuzman Br. at 64-65).

Amanat argues that (a) there was insufficient evidence to support his convictions (Amanat Br. at 4-28); (b) the Court erred by permitting FBI Special Agent Joel DeCapua to offer expert testimony about Amanat's fabrication of evidence (Amanat Br. at 28-41); (c) he was deprived of an impartial jury because one juror did not disclose her or father's prior work experience (Amanat Br. at 41-45): and (d) the Government's jury arguments were improper (Amanat Br. at 46-52).

The trial evidence, viewed in the light most favorable to the Government and with all inferences drawn in the Government's favor, establishes the guilt of both Isaza Tuzman and Amanat beyond a reasonable doubt. The defendants' arguments fail to show that – as a matter of

law – no rational jury could have convicted Isaza Tuzman and Amanat based on the evidence introduced at trial. The defendants' other arguments are equally without merit. Accordingly, the defendants are not entitled to judgments of acquittal or a new trial, and their motions should therefore be denied.

## BACKGROUND

The S8 Indictment in this case charged Isaza Tuzman and Amanat with various interconnected fraud schemes perpetrated on the investors of Maiden Capital and KITD. The Indictment contained six counts. Counts One, Two and Three of the Indictment charged Omar Amanat with conspiring to commit wire fraud on investors in Maiden Capital, a hedge fund managed by Stephen Maiden ("Maiden"), wire fraud, and aiding and abetting Maiden's investment advisor fraud. Count Four of the Indictment charged Amanat and Isaza Tuzman with conspiracy to commit securities fraud in connection with a scheme to manipulate the market shares of KIT digital, Inc. ("KIT digital" or "KITD"), a publicly traded company named after and led by Isaza Tuzman, the company's CEO and Chairman of the Board. Count Five of the Indictment charged Isaza Tuzman with conspiracy to commit wire fraud for his participation in a scheme to mislead KITD shareholders by failing to disclose that certain investments with Maiden Capital that defendant Isaza Tuzman caused KITD to make were not part of an arms-length relationship but were actually related party transactions made for an improper purpose. Count Six of the Indictment charged Isaza Tuzman with conspiracy to commit securities fraud for his involvement in an accounting fraud scheme in which Isaza Tuzman caused KITD to deceive KITD's shareholders, members of the investing public, KITD's independent auditor and others concerning KITD's true operating performance and financial results.

Jury selection began on October 24, 2017 and the jury heard opening statements on October 30, 2017.  In the Government's case-in-chief, the Government introduced approximately 415 exhibits and called 16 witnesses, including cooperating witnesses Stephen Maiden, the managing member of Maiden Capital; Robin Smyth, KITD's Chief Financial Officer; and Gavin Campion, KITD's former President.  In a rebuttal case focused on Amanat's introduction of fabricated emails to the jury, the Government called three witnesses, including FBI Special Agent Joel DeCapua who offered expert testimony undermining the authenticity of certain emails introduced by Amanat.

In his case-in-chief, Isaza Tuzman called three witnesses, including Andy Stewart, KITD's former Chief Technology Officer; a summary witness who analyzed certain travel and phone records; and a Harvard professor who testified about Maiden's trading activity in KITD and the results of an event study the professor conducted.  Isaza Tuzman also introduced more than 100 exhibits.   In his case-in-chief, Amanat called no witnesses but introduced several dozen exhibits. In response to the Government's rebuttal case on the issue of Amanat's fabrication of emails, Amanat called a paralegal employed by defense counsel.

After eight weeks of testimony, the jury deliberated for less than one day before reaching a unanimous verdict of guilty on all Six Counts of the Indictment.

## ARGUMENT

### I.    APPLICABLE LEGAL STANDARDS

#### A.    Rule 29

"'In challenging the sufficiency of the evidence, [a] defendant faces an uphill battle, and bears a very heavy burden.'"  *United States* v. *Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013) (per curiam) (quoting *United States* v. *Crowley*, 318 F.3d 401, 407 (2d Cir. 2003)); *United States* v. *Lee*, 723 F.3d 134, 143 (2d Cir. 2013); *United States* v. *Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011);

*United States* v. *Temple*, 447 F.3d 130, 137 (2d Cir. 2006). A jury verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States* v. *Persico*, 645 F.3d 85, 105 (2d Cir. 2011) (quoting *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). A "court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States* v. *Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (quoting *United States* v. *Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999)). In a close case, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States* v. *Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (quoting *United States* v. *Guadagna*,183 F.3d at 129) (internal quotation marks and brackets omitted); *United States* v. *Temple*, 447 F.3d at 137 (citing *United States* v. *Autuori*, 212 F.3d at 114).

In considering the sufficiency of the evidence supporting a guilty verdict, the evidence must be viewed in the light most favorable to the Government. *See Temple*, 447 F.3d at 136-37. The Court must analyze the pieces of evidence "in conjunction, not in isolation," *United States* v. *Persico*, 645 F.3d at 104 (quoting *United States* v. *Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *Guadagna*, 183 F.3d at 130; *Persico*, 645 F.3d at 104. "These standards apply whether the evidence being reviewed is direct or circumstantial." *Id.* at 105 (internal citations omitted). Indeed, "'the jury's verdict may be based on circumstantial evidence, and the Government is not required to preclude every reasonable hypothesis which is consistent with innocence.'" *United States* v. *Zayac*, 765 F.3d 112, 117 (2d Cir. 2014) (quoting *United States* v. *Ogando*, 547 F.3d 102, 107 (2d Cir. 2008)).

Finally, "to avoid usurping the role of the jury," *Autuori*, 212 F.3d at 114 (quoting *Guadagna*, 183 F.3d at 129), the Court must resolve all issues of credibility in favor of the jury's verdict, *United States* v. *Kozeny*, 667 F.3d at 139. "[T]he credibility of witnesses is the province of the jury, and [the Court] simply cannot replace the jury's credibility determinations with [its] own." *United States* v. *James*, 239 F.3d 120, 124 (2d Cir. 2000) (internal quotation and citation omitted); *see Autuori*, 212 F.3d at 114 (court "may not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury"). The Court must also "credit[ ] every inference that the jury might have drawn in favor of the government," *Temple*, 447 F.3d at 136-37 (internal quotation and citation omitted), because "the task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court," *United States* v. *McDermott*, 245 F.3d 133, 137 (2d Cir. 2001).

### B.    Rule 33

Under Federal Rule of Criminal Procedure 33, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." A new trial should be ordered "[s]paringly and in the most extraordinary circumstances." *United States* v. *Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001); *Romero* v. *United States*, 28 F.3d 267, 268 (2d Cir. 1994). Because "motions for a new trial are disfavored in this Circuit," *United States* v. *Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), district courts, after examining the totality of the evidence and considering objectively all of the facts and circumstances, should grant the motion only if the court finds "a real concern that an innocent person may have been convicted." *United States* v. *Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). "It is only when it appears that an injustice has been done that there is a need for a new trial 'in the interests of justice.'" *Id.*

## II.    A RATIONAL JURY COULD CONCLUDE THAT AMANAT WAS GUILTY OF DEFRAUDING MAIDEN CAPITAL INVESTORS

Counts One, Two and Three of the Indictment charged Omar Amanat with conspiring to commit wire fraud on investors in Maiden Capital, the hedge fund managed by Maiden, wire fraud, and aiding and abetting Maiden's investment advisor fraud.  The jury convicted Amanat on each of these counts.  Amanat now argues that the jury was not presented with sufficient evidence that (a) Amanat had any role in, or even knowledge of, a fraud against Maiden Capital investors; (b) false information involving Enable was transmitted to the Maiden Capital investors; or (c) Amanat understood Maiden was misrepresenting the value of the Maiden Capital fund to investors.  In other words, Amanat argues that there was insufficient evidence from which a jury could conclude Amanat knowingly helped Maiden defraud his investors.  The record, which includes extensive testimony from Maiden, highly incriminating emails and text messages authored by Amanat, and corroborating loan agreements and other financial documents, is substantially to the contrary.  In light of the trial record, Amanat falls far short of meeting his "heavy burden" of showing that no rational jury could have convicted him of Counts One through Three.  *Jackson*, 335 F.3d at 180.

The Government presented extensive testimony from Maiden that, if credited by the jury, was alone sufficient for a reasonable jury to conclude that Amanat knew Maiden was defrauding his investors using the Enable balances provided to him by the Amanat brothers.

Maiden testified that, in June 2008, Amanat solicited Maiden to invest in Enable, which Amanat represented as a "riskless" and "[v]ery liquid" Dubai-based asset management fund run by Omar Amanat's brother, Irfan Amanat.  (Tr. 582.)  While Maiden initially declined to invest, he ultimately invested $1 million in August 2008.  (Tr. 582.)  Relevant to the issue of knowledge, prior to making this $1 investment with Enable, Maiden confirmed with Omar Amanat that Maiden Capital would receive written monthly statements from Enable.  (Tr. 584.)  As Maiden explained

to Amanat, Maiden required statements so that he could "reflect them in the returns" sent out to Maiden Capital investors. (Tr. 584.) In other words, it would be permissible for the jury to credit Maiden's testimony that Amanat was aware of how Maiden intended to use the Enable statements to infer that if Enable provided false statements to Maiden, Amanat understood that Maiden Capital investors would receive false statements. *See United States* v. *Valle*, 807 F.3d 508, 522 (2d Cir. 2015) (in the context of explaining inferences in the Government's favor must be "sufficiently supported to permit a rational juror to find each element of the offense.").

Corroborating Maiden's testimony, Maiden received monthly Enable statements, typically from Irfan Amanat. (Tr. 585-86; GX 1507). On October 1, 2008, Maiden received his first Enable statement, from Irfan Amanat, which reflected that the $1 million investment had grown to $1,025,666.67 in the first month. (Tr. 590; GX 1507). Also in October 2008, Omar Amanat told Maiden that the Maiden Capital investment in Enable was performing well. (Tr. 592.) As reflected in contemporaneous emails, however, by October 2008, the Amanat Brothers knew Enable was insolvent and unable to pay redemptions, including to KITD.

In particular, the email evidence demonstrates that in November 2008, Amanat solicited an additional $2 million from Maiden, purportedly as a one-week short term loan, but which Amanat intended to use to repay a portion of the KITD redemption. (Tr. 624; GX 1509.) In return, Amanat promised to generate $5-10 million in investments for Maiden Capital. (Tr. 625; GX 1509.) While Maiden made Amanat aware of the significance of $2 million to his fund, he ultimately agreed to the loan. (Tr. 625-28; GX 1510, GX 1510B.) At the same time, unbeknownst to Maiden, the Amanat brothers were exchanging desperate emails about how Enable would come up with the money to repay a redemption request made by Isaza Tuzman, on behalf of KITD,

because Enable did not have the money. (Tr. 623; GX 3051.) Amanat then used the majority of the Maiden Capital funds to repay KITD. (GX 3053.)

At no point did Amanat tell Maiden the truth about the $2 million. (Tr. 635-7.) Instead, at the end of December 2008, Amanat persuaded Maiden to enter into a written agreement (the "December 2008 Agreement"), discussed below in the context of Count Four, pursuant to which Maiden agreed not to seek to redeem Maiden Capital's investment in Enable. (Tr. 650.) In January and February 2009, Amanat continued to deceive Maiden, knowing that Maiden was reporting his fund performance to investors based, in part, on information about Enable provided by Amanat.

Emails introduced at trial still further demonstrated that Amanat was aware that Maiden was using Enable statements that Amanat knew to be false in order to generate returns to show Maiden Capital investors. For example, in Government Exhibit 2967, a January 2009 email, Maiden emails Irfan Amanat to express confusion over the returns in his Enable statement. After receiving the email from his brother, Omar Amanat responded: "Coordinate with me on this. He needs to show good year-end returns." That Omar Amanat knew the Enable returns being provided to Maiden were fabricated and being used by Maiden to calculate the investor returns he relayed to investors are logical inferences supported by this email. The next month, in February 2009, after Maiden begged Irfan Amanat to return $500,000 of Maiden Capital money in order to pay investor redemptions, Omar tells his brother: "Yes, send him back 500k ASAP. Oh, I forgot, we don't have it. That's why this is an absurd question." (GX 2975). This email demonstrates that as of February 2009, Omar Amanat knew that Maiden Capital investors were being misled about their investment returns because Maiden is being misled about the status and health of the funds he has provided to Enable.

In March 2009, unable to keep Maiden's requests for redemptions at bay, the Amanat brothers finally disclosed to Maiden what they have known for months – that Maiden Capital could not redeem any of the $3 million supposedly placed with Enable. The brothers explained to Maiden that the issue related to a liquidity problem with one of Enable's brokers in the Middle East. (Tr. 661.) As the jury learned, the majority of Maiden Capital's money had never been sent to the Middle East but instead used for redemptions to KITD. The testimony and documentary evidence concerning the events occurring in late 2008 and early 2009 were properly admitted as background relevant to knowledge and motive. From this evidence, the jury could infer that, certainly by March 2009 – when Maiden is brought into the criminal fold – Amanat was motivated to knowingly lie to Maiden's investors.

Even without this background evidence, Maiden's testimony directly supports the jury's conclusion that Amanat knowingly helped Maiden lie to investors. In particular, Maiden testified that, after March 2009, he called Omar Amanat directly to address the loss of Maiden Capital funds and what to tell his investors. (Tr. 663.) Maiden recalled that "Omar said to [Maiden] very calmly: Don't worry about it. There are a lot of assets here in KIT Media. Among the parties. We'll figure out a way to deal with this." (Tr. 663.) Maiden, Amanat and Isaza Tuzman started referring to the lost Enable money as "the Enable hole, money that had vanished, was gone." (Tr. 664.) The next day, Maiden lied to an investor, telling the investor that Maiden Capital was doing fine. (Tr. 677.) Maiden then called Amanat and told him, in substance, that Maiden had just lied to his investor and that Maiden was desperate for money in light of the loss of the "3 million that [Maiden] thought [he] had in Enable." (Tr. 677.) While Amanat may claim to view Maiden's testimony as incredible, credibility determinations must be resolved in favor of the jury's verdict. *See United States* v. *Desena*, 287 F.3d 170, 177 (2d Cir. 2002).

From March 2009 forward, Maiden regularly received false Enable account statements from Irfan and Omar Amanat, which were then used to provide false statements to Maiden Capital investors. For example, Maiden testified about Government Exhibit 1624, a September 2, 2009 email Maiden sent to Omar Amanat and Irfan Amanat in which Maiden stated "Guys, I need my Enable balance now" and explicitly stated that the balance was needed because Maiden "need[ed] to put out num[ber]s" to his investors. (Tr. 795-76.) Omar Amanat responded to that email by directing his brother: "Irfan, can you get this immediately." (Tr. 805; GX 1625.) It is clear from the face of this email that Maiden intended to use the Enable balance provided by the Amanat brothers to prepare his investor returns. Nonetheless, Omar Amanat directed Irfan to provide Maiden with the false information. Maiden further testified that he told Omar Amanat that the returns he (Maiden) was providing to his investors "were false because Enable, which we all knew was nonexistent, was in my numbers." (Tr. 805). In light of this evidence, there is a more than sufficient basis for the jury to conclude that Amanat knew Maiden was lying to his investors about their returns, and that Amanat was helping provide Maiden with false information about Enable to facilitate the fraud.

The agreement between Amanat and Maiden pursuant to which Amanat agreed to loan Maiden money to allow him to forestall redemption requests is yet more evidence the jury may have relied on to conclude that Amanat intended to help Maiden lie to Maiden Capital investors. In particular, Maiden testified that, in March 2011, he received a $1 million redemption request from Alpine Capital which was "the first one that [Maiden] absolutely could not meet." Maiden called Amanat to tell him about the request and Maiden's inability to meet it. (Tr. 873.) Amanat agreed to loan Maiden money to pay investor redemptions. (Tr. 873-879.) As part of the loan paperwork, Maiden provided Amanat with a list of the assets that Maiden Capital purported to

maintain on its balance sheet and which listed Enable's value at more than $2.5 million as of April 30, 2011. (Tr. 879.) During this time period, Amanat and Maiden "talked often," including about the status of investor redemption requests. (Tr. 884.) At no point did Amanat ever suggest that Maiden should tell his investors that $2 million of Maiden Capital funds had been sent to KITD. (Tr. 884.) When Amanat and Maiden did discuss whether Maiden should "mark down" or lower the value of this fund, Maiden told Amanat "several times" that – in large part due to the significance of an investment in excess of $2 million to Maiden Capital – the required markdown would be:

> [S]uch a meaningful amount, that [Maiden] would get sued, some investor would go to the authorities, the SEC, the FBI. They would all come back to Enable, to [Omar], to Kaleil. It would be a disaster. And then he would back off and continue to work with me on the loan and paying redemptions.

(Tr. 885.) This testimony strongly supports the inference that Amanat was fully aware of the dire situation facing Maiden Capital as a result of the money lost in Enable, and that Amanat's decision to lend Amanat money was motivated by Amanat's desire to prevent Maiden Capital investors from learning the truth about the money Maiden Capital had sent to Enable, and the criminal consequences that could (and later did) result from such a disclosure.

Similarly, Amanat's communications to Maiden in the summer of 2011, as Maiden Capital redemption requests mounted, is yet additional evidence upon which the jury could conclude that Amanat appreciated that Maiden Capital investors had been defrauded. For example, on July 15, 2011, prior to and during the New York meeting to discuss saving Maiden Capital, Amanat sent the following text message to maiden, reflecting Amanat's knowledge of the situation:

> Be aggressive today: Say it doesn't matter who did what. Paint a stark nightmare scenario if your fund goes under. Trustee is appointed -- he will quickly realize all money was lost in KIT digital and everyone here will be sued. Securities laws violations

> have occurred. Criminal behavior jail time. Bottomline: Fund
> needs to be made whole or ship will sink.

(GX 1785D.)

The jury could have properly viewed this text message as an admission that Amanat knew full well that Maiden was defrauding his investors.

There was still more evidence in support of Counts One through Three.  Maiden further testified that at this July 2011 meeting, Maiden made clear to the attendees – including, of course, Amanat – that Maiden Capital was "mismarked, that it was a mess," referring to the fact that inaccurate returns were being presented to investors.  (Tr. 1955.)  Again, this testimony supports an inference that Amanat knew Maiden was defrauding his investors.  Based on these text messages, the jury could reasonably have inferred that Amanat agreed to continue to loan money to Maiden Capital to pay redemption requests so that investors did not discover the mismarking. (Tr. 895.)

Finally, Amanat argues that the Enable statements provided to Maiden Capital were not fraudulent because the Enable balance accurately reflected a debt obligation owed by Enable to Maiden Capital, and because Maiden Capital investors knew they might be required to accept "in-kind" distributions in lieu as necessary, in lieu of cash.  (Amanat Mot. at 9-13).  These strained arguments rest on the notion that Enable was a going concern that would be able to repay a multi-million debt obligation.  All evidence introduced at trial indicated that from at least October 2008, Enable was insolvent.  As Maiden testified, Amanat knew that it was false to represent Enable as having "any value whatsoever."  (Tr. 1183.)  In any event, these arguments were presented to and rejected by the jury.

Relatedly, Amanat also argues that he did not have the "requisite knowledge to be guilty as an aider and abettor" of investment advisor fraud.  This argument can easily be dismissed.  There

was no dispute at trial that Maiden – indisputably an investment advisor – defrauded his investors. The only question the jury had to decide for Count Three was whether or not Amanat aided Maiden in this fraud.  As set forth above, the evidence at trial established that Maiden took a series of steps to aid Maiden in defrauding his investors, including causing Irfan Amanat to provide Maiden with false Enable statements, which Amanat knew would be used to calculate false Maiden Capital returns.

In sum, given Maiden's testimony about explicit conversations he had with Amanat about deceiving his investors, and the corroborating emails, text and documentary evidence demonstrating Amanat's motives to deceive Maiden Capital investors, there was more than sufficient evidence upon which the jury rested its conviction of Amanat on Counts One through Three.

## III.    THE GOVERNMENT ADDUCED SUFFICIENT EVIDENCE THAT OMAR AMANAT INTENDED TO MANIPULATE KIT DIGITAL STOCK

Amanat's next contention is that the Government failed to offer sufficient evidence that he had the requisite intent to manipulate the KITD stock.  (Amanat Br. at 24.)  The record is again to the contrary.  It includes, among other things, Maiden's testimony about the conspiracy to manipulate KITD stock and Amanat's participation in that conspiracy, the December 31, 2008 agreement (remarkable written evidence of the conspiracy's genesis), and communications from Amanat in which he takes credit for Maiden's efforts to manipulate the KITD stock.

Pursuant to the December 31, 2008 agreement, Maiden agreed to purchase at least $400,000 of KITD stock in the open market, over a period of 30 days, and to hold those shares for at least 90 days.  (Tr. 639-640; GX 2970.) Maiden also agreed not to seek to redeem his investments in KIT Media or Enable.  In exchange for Maiden's participation in the agreement, both Isaza Tuzman and Amanat agreed to compensate Maiden with profits of KIT Media, the

13

private vehicle whose principal asset was public KITD stock. (Tr. 647.) Isaza Tuzman also promised to make efforts to retain Maiden in an investor relations capacity at KITD.

First, Maiden's testimony directly established that Amanat was a knowing participant in the conspiracy to manipulate the KITD stock. Maiden testified that prior to signing the December 31, 2008 agreement in which he agreed to manipulate the KITD stock, he spoke with both Amanat and Isaza Tuzman. Maiden explained that Amanat was the person who first suggested the agreement. (Tr. 640.) He then testified that Amanat "told me in several conversations that there was an aggressive seller that could really hurt the [KIT digital] stock called RAM Capital. And KIT digital was looking to raise money short term, the next month or two. And that [] was Vision Capital. So they were looking at the stock closely." (*Id*. at 645.) The jury therefore learned not only that Amanat was the person who first conceived of the agreement, but that he also fully understood that the agreement was designed to artificially counteract the negative market pressure being placed on KITD stock by RAM Capital. Maiden also testified that he continued to discuss the manipulation scheme with Amanat after the initial 30-day window contemplated by the December 31, 2008 agreement had ended. (*Id.* at 646.)

Second, Maiden's testimony was strongly corroborated by documentary evidence, which not only included the December 31, 2008 agreement (GX 1517-A), but also included a May 5, 2009 email in which Amanat, Isaza Tuzman and Maiden discussed the market manipulation. In that exchange, Amanat demonstrated his knowledge of Maiden's manipulative trading and proudly claimed credit for that manipulation. Amanat boasted to Isaza Tuzman: "You wouldnt have had Maiden's $2.5 million in open market purchases *which singlehandedly kept the stock up* if I didnt spen[d] the time." (GX 3036 (emphasis added).) And, of course, prior to the July 2011 New York meeting with Isaza Tuzman and others, after reminding Maiden that "[s]ecurities violations have

14

occurred" that could lead to "jail time," Amanat pressed Maiden to "[m]ake sure you bring up aggressively that kaleil put money in your fund, gave you questions to ask in advance etc. *You supported the stock, owned 400k shares*."  (GX 1785-D (emphasis added).)

Given that Amanat conceived of the market manipulation agreement, boasted about its success and then reminded Maiden of the consequences of their criminal activity prior to detection, the jury easily concluded that Amanat was a willing participant in the market manipulation conspiracy.

## IV.   THE GOVERNMENT PROVED UP INSTERSTATE WIRES IN FURTHERANCE OF THE SCHEME CHARGED IN COUNTS ONE AND TWO AND VENUE IN THE SOUTHERN DISTRICT OF NEW YORK

Amanat argues that the Government failed to identify the use of any interstates wires in furtherance of the scheme charged in Counts One and Two of the Indictment and that the Government failed to establish venue in the Southern District of New York for the Maiden Capital scheme.  He is wrong.

The trial record contains numerous examples of interstate wires sufficient to satisfy the Government's burden.  The proof at trial established that Amanat resided and did business in Manhattan while Maiden resided and did business in North Carolina. (*See, e.g.*, GX 1517-A (providing a West End Avenue Manhattan address for Amanat and a Charlotte, North Carolina address for Maiden); GX 635 (Amanat making Enable bank withdrawals from Manhattan); GX 651 (Cornucopia, a vehicle controlled by Amanat, based in Manhattan); Tr. 790 ("A. Because Kaleil called me from the floor of the NASDAQ when they were ringing the closing bell.  Q. Where were you?  A. I was at my home trading in Charlotte.") and 5887 ("Q. Do you have an understanding, based on your review of these records, where Mr. Maiden and his company were based?  A. Yes. North Carolina").)

The Government introduced a substantial number of interstate wire communications between Amanat and Maiden – including emails and text messages in which they discuss, among other things, meeting investor redemptions in order to stave off discovery of the Maiden Capital fraud. For example, in GX 1785-F, an August 10, 2011 exchange between Maiden and Amanat, Maiden wrote, speaking of Maiden Capital investor Kris Peavy: "Peavy needs 150k. Thank u. U need me to send wiring instructions again?" In GX 1729, a November 17, 2011 email chain between Amanat and Maiden titled "Important – Wire", Maiden says: "You said you would send 250k once I emailed him to reregister. He won't ask a million questions – we traded emails on this before. Folks are expecting cash this week as I led them to believe that given you saying you'd send the 250. You can't fade on this stuff dude. I am communicating to investors based on what you tell me." The text messages, which are all about the fraud, continue. In GX 1785-AT, a December 27, 2011 exchange between Maiden and Amanat about unsuspecting Maiden Capital investors, Maiden wrote: "Well I need that 100k now you have been supposed to send (for alpine) plus another 100k ASAP (for Solaris capital – guy Sohail intro'd to me) to delay those guys. Then after that may be only 400 more upon signing assuming I get the 300+ dividend. Not bad." Other wire communications express similar statements in furtherance of the scheme. For instance, GX 1785-AY is a January 22, 2012 text message exchange between Amanat and Maiden. Maiden wrote: "Can u send 150 tomorrow. Critical bro." Amanat responded: "Why?" Maiden then explained that the money would be used "[t]o pay 2 guys – I have negot every one else to stay in. Been working on trying to minimize loan. Cant wait anymore. need this amount now. Should be clear after this." Maiden went on to say: "I have been dealing w these guys for months. I will manage them on rest but have to get this. One is Bonnie's ex boss who is threatening lawsuit etc.

ruining family relationships. Just killing Bonnie. U promised 100before when I sent cert. pls just deliver bro. We are partners. Honor your word pls."

Simply put, the trial record is filled with interstate wire communications just like the examples above, which on their face furthered the scheme to defraud Maiden Capital investors and were devastating proof of Amanat's guilt. Indeed, Amanat's motion fails to acknowledge the Maiden-Amanat text messages, beyond claiming – in conclusory fashion and contrary to the record evidence – that "much" of these communications related to Maiden's personal financial survival. (Amanat Br. at 20.)[1]

Of course, the text messages were only part of the Government's proof of interstate wires in furtherance of the Maiden Capital scheme. The Government also presented the jury with substantial evidence of interstate wire transactions between Enable's First Republic bank account in California, and Maiden Capital's Bank of America account in North Carolina. (*See, e.g.*, GXs 606 (Maiden Capital's Bank of America statements containing wire information); 631 (Enable checks stating "First Republic Bank, San Francisco, CA"); 633 (Enable's First Republic statements containing wire information); 634 (Enable's First Republic wire statements identifying Maiden Capital's bank as "BK America NC"). Although Amanat disputes that these Enable-Maiden Capital wires were made in furtherance of the scheme, that is certainly argument, one the jury considered and rejected at trial. (*See* Tr. 7089-91.)

---

[1]     Defense counsel argued to the jury that, despite listing a Manhattan address, Amanat may have been elsewhere when he communicated with Maiden. This argument was unpersuasive. As the Court correctly instructed the jury, the Government need only prove beyond a reasonable doubt that a wire passed between two or more states, or between the United States and another country. (Tr. 7176.) Other than two instances in which Amanat and Maiden were both in New York City together (*id*. at 636 (charity event in Manhattan); 886 (meeting with Maiden, Amanat, Isaza Tuzman and others in Manhattan)), Amanat and Maiden were in different states. Indeed, there is no evidence that Maiden ever traveled from North Carolina to New Jersey, California, or any of the other locations defense counsel suggests Amanat could have been when he communicated with Maiden by text message. (Tr. 7090.)

With respect to venue, the Government bears the burden of proving venue as to each count by a preponderance of the evidence. *See, e.g.*, *United States* v. *Stephenson*, 895 F.2d 867, 874 (2d Cir. 1990). The evidence introduced at trial easily satisfies this burden. This includes interstate wires in furtherance of the charged crimes. First, as set forth above, the record includes scores of text messages between Manhattan-based Amanat and North Carolina-based Maiden. The jury was entitled to conclude that it was more likely than not that at least one of these interstate wire communications commenced or terminated in the Southern District of New York, where Amanat lived. Second, the Government offered substantial evidence of wire transactions between Amanat (via Enable's First Republic Bank account) and Maiden. (*See* GX 3800-AA.) Given that Amanat resided in Manhattan, controlled his businesses from Manhattan and conducted financial transactions with First Republic Bank from Manhattan, the jury could have concluded that it was more likely than not that Amanat caused Enable wires to be sent to Maiden while he was in Manhattan.

In addition to Amanat's operating in Manhattan, the Government presented additional venue evidence in the form of interstate wire transfers that commenced in Manhattan and that furthered the Maiden Capital scheme. For example, the evidence showed that on March 1, 2011, Isaza Tuzman, an unindicted co-conspirator in the Maiden Capital fraud, worked with Maiden to cause KITD, a Maiden Capital investor, to wire $250,000 in additional funds from its HSBC account, which was domiciled at the HSBC office at 452 Fifth Avenue in Manhattan, to Maiden Capital's North Carolina-based Bank of America account. (*See* GXs 606, 611, 619, 645, 649-A, 649-E, 2793.) Two days later, Maiden wired $288,101 to Isaza Tuzman's bank account. (*See* GXs 606, 611.) Maiden explained that these wires were designed to lure additional money into Maiden Capital, which was bankrupt largely because of the Enable losses, so that he could redeem

Isaza Tuzman's personal investment. (*See* Tr. at 824-31.) This conduct, similar to other wires

into and out of Maiden Capital to meet investor redemptions, plainly furthered the Maiden Capital

scheme charged in Counts One through Three,[2] and the jury was entitled to rely on this proof to

conclude that the Government established venue by a preponderance of the evidence. (*See id.* at

7177 ("The wire communication requirement may be satisfied even if the wire communication

was done by a person with no knowledge of the fraudulent scheme, including the victim of the

alleged fraud.")).

**V.    THE COURT PROPERLY ADMITTED THE EXPERT TESTIMONY
OF SPECIAL AGENT JOEL DECAPUA**

Amanat contends that (a) the Court erred in admitting the expert testimony of FBI Special

Agent Joel DeCapua pursuant to Rule 702 because his testimony was not reliable, and (b) because

Special Agent DeCapua purportedly offered "false" testimony, he is entitled to a new trial.

(Amanat Br. at 28-41.) These claims should be rejected.

In his motion, Amanat now contends that Special Agent DeCapua was not qualified to offer

expert testimony. Notably, Amanat did *not* object to Special DeCapua offering expert testimony

at trial — even after the Court held two mid-trial hearings at which at which Amanat's counsel

extensively cross-examined Special Agent DeCapua. The record is clear:

> MS. GRISWOLD: Your Honor, may Special Agent DeCapua offer
> an opinion related to the analysis of electronic evidence, including
> email headers and email platforms?
>
> THE COURT: Any objection?
>
> MR. JACKSON: No, Your Honor.

---

[2]    Amanat argues that this wire transaction was relevant only to Count Five. (*See* Amanat Br. at 27.) That is incorrect. While this wire transaction was powerful proof of Isaza Isaza Tuzman's fraud on KITD shareholders, it is also highly probative of the Maiden Capital scheme, which Isaza Isaza Tuzman participated in even though he was not charged with it.

THE COURT: Yes, he may offer opinion testimony on those subjects.

(Tr. 6546.) Because the defendant did not object at trial to Special Agent DeCapua's testifying as an expert witness, the Court reviews this evidentiary ruling for plain error. *See*, *e.g.*, *United States* v. *Riley*, 90 F. Supp. 3d 176, 185 (S.D.N.Y. 2015) (denying Rule 33 and finding no plain error where defendant failed to object to jury instruction).

Amanat has failed to show that there was error, let alone a plain error. Amanat's specific arguments challenging the reliability of Special Agent's DeCapua's testimony make no sense. Amanat's arguments were raised on cross-examination, and do not undercut the reliability of the agent's testimony under Rule 702. *See* Fed. R. Evid. 702(c) & (d) (expert may offer opinion if, among other things, "the testimony is the product of reliable principles and methods" and "the expert has reliably applied the principles and methods to the facts of the case"). Tellingly, although Amanat called an expert witness at the first mid-trial hearing (Tr. 4371-4414), he declined to call one at the second mid-trial hearing or at trial.

First, Amanat argues that the agent "offered substantively different testimony at the last-minute hearing held on his testimony than he did at trial" with respect to the epoch time stamp. (Amanat Br. at 29-31). He is wrong. As the Court will recall, the agent accurately explained that he had compared the epoch time stamps — the number of seconds that have elapsed since January 1, 1970 (Tr. 6312) — of other emails that Amanat sent with the same emails on Maiden's computer. (GXs 3579-A, 3579-B; Tr. 6310-25; Tr. 6559- 3579-B.) Amanat tries to make something of the fact that at the hearing, the agent testified that he had found that the dates "matche[d]" (Tr. 6313-14), and at the trial he testified that the dates also "match[ed] . . . within an approximation," meaning within "a few seconds or maybe a minutes or two" (Tr. 6577, 6602). In contrast, the fake emails that Amanat introduced into evidence had fake epoch time stamps with

dates in the future, such as 2087. (GXs 3579-A, 3579-B; Tr. 6577-79, 6584.) This slight delay with respect to epoch time stamps for emails not alleged to be fabricated is the result of emails traveling from the one computer to another, nothing more. The agent's testimony and analysis on the score was reliable and devastating. (Tr. 6619-20.)[3]

Second, Amanat contends that "Special Agent DeCapua offered objectively false testimony on the subject of UUIDs." (Amanat Br. at 31.) Once again, this claim is wrong. As the Court will recall, the agent accurately testified at the hearing and at trial that in his experience that UUIDs are sixteen characters in length. (Tr. 6319-20; 6565-66.) On both occasions, defense counsel cross-examined the agent about his testimony. (Tr. 6330-35, 6611-20, 6628-42.) Defense counsel failed to offer any evidence that contradicted or impeached the agent's testimony, such as from a competing expert. As the Court observed at trial:

> THE COURT: Well, without getting into the details of whether it's true or not, he testified to that at the hearing, so you have known for some time that that was his position. And so if you thought it was wrong or incorrect, as you're saying now, then presumably the expert that you retained on this issue could testify that Agent DeCapua is wrong. In other words, my point is it wasn't — it could not have been a surprise to you that he testified in the fashion he did about UUIDs, because he testified to that before.
>
> MR. JACKSON: Right. He testified to that.
>
> THE COURT: So to the extent he was wrong on that point, you knew he was wrong, or you had a basis for your belief that he was

---

[3]     Amanat claims that there were "serious discovery issues raised by the Government's failure to produce" certain work product about which Special Agent DeCapua testified at the hearing and at trial. (Amanat Br. 30 & n.7). This claim is meritless. As the Court will recall, during cross-examination at trial, the agent testified that he was not sure whether he had maintained certain of his work product records; the Government said that it was not previously aware of these records, but it would produce whatever existed. (Tr. 6600-01, 6672). That night, the Government obtained the agent's work product and produced it to defense counsel. The next day, the Court offered defense counsel the opportunity for a continuance and to recall the agent — both of which defense counsel declined. (Tr. 6802-14).

> wrong after he testified at the hearing outside the presence of the
> jury.

(Tr. 6673)

Amanat's suggestion that the agent relied only on Wikipedia is inaccurate.  (Amanat Br.
33-34.)  The agent testified that his understanding of the basic concept of UUIDs was based on his
"common sense" and general understanding of an "established standard."  (Tr. 6612 (Q. You're
relying on Wikipedia?  That's your testimony? / MS. GRISWOLD:  Objection. / THE COURT:
His testimony was that he was relying on his own observation and Wikipedia. / Q. OK, so your
observations plus Wikipedia, right? / A. Plus other sources that don't come to mind right now, but
it's an established standard."); *id.* at 6631 ("So I'm bound by common sense here, and when I see
this format, 8-4-4-4-12, and everything conforms and looks like hex, and I read articles that say
that it's supposed to be hex for Apple mail, and I do experiments myself and every single time I
sent something from Apple mail it's in hex, it's UUID and has the domain name.").  Similarly,
Amanat's citations to various blog posts in his brief, which are not in evidence, do nothing to
undermine the reliability of the agent's testimony.  (Amanat Br. at 34-39.)  The defense could have
called an expert to articulate a competing opinion on this issue.  It was given ample opportunity to
do so.  It did not.  That choice does not somehow render Special Agent DeCapua's testimony
inadmissible.

Because Amanat has failed to show that Special Agent DeCapua's testimony was
unreliable or false, and because he has otherwise failed to show plain error, Amanat is not entitled
to a new trial.

## VI.  AMANAT HAS FAILED TO SHOW THAT A JUROR WAS BIASED BECAUSE OF PRIOR CONNECTIONS TO TSA AND NEW YORK CITY CORRECTIONS DEPARTMENT

While the jury was deliberating, Amanat raised for the first time his claim that a juror had intentionally failed to disclose connections to law enforcement during *voir dire*. Although trial had begun approximately seven-weeks earlier, defense counsel represented that Amanat's family had "engaged in some online Googling of one of the jurors" over the weekend of December 23-25, 2017 that revealed purported connections to law enforcement. (Tr. 7521.) The Court questioned the juror at sidebar, who honestly acknowledged that she had previously been a TSA agent and that her father had retired as a New York City Corrections Officer approximately twenty years ago. (Tr. 7261-62.) The juror explained that she did not consider her employment at TSA to be a law enforcement position because "[a]ll I did was screen bags." (Tr. 7266.) With respect to her father, the Court asked the juror whether she believed his prior employment at the Corrections Department was responsive to the Court's questioning at *voir dire*. (Tr. 7266.) The juror responded, "No, because it was so long ago. I didn't even remember when he was employed by the Department of Corrections." (Tr. 7266.) After the juror was excused, the Court noted, "She struck me as extremely straightforward, and it's my conclusion, having observed her demeanor, that there was no intent to withhold anything responsive to those questions." (Tr. 7267.)

Recognizing that every defendant "is entitled to a fair trial but not a perfect one, for there are no perfect trials," *McDonough Power Equipment, Inc.* v. *Greenwood*, 464 U.S. 548, 553 (1984) (quoting *Brown* v. *United States*, 411 U.S. 223, 231-32 (1973)), the Supreme Court has set out a multi-part test to govern the analysis of claims that a juror failed to respond accurately at *voir dire*:

> [A] party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*Id.* at 556. Under the *McDonough* test, "a court must first find that a juror answered a question dishonestly." *United States* v. *Stewart*, 317 F. Supp. 2d 432, 436-37 (S.D.N.Y. 2004) (denying motion for new trial). The Second Circuit has noted that a "good faith failure to respond, though mistaken, [does] not satisfy . . . the first prong of the test." *United States* v. *Shaoul*, 41 F.3d 811, 815 (2d Cir. 1994) (citing *McDonough*, 464 U.S. at 555). "The court must then determine whether it would have granted a challenge for cause based on a truthful answer." *United States* v. *Stewart*, 317 F. Supp. 2d at 437 (citing *United States* v. *Greer*, 285 F.3d 158, 171 (2d Cir. 2002). "Challenges for cause are generally based on a finding of bias." *Stewart*, 317 F. Supp. 2d at 437 citing *United States* v. *Greer*, 285 F.3d at 171; *United States* v. *Torres*, 128 F.3d 38, 43 (2d Cir.1997)). "The difficulty of this showing is evident from the fact that no verdict in the Second Circuit has been overturned on the basis of juror nondisclosure under the *McDonough* test." *Stewart*, 317 F. Supp. 2d at 437.

Under the *McDonough* test, Amanat's claim can be swiftly rejected.[4] First, Amanat has failed to show that the juror failed to answer honestly, or that she was intentionally withholding information. The juror credibly explained that she was previously a TSA security screener and

---

[4]    Amanat fails to explain how or why he first raised this purported issue almost two months into trial and while the jury was deliberating, and thus did not waive the argument. *See*, *e.g.*, *McDonough*, 464 U.S. at 551 n.2 ("It is not clear from the opinion of the Court of Appeals whether the information stated in Greenwood's affidavit [about the juror] was known to respondents or their counsel at the time of the voir dire examination. If it were, of course, respondents would be barred from later challenging the composition of the jury when they had chosen not to interrogate [the] juror . . . further upon receiving an answer which they thought to be factually incorrect." (citing *Johnson* v. *Hill*, 274 F.2d 110, 115-16 (8th Cir.1960))); *see also City of Richmond* v. *Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 459 (4th Cir.1990) (counsel "could have discovered that [the juror's] answer was false before trial because they were given a list of the jurors' addresses. We cannot find that the district court abused its discretion by not excusing the Pipe Defendants' failure to act earlier on the information available to them. If 'the right to challenge a juror is waived by failure to object at the time the jury is empaneled if the bases for objection might have been discovered during voir dire,' such a right surely is waived if the basis could have been discovered before voir dire." (citation omitted)).

that she did not believe that was a law enforcement position.  She also credibly explained that she

did not believe her father's employment over twenty years ago in corrections was responsive.  *See*

*McDonough* 464 U.S. at 555 ("[J]urors are not necessarily experts in English usage. Called as they

are from all walks of life, many may be uncertain as to the meaning of terms which are relatively

easily understood by lawyers and judges."); *Shaoul*, 41 F.3d at 815 (a "good faith failure to

respond, though mistaken, [does] not satisfy . . . the first prong of the test"); *United States* v. *Cean*,

2014 WL 1653200, at *3-*4 (S.D.N.Y. Apr. 24, 2014) ("Any omission by Juror Number 6 would

be more reasonably construed as a mistake.") (citing *United States* v. *Sattar*, 395 F. Supp. 2d 66,

73 (S.D.N.Y 2005), a*ff'd sub nom. United States* v. *Stewart*, 590 F.3d 93 (2d Cir. 2009))); *United*

*States* v. *Bangiyev*, 2008 WL 4240005, at *8-*9 (E.D.N.Y. Sept. 12, 2008) (juror "not dishonest

by not revealing past employment with New York City Law Department" in response to *voir dire*

question about prior employment with "law enforcement agent").

Second, Amanat has failed to show that the Court would have granted a for cause challenge.

Prior employment as a TSA screener and a family member's prior employment decades ago as a

corrections officer do not warrant a finding of actual or implied bias.  "It is well settled that a juror

not shown to have actual bias is not excludable merely because he or she is a member of a particular

occupation or even of law enforcement."  *United States* v. *Marji*, 158 F.3d 60, 62 (2d Cir. 1998);

*see also United States* v. *Morales*, 185 F.3d 74, 84 (2d Cir. 1999) (status as law-enforcement

officer does not render a juror presumptively biased supporting challenge for cause; actual bias

needed).  *Compare Rodriguez* v. *Vance*, No. 12 Civ. 5418 (LAP), 2015 WL 5172899, at *4

(S.D.N.Y. Sept. 3, 2015) (*McDonough* test not satisfied where juror "simply forgot[]" to mention

a prior internship with District Attorney's Office"); *Bangiyev*, 2008 WL 4240005, at *8-9 ("Even

if defendant could satisfy *McDonough*'s first prong by demonstrating that the New York City Law

Department is a law enforcement agency, he would fail the second prong because Rozinski would not have been removable for cause"), *with United States* v. *Colombo*, 869 F.2d 149, 151 (2d Cir. 1989) ("[J]uror in question deliberately failed to reveal that her brother-in-law was an attorney for the government and did so because she believed that revelation of that information might thwart her desire to sit on this case. [Those facts] . . . indicated an impermissible partiality on the juror's part.").

## VII.    THE GOVERNMENT'S REBUTTAL SUMMATION WAS PROPER AND DID NOT PREJUDICE AMANAT

Amanat advances two complaints about the Government's rebuttal summation, neither of which has merit.

### A.    Applicable Law

"[A] defendant asserting that a prosecutor's remarks warrant a new trial faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial." *United States* v. *Coplan*, 703 F.3d 46, 86 (2d Cir. 2012) (internal quotation omitted). "It is well established that the Government 'has broad latitude in the inferences it may reasonably suggest to the jury during summation.'" *Id.* at 87 (quoting *United States* v. *Edwards*, 342 F.3d 168, 181 (2d Cir. 2003)); *see also United States* v. *Tocco*, 135 F.3d 116, 130 (2d Cir. 1998) ("The prosecution and the defense are generally entitled to wide latitude during closing arguments, so long as they do not misstate the evidence."); *United States* v. *Caputo*, 808 F.2d 963, 968-69 (2d Cir. 1987) (citing cases after noting that "[t]his court has previously upheld the use of vigorous rebuttal by the prosecution").

Moreover, a prosecutor is "entitled to respond to the evidence, issues, and hypotheses propounded by the defense." *United States* v. *Marrale*, 695 F.2d 658, 667 (2d Cir. 1982). As Judge Learned Hand memorably explained:

> It is impossible to expect that a criminal trial shall be conducted
> without some show of feeling; the stakes are high, and the
> participants are inevitably charged with emotion. Courts make no
> such demand; they recognize that a jury inevitably catches this mood
> and that the truth is not likely to emerge, if the prosecution is
> confined to such detached exposition as would be appropriate in a
> lecture, while the defense is allowed those appeals in misericordiam
> which long custom has come to sanction. The question is always as
> to the particular incident challenged, in the setting of the whole trial.

*United States* v. *Wexler*, 79 F.2d 526, 529-30 (2d Cir. 1935); *see also DiCarlo* v. *United States*, 6

F.2d 364, 368 (2d Cir. 1925) (L. Hand, J.) ("While . . . we recognize that the prosecution is by

custom more rigidly limited than the defense, we must decline to assimilate its position to that of

either judge or jury, or to confine a prosecuting attorney to an impartial statement of the evidence.

He is an advocate, and it is entirely proper for him as earnestly as he can to persuade the jury of

the truth of his side, of which he ought to be thoroughly convinced before he begins at all.  To

shear him of all oratorical emphasis, while leaving wide latitude to the defense, is to load the scales

of justice.").

Even greater leeway is afforded in rebuttal summations, which are not fully constructed in

advance and are often improvised.  *See United States* v. *Arias-Javier*, 392 F. App'x 896, 898 (2d

Cir. 2010); *see also United States* v. *Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) ("Precisely because

such arguments frequently require improvisation, [the Court] will not lightly infer that every

remark is intended to carry its most dangerous meaning.").

Even if a defendant can meet the heavy burden of demonstrating that a prosecutor's

remarks were improper, a new trial is not warranted unless he can also carry the "heavy burden"

of showing that "the comment, when viewed against the entire argument to the jury, and in the

context of the entire trial, was so severe and significant as to have substantially prejudiced him,

depriving him of a fair trial."  *Farhane*, 634 F.3d at 167; *see also United States* v. *Shareef*, 190

27

F.3d 71, 78 (2d Cir.1999) ("Remarks of the prosecutor in summation do not amount to a denial of due process unless they constitute 'egregious misconduct.'").

The Court uses a three-part test for "determining whether an inappropriate remark amounts to prejudicial error," consisting of "[1] the severity of the misconduct, [2] the measures adopted to cure the misconduct, and [3] the certainty of conviction absent the misconduct." *United States* v. *Caracappa*, 614 F.3d 30, 41 (2d Cir. 2010) (internal citation and quotation omitted). Cases in which a defendant suffers substantial prejudice are "rare," *id.*, and "arise only when improper comments so infect the trial as a whole as to result in a conviction violative of due process," *United States* v. *Bonventre*, 646 F. App'x 73, 87 (2d Cir. 2016).

### B. The Government's Reference to Amanat as the "Owner" of Maiden Capital was Proper and Based on the Record

Amanat asserts that a single statement in the Government's lengthy rebuttal – that Amanat "literally owned Maiden Capital" and that he could have disclosed the Enable "hole" to investors had he wanted – constructively amended the Indictment and amounted to prosecutorial misconduct. (Tr. 7120.) This argument is baseless.

There was ample support in the record for the fact that Amanat controlled Maiden Capital and its assets as of June 2, 2011 when Amanat and Maiden entered into a loan agreement, with Maiden himself having testified that this arrangement essentially transferred ownership of Maiden Capital. The agreement, which was admitted into evidence as Government Exhibit 1692, was between Cornucopia LTD, a vehicle that Amanat owned (*see* Tr. 874, 1183-84), and Maiden Capital. The agreement contained a series of onerous terms. For instance, the agreement stripped Maiden of his role as Maiden Capital's sole Managing Member and installed Cornucopia in his place. That change put Amanat, through Cornucopia, firmly at the helm of Maiden Capital. The agreement stated: "On the Closing Date, the Borrowers shall appoint the Lender or Lender's

designee as the sole managing member of the Company until full repayment of the Loan under the Loan Documents. . . *Such appointment shall effectively give the Lender or Lender's designee control over operations and business decisions of the Borrowers*." (*Id.* (emphasis added).) The agreement also required Maiden to transfer and assign all of Maiden Capital's assets to Cornucopia until the loan was repaid. (GX 1692 (sections 2.9-2.11); GXs 1693 (stock pledge and assignment agreement) and 1694 (pledge agreement)); Tr. 878 (Maiden's testimony: "Q. Can you explain what the stock pledge agreement and pledge agreement, the role of these documents? A. Yeah. The basic role was to assign all of the value of Maiden Capital, all of the assets Maiden Capital owned to, to pledge them to Cornucopia to stand behind any dollar amount they would loan to me to pay redemptions.").)

Critically, Maiden testified that he understood that the loan agreement meant that Cornucopia, originally through Helena Houdova, Amanat's wife who signed as Cornucopia's "officer," was "the *owner* of Maiden Capital." (Tr. 876 (emphasis added).) Amanat fails to explain how the Government could have committed error – much less one that merits disturbing the jury's verdict – by echoing the testimony and documentary evidence that plainly establish Amanat's ownership and control of Maiden Capital.[5]

---

[5]    Amanat also argues that the Government committed error by invoking Ms. Houdova's name in its rebuttal summation. That argument is meritless. As the Court surely recalls, prior to the Government's rebuttal summation, defense counsel stated: "We would ask that the Court direct the government not to make any further references to Mr. Amanat's wife *as a supermodel*." (Tr. 6906.) (emphasis added) In response, the Government assured defense counsel and the Court that not only would it not refer to Ms. Houdova as a supermodel, but it would also not invoke the related issue of whether she was qualified to be named the head of Maiden Capital (through Cornucopia). (*Id.* at 6907.) At no point did the Government represent that it would not refer to Ms. Houdova at all. Indeed, that would be nearly impossible, given that her name appears on the critical loan agreement and related documents that were central to the Government's proof against Amanat.

Because the Government's reference to Amanat's ownership of Maiden Capital was firmly rooted in the trial record, there is no need to linger on Amanat's ultimate argument – that the supposedly improper reference to Amanat's ownership "constituted such an enormous shift in the theory of the case that it must be viewed as a constructive amendment of the Indictment" because the "argument transformed Mr. Amanat into a principal and drastically altered the calculus in terms of his liability and his presumed knowledge." (Amanat Br. at 48-49.) The Government merely wishes to underscore three facts that Amanat ignores or misconstrues.

First, contrary to his assertions that "there was never any substantive allegation that Mr. Amanat was a principal in the crimes charged in Counts One through Three, the Indictment clearly charged and the evidence at trial clearly established that Amanat was a principal in Counts One and Two, having fully participated in the wire fraud conspiracy and wire fraud scheme. By contrast, Amanat is charged only as an aider and abetter in Count Three.

Second, the Government's reference to Amanat as the "owner" of Maiden Capital who could have "disclose[d] something to the investors" if he wanted did not suggest that Amanat had an affirmative duty to alert them of the fraud. (Tr. 7120.) The Government's argument was in direct response to defense counsel's argument that Amanat had limited interactions with investors and that, when he did speak, he disclosed the truth about Maiden Capital's financial situation. Specifically, defense counsel's summation focused on a phone conversation that Amanat had with Jess Ellington, a Maiden Capital investor, in which Amanat disclosed that he had loaned Maiden Capital money. (Tr. 7072 ("The only thing that happened on that phone call was that Omar Amanat said I'm loaning Maiden money in order to pay redemptions. That was the only conversation of any substance he ever had with an investor, and Mr. Maiden acknowledged that was the truth[.] . . There was nothing false said on that phone call.").) In the Government's view, that argument

30

was misleading because it ignored Maiden's testimony that Amanat told Ellington that "everything was going to work out" – a false statement in light of Maiden Capital's true (and undisclosed) financial problems caused by the Enable losses. (*Id.* at 1184.) The Government was entitled to inform the jury that, having displaced Maiden as Managing Member and taken "control over operations and business decisions" of Maiden Capital under the loan agreement, Amanat had the power to (but chose not to) share the truth with the Maiden Capital's investors with whom he spoke, such as Ellington or Peavy.

Third, there was no danger that the jury could have concluded that Amanat was an investment adviser based on the Government's argument. That is because, in part, the jury was specifically instructed that "the government does not contend that Omar Amanat is himself an investment advisor." (Tr. 7235.) *Zafiro v. United States*, 506 U.S. 534, 540 (1993) ("[J]uries are presumed to follow their instructions.") (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

In light of the foregoing, there is no merit to Amanat's complaint that the Government's "ownership" comment was error.

### C.    The Government Did Not Develop a New Wire Fraud Theory In Rebuttal

Amanat next argues that the Government's rebuttal was improper because it made a "last minute disclosure of its theory as to which wires demonstrated a wire fraud in Counts One and Two." (Amanat Br. at 51.) This argument is contrary to the record. As the Court recalls, in advance of summations, the parties discussed (and briefed) whether the Government had offered sufficient proof to establish the existence of interstate wires in furtherance of the wire fraud counts, as well as the existence of venue in the Southern District of New York. As the Government explained in its December 19, 2017 letter (Dkt. 622), the trial record contained sufficient evidence of interstate wire communications between the Manhattan-based Amanat and the North Carolina-

based Maiden.  The following day, the Government further explained that "there is sufficient evidence in the record otherwise of wire[s] and the location of the wires back and forth."  (Tr. 6499.)[6]  The Government noted that the evidence of interstate wires was "in a multitude of documents" but that there was "evidence already in the record showing wires from Enable to Maiden Capital, between San Francisco and North Carolina, wires from Maiden Capital into Manhattan."  (*Id.* at 6499-50.)

When summations began, the Government did not know whether defense counsel planned to argue to the jury that the Government failed to offer proof of interstate wire.  However, when the argument arose, the Government responded, as it was entitled to do.  The Government therefore reminded the jury that the record contained evidence of "wires from Omar Amanat and Enable over to Maiden Capital, California to North Carolina.  Last time I checked, California and North Carolina are not the same state.  This is all in the record."  (*Id.* at 7121.)  Contrary to Amanat's argument, that modest response was not an attempt "to hide the ball on its theory as to the wires up until the rebuttal summation itself." (Amanat Br. at 51.)  The Government merely told the jury what the Government represented to defense counsel two days before in open court.  Amanat's claim of prosecutorial misconduct therefore fails.

## VIII.  THE EVIDENCE WAS SUFFICIENT FOR THE JURY TO CONCLUDE THAT THE MARKET MANIPULATION CONSPIRACY CONTINUED PAST AUGUST 12, 2010 AND ACCORDINGLY COUNT FOUR WAS NOT TIME BARRED

---

[6]    The Government also requested leave to reopen its case to offer Government Exhibit 610, which compiled various interstate wires (that were otherwise in the trial record) into a single document.  The Government sought to introduce GX 610 in light of defense counsel's complaint that he could not identify any interstate wires in the trial record.  As the Government explained, "Government Exhibit 610 simplifies the matter by putting everything on one page."  (Tr. 6499.) Defense counsel, however, objected to GX 610's admission, and the Court sustained that objection. (*Id.* at 6503.)

Count Four of the Indictment charged both Isaza Tuzman and Amanat with conspiring to manipulate the market in KITD shares.  The jury convicted both defendants of this Count.  The defendants insist that any conspiracy ended in August 2009, "immediately" (and somehow automatically) after KITD became listed on the NASDAQ, and was not still going as of August 12, 2010, the relevant date for statute of limitations purposes.  Because the jury was presented with more than sufficient documentary evidence and testimony that the market manipulation conspiracy continued well into 2011 – and that neither defendant withdrew from the conspiracy – the defendants' motion should be denied.

As an initial matter, the defendants appear to essentially concede that the Government presented sufficient evidence at trial for a reasonable jury to conclude that the defendants and Maiden entered into a market manipulation conspiracy, which they memorialized in writing on December 31, 2008.  This is not surprising, given the overwhelming evidence adduced at trial establishing the conspiracy.  As discussed above, rather than return the $2 million Amanat had obtained from Maiden Capital through false pretenses, Amanat persuaded Maiden to enter into the December 2008 Agreement pursuant to which Maiden would purchase $400,000 shares of KITD in the open market, over a period of 30 days, and to hold those shares for at least 90 days.  (Tr. 639-640; GX 2970.)  Maiden testified that the purpose of his purchases pursuant to the agreement was to artificially support the stock, which included counteract negative market pressure placed on the stock by aggressive sellers, as discussed above, and to make the stock appear healthier by increasing the volume of trading in KITD. (Tr. 646.)  In exchange for Maiden's participation in the agreement, both Isaza Tuzman and Amanat agreed to compensate Maiden with profits of KIT Media, the private vehicle whose principal asset was public KITD stock.  (Tr. 647.)

Communications between Isaza Tuzman and/or Amanat concerning the December 2008 Agreement corroborated Maiden's testimony that the purpose of his KITD purchases under the agreement was to manipulate KITD stock. For example, when questioned about an email he exchanged with Isaza Tuzman, on March 27, 2009, in which Maiden describes the selling pressure on KITD stock as a "ruthless wall" notwithstanding his purchase that day of "800K" of KITD, Maiden testified that his purpose in making those purchases was "trying to maintain the stock price." (Tr. 656; GX 1564.)

In addition, Maiden's testimony, as well as corroborating emails, texts and trading records, reflect that Maiden continued to purchase KITD stock well after the 30 or 90 day time periods contemplated by the agreement. In fact, once Maiden and Isaza Tuzman learned that their Enable investments were worthless, their shared purpose to keep KITD stock propped up was, if anything, stronger. Specifically, beginning in March 2009, the parties began discussing a settlement that would plug Maiden's Enable hole with shares of KITD Media, the value of which were directly tied to KITD's public stock price. (Tr. 678.)

After the March 2009 call, Isaza Tuzman wired funds to Maiden for the express purpose of having Maiden continue to support the stock, as well as to ensure that Maiden Capital did not collapse. For example, in an email chain dated March 10, 2009, Isaza Tuzman and Maiden discuss both a $200,000 potential investment by KITD into Maiden Capital to help Maiden's lack of cash ("Would be big to execute today – still have margin call") and Maiden's continued efforts to support KITD stock ("KDGL still hasn't traded outside of me all day"). (Tr. 681-82; GX 1540.) In response, Isaza Tuzman thanked Maiden for working to manipulate the market in KITD ("The steady trading action and market movement helps a lot") and asks Maiden to confirm that Maiden received the investment by KITD ("Did Robin [Smyth] get wire done."). (Tr. 683.) In another

34

email exchange between Maiden and Isaza Tuzman on July 9, 2009, Maiden wrote that the "KDGL Hindenberg continues . . . there is unending supply that keeps being offered lower." (GX 1614.) Isaza Tuzman responded: "We desperately need the stock to stay strong during this process," which Maiden took as direction to "push the stock up." (Tr. 659.) Amanat likewise understood – and took credit for – the fact that Maiden's manipulative trading continued after the period described in the written agreement. In a May 2009 email, discussed above, Amanat described Maiden's 2.5 million in open market purchases of KITD as responsible for "singlehandedly ke[eping] the stock up." (Tr. 647; GX 3036).

Most fatal to the defendants' arguments that any conspiracy ended with the August 2009 listing on NASDAQ is Maiden's testimony that he continued to manipulate KITD stock pursuant to his conspiratorial agreement with the defendants – and for the purpose of their shared illicit agreement to artificially keep KITD stock looking healthy – well into 2011. Maiden testified that on September 3, 2009, the day that Isaza Tuzman had been invited to ring the NASDAQ closing bell, that Isaza Tuzman called Maiden and told Maiden that KITD's share price was "down a little bit" and told Maiden "[i]t would really help our mood if you could push it up," to which Maiden responded that he would do it. (Tr. 790.) Maiden's trading for that day reflects that he did in fact purchase shares of KITD on September 3, 2009 at $7.80, the highest price of that day. (Tr. 792.) In his motion, as at trial, Isaza Tuzman attacks Maiden's account of this day as incredible, pointing to the fact that Isaza Tuzman's cellphone records for that day contain no calls with a North Carolina number. As noted above, however, "the credibility of witnesses is the province of the jury." *James*, 239 F.3d at 124. The jury considered and rejected defense counsel's arguments.

Maiden testified that he continued to purchase KITD shares, pursuant to his agreement with the defendants, in 2010, and that he regularly spoke with Isaza Tuzman about his continued

purchases of KITD.  (Tr. 810.)  When asked by the Court to describe what Isaza Tuzman said to Maiden about Maiden's continued purchases of KITD stock in the 2010 time period, Maiden testified: "The substance was always to keep the stock up and to – through trading, through volume, you know, pushing the stock.  It was less frequent, but it was the same substance as we had spoken before."  (Tr. 811.)  For example, Maiden testified about how, on July 29, 2010, Maiden bought and sold approximately 16,063 shares of KITD.  (Tr. 811.)  Maiden paid more to buy the shares that day than he obtained for selling them, not including commissions, which Maiden also paid for both the buy and sell transactions in KITD that day (Tr. 811.)  When asked why he would buy and sell shares in this fashion, Maiden testified that he did so "to generate volume . . . it creates volume and volume creates the appearance of strength for other investors looking at the stock." (Tr. 812.) When asked specifically about his trading in the 2011 time period when Maiden and the defendants were meeting in New York to discuss how to save Maiden Capital, Maiden was explicit – he continued to by KITD shares "supporting or pumping the stock even with the limited assets [he] had."  (Tr. 921.)  Maiden's trading in 2010 and 2011 corroborate his testimony.  Maiden continued to engage in uneconomic trading – such as buying and selling roughly the same number of shares, on the same day, at a loss, throughout this period.

Unable to dispute the fact that Maiden was engaged in facially manipulative trading during the relevant time period, the defendants argue that Maiden's trading post-NASDAQ was not part of the earlier market manipulation conspiracy.  However, because conspiracy is a continuing crime, "the limitations period begins only when the purposes of the conspiracy have been accomplished or abandoned.  Once the government 'has presented sufficient evidence to show a conspiracy that has continuing purposes or goals' and that has continued into the limitations period, 'the burden is on the defendant to prove . . . that he took affirmative steps to withdraw.'" *United*

*States* v. *Martinez*, 862 F.3d 223, 232 (2d Cir. 2017) (quoting *United States* v. *Eppolito*, 543 F.3d 25, 49 (2d Cir. 2008) (internal quotations marks omitted)).

Here, Isaza Tuzman's claims that he withdrew from the conspiracy after the NASDAQ listing are without merit.  Isaza Tuzman's sporadic offers to help Maiden sell his KITD holdings fall well short of an affirmative withdrawal.  *See United States* v. *Borelli*, 336 F.2d 376, 388 (2d Cir. 1964) (affirmative withdrawal consists of "either the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators"); *United States* v. *Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988) ("Mere cessation of conspiratorial activity is not enough" to qualify as an affirmative withdrawal from a conspiracy).  *United States* v. *Berger*, 224 F.3d 107, 118 (2d Cir. 2000) ("Our case law strongly suggests that resignation from a criminal enterprise, standing alone, does not constitute withdrawal as a matter of law; more is required.")  The purpose of this bright line is clear.  As the Second Circuit has explained:

> [S]ince it is all too easy after the fact for a defendant to claim that he or she withdrew from a plot, the law generally requires the taking of some "affirmative action." Indeed, unless a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators.
>
> The point of such "affirmative evidence" requirements, though, is not to compel a conspirator to inform on his or her co-conspirators or to warn-off possible victims, admirable as those actions might be. It is rather to make sure that a withdrawal did occur and is not simply being invented *ex post.*

*United States* v. *Greenfield*, 44 F.3d 1141, 1150 (2d Cir. 1995) (internal citations omitted).

Nor do the text messages cited by Isaza Tuzman in which he tells Maiden he will not commit fraud evince withdrawal of the conspiracy prior to August 12, 2010 – every one of these self-serving text messages is from 2012, after Isaza Tuzman had been pushed out as CEO of KITD.

Without affirmative evidence of his withdrawal, Isaza Tuzman argues that the purposes of the conspiracy had been accomplished with the NASDAQ listing. That purpose remained following the listing on NASDAQ for several reasons. Both defendants and Maiden had an interest in keeping KITD looking strong. All three owned shares of KIT Media and any settlement to save Maiden Capital was premised on the value of KIT Media, whose most significant assets were KITD shares.

With KIT Media as the sole asset Maiden hoped to obtain from a settlement, Maiden and the defendants continued their efforts to manipulate KITD stock. Government Exhibit 3816, which is a summary chart of Maiden's trading in KITD on September 8, 2011, demonstrates that Maiden Capital sold 1,950 KITD shares and purchased 1,950 shares on the same day, an uneconomical sequence of trading. Maiden testified that in August and September 2011, he continued buying and selling KITD stock with the goal of "supporting or pumping the stock even with the limited assets I had at this point." (Tr. 921.) Maiden also testified that he continued discussing the KITD stock with both defendants. For example, on August 2, 2011, Maiden sent a text message to Isaza Tuzman in which Maiden stated "Stock very heavy today" and asked Isaza Tuzman if there were any specific investor concerns that might be causing the lack of interest. Isaza Tuzman argues this text message cannot constitute an overt act because it was "mere talk" among alleged co-conspirators. In support of this argument, Isaza Tuzman points to *United States* v. *Gigante*, 982 F. Supp. 140, 169 (E.D.N.Y. 1997). The central issue in *Gigante* – whether the onset of an incapacitating illness can constitute withdrawal – is not at issue here. The passing reference to "mere talk" in *Gigante* is in the context of analyzing what is required to form a conspiracy, not whether the purposes of a conspiracy have been accomplished or a co-conspirator has withdrawn. Similarly in *Valle*, a case in which the Court granted a Rule 29 motion, the Court was persuaded

by the fact that no acts had ever been committed in furtherance of the alleged crimes in question. Here, there is no question that there is post-August 12, 2010 conduct by a co-conspirator. Maiden continued to engage in non-economic trading in KITD Digital, throughout 2010 and 2011, in order to make KITD appear successful, a purpose he had continually shared with the defendants since December 2008.

Finally, Isaza Tuzman argues that the market manipulation conspiracy did not continue post-NASDAQ because Maiden's trading failed to have "a statistically significant effect on KIT Digital's Stock Price." This argument fails for at least two significant reasons. First, there is no requirement that a market manipulation conspiracy be successful. In other words, successful market manipulation is not an element of the charged crime, as the jury was instructed. (Tr. 7209.) Second, the defendant's own expert witness, Harvard Professor Alan Ferrell, testified about numerous dates that Maiden did, in fact, have a statistically significant impact on KITD's stock price, ***including eight dates*** after August 12, 2010.

In light of the evidence that the Government introduced showing that Maiden continued to manipulate the stock well into 2011, and the lack of evidence that either defendant affirmatively abandoned the conspiracy, the motion for acquittal fails.

## IX. THE COURT SHOULD DENY ISAZA TUZMAN'S RULE 29 MOTION WITH RESPECT TO THE WIRE FRAUD CONSPIRACY CHARGED IN COUNT FIVE

Isaza Tuzman asks the Court to enter a judgment of acquittal with respect to the wire fraud conspiracy charged in Count Five because "the Government's theory was predicated on alleged deception that did not concern essential elements of the bargained for investment." (Isaza Tuzman Br. at 25-33.) The Court rejected the same argument — which misrepresents what Count Five charged, what the Government's theory was, and what the evidence at trial established — at the charge conference, commenting: "I think you're setting up a straw man that is not their argument.

Their argument is based on the premise that KIT Digital was deprived of the necessary information to make a rational decision about what to do. That's their theory." (Tr. 6726; *id.* at 6701-29.) The Court should do so once again.

Isaza Tuzman again incorrectly seeks to narrow Count Five by claiming it only charges Isaza Tuzman with committing a wire fraud conspiracy "against KIT Digital's *shareholders* by *deceiving* KIT Digital's auditors regarding a 'related party' relationship with Maiden Capital." (Isaza Tuzman Br. at 25 (first emphasis in original; second emphasis added); *id.* at 27 ("the government's allegations showed deceit, not fraud"). Count Five charges much more. Specifically, Count Five charges Isaza Tuzman with *defrauding* KIT Digital's shareholders by, among other things, (a) "failing to disclose that KITD's 'investments' with Maiden Capital were not part of an arms-length relationship but were actually related party transactions for an improper purpose"; (b) "falsely represent[ing] to KITD that the $250,000 [that Isaza Tuzman caused KITD to invest in Maiden Capital] was for a legitimate investment with Maiden Capital when, as ISAZA TUZMAN and Maiden had agreed, it was instead to be paid to ISAZA TUZMAN for his personal use"; and (c) "[taking] steps to conceal form the KITD Board and Accounting Firm-2 that Maiden Capital did not have the funds invested by KITD." (S8 Indictment ¶¶ 78-80.) The jury charge similarly summarized the indictment. (*E.g.*, Tr. 7159-60, 7214-15.) The Government's theory of the case was text book wire fraud.

The evidence — which the jury plainly credited — overwhelming established that Isaza Tuzman was guilty of defrauding KIT Digital's shareholders. This evidence included (a) the December 2008 market manipulation agreement; (b) Isaza Tuzman's efforts to hide this illicit agreement from KIT Digital's auditors, Board, and shareholders, including by telling explicit lies to KIT Digital's auditors about his relationship with Maiden Capital; (c) Isaza Tuzman's efforts to

hide the Enable losses and Maiden's financial position from KIT Digital's auditors, Board, and shareholders; and (d) Isaza Tuzman's efforts to cause KIT Digital to invest $250,000 of company money into Maiden Capital so that Maiden Capital could redeem Isaza Tuzman's personal investment in the failing hedge fund. Isaza Tuzman has not met his burden of showing the mountain of evidence was insufficient. That the jury rejected his "straw man" argument is not a basis for entering a judgment of acquittal. *See United States* v. *Espaillet*, 380 F.3d at 718 (a "court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt").

Moreover, contrary to Isaza Tuzman's say-so, the Court's jury instructions did not "permit[] conviction based on deceit that did not concern an essential element of the bargain between KIT Digital investors and the Company." (Isaza Tuzman Br. at 28.) The Court's instruction was consistent with numerous Second Circuit cases, including *United States* v. *Binday*, 804 F.3d 558, 579 (2d Cir. 2015) (holding that "it is not necessary that a defendant intend that his misrepresentation actually inflict a financial loss — it suffices that a defendant intend that his misrepresentations induce a counterparty to enter a transaction without the relevant facts necessary to make an informed economic decision"). (Tr. 7174.) *See also United States* v. *Tagliaferri*, No. 15-536, 2015 WL 2342712, at *4 (2d Cir. May 4, 2016) (wire fraud does not require actual financial loss; it is sufficient if the victim was "deprived of potentially valuable economic information, such as where the deceit affected the victim's economic calculus or exposed the victim to unexpected economic risk") (internal quotations and citations omitted); *United States* v. *DiNome*, 86 F.3d 277, 284 (2d Cir. 1996) (definition of property includes the right to control the use of one's assets; where defendant intends to deprive victim of information material to victim's

decision on how to deal with his assets, required intent to defraud is present); *United States* v. *Levis*, 488 F. App'x 481, 485; 2012 WL 2914118 (2d Cir. 2012) ("A defendant engages in wire fraud when he intentionally deprives a victim of potentially valuable economic information that could impact on economic decisions made by the victim.").

In this case, as the jury concluded, the defendants deprived KITD shareholders of economically valuable information that would have been material to their decisions as to whether to invest in KITD.

## X.    CONTRARY TO ISAZA TUZMAN'S CLAIMS, THE GOVERNMENT DID NOT COMMIT "PERVASIVE MISCONDUCT"

Isaza Tuzman moves for a new trial under Rule 33 based on his claim that the Government committed "pervasive misconduct."  (Isaza Tuzman Br. at 33.)  Isaza Tuzman's assertions are filled with exaggeration, misrepresentation, or both.  A faithful review of the record demonstrates that the Government's conduct was proper.  Accordingly, Isaza Tuzman is not entitled to the extraordinary relief he seeks.

### A.    The Government's Summations Were Proper

#### 1.    The Government Did Not Intentionally Mischaracterize Professor Ferrell's Testimony

Isaza Tuzman's first complaint is that the Government incorrectly claimed that Professor Ferrell, the defendant's market manipulation expert witness, "testified that there were a number of days where Maiden did impact the price." (Tr. 6876.)  This single sentence, the defendant insists, amounts to prosecutorial misconduct.  It does not.  Professor Ferrell testified on direct examination that his analysis was focused on "investigating whether *Maiden Capital* trading during the December 31st, '08 to December 30, 2011 period was somehow propping it up, propping up the [KITD] stock price."  (*Id*. at 6142 (emphasis added).)   The jury was thus made well aware that

42

Professor Ferrell's analysis was designed to detect the impact, or lack thereof, of Maiden Capital's trading on the KITD stock.  It was in this context that Professor Ferrell conceded, on cross-examination, that his "methodology found that there was a statistically significant price increase in KIT stock on December 31, 2008."  (*Id.* at 6153; *see also id.* at 6157.)  December 31, 2008 is the day Isaza Tuzman, Amanat and Maiden signed the manipulation agreement, and Maiden comprised 64 percent of all KITD trading volume, totaling 1.3 million shares, on that day.  (Tr. 5074.)

It was therefore proper for the Government to argue in summation that Professor Ferrell "spent a day testifying about how he did not believe *Maiden* had a big impact on price each day." (*Id.* at 6876 (emphasis added).)  That was the clear import of Professor Ferrell's testimony, even if he did not state that conclusion in the form of opinion testimony.  Isaza Tuzman did not object to that statement at trial and does not object to it now – no doubt because it helped him.  But, by the same token, it was similarly fair argument for the Government to tell the jury that Professor Ferrell's testimony established that there were a number of days where Maiden's trading *did* impact the price.  Therefore, even though Professor Ferrell never affirmatively attributed the statistically significant market movement on December 31, 2008 to Maiden's trading, that was the obvious implication of his testimony.  Even if there were any misstatement, it certainly was not prejudicial and was "adequately addressed by the district court's instructions that only the jury's own recollection of the evidence controlled." *Bonventre*, 646 Fed. Appx. at 88.  And, in any event, even though defense counsel objected to the Government's statement at the conclusion of the main summation, defense counsel declined to address the statement in the defense summation.  That silence was telling, particularly because the Court specifically welcomed such a response.  (Tr. 6913 (THE COURT: "It does seem to me that . . . to the extent it was wrong, it would certainly be

easy to respond to that.").) Defense counsel's choice to not respond to the Government's statement simply reveals the extent to which this single sentence was a non-issue and likely lost on the jury in the mass of evidence proving Isaza Tuzman's guilt.

### 2. The Government Did Not Falsely Imply Isaza Tuzman Received Criminal Fraud Proceeds

Isaza Tuzman next asserts that the Government improperly invited the jury to disregard corporate form in order to imply that Isaza Tuzman received millions of dollars in fraud proceeds. (Isaza Tuzman Br. at 37.) To advance this weak claim, Isaza Tuzman stitches together disparate remarks, none of which was error. We consider each comment in turn.

The first comment Isaza Tuzman identifies was made during the Government's main summation. In addressing Counts One through Three – conduct for which Isaza Tuzman was not charged – the Government began explaining the ways in which "Omar was keeping Maiden in the dark about Enable" before ultimately telling Maiden the truth about Enable's problems. (Tr. 6888.) As an example, the Government discussed the $2 million short term loan that Amanat solicited from Maiden but used to repay KITD after Isaza Tuzman made a redemption request on the company's behalf. (*Id.* at 6868-69.) It was clear from the Government's comments, and citation to specific exhibits, that the $2 million was meant to repay KITD, not Isaza Tuzman personally. For instance, the Government pointed the jury to GX 3053, an email chain in which Isaza Tuzman, Irfan Amanat and Omar Amanat discussed Enable sending $2 million directly to KITD's HSBC account. Isaza Tuzman wrote: "Omar, do you need wiring info for KITD HSBC account in NY?" Later in the same exhibit, in a section that the Government highlighted for the jury in its summation, Irfan Amanat wrote: "I hope you are on top of the wire situation for KITD?" Omar Amanat responded: "On top of it. Will take 2 wires for maiden to send. From goldman to bofa, then to chase enable then to KIT but [I]'ve assured kaleil its coming so he shouldn't worry." (GX

3053.)  At no point did the Government argue that Government Exhibit 3053 established that Isaza Tuzman "personally benefitted from the Enable fraud Omar Amanat allegedly perpetrated on KIT Digital."  (Isaza Tuzman Br. at 37.)  Isaza Tuzman's argument to the contrary reveals the weakness of his claims.

The second comment Isaza Tuzman finds objectionable had nothing to do with Isaza Tuzman receiving money at all.  Instead, it concerned Isaza Tuzman's false statements to Michael Halkias, KITD's outside auditor, about his relationship with Maiden and Maiden Capital.  (GXs 745, 3202.)  The Government's theory was that Isaza Tuzman made a number of false statements to Halkias in Government Exhibit 745, including the statement that "[t]here has never been any other relationship with Steve [Maiden], no understandings or agreements, implicit or explicit, of any buying or selling behavior of any stock, KIT digital or otherwise. . . . No one at KIT digital or anyone associated with KIT digital has any suasion of any kind over Maiden Capital's investments." (GX 745.)  Isaza Tuzman echoed this false statement in Government Exhibit 3202, telling Halkias: "KIT digital has never had any understandings or agreements with Maiden or Maiden Capital, implicit or explicit, of any buying or selling behavior of any stock, KIT digital or otherwise. . . .  No one at KIT digital or anyone associated with KIT digital has any suasion of any kind over Maiden Capital's investments."  Both statements were false in light of Isaza Tuzman's December 31, 2008 agreement with Maiden to manipulate the KITD stock and his ongoing conspiratorial relationship with Maiden.

In response, defense counsel argued in summation that Government Exhibit 3202 was accurate because Isaza Tuzman signed the December 31, 2008 market manipulation agreement on behalf of KIT Capital, not KIT digital.  (Tr. 6963.)  That argument, of course, was wordplay, as it did nothing to wipe away the clearly misleading and materially omissive nature of Isaza Tuzman's

communications with Halkias.  Importantly, Halkias testified that he was seeking "a complete and comprehensive response from management as to what the nature of [the Maiden] account was." (*Id.* at 2067.)  Therefore, as the Government argued, signing the December 31, 2008 agreement as Kaleil Isaza Tuzman, owner of KIT Capital, did not mean that Isaza Tuzman provided a "complete and comprehensive response" when he represented to Halkias that he, Kaleil Isaza Tuzman, Chairman and CEO of KIT digital, had no agreements with Maiden.  The Government's rebuttal simply called out that common sense fact.

In any event, it should be clear that the back-and-forth in summations about which hat Isaza Tuzman wore when he signed the manipulation agreement had everything to do with his lies to Halkias and nothing to do with his receipt of fraud proceeds.  Isaza Tuzman has merely pulled this single, unrelated comment out of the rebuttal in order to allege a pattern of misconduct when none exists.

### 3. The Government Did Not Make Arguments From Facts Outside the Trial Record

Isaza Tuzman also insists that the Government falsely characterized Maiden's post-August 2010 trading as "wash trades" and falsely claimed that Isaza Tuzman had knowledge of Maiden's manipulative trading in other stocks beyond KITD.  Neither contention is correct.

First, Isaza Tuzman's complaint about the Government's reference to "wash trades" is no more than a quibble over nomenclature.  From context, it is obvious that the Government was referring to the evidence of Maiden's uneconomical trading in KITD stock well into 2011, which included instances in which Maiden bought and sold the same amount of KITD stock, on the same day, with the intent to manipulate the market.  (GX 3814 (Maiden buying and selling 600 KITD shares on March 18, 2011); GX 3816 (Maiden buying and selling 1,950 KITD shares on September 8, 2011).)  Isaza Tuzman claims that this trading amounted to "day-trading," but that is argument

– and one the jury certainly rejected when defense counsel made it in summation. (Tr. 6967 (defense counsel telling the jury that "[t]he reality is that Mr. Maiden's M.O. was day trading").)

Second, the Government never told the jury that Isaza Tuzman had actual knowledge of Maiden's manipulative trading in other stocks. Those words do not appear in the transcript. Instead, the Government was responding to the defense argument that since Maiden manipulated other stocks he likely manipulated KITD on his own. (Tr. 6967 ("If the man was doing the same thing by himself, without Kaleil, in many other stocks, don't you think that raises a question as to whether or not he did it with KIT Digital he was just acting pursuant to his M.O.?")). This defense argument was part and parcel of Isaza Tuzman's broader strategy to paint Maiden as a fabulist and scofflaw. (Tr. 6967-68 ("Say what you will, say what you will, but if your case depends on Mr. Maiden, you don't need to bring that case. . . . This man has a tangential, peripheral relationship with reality and an aversion to the truth like nobody.").) The Government's response was designed to remind the jury that it was Isaza Tuzman – not the Government – who chose to partner with a man like Maiden and to underscore that his choice was spot on, because, as a CEO proposing to pay an investor to purchase his company's stock (something no witness at trial had ever seen), Isaza Tuzman needed to be sure that he selected a person who would be willing to break the law instead of blowing the whistle. The Government made no comment about Isaza Tuzman's knowledge of Maiden's other trading or, more generally, about how Isaza Tuzman concluded that Maiden was the man for the job. But it was fair argument to tell the jury that, having picked Maiden for a market manipulation conspiracy, Isaza Tuzman could not plausibly argue that Maiden's willingness to commit market manipulation was badge of innocence. This argument drew no objection during the rebuttal summation or afterwards when Isaza Tuzman preserved various objections before the jury was charged. That is because there was nothing objectionable

about it.  *Farhane*, 634 F.3d at 167 ("Precisely because [rebuttal] arguments frequently require improvisation, [the Court] will not lightly infer that every remark is intended to carry its most dangerous meaning.").[7]

### 4.    The Government Did Not Improperly Bolster or Burden Shift

Isaza Tuzman next complains that the Government's statement about not calling additional witnesses – thereby prolonging a long trial – amounted to improper bolstering and burden shifting. This claim fails.

The Government's remark was a proper response to Isaza Tuzman's argument that the Government should have called "the other board members and executives at KIT Digital, the corporate development team, other people in account and finance, outside auditors, lawyers, M&A counterparties, other coconspirators of Robin Smyth."  (Tr. 6953.) As the Court may recall, as defense counsel made this argument, he displayed a PowerPoint slide depicting dozens of nameless, faceless people connected to KITD who the Government did not call.  Instead of stopping there, at the outer boundary of proper argument, defense counsel plowed ahead, telling the jury that this sea of missing witnesses would have provided exculpatory testimony and "drowned out" the Government's proof:

> Look at all these other people that they could have called. *You know what they all would have said?* They would have said the same thing as every other category of witnesses the government called: We

_____

[7]    Isaza Tuzman argues, in passing, that the Government's rebuttal summation improperly lowered the Government's burden of proof by omitting an essential element of the market manipulation conspiracy. (Isaza Tuzman Br. at 42-43.) That is incorrect.  The remark that Isaza Tuzman cites was not a recitation of the necessary elements of conspiracy to commit securities fraud.  Instead, the comment clearly identified the issue that was in sharp dispute – whether Isaza Tuzman agreed with Maiden to manipulate KITD stock and whether Maiden took steps to accomplish that shared goal.  (Tr. 7117.)  Separating for the jury issues that are in dispute from those that are not is standard fare for argument.  Isaza Tuzman's suggestion that it was an attempt to reduce the Government's burden of proof makes no sense.  In any event, to the extent there was any potential for confusion, and there was not, the jury was properly instructed on the elements of the market manipulation before finding Isaza Tuzman guilty.

> can't tell you what Kaleil did or didn't know. *And that would have eclipsed, drowned out, the already unreliable testimony of the felon witnesses.*

(Tr. 6953-54.)  This was textbook bolstering.  It was a "clear and deliberate reference" to favorable evidence that the defense claims it possessed but did not offer.  And, as Isaza Tuzman acknowledges, when done by the Government, it "is one of the worst sins a prosecutor can commit." *United States* v. *Potter*, 463 F.3d 9, 24 (1st Cir. 2006); (Isaza Tuzman Br. at 43.)  It also ran contrary to the Court's eventual instruction that the jury "should not draw any inference or reach any conclusions about what [witnesses who were not called at trial] would have testified to had they been called."  (Tr. 7149.)

The Government did not respond in kind by saying it knew what uncalled witnesses would have said; instead, it addressed defense counsel's remark as follows:

> The last thing I want to respond to you about, before I get into the counts, is this false notion that just because the government didn't call more witnesses, somehow there's a problem with our case.  We believe in a concept of mercy.  Do you want to be here in 2020?  No. We all want to go home, and frankly, if there are any witnesses that they thought would help them – obviously they have no burden to call anyone – but you saw what they did.  When they thought that Andy Steward would help them, they flew all the way to England to hear from Andy Steward.

(Tr. 7101-02.)  Unlike counsel for Isaza Tuzman, the Government did not say a word about what the missing witnesses would have said had they testified and did not respond to defense counsel's vouching that such testimony would have "drowned out" the Government's proof.  It is therefore quite remarkable that Isaza Tuzman cries error at the Government's mild retort that calling such a multitude of witnesses would have kept the trial going until the year 2020.  (*Id*. at 7101.)[8]

---

[8]    Isaza Tuzman also claims that the Government's reference to "mercy," coupled with the timing of the Government's rebuttal, falling three days before Christmas, evoked the jury's desire for comfort, convenience and desire for the trial to end in time for the holidays.  This argument is

Isaza Tuzman finally complains that the Government's response to his missing witness argument "*implied* that Isaza Tuzman bore burdens of proof and persuasion." (Isaza Tuzman Br. at 44 (emphasis added).) That curious claim fares no better, particularly because embedded in the Government's remarks was the *explicit* reminder that the defendant had "no burden to call anyone." (Tr. 7101.) And, to the extent the jury thought differently, this Court repeatedly and properly instructed the jury on the burden of proof and presumption of innocence. (*See, e.g.*, *id.* at 7102 (the Court reminding the jury that "the defendants have no obligation to offer any evidence at all, so keep that in mind as you listen to these arguments"); 7134-35 (final jury charge).) The Government's remark was instead directed at the undisputed principle that witnesses were equally available to both sides, and the absence of these supposedly exculpatory witnesses was not due to Isaza Tuzman's lack of access to them. The Government underscored the latter point by reminding the jury that defense counsel flew to England to depose Andy Steward, thereby demonstrating their substantial reach and ability to call witnesses from KITD, no matter where they resided.

### 5. The Government Did Not Invite the Jury to Convict Based on His Position Within KIT Digital or Otherwise Use Inflammatory Rhetoric

Next, Isaza Tuzman asserts that the Government invited the jury to ignore the evidence and convict him because of his leadership position within KITD. Isaza Tuzman seizes on one comment – the proverb that "the fish rots from the head down" – and claims it illustrates his point. It does not. The Government expressly told the jury that the proverb was "about accountability and corruption. When an organization gets taken over with rot and fraud, look to the top. Look at the

---

a stretch, at best. The Government made no reference to Christmas. Indeed, the only reference to Christmas – and the jury's desire to head home to celebrate – came again from the defense table. (Tr. 6995 ("It's almost Christmas. And all of you will be forgiven if after you leave here today when you sit down at your respective homes and start writing out your Christmas list and you think about what you want from that jolly little elf up North, if you put on your list that you want this trial to finally be over, we'll all forgive you. I never speak for Judge Gardephe, but I promise no one in this courtroom will be upset with you.") (Amanat summation)).

head. *See what's happening there*." (Tr. 7096 (emphasis added).) Asking the jury to examine the CEO to "see what's happening there" was clearly a request for the jury to examine the evidence of Isaza Tuzman's actions. And, of course, Isaza Tuzman omits the Government's additional statements about the proverb, which made this plain. The Government told the jury that the trial was truly "about what [Isaza Tuzman and Amanat] did. That's what we're going to focus on. Our duty, this table's duty is to look at the facts and take them where they lead. And where did they lead? To a corrupt CEO and his smooth-talking investor friend – that's it – to the head of the rotten fish. That's why we're here." (Tr. 7098.)

Isaza Tuzman also complains that the Government referred to him as a "hunter" who tasked Smyth as his "bird dog" with executing fraudulent transactions in furtherance of the accounting fraud conspiracy. In Isaza Tuzman's view, the words "hunter" and "bird dog" were inflammatory and prejudicial because they appeared, for the first time, in the rebuttal summation. That is incorrect. The Government's references to Isaza Tuzman as a "hunter" and Smyth as a "bird dog" were rooted in the trial record. For instance, as the Court no doubt recalls, the evidence showed that Isaza Tuzman, Smyth and Campion frequently discussed their "elephant hunting" efforts, criminal code for their urgent attempts to cover up the accounting fraud with illegal M&A deals. In these communications, Isaza Tuzman described himself as a hunter who sought to "slay elephants." (GX 863 (Isaza Tuzman: "we could slay a BIG elephant w/ this one"; Smyth: "Good work. Sounds like you are killing elephants with you[r] bare hands."); GX 855 (Isaza Tuzman: "A small elephant is slain as part of the deal, circa $1.5-2M."); GX 2862 (Isaza Tuzman: "I am trying to slay elephants."); GX 2864 (Isaza Tuzman: "This is the next hit to the elephant leg."); Tr. 2461 (Q. "Would you please tell the jury what you meant by that, 'killing elephants with your bare hands?'" A. "That [Isaza Tuzman] was out there trying to generate the money that we could kill

off part of the elephant, being the fake transactions.").)  And, of course, the Government's reference to Smyth as the "bird dog" came verbatim from an email, GX 2568, in which Isaza Tuzman asked Smyth to "bird-dog" an illegal $1 million round trip payment, drawn from the $7.85 million Sezmi cash reserve, that was backed by a fake invoice from their co-conspirator, Tomas Petru.[9]  (*See also* Tr. 2543 (Q. "What is a bird dog?" A. "A bird dog is a dog that goes hunting and maybe if a bird is shot, he chases down the bird.").)

In light of the above, Isaza Tuzman's argument that the words "hunter" and "bird dog" were inflammatory lacks all persuasive force.  The Government merely used the words that were in the record, drawn from the criminal vernacular the defendant employed, which were devastating on their own.

### B.    Because There Was No Error, Much Less Prejudicial Error, Isaza Tuzman Is Not Entitled to a New Trial

As noted above, the Government's arguments in summation were proper and firmly rooted in the trial record.  For that reason, Isaza Tuzman's request for a new trial based on prosecutorial misconduct fails at the threshold.

Of course, even if the Government made an inappropriate remark over the course of its lengthy summations in this complex trial, and it did not, that alone would not entitle Isaza Tuzman to a new trial.  Isaza Tuzman must still establish "prejudicial error," which is determined based on "the severity of the misconduct," "the measures adopted to cure the misconduct" and "the certainty of conviction absent the misconduct."  *Caracappa*, 614 F.3d at 41.  The conduct about which Isaza

---

[9]    Isaza Tuzman tries to assert that Government Exhibit 2568 is a communication about a legitimate transaction.  (Isaza Tuzman Br. at 46 n.21.)  That ignores Smyth's testimony that the $1 million for supposed integration services was fraudulent.  (Tr. 2541 (Smyth, referring to the $1 million payment to Tomas Petru's company, AVIT: Q. "What was fake about it?"  A. "There was no post Sezmi acquisition integration and support services delivered by AVIT."  Q. "Did Tomas Petru have anything to do with post Sezmi acquisition integration and support services?"  A. "No.").)

Tuzman complains – viewed in isolation or taken together – falls well short of the kind of prejudicial error that warrants a new trial.

The Government's statements were mild in comparison to the kind of misconduct seen in other cases where the circuit has declined to find prejudicial error. Take *United States* v. *Modica*, 663 F.2d 1173 (2d Cir. 1981), the case on which Isaza Tuzman relies most heavily. There, the prosecutor was accused of bolstering, telling the jury that he personally believed a witness was being truthful. He later attempted to explain away weaknesses in the same witness's testimony by implying that the witness was scared of the defendant. The prosecutor finished his summation with an explicit appeal to the jury's emotions, warning them to not let the defendant "walk out of this room laughing at you." *See id.* at 1178-80. By any lights, the Government's remarks in this trial pale in comparison.

Not surprisingly, Isaza Tuzman failed to object to many of the statements that he now complains were improper. In fact, Isaza Tuzman's only contemporaneous objection was to the Government's remark about missing witnesses, after which the Court reminded the jury that the defendant had no burden of proof. (Tr. 7102.) By contrast, the trial court in *Modica* overruled defense counsel's contemporaneous objections to the clearly improper remarks and otherwise "made no effort to cure the effects of the improper remarks." *Modica*, 663 F.2d at 1181-82.

Finally, even if any of the Government's remarks were improper, there is no doubt that the jury would have convicted Isaza Tuzman without them. As in *Modica*, which found no prejudicial error, "the case against [Isaza Tuzman] was overwhelming; he was caught red-handed, and his explanation was implausible and refuted." 663 F.2d at 1182. The documentary proof against Isaza Tuzman included an explicit market manipulation agreement and an "assurance note" to Robin Smyth about an $8 million shortfall in KITD's SEC filings. That was coupled with

compelling testimony from three cooperating witnesses whose testimony was corroborated by their contemporaneous communications and writings – such as Maiden's text messages and Smyth's notebooks – demonstrating Isaza Tuzman's role in the crimes. The proof is rarely better in a complex securities fraud case. Against this proof, Isaza Tuzman's main defense was to cast the cooperating witnesses as liars. After a seven-week trial, the jury needed only a few hours to reject that defense and convict Isaza Tuzman and Amanat on all counts – a reflection of the strength of the Government's case.

## C.    The Cooperating Witnesses Did Not Commit Perjury

Isaza Tuzman insists that the Government solicited false testimony from its cooperating witnesses, Maiden, Smyth and Campion. In support of this threadbare claim, Isaza Tuzman cites a handful of marginal examples, none of which are false.

"Reversal of a conviction based upon allegations of perjured testimony should be granted only with great caution and in the most extraordinary circumstances." *United States* v. *Zichettello*, 208 F.3d 72, 102 (2d Cir. 2000) (internal quotation marks omitted). Reversal is not justified unless the defendant "establishes four matters: (i) the witness actually committed perjury, (ii) the alleged perjury was material, (iii) the government knew or should have known of the alleged perjury at time of trial, and (iv) the perjured testimony remained undisclosed during trial." *Id.* (internal quotation marks and citations omitted); *accord United States* v. *Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009).

Significantly and unsurprisingly, "[s]imple inaccuracies or inconsistencies" arising from "confusion, mistake, or faulty memory … do not rise to the level of perjury." *United States* v. *Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001); *see United States* v. *Dunnigan*, 507 U.S. 87, 94 (1993) ("A witness testifying under oath or affirmation violates this statute if she gives false

testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."); *United States* v. *Sessa*, 2011 WL 256330, at *44 (E.D.N.Y. 2011).  Rather, a witness perjures himself by adducing "false testimony concerning a material matter with the willful intent to provide false testimony." *Monteleone*, 257 F.3d at 219.  The movant bears the burden to prove perjury by a preponderance of the evidence. *Sessa*, 2011 WL 256330, at *44.

If a defendant can also demonstrate that the Government knew or should have known of the perjury, the Court must determine if the perjury was material—that is, "if there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States* v. *Cromitie,* 727 F.3d 194, 221-22 (2013) (quoting *United States* v. *Agurs*, 427 U.S. 97, 103 (1976)).  However, where the Government was unaware of the perjury, the conviction must be set aside "only if the testimony was material and the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *United States* v. *Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (internal quotation marks and alteration omitted).

Moreover, in those circumstances, "a defendant seeking relief on the ground of the government's use of perjured testimony must demonstrate that he was unaware, and with due diligence would have remained unaware, of the falsity of the testimony." *Conteh* v. *United States*, 226 F. Supp. 2d 514, 520 (S.D.N.Y. 2002); *cf. United States* v. *Helmsley*, 985 F.2d 1202, 1205-08 (2d Cir.1993) (collateral attack based on the Government's use of perjured testimony, the falsity of which was known by the defendant or knowable by the defendant had he used due diligence will be entertained "only where the prosecutor was directly involved in the falsity"). That is, a

defendant must demonstrate that he was unaware of the supposed perjury during the trial, and thus unable to argue it to the jury. *See Josephberg*, 562 F.3d at 494.

Isaza Tuzman cites the following as "egregious" examples of false testimony: (1) Maiden's testimony on direct examination that he purchased additional KITD stock after receiving $700,000 from KITD; (2) Maiden's testimony that he bought and sold 28,571 shares of KITD on the same day with the intention of manipulating the stock; (3) Maiden's testimony that Isaza Tuzman called him from the "floor" of the NASDAQ; (4) various statements made by Smyth and Campion over the course of their testimony. None of these examples are false; all are based on Isaza Tuzman's distortions of the record or arguments the jury rejected.

On the $700,000 investment from KITD, Isaza Tuzman again distorts the record, as he did at trial. Maiden testified on direct examination that he received $700,000 from KITD on February 3, 2010 and that, thereafter, he executed additional trades in KITD. (Tr. 807 ("Q. When did you receive that [$700,000]? A. February 3, 2010. Q. After receiving that money, did you execute additional trades in KIT digital? A. Yes.").) On cross examination, and again in his instant motion, Isaza Tuzman misleadingly accused Maiden of testifying that he used *all* of that money to purchase KITD stock, even though he never testified to that effect. (Tr. 1905 (accusing Maiden of testifying that he used $700,000 to purchase KITD stock); Isaza Tuzman Br. at 53 ("Maiden did not use the $700,000 investment to purchase KIT Digital stock as he testified").) The Government objected to defense counsel's distortion of the record, and the Court sustained the objection. (Tr. 1906 (Defense counsel: "I think this is proper impeachment…." The Court: "I disagree. The objection is sustained.").) Isaza Tuzman's only response is to switch gears and claim that Maiden also lied when he testified on redirect that he used $200,000 of the $700,000 to purchase KITD stock on February 3 and 4, 2010. (Tr. 1909.) This was truthful testimony, and it was responsive to the

question posed to him.  (*Id.*)  The trading records show that Maiden bought $219,607 in KITD stock on February 3 and 4, 2010.  True, he also sold $378,352 in KITD stock on the same days. (GXs 411-A & 411-B.)  But that type of buying and selling activity, with no ostensible economic purpose, was consistent with Maiden's manipulative trading in which he would often buy and sell KITD shares with the intent of inflating volume.  (Tr. 737-38.)  And, to the extent defense counsel thought it was "well outside the scope of fair advocacy" for Maiden to testify about his February 3 and 4, 2010 KITD purchases without testifying about his KITD sales on the same days (Isaza Tuzman Br. at 54), he could have asked Maiden additional questions on recross about that trading. He declined to do so.

On Maiden's trading on March 9, 2009, which included purchases and sales of 28,571 shares of KITD stock, Isaza Tuzman asserts that Maiden lied when he said the "main purpose" of his trading "was to inflate the stock by showing volume, buying and selling both sides of the same trade." (Tr. 737-78.)  In Isaza Tuzman's telling, "the true reason for these trades was that Maiden's brokerage firm had issued a margin call for the Maiden Capital account and that Maiden sold the shares to cover the margin call, but then purchased the shares in his Saxon account because he continued to believe in KIT Digital and desired to keep his net position in KIT Digital."  (Isaza Tuzman Br. at 55.)  There is no support in the record for Isaza Tuzman's assertion.  Maiden never testified that his "true reason" for trading in that uneconomic fashion was because of his continued belief in KITD and his desire to maintain his net position.  And the transcript pages Isaza Tuzman cites in support of that claim contain no testimony on the point.  On redirect, Maiden clarified that he engaged in manipulative trading on March 9, 2009 *after* he met his margin call.  (Tr. 1949.) Nothing about this testimony is false.  Once again, defense counsel had the opportunity to question

57

Maiden about this testimony on recross, to the extent he believed Maiden's explanation was not truthful. As before, defense counsel was silent on the matter.

On the September 3, 2009 call from Isaza Tuzman to Maiden in which Isaza Tuzman asked Maiden to help "push" the KITD stock price when KITD was ringing the closing bell at NASDAQ (Tr. 790), Isaza Tuzman claims to be "surprise[ed]" that the Government did not introduce any phone records to confirm Maiden's testimony, something he calls "a core investigative technique" (Isaza Tuzman Br. at 55.) This argument is frivolous. Isaza Tuzman is well aware that Maiden testified that he received the call from Isaza Tuzman on his home land line (Tr. 1891), and Isaza Tuzman *stipulated* that no one, including the Government, had access to those phone records (Tr. 5928 (reading stipulation).) The Government, however, presented trading records that confirmed Maiden's account that he traded KITD on September 3, 2009 in a manipulative fashion. (GX 411-B (Tr.ading records).) Like Isaza Tuzman's other claims of perjury, this one also falls flat.

Finally, Isaza Tuzman points to a number of statements made by Smyth and Campion, all of which are explained by failure of recollection, differences in opinion between witnesses or Isaza Tuzman's continued disagreement with testimony that did not help him. (Isaza Tuzman Br. at 56.) None of this rises to the level of perjury. *See, e.g.*, *Monteleone*, 257 F.3d at 219 ("Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury."); *United States* v. *Sanchez*, 969 F.2d 1409, 1415 (2d Cir. 1992) ("Differences in recollection alone do not add up to perjury."). "Under the circumstances of this case, the differences in testimony presented a credibility question for the jury, at most." *Sanchez*, 969 F.2d at 1415. Isaza Tuzman's arguments to the contrary, which merely rehash the same credibility arguments he presented to the jury, are as unpersuasive now as they were then.

At bottom, this is not the rare case where there is "a real concern that an innocent person may have been convicted." *United States* v. *Ling Guang*, 511 F.3d 110, 119 (2d Cir. 2007). Even if any of the Government's cooperating witnesses testified incorrectly, and none did, the testimony Isaza Tuzman identifies as false was clearly immaterial and the Government was unaware of any falsity. *See, e.g.*, *Wallach*, 935 F.2d at 457 ("Whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury."). Accordingly, the jury's verdict can only be set aside if the Court "is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Id*. at 456 (internal quotation marks and alteration omitted). Isaza Tuzman's guilt was plain to all, especially the jury, which did not struggle to conclude beyond a reasonable doubt that he committed the crimes with which he was charged.

## XI.   THE INTRODUCTION OF EVIDENCE OF AMANAT'S FABRICATION OF EVIDENCE DOES NOT WARRANT A NEW TRIAL FOR ISAZA TUZMAN

Isaza Tuzman contends that the "spillover prejudice" from the admission of evidence of Amanat's fabrication of evidence required the Court to exclude the evidence or sever the trials. (Isaza Tuzman Br. at 59-64.) This claim fails.

Before permitting the Government to offer evidence of Amanat's fabrication of evidence, the Court carefully considered the question, including by holding two mid-trial hearings and considering extensive briefing. Ultimately, the Court permitted such evidence, after finding that it was relevant to the question of Amanat's "consciousness of guilt" and that "it satisfie[d] Rule 403." (Tr. 6439 ("As I've said a number of times in the case, I believe that evidence that emails introduced in this case are fabricated is highly relevant on the issue of consciousness of guilt. It goes to the integrity of these proceedings also, and I find that it is more probative than prejudicial under Rule 403.")).

Before the start of the rebuttal case, the Court discussed a limiting instruction with the parties, with which the parties agreed. (Tr. 6434-39.) The Court then gave the following carefully crafted instruction to the jury, on consent:

> Ladies and gentlemen, I'm going to give you an instruction about some additional evidence that the government's going to be introducing at this point. The government intends to offer evidence that defendant Omar Amanat introduced into evidence earlier in this trial emails that had been fabricated. Mr. Amanat denies that any of the emails he introduced were fabricated.
>
> First, let me instruct you that the government's evidence concerning allegedly fabricated emails has no application whatsoever to Mr. Isaza Tuzman. It is being offered solely as against Mr. Amanat. The government does not claim that Mr. Isaza Tuzman was involved in any way in the alleged fabrication of the email. You may not consider this evidence for any purpose as to Mr. Isaza Tuzman.
>
> Secondly, the evidence concerning allegedly fabricated is being offered for a limited purpose. That limited purpose is on the issue of whether it demonstrates Mr. Amanat's consciousness of guilt. If you find that Mr. Amanat introduced fabricated emails into evidence, you may, but need not, infer that he believed that he was guilty of the charged crimes. You may not, however, infer on the basis of this evidence alone that Mr. Amanat is, in fact, guilty of the crimes with which he's been charged.
>
> To repeat, the evidence you are about to hear concerning allegedly fabricated emails may only be considered by you as to Mr. Amanat, and only on the issue of whether it demonstrates Mr. Amanat's consciousness of guilt. You may not infer on the basis of this evidence alone that Mr. Amanat is guilty of the charged crimes.
>
> As with all factual questions, it is the jury's responsibility to determine whether this evidence does or does not show consciousness of guilt on the part of Mr. Amanat. Whether evidence that Mr. Amanat introduced fabricated emails into evidence shows that he believed that he was guilty of the charged crimes and the significance, if any, to be given to such evidence are matters for you, the jury, to decide.

(Tr. 6445-46.)

The Second Circuit has repeatedly held that juries are generally presumed to "follow the instructions they are given." *United States* v. *Agrawal*, 726 F.3d 235, 258 (2d Cir. 2013). That

the Court expressed some reservation about the instruction that the Government had proposed earlier in the trial (Tr. 5978) does not mean that the instruction that the Court ultimately gave was insufficient to cure any purported "spillover prejudice."  The Court made crystal clear that the evidence had nothing to do with Isaza Tuzman:  "First, let me instruct you that the government's evidence concerning allegedly fabricated emails has no application whatsoever to Mr. Isaza Tuzman.  It is being offered solely as against Mr. Amanat.  The government does not claim that Mr. Isaza Tuzman was involved in any way in the alleged fabrication of the email.  You may not consider this evidence for any purpose as to Mr. Isaza Tuzman."  (Tr. 6445.)  And, despite Isaza Tuzman's claim that "the topic consumed a large portion of the government's rebuttal summation," the reality is that it covered a couple of transcript pages.  (Tr. 7122-24.)  The evidence at trial of Isaza Tuzman's guilt, which was the focus of the Government's summations was overwhelming — as made clear by the fact that the jury returned its verdict in about four hours.

In arguing that the Court should have severed the trials, Isaza Tuzman's counsel completely ignores that he specifically asked the Court not to grant a mistrial and sever the cases:  "At this point in the trial if I sought a severance we would get a mistrial.  I don't want that.  We have tried this case, we want to take this case to the jury.  We don't want a mistrial."  (Tr. 5978.)

Having strategically decided not to renew his request for a severance, Isaza Tuzman's claim is reviewed for plain error — a standard that Isaza Tuzman cannot meet.[10]  *See*, *e.g*, *United States* v. *Quinones*, 511 F.3d 289, 321 (2d Cir. 2007) ("The law is well established that if, 'as a tactical matter,' a party raises no objection to a purported error, such inaction constitutes a true

---

[10]    "Under a plain error standard of review, if the Court finds that "(i) [there] was error; (ii) that the error was plain; and (iii) that the error affected substantial rights, then th[e] Court (iv) has discretion to correct the error, 'but it is not required to do so.'"  *United States* v. *Botti*, 711 F.3d 299, 310 (2d Cir. 2013) (quoting *United States* v. *Olano*, 507 U.S. 725, 735 (1993)); *see also United States* v. *Marcus*, 560 U.S. 258, 262–63 (2010).

waiver which will negate even plain error review." (internal quotation omitted)); *United States* v. *Sweig*, 441 F.3d 114, 119 (2d Cir. 1971) (finding no plain error where defendant failed to renew severance motion); *United States* v. *Riley*, 90 F. Supp. 3d at 185 (denying Rule 33 and finding no plain error where defendant failed to object to jury instruction).

Because Isaza Tuzman has failed to show that the Court's jury instruction was insufficient to sure any claimed prejudice and that severance was required, and because he has otherwise failed to show plain error, Isaza Tuzman is not entitled to a new trial.

## XII.    ISAZA TUZMAN'S CLAIMS OF "OTHER ERRORS" ARE MERITLESS

Isaza Tuzman also argues that he entitled to a new trial because the Court made "[m]ultiple other errors at trial [that] undermined [his] constitutional rights to a fair trial, to due process of law, to confront the witnesses against him, and to present a defense." (Isaza Tuzman Br. at 64.) Each is meritless.

First, Isaza Tuzman claims that the Court erred in excluding the testimony of Dr. Albert Lyter. (*Id.*) The Court properly excluded Dr. Lyter's testimony in a thorough opinion, after a lengthy *Daubert* hearing. (Dkt. 614.) Isaza Tuzman raises no basis for the Court to revisit this ruling.

Second, Isaza Tuzman oddly claims that the Court erred in precluding "Isaza Tuzman's right to confront Gavin Campion regarding his false accusations that [] Isaza Tuzman had orchestrated (while imprisoned in Colombia) a theft from Campion's car in Australia." (Isaza Tuzman Br. at 64.) Before Campion testified, Isaza Tuzman's counsel asked the Government to confirm that it "does not intend to elicit any testimony from Gavin Campion that remotely suggests or implies that Kaleil was involved in the alleged 2016 break-in of Mr. Campion's car in Melbourne or any other alleged act of intimidation or violence against Mr. Campion." (Ex. A hereto (Dec. 4, 2017 email from Avi Weitzman to the Gov't).) The Government agreed not to

elicit this testimony.  (*See id.*)  And it did not elicit this testimony.  It thus makes no sense for Isaza Tuzman to now complain that he was unable to "confront Campion with this line of cross-examination" that he asked not come before the jury.

Third, Isaza Tuzman repeats his argument that the Court erred in denying his motion to "dismiss the S8 Indictment" because it "violated the Rule of Specialty."  (Isaza Tuzman Br. at 64-65.)  The Court properly denied this motion, again in a thorough opinion.  (Dkt. 508.)  Isaza Tuzman raises no basis for the Court to revisit this ruling.

Finally, Isaza Tuzman complains that the Court erred in denying Isaza Tuzman's requests for various Rule 17(c) subpoenas.   The Court properly denied these requests, again in thorough opinions.  (Dkt. 534, 535, 539.)  Isaza Tuzman raises no basis for the Court to revisit these rulings.

## CONCLUSION

For the above reasons, the Court should deny the defendants' Rule 29 motions because the evidence amply supported their convictions, and their Rule 33 motions because they have failed to meet their burden that "the interest of justice so requires."  Fed. R. Crim. P. 29 & 33.


Dated:  New York, New York
        March 14, 2018

                                        Respectfully submitted,

                                        GEOFFREY S. BERMAN
                                        United States Attorney


                        By:     _____/s/_____
                                        Damian Williams
                                        Andrea M. Griswold
                                        Joshua A. Naftalis
                                        Assistant United States Attorneys
                                        (212) 637-2298 / 1205 / 2310