

RANDALL W. JACKSON
Tel.: (212) 303-3650
E-mail: rjackson@bsfllp.com

March 21, 2018

**BY EMAIL AND ECF**
Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. Kaleil Isaza Tuzman, et al.*, 15 Cr. 536(PGG)

Dear Judge Gardephe:

    This letter is respectfully submitted in brief reply to the Government's March 14, 2018 Opposition to the Defendants' Post Trial Motions (hereinafter "Opp."). The Court did not specify any time for a reply in its Order setting the briefing schedule, but we respectfully request that the Court permit this brief reply in consideration of the pending motions. There are several problems with the Government's Opposition that we feel obligated to bring to the Court's attention.

**I.**    **The Government's Opposition Fails to Address the Insufficiency of the Evidence**

    First, while the Court is required to draw all reasonable inferences in favor of the Government, the Government's Opposition stretches that principle beyond its limits by repeatedly citing portions of the transcript for testimony that was not offered at trial. For example, the Government writes that "in October 2008, Omar Amanat told Maiden that the Maiden Capital investment in Enable was performing well," citing Transcript Page 592. (Opp. 7). The transcript, however, includes no such testimony. Rather, the Government asked Maiden a more general question about conversations regarding how Enable was doing:

> Q. And in the course of those conversations did you discuss how Enable was performing?
> A. Yes.
> Q. What did Mr. Amanat tell you?



      A. He told me it was doing well.

(Tr. 592). On the following page of the Government's brief, the Government asserts without any citation whatsoever that "In January and February 2009, Amanat continued to deceive Maiden, knowing that Maiden was reporting his fund performance to investors based, in part, on information about Enable provided by Amanat." (Opp. 8). The reason the Government has not cited any portion of the transcript for this proposition is that it simply does not appear in the testimony. Nowhere in the testimony was there evidence that Omar Amanat understood how Maiden was translating information about Enable into his "reporting [of] his fund performance to investors." Later, the Government cites an email where Omar Amanat stated to his brother that they did not have $500,000 to send to Maiden as supposed evidence of scienter, writing "[t]his email demonstrates that as of February 2009, Omar Amanat knew that Maiden Capital investors were being misled about their investment returns because Maiden is being misled about the status and health of the funds he has provided to Enable." (Opp. 8). This is simply not true. A reasonable factfinder could not infer from the mere fact that Omar Amanat communicated that Enable did not have cash to send to Maiden that Omar Amanat *knew* Maiden Capital investors were being misled about their returns.

      Indeed, this gets to the second major problem with the Government's Opposition, which is that almost all of the activity that the Government cites in its Opposition as proof of Mr. Amanat's supposed knowledge of the fraud scheme charged in Counts One through Three predates the fraud scheme charged in Counts One through Three. Omar Amanat was charged with a scheme that began in March that involved Maiden's deception of his investors – it is impossible for the Government to argue that the jury could have relied on communications that predate Maiden himself knowing the status of the Enable investment as proof of Omar Amanat's knowledge of the charged scheme.

      Where the Government cites conversations during the time period of the supposed conspiracy, again, it has misstated the testimony and the facts. For example, the Government's brief asserts that in March 2009 "Maiden then called Amanat and told him, in substance, that Maiden had just lied to



his investor and that Maiden was desperate for money in light of the loss of '3 million that Maiden thought he had in Enable.'" (Opp. 9, citing Tr. 677). This is not what the testimony was at trial. As an initial matter, this is an improper citation to the record, since the defense made an objection to Maiden's testimony, which appeared to veer beyond the scope of the question into Maiden's personal justifications, and the Government elected to move on to another question before the Court ruled. (Tr. 677). Even assuming this answer is part of the record, the only part of Maiden's answer that was actually responsive to the question "**Q.** What, if anything else, did you say on that call?" was "**A.** I just told him I needed money." The Government asserts that "[a]t no point did Amanat ever suggest that Maiden should tell his investors that $2 million of Maiden Capital funds had been sent to KITD," (Opp. 11), but ignores the fact that on the very transcript page it cited Maiden admitted that Omar Amanat has explicitly told Maiden that he should tell investors about the money that had been lost and mark down the fund to appropriately reflect any losses. (Tr. 884). The specific question about the $2 million supposedly sent to KITD is a red herring, because the record, here and elsewhere, reflects that Omar Amanat was advocating for Maiden to disclose all of his losses to his investors and appropriately mark down the fund. (Tr. 884 *et seq.*).

      In response to the substantial evidence that there was no fraud in the Enable statements because, by Maiden's own admission, the Enable balance had been converted to a promissory note and the Enable statements simply reflected the debt, the Government states only that "[t]hese strained arguments rest on the notion that Enable was a going concern that would be able to repay a multi-million [sic] debt obligation." (Opp. 12). This is a principle that the Government extracts from thin air and for which it offers no support whatsoever. There is no applicable law or theory of fiduciary responsibility that says Enable had to be a successful business for Maiden to agree to convert its obligation into a debt interest. Any entity can execute a promissory note. Indeed, the entire law of bankruptcy surrounds the idea that even a business that has failed as a matter of law can restructure its obligations and enter into new agreements to fulfill them.



Third, the Government's Opposition brief conflates the question of Mr. Amanat's supposed knowledge of Maiden's fraud with participation in the fraud conspiracy. In the limited amount of evidence from the actual time period of the charged conspiracy that the Government cites on Counts One through Three, all of it goes to the idea that Omar Amanat was somehow aware that Maiden was defrauding his investors, but the Government cites no evidence that Omar Amanat knowingly *participated* in a scheme to defraud the Maiden Capital investors. (Opp. 6-11). Even assuming Mr. Amanat was aware of Maiden's fraudulent activities, there is simply no evidence of Omar Amanat's participation in the supposed fraud scheme if a reasonable factfinder could not conclude, beyond a reasonable doubt, that that the Enable Statements were "fictional" as alleged in the Indictment, as opposed to mere statements of the debt liability. Again, Maiden admitted the Enable balance had been converted into a simple debt interest, (Tr. 1176), so it is impossible that a reasonable factfinder could conclude these statements were "fictional" as alleged in the Indictment. Moreover there is no proof that Omar Amanat had any idea how Maiden was calculating the value of his fund or translating that into his communications with the investors. The Government has ignored the fact that the undisputed evidence indicated that: **(1)** no information about Enable ever went to any investor (Tr. 880) ("THE COURT: So no Maiden Capital investor received a account statement showing that Maiden Capital had an Enable balance of 2.5 million? THE WITNESS: That's right**. I didn't communicate to them that I had made any investment in Enable**.") (emphasis added); and **(2)** Maiden *admitted* that he led Omar Amanat to believe he was *undervaluing* the fund in his communications to investors. (Tr. 1185 ("Q. And you understood that Mr. Amanat actually believed that KIT Media, the KIT Media investment had a lot of value, right? …. Q. Right. It was your understanding in your interactions with him that he actually believed that, right? A. Yes, that is true."); 1187 ("1187 ("It's a fact, isn't it, sir, that you when you valued the KIT investment repeatedly left out the 2.5 percent sales fee that you thought A. That's true.")). On these facts, even drawing all



inferences in favor of the Government, the Government simply cannot demonstrate that the evidence was sufficient.

Similarly, the Government's Count Four evidence fails because it requires unreasonable inferences to be drawn from the evidence. The Government argues that the jury could infer that Mr. Amanat "fully understood that the agreement was designed to artificially counteract the negative market pressure being placed on KITD stock by RAM Capital" from Omar Amanat's supposed statement that Amanat told him that "there was an aggressive seller that could really hurt the [KIT digital] stock called RAM Capital." (Opp. 14). But simply soliciting investments to counteract aggressive selling is *not* stock manipulation – companies and their fundraisers are permitted to raise capital, and there is no prohibition on attempting raise capital in light of "aggressive sellers" of a company's stock. Nor is it evidence of manipulation that Mr. Amanat noted in hindsight that Maiden's investments had helped keep the stock price up. The fact of the matter is that the Government was not able to introduce a single message between Omar Amanat and Maiden in which they discussed any of Maiden's activities supposedly manipulating the stock.  No reasonable factfinder could infer participation in the charged Count Four conspiracy on this evidence. Ultimately, the Government's Opposition on Count Four is circular – the Government starts with the premise that the December 2008 agreement was a "market manipulation agreement," even though nothing in the agreement refers directly or indirectly to market manipulation, and then concludes with the argument that "[g]iven that Amanat conceived of the market manipulation agreement," the jury could infer Mr. Amanat's participation in the market manipulation. The Court should reject this circular reasoning and find the evidence on Count Four to be insufficient.

**II.     The Government's Opposition Fails to Address the Failure to Prove Interstate Wires To New York**

Without restating the arguments in our opening brief, we note first that the Government is incorrect in stating that the proof indicated that Mr. Amanat resided in New York. In fact, the only



substantive evidence of Mr. Amanat's home address introduced at trial demonstrated that Mr. Amanat lived in New Jersey. (GX 630; Tr. 6525 ("Can we please pull up Government Exhibit 630. This is a set of bank records in evidence in this case. And please highlight the authorized signer information on this account. Q. Do you see that, Special Agent Amato? A. I do. Q. What is the name on the authorized signer information to this account? A. Omar Amanat. Q. What is the home address? A. 68 Windsor Drive, Pine Brook, New Jersey 07058."). So any argument the Government seeks to make about the Mr. Amanat's supposed residence in Manhattan and any inferences that could be drawn from that idea must be rejected.

Regardless, the Government's Opposition still fails to identify any specific communications sent in furtherance of the conspiracy that the Government demonstrated crossed state lines and passed through or terminated in New York. The emails the Government cites on page 16 of their brief are not connected to any location information whatsoever. We have no idea where either the sender or the recipient was at the time of these communications, and in a wire fraud case the Government cannot escape their burden by suggesting that the jury could have simply made a guess. The Government argues that the jury could have considered various bank wires from Enable's First Republic bank account and Maiden's Bank of America account. But there was no information about the nature or purpose of these transactions, and therefore no information that *any* reasonable factfinder could have used to determine they were sent in furtherance of the scheme. It is not the case that every interstate communication sent during the course of a fraud scheme can be considered an interstate communication sent *in furtherance* of the fraud scheme. *See, e.g. United States v. Lake*, 472 F.3d 1247, 1260 (10th Cir. 2007) ("In short, the government failed to present evidence from which the jury could infer beyond a reasonable doubt that any of the reports wired to the SEC was false, fraudulent, or even misleading. Under *Parr*, 363 U.S. 370, as we understand it, the wire-fraud charges were not proved. And even if we were to adopt a less-restrictive view of *Parr*, we fail to see how one could infer from the evidence at trial that a purpose of submitting the reports was in any



fashion to further the alleged fraudulent scheme."); *see also United States v. Narum*, 577 Fed. Appx. 689, 691 (9th Cir. 2014) ("We reject the government's contention that a wire fraud conviction may be based on any wire transfer taking place during the time period encompassed by the scheme to defraud. **Wire fraud requires a use of the wires in furtherance of a scheme to defraud, not merely a use of the wires during a scheme to defraud**.") (emphasis added); *United States v. Siembida*, 604 F. Supp. 2d 589, 598 (S.D.N.Y. 2008) (vacating wire fraud conviction where Government failed to establish that wire sent "via a server located in Virginia"[1] was in fact an email sent in furtherance of the scheme"). Moreover, that a bank is based in one location does not prove that any transaction with a bank account of a bank based in another state will require an interstate wire. The Government simply failed to even attempt to meet its burden here. This is why the Government attempted to reopen its case after the defense made its initial Rule 29 application. The Court should not allow the Government to sidestep its burden with regard to the critical wire elements of the wire fraud charges.

### III.  The Government's Opposition Misstates the Record With Regard to Agent DeCapua's Testimony

The Government argues that the defense failed to object to Special Agent DeCapua offering expert testimony at trial. This is false. The entirety of Section D of the defendant's December 11, 2017 letter to the Court (hereinafter "Dec. 11 Let.") was an objection to Agent DeCapua offering expert testimony on this issue at trial. *See* Dec. 11 Let. at 10-14. The defense noted that any testimony by Agent DeCapua on this issue would be violative of Rule 702, would involve improper speculation, would be misleading, and would be particularly improper given the status of Agent DeCapua as a law enforcement agent. Later, in a December 15, 2017 letter to the Court, the defense stated that "[t]here is a deep concern that the methodology that the Government would seek to put

---

[1] It is noteworthy that Judge Castel's opinion makes reference to actual evidence of the location of servers connected to emails, which is the type of actual evidence of location that is necessary to sustain wire fraud charges.



before the jury through testimony of Agent DeCapua is not based in reasoned analysis and cannot comport with Rule 702 or even Rule 401." Later, in argument before the Court, the defense stated that "[t]hey still have to meet the basic requirements of demonstrating that the testimony that they elicit from their witnesses corresponds with basic scientific reality or reason. And as we laid out in our letter, they have not met that burden with respect to Agent DeCapua or Agent Amato. There's just no proof." (Tr. 5374). It is difficult to imagine a more full throated objection to his testimony. Indeed, at one point in the discussion about a critical component of Agent DeCapua's testimony, the Court stated to the Government: "THE COURT: Agent DeCapua is not competent, in Mr. Jackson's view, to testify about what he did to get the fabricated e-mail back into Yahoo. What do you say?" (Tr. 5834). Later, the defense noted that "[w]hat we quibble with, Judge, is the in-court demonstration by an FBI special agent who is going to be -- you know, the cases are legion talking about the extraordinary, I guess for lack of a better word, that although that comes with an agent and the dangers of improper expert agent testimony." (Tr. 5984). The Court observed that "[y]ou clearly take the view that Agent DeCapua is offering expert testimony." *See id.* Later, when Agent DeCapua actually testified, there was no need to offer an additional objection because the parties had agreed that there would be no need to restate objections before the jury where objections had been articulated outside of the presence of the jury. (Tr. 851). There was no waiver on this issue.[2]

      On this issue, we otherwise stand on our opening papers, except to note that the Government has not substantively addressed at all the question of whether Agent DeCapua offered false expert testimony. This should be deeply troubling to the Court. The question of whether the defense was permitted an opportunity to cross the witness is separate from the core question regarding false testimony.

---

[2] Indeed, the idea that the defense was not pressing the issue of Agent DeCapua's qualifications at every turn is undermined even by the defense summation. (Tr. 7040 ("Again, we have no issues with Special Agent DeCapua or his work as a special agent. He's a good special agent. What he's not is an expert in computing. That was made painfully obvious when you heard him testifying on the stand.")).



**IV.     The Government Has Failed to Address the Serious Problems With its Rebuttal Summation**

First, the Government's continued insistence that the record supported the conclusion that Omar Amanat "literally owned Maiden Capital" is deeply problematic and false. The Government's Opposition suggests that this statement was justified by the fact that Cornucopia had entered into an "onerous" loan agreement with Maiden Capital that supposedly allowed Helena Houdova to sign as the "owner of Maiden Capital." (Opp. 28-29). This argument completely misconstrues the evidence. This agreement was not even reached until June 2011, more than two years after the start of the supposed conspiracy. (Tr. 885). Regardless, the Government ignores the fact that Maiden *admitted* that the arrangement by which Helena Houdova was the nominal head of Maiden Capital: (1) was put in place only because Omar Amanat wanted to limit Maiden's signatory authority because he was afraid Maiden would steal the money instead of paying redemptions with it; and (2) that this arrangement only lasted for a few days. (Tr. 876). At bottom, the Government cannot justify arguing that because Omar Amanat loaned Maiden Capital and made his wife a signatory on the bank account for a few days that he "literally owned Maiden Capital," particularly not in the context of an argument that this supposed ownership somehow positioned Omar Amanat to make corrective disclosures to Maiden's investors about all of Maiden's unspecified lies. (Tr. 7120). This was an incredibly misleading argument that went to the heart of the charges, and Mr. Amanat was prejudiced by it.

The Government's argument in its Opposition that "[w]hen summations began, the Government did not know whether defense counsel planned to argue to the jury that the Government failed to offer proof of interstate wires" makes no sense in light of the record. (Opp. 32). The defense not only pressed this argument in detail in its Rule 29 motion filed at the close the Government's case, but it also repeatedly begged the Government in open court for disclosure of what exactly was the wire proof in the case. The Court even noted that the Government had repeatedly declined to

9



offer any specificity on the wires at issue in the context of the Government's belated request to reopen its case to put in wire evidence:

> THE COURT:  That's kind of a problem, too, you make a representation, I think you said there are hundreds of text messages and emails that you believe satisfy, but you haven't been able to cite -- you haven't been able to give me exhibit numbers that I can go to and immediately say okay, this was in furtherance of the charged conspiracy.  I don't understand why that's been difficult.  If in fact there are hundreds of exhibits that, according to you, satisfy this requirement, why has it been so hard to tell me -- give me some subset of the hundreds of exhibits so that we can just put that matter to bed?  Why has that been so difficult?

(Tr. 6501-02). The Government, of course, still declined to offer any specificity. The idea that the Government did not know this was a live issue that the defense intended to press on summation is simply in conflict with the record. More to the point, the idea that in a *wire fraud* prosecution the Government was entitled to hide the supposed wires at issue until the rebuttal is an absurdity in conflict with all reasonable notions of due process, fairness and logic.

The Court of Appeals has very recently reversed a conviction for Government abuses in a rebuttal summation that were similar but not as significant as the problems in this case. *See United States v. Ballard*, No. 17-427-cr, 2018 WL ----- at 6-7 (2d Cir. Mar. 16, 2018).[3] In *Ballard*, the Court of Appeals reversed because of comments made by the prosecution that: (1) "undermine[d] [the] defendant's constitutional right to present a defense," (2) "appear[ed] to reduce the government's burden to prove guilt beyond a reasonable doubt at trial"; and (3) made arguments that "came close to urging the jury to find the officers credible because of their official positions, an argument not permitted by the law."[4] *Id.* (quoting *United States v. Newton*, 369 F.3d 659, 682 n.12. (2d Cir. 2004)).

---

[3] The decision is a recent summary order issued by Judges Cabranes, Raggi, and Villardo. Pursuant to Fed. R. App. Proc. 32.1 and Second Circuit Rule 32.1.1, citation to such an Order is permitted and appropriate.

[4] The defense objected at trial to this argument and raised it as problematic in the portion of our opening brief that addressed the totality of the problems with Agent DeCapua's testimony and the manner in which it was used by the Government. Tr. 7128 ("There was a portion during [the]           rebuttal summation where he cited Agent DeCapua's status as agent of the year, etc. . . . . We think that was improper bolstering");



Here, as set out in our opening brief, the Government engaged in all three of these errors, and in a more significant fashion than in *Ballard*. The Court should order a new trial.

We appreciate the Court's consideration.

                                                       Respectfully submitted,

                                                       _/s/ Randall W. Jackson_____
                                                       Randall W. Jackson

**cc: All parties**

---

Opening Brief at 40 (arguing that the Government improperly held Agent DeCapua up as a "superagent in the rebuttal summation").