UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    :

   -v.-                                                  :          S8 15 Cr. 536 (PGG)

OMAR AMANAT,                                       :

              Defendant.                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


## THE GOVERNMENT'S SENTENCING MEMORANDUM


GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Damian Williams
Andrea M. Griswold
Joshua A. Naftalis
Assistant United States Attorneys
      -Of Counsel-

## **Table of Contents**

I.     PRELIMINARY STATEMENT ............................................................................................... 1

II.    THE OFFENSE CONDUCT IN THIS CASE.......................................................................... 2

   A.   Background ............................................................................................................... 3

   B.   The Market Manipulation Scheme............................................................................ 4

   C.   The Maiden Capital Scheme ..................................................................................... 7

   D.   Amanat's Obstruction of Justice............................................................................. 10

   E.   The Verdict .............................................................................................................. 12

III.   THE GUIDELINES CALCULATION................................................................................... 12

   A.   Applicable Loss Amount – U.S.S.G. § 2B1.1 ........................................................ 14

      1.   Counts One to Three – Maiden Capital Investors ...................................... 14

      2.   Count Four – Market Manipulation Conspiracy......................................... 16

   B.   Enhancement For Sophisticated Means/Scheme Committed From Outside the United
States – U.S.S.G. § 2B1.1(b)(10)(B) or (C)........................................................... 21

   C.   Enhancement For Being Associated With An Investment Advisor – U.S.S.G. §
2B1.1(b)(19)(A)(iii) ............................................................................................... 22

   D.   Enhancement for Obstruction of Justice – U.S.S.G. § 3C1.1 ............................... 23

IV.   THE COURT SHOULD SENTENCE AMANAT TO A GUIDELINES SENTENCE....... 24

   A.   Nature and Circumstances of the Offenses, Seriousness of the Offenses, Need to Promote
Respect for the Law, and Need for Just Punishment ......................................... 24

   B.   History and Characteristics of the Defendant ................................................... 27

   C.   Deterrence ......................................................................................................... 29

   D.   Unwarranted Sentencing Disparity .................................................................. 30

V.    CONCLUSION........................................................................**Error! Bookmark not defined.**

# Table of Authorities

## Federal Cases

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005)........................................................ 21

*In re MarketXT Holdings Corp.*, 2009 WL 7216076 (S.D.N.Y. Bankr. 2009) ........................... 28

*In re: Aman Resorts Group Limited*, 17-12811 (SCC) (S.D.N.Y. Bankr.).................................. 28

*In re: MarketXT Holdings Corp.,* 376 B.R. 390 (S.D.N.Y. Bankr. 2007).................................... 28

*In re: MarketXT Holdings Corp.,* 426 B.R. 467 (S.D.N.Y. Bankr. 2010).................................... 28

*In re: Park Hotels and Resorts Group, Ltd.*, 17-12813 (SCC) (S.D.N.Y. Bankr.)....................... 28

*United States v. Bernick*, 651 F. App'x 102 (3d Cir. 2016)........................................................ 15

*United States v. Case*, 180 F.3d 464 (2d Cir. 1999) ................................................................. 24

*United States v. Cusack*, 66 F. Supp. 2d 493 (S.D.N.Y. 1999)................................................. 24

*United States v. Cusack,* aff'd, 229 F.3d 344 (2d Cir. 2000)..................................................... 24

*United States v. Fredette*, 15 F.3d 272 (2d Cir. 1994).............................................................. 24

*United States v. Geevers*, 226 F.3d 186 (3d Cir. 2000) ........................................................... 18

*United States v. Heffernan*, 43 F.3d 1144 (7th Cir. 1994)........................................................ 30

*United States v. John Galanis et al.*, 16 Cr. 371 (RA) (S.D.N.Y. May 31, 2018)....................... 30

*United States v. Krause*, 786 F. Supp. 1151 (E.D.N.Y. 1992).................................................. 20

*United States v. Lacey*, 699 F.3d 710 (2d Cir. 2012)................................................................ 15

*United States v. Longo,* 184 F. App'x 910 (11th Cir. 2006)....................................................... 22

*United States v. Maurer*, 76 F. Supp. 2d 353 (S.D.N.Y. 1999) ................................................ 24

*United States v. Maurer,* aff'd, 226 F.3d 150 (2d Cir. 2000) .................................................... 24

*United States v. Robichaux*, 995 F.2d 565 (5th Cir. 1993) ....................................................... 15

*United States v. Rubashkin*, 655 F.3d 849 (8th Cir. 2011) ....................................................... 15

*United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007)............................................................ 21

*United States v. Simpson*, 538 F.3d 459 (6th Cir. 2008)........................................................... 16

*United States v. Tatum*, 138 F.3d 1344 (11th Cir. 1998)........................................................... 20

*United States v. Whiting*, 471 F.3d 792 (7th Cir. 2006)............................................................ 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    :

   -v.-                                                    :          S8 15 Cr. 536 (PGG)

OMAR AMANAT,                                          :

              Defendant.                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

### THE GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America respectfully submits this memorandum in advance of defendant Omar Amanat's sentencing, which is scheduled for August 7, 2018 at 12:30 p.m.  Given the pattern of protean fraud proven at trial and Amanat's extraordinary efforts to obstruct justice, a Guidelines sentence is warranted in this case.

## I.       PRELIMINARY STATEMENT

Omar Amanat was convicted at trial for defrauding investors at Maiden Capital and KIT digital ("KITD").  The jury rendered a swift verdict despite Amanat's best efforts to corrupt the truth-seeking process by introducing fabricated emails—"evidence" that was designed to fool the jury into believing that he is an innocent man.  Taken together, Amanat's actions reveal just how little he respects the law and how much he deserves a significant sentence for his criminal conduct.

For years, Amanat adopted the pose of a successful businessman.  Well-educated and well-connected, the defendant presented himself to his future co-conspirators Kaleil Isaza Tuzman ("Isaza Tuzman") and Stephen Maiden ("Maiden") as someone who could raise capital with ease and put it to use at KITD, Maiden Capital or Enable, the Dubai-based cash management fund to which Amanat was connected.

1

The reality, as revealed over thirty-two trial days, was starkly different. Amanat was broke and had a penchant for spending other people's money. It led him to steal millions from Maiden Capital to fill the financial hole he had dug for himself at Enable. He was a fabulist who told lies with ease to keep the truth (and accountability) from catching up with him. And, of course, he was keenly aware that what he was doing was wrong, admitting to co-conspirators that jail time would inevitably follow from their criminal behavior if they were caught. (GX 1785-D.)

There is no excuse for Amanat's decision to steal millions of dollars from Maiden Capital and to team up with Maiden to deceive investors. There is no excuse for his decision to band together with Isaza Tuzman and Maiden to manipulate KITD's stock. And there is no excuse for his decision to obstruct justice when he was finally caught for his crimes. These are the actions of a scofflaw, who thought nothing of imperiling the truth seeking function of a criminal trial by fabricating evidence if it meant he would be just one step closer to evading justice.

The United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") recommend a sentence of 168 to 210 months. While the Probation Office recommends a sentence of 144 months' imprisonment, the Government respectfully submits that a Guidelines sentence would be reasonable and just, in light of Amanat's deception, manipulation, and obstructive conduct at trial. Accordingly, the Government respectfully requests that the Court impose a Guidelines sentence.

## II.      THE OFFENSE CONDUCT IN THIS CASE

The Court is well aware of the trial record in this case, which overwhelmingly established that the defendant participated in two schemes, one targeting Maiden Capital investors and the other targeting KITD shareholders. Amanat was charged in Counts One through Four of the Indictment. Counts One, Two and Three of the Indictment charged Amanat with conspiring to commit wire fraud on investors in Maiden Capital, wire fraud, and aiding and abetting Maiden's investment advisor fraud. Count Four of the Indictment charged Amanat and Isaza Tuzman with

conspiracy to commit securities fraud in connection with a scheme to manipulate the market shares of KITD.

### A.  Background

Amanat first met Maiden in June 2008.  (Tr. 562.)  Amanat told Maiden that he was a Wharton-educated businessman who had founded a trading company, which he subsequently sold in his early twenties for one hundred million dollars. (Tr. 565.)  Amanat, in his own telling, then invested in the Twilight films and socialized with celebrities.  (Tr. 565-66.)  In those early conversations, Amanat asked Maiden to invest $1 million of Maiden Capital funds into KIT Media, a special purpose investment vehicle controlled by Isaza Tuzman.  (Tr. 570.)  Around the same time, Amanat also solicited Maiden to invest additional Maiden Capital funds in Enable, which Amanat represented was an "essentially 'riskless'" asset management fund based in Dubai that was run by his brother, Irfan Amanat. (Tr. 576-77.)  Maiden agreed, and he ultimately wired $3.5 million of Maiden Capital funds to Enable.  Isaza Tuzman caused KITD to invest more than $6 million in Enable.

Amanat's promise that Enable was "riskless" was a lie, designed to induce investments that would satisfy Amanat's urgent need for capital.  In the weeks prior to Maiden's Enable investment, Amanat and Irfan Amanat discussed Amanat's misappropriation of Enable assets.  Irfan Amanat scolded Amanat for stealing hundreds of thousands of dollars of Enable funds without authorization or explanation.  For instance, on May 30, 2008, Irfan Amanat warned "you are digging a hole we can't get out of" and admonished that "we are—again—sinking into too much debt."  (GX 2906.)   On July 21, 2008, Irfan Amanat wrote:  "Om, We need to talk about your wires out.  It is getting out of control again, and I am very disappointed."  (GX 2932.)  And, on July 22, 2008, Irfan Amanat wrote: "you have wired out over 1.1 mil of our money, and I have no idea to where.  At this rate you are making all of us broke, again."  He went on to say: "I can't bail

us out again, this is the last cash we have.  I really have no idea what you are thinking."  (GX 2935.)

Having falsely induced Maiden and Isaza Tuzman to invest millions of dollars in Enable in August 2008, Amanat, working with Irfan Amanat, proceeded to lose (or steal) nearly all of it by September 2008.  (GX 693-D (showing trading losses and outgoing wires to Amanat's wife).)  Instead of immediately disclosing these losses to Maiden, Amanat stole more money from him in November 2008.  Specifically, Amanat falsely induced Maiden to direct $2 million of Maiden Capital funds to Enable by claiming the money was a "short term" loan that Amanat would return within one week and that would result in Amanat raising $5 million for Maiden Capital.  (GX 1509.)  None of this was true.  Instead, Amanat used the $2 million to redeem a portion of KITD's Enable investment—thereby robbing Peter (Maiden Capital) to pay Paul (KITD).  That was his plan all along.  (*See* GX 3053 (Amanat discussing his intention to send Maiden Capital's money to KITD).)  Amanat's $2 million theft was devastating to Maiden Capital's health, as the stolen money comprised nearly twenty-five percent of Maiden Capital's assets under management.  (Tr. 626.)

Still unaware that Amanat had stolen Maiden Capital's money, Maiden requested the $2 million back in mid-December 2008.  On December 19, 2008, Amanat wrote to Irfan Amanat in a panic:

> Maiden has tried to reach me and is asking for his $2mln back.  In a post madoff world everyone is suspicious.  This is a major problem and red flag for me.  As u know.  I don't have any ability to repay it. . . . This is a major disaster—of madoff proportions—if maiden suspects fraud of some sort and notifies the authorities I'm cooked.  All in all this is some pickle of a situation this time.

(GX 2965-A (redacted version admitted at trial).)

**B.  The Market Manipulation Scheme**

4

Instead of being honest with Maiden about his theft, Amanat approached him with an idea that, in Amanat's view, would cover it up.  Amanat suggested that he, Maiden and Isaza Tuzman enter into an agreement to manipulate the market for KITD stock.  (Tr. 640; GX 1517-A.)  The agreement required Maiden to purchase $400,000 of KITD stock in the open market and to hold that position for at least 90 days.  The agreement was enticing to Amanat because, by compensating Maiden for open market purchases of KITD stock, he hoped to stall Maiden's requests that Amanat return Maiden Capital's money.  And, as an investor in KIT Media (which in turn held substantial KITD stock), Amanat stood to profit from Maiden's manipulative trading.

KITD's trading volume and closing price skyrocketed the day Amanat signed the market manipulation agreement, and stayed elevated over the remainder of the agreement's three-month term.



The manipulative conduct, however, continued well past that time.  Between 2009 and 2012, Maiden continued to prop up KITD's stock price and trading volume.  At trial, the Government established that Maiden communicated frequently with Isaza Tuzman about the day-to-day aspects of the manipulative trading.  (*See, e.g.*, GX 1540 (Maiden: "[KITD] still hasn't traded outside of me today—any progress there?  Robyn and I working out getting 200k in—should come today I think—tx." Isaza Tuzman: "How much vol today?  The steady trading action and market movement helps a lot.  Did Robin get wire done?"); GX 1549 (Maiden: "9.25 last." Isaza Tuzman: "This is helping hugely."); Tr. 685 (Maiden, referring to GX 1549: "I think this was midday.  I just emailed him because it was a new high.  I had pushed it up quite high."); GX 1603 (Isaza Tuzman: "We can't close at 7.35"; Maiden: "I can't do any more unfort[unately];" Isaza Tuzman: "Fuck"; Maiden: "Yup—shame—its half my fund—and I have no cash;"  Isaza Tuzman: "You've done your best."); GX 1614 (Isaza Tuzman: "We desperately need the stock to stay strong during this process.").).  Amanat was well aware of the ongoing manipulation.  He happily took credit for the successful scheme, telling Isaza Tuzman that he "wouldn't have had Maiden's $2.5 million in open market purchases which singlehandedly kept the stock up if I didnt spen[d] the time."  (GX 3036.)  And he was well aware that what he, Maiden and Isaza Tuzman had done was wrong.  In July 2011, shortly after telling Maiden to "[b]e aggressive" about highlighting the "[c]riminal behavior" that they engaged in and the "jail time" that would result, Amanat reminded Maiden to "bring up aggressively" that Maiden had "supported the stock, owned 400k shares."  (GX 1785-D.)

### C. The Maiden Capital Scheme

Contrary to Amanat's hopes, the market manipulation scheme did not end Maiden's demands that Amanat return Maiden Capital's money.  By early 2009, Maiden's requests had become increasingly insistent.  For instance, on February 11, 2009, Maiden pleaded with Amanat and Irfan Amanat to return $500,000 (out of the millions Maiden Capital was owed).  Maiden wrote: "Not sure the holdup.  But pls send it over today.  Pls ok this.  I can't operate my business – i have almost no free trading cash in my account and have to meet redemptions."  Amanat responded by writing to Irfan Amanat: "Yes send him back $500k asap.  Oh I forgot, we don't have it!!!!!!!!!!"  (GX 2975.)

On March 8, 2009, unable to repay the millions owed to Maiden Capital and KITD, Amanat and Irfan Amanat participated in a conference call with Maiden and Isaza Tuzman on which they revealed that Enable could not meet redemptions.  Maiden recounted the call:  "[Omar Amanat] told me that the money wasn't there and they couldn't access the money. I couldn't redeem any money of my Enable investment which by then was over $3 million. I asked him at one point: I can't get anything? 25,000? A hundred? No. Came the answer." (Tr. 661.)

Rather than disclose the Enable losses to Maiden Capital investors, Maiden joined forces with Amanat and Irfan Amanat to cover it up.  The morning after Maiden learned of the Enable losses, he spoke with one of his investors and lied about Maiden Capital's performance.  (Tr. 676.) When the call ended, Maiden immediately spoke with Amanat and "told him that I had just lied to my investor, and we needed to figure this out." (Tr. 677.)  Amanat promised Maiden that he would "work on an arrangement to settle this and cover it up basically." (Tr. 664.)  This was the genesis of what Amanat and Maiden began referring to as "the Enable hole."  (Tr. 664.)

To hide the Enable hole from Maiden Capital investors, between 2009 and 2012, Maiden provided his investors fictitious account statements, which failed to disclose losses incurred as a

result of the Enable hole.  In what became a monthly routine, Maiden would contact Amanat, Irfan Amanat, or both, to request a "fictional Enable balance," which Maiden would then forward to Maiden Capital's fund administrator to process individual asset account balances for investors. (Tr. 796-97; GX 1624.)   The balance that Amanat and Irfan Amanat provided falsely reported that Maiden Capital held more than $2 million with Enable and that the money was earning LIBOR plus 300 basis points every month.  (Tr. 797.)

To further prop up Maiden Capital, and keep the Enable hole hidden from its investors, Amanat wired hundreds of thousands of dollars to Maiden.  Specifically, in spring of 2011, Maiden Capital received a number of substantial redemption requests that Maiden could not meet.  (Tr. 893.)  Failure to meet the requests naturally meant that investors would discover the Enable hole as well as the fraud that Amanat and Maiden were perpetrating to cover it up.  Amanat and Maiden discussed these "criminal consequences," (Tr. 873), and Amanat agreed to wire money to Maiden to meet the redemption requests.  The men executed a loan agreement in which Maiden agreed to relinquish control of Maiden Capital and its assets to Amanat (through a vehicle he controlled). (Tr. 878; GX 1692 (loan agreement); GX 1693 (stock pledge and assignment agreement); GX 1694 (pledge agreement).)  In Maiden's stead, Amanat installed his wife "as the owner of Maiden Capital" and the "signatory and controller of Maiden Capital LLC who had control of the bank accounts."  (Tr. 876.)

Amanat wired funds to Maiden, bit by bit, so that Maiden Capital could meet redemptions one at a time.  (*See, e.g.*, GX 1785-AY (January 22, 2012 text messages between Maiden and Amanat: (Maiden: "Can u send 150 tomorrow.  Critical bro."  Amanat: "Why?"  Maiden: "To pay 2 guys. . ."  Amanat: "Pay who."  Maiden: "Partial redemp 2 Investors that been waiting 9 months and won't wait any more for something."  Amanat: "What is in writing that they won't redeem anymore."  Maiden: "Nothing in writing. . . . We are partners.  Honor your word pls."); GX 1785-

F (August 10, 2011 text message from Maiden to Amanat: "So we are at execution state.  U need to call nazeer, read doc etc. Alpine antsy . . . Can u talk?  Need to deal w alpine."); GX 1785-Q (August 10, 2011 text message from Maiden to Amanat: "Peavy needs 150k.  Thank u.  U need me to send wiring instructions again?"); GX 1785-AT (December 27, 2011 text message from Maiden to Amanat: "Well I need that 100k now you have been supposed to send (for alpine) plus another 100k ASAP (for Solaris capital . . . ) to delay those guys.").)  Amanat even spoke with a Maiden Capital investor directly to delay a redemption request.  (Tr. 917 (Maiden testifying that he asked Amanat to speak with an investor "[t]o keep [the investor] calm so he wouldn't go to the authorities . . . you know, he had asked for a redemption, so I was trying to buy time.").  And while Maiden and Amanat at times discussed the possibility of disclosing the Enable hole to investors, both men ultimately agreed that the consequences of doing the right thing would be too devastating.  As Maiden described it:

> The authorities would be involved.  Dominoes would start to fall. My investors would freak out.  One of them would call the SEC or the FBI.  It would – they'd look at all the misdeeds, misbehavior.  It would flow back to Enable, to [Amanat], to Kaleil, to KIT. Everything would fall down.  And then [Amanat] backed off every time.

(Tr. 1927.)  Or, as Amanat put it: "Criminal behavior jail time.  Bottom line: fund needs to be made whole or ship will sink."  (GX 1785-D.)

By July 2012, Maiden, despite Amanat's assistance, was unable to forestall investor redemptions.  As a result, Maiden Capital quickly collapsed.  In total, Maiden Capital investors lost approximately $8 million.

### D.  Amanat's Obstruction of Justice

Despite being indicted for the fraudulent conduct set forth above, Amanat decided to perpetrate *another* fraud – this time upon the Court and the jury by seeking to introduce fabricated evidence at trial.

During Maiden's cross examination, the defendant produced to the Government for the first time and then introduced Amanat Exhibits 9002, 9010, 9013 and 908, all of which appeared to be emails the defendant sent to Maiden from a Yahoo! account ("Yahoo! Account-1"), between 2008 and 2012.[1]  (Unredacted emails attached as Ex. A hereto).  Aware of the Government's belief that Yahoo! Account-1 was empty, the defendant claimed to have contemporaneously forwarded the emails to his father at a different Yahoo! account ("Yahoo! Account-2"), which remained accessible.  Having no immediate reason to doubt defense counsel's proffer that the emails were authentic based on their presence in Yahoo! Account-2, the Government did not object to their authenticity.  The Government raised a series of evidentiary objections resulting in the documents being admitted in redacted format.

Once the Government alerted the Court that the emails were likely fake, the Court remarked: "[T]he issue about the legitimacy of these emails goes to the integrity of the proceedings.  And it's not tangential evidence, it's critical evidence.  It was obvious to everyone here once the emails were produced that I don't know if 'game changer' is too strong a word, but they were highly significant evidence, evidence the government had not seen before."  (Tr. 6256.)

At an evidentiary hearing held by this Court on December 5, 6 and 8, 2017, the Government

---

[1]     Amanat also attempted to offer Amanat Exhibit 907, a purported December 19, 2008 email between Amanat and his father in which Amanat claimed that he was just exaggerating when he told Irfan Amanat that there would be "[c]riminal behavior jail time" if the Enable theft from Maiden Capital is exposed.  The Government successfully argued that the email contained impermissible hearsay.

introduced documentary evidence and called four witnesses, including (a) Joel DeCapua, an FBI

cyber agent; (b) Julie Amato, an FBI case agent who reviewed Maiden's computers; (c) Maiden;

and (d) Julie Liang, a Senior Legal Assistant from Yahoo!.  A brief summary of their testimony

follows:

- *First*, at the first mid-trial hearing on the fabrication issue, Special Agent DeCapua, an experienced cyber agent with the FBI, demonstrated for the Court the technique the defendant and his brother discussed in Government Exhibit 2908 regarding deleting emails from his Yahoo! account.  The technique, which uses simple software found on any PC or Mac, allows an individual to pull emails from a Yahoo! webmail account onto an individual computer and then delete them from Yahoo!'s servers. (Tr. 3690-3962.)  Special Agent DeCapua then demonstrated the ease with which one can put emails back into a Yahoo! account and, if desired, alter the emails prior to doing so, again using standard tools available on most computers. (Tr. 3964-70.)  Special Agent DeCapua then logged into a Yahoo! account created for his testimony and displayed fabricated emails identical to the May 8, 2009 5:21 PM email and Amanat Exhibits 9002, 9010, 9013 and 908.  Special Agent DeCapua also testified about certain suspicious features of the 5:21 PM email,  the absence of the 5:21 PM email from the account purportedly used by Isaza Tuzman to send the email, and certain particularly suspicious features of the Message ID, a piece of information contained in the header or metadata for the 5:21 PM Email. (Tr. 3946 and 3952-53.)

- *Second*, in the second mid-trial hearing on the fabrication issue, and also at trial in the Government's rebuttal case, Special Agent DeCapua offered opinions – based on his knowledge of email headers and an examination of available header information for three of the emails – that those three emails were not authentic. For two of the emails, Special Agent DeCapua identified a hidden "epoch" timestamp in the header. (Tr. 6312.)  He then examined a series of emails between Maiden and Amanat known to be legitimate and determined that the hidden timestamp in the legitimate emails matched the actual date the email was actually sent. (GX 3579-A.)  In contrast, the hidden timestamp for two of the emails in question did not match the date the email was sent. (Tr. 6314.)  Based on this analysis, Special Agent DeCapua offered an expert opinion about the two emails where the timestamps failed to match.  (Tr. 6314-18) ("Q. Based on your review of the Message-IDs for this particular email and your review of all of the sample size from Mr. Maiden's computer and Mr. Irfan Amanat's Gmail account, are you able to offer an opinion as to whether or not this email is authentic? A. Yes. It's fake.")  Special Agent DeCapua's analysis of the header information in the third email identified a different type of "hexadecimal" hidden timestamp, which, when decoded, indicated that the email had been sent from the future, specifically in the year 2087.  (Tr. 6323-24.)  Based on this information, Special Agent DeCapua was again able to offer an opinion as to the email's legitimacy.  (Tr. 6322 ("Q: [A]re

11

you able to offer an opinion based on this Message-ID as to whether or not this email is fake or real? A. Yes. It's fake.").)

- *Third*, Special Agent Amato testified that none of Amanat Exhibits 9002, 9010, 9013 or 908 are present on Maiden's computers. (Tr. 4042-43.) She further testified about certain features of the emails that are inconsistent with other emails (or text messages) sent by the defendant on particular days.

- *Fourth*, Maiden testified that he did not recognize and believed he did not receive Amanat Exhibits 9002, 9010, 9013 or 908. (Tr. 4282-94.) Maiden noted that (a) he had first been given a limited time to review these emails while on cross examination and was only shown heavily redacted versions of certain of the emails (Tr. 4290; 4979); (b) the emails do not make sense in the context of contemporaneous events, including other emails or texts Maiden exchanged with Amanat on particular days (Tr. 4289); and (c) the emails do not appear on his computer.  Maiden also frankly admitted that he had approached his testimony assuming only authentic documents would be shown to him (Tr. 4287).

- *Finally*, Julie Liang, a Senior Legal Assistant at Yahoo! with four years of experience executing search warrants, testified about how, in 2016, Yahoo! *twice* queried its system for emails between 2008 and 2012 in Yahoo! Account-1 with negative results.  Ms. Liang then testified that a search in November 2017 revealed that the account contained emails for the same time period.

At the conclusion of the trial, the Court remarked:  "Substantial evidence was introduced at trial that Mr. Amanat fabricated emails that were introduced into evidence.  That evidence evinces a disregard and a disdain for the Court and for legal process."  (Tr. 7328.)

## E.  The Verdict

The jury convicted Amanat of all counts with which he was charged.

## III.  THE GUIDELINES CALCULATION

The parties and the Probation Department agree that Counts One through Four are grouped for Guidelines calculation purposes pursuant to U.S.S.G. § 3D1.2(d), and that the group has a base offense level of seven.  (PSR ¶ 160.)

The PSR calculates a Guidelines range of 168 to 210 months' imprisonment, based on a Criminal History Category of I and a total offense level of 35, calculated as follows: (a) a base offense level of seven pursuant to U.S.S.G. § 2B1.1(a)(1); (b) a 22-level increase for a total loss

amount for Counts One through Four of $25,000,000 to $65,000,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(L); (c) a two-level enhancement because a substantial part of the scheme was committed from outside the United States or the offense involved sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(2)(10); and (d) a four-level enhancement because the offense involved a violation of securities law and, at the time of the offense, the defendant was in investment advisor or a person associated with an investment advisor, pursuant to U.S.S.G. § 2B1.1(b)(2)(19)(A). The PSR also noted the Government's request for an enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1, and deferred to the Court which presided over the trial and evidentiary hearings relating to the defendant's fabrication of evidence.

The Government agrees with the Guidelines range outlined in the PSR, with two exceptions.

*First*, while the facts support a loss amount increase of 22 levels for Counts One through Four, as calculated in the PSR, a lower increase of 20 levels is also reasonable and reflects the low-end of the Count Four actual loss calculation set forth in the attached Expert Report of Torben Voetmann, PhD, a Principal at The Brattle Group (the "Voetmann Report," Ex. B hereto). The Government accordingly requests that the Court apply the more conservative increase of 20 levels.

*Second*, the Government believes that a two-point obstruction of justice enhancement is warranted based on the defendant's introduction of fabricated emails.

With both of these adjustments, the total offense level would remain 35, and the Guidelines range would remain 168 to 210 months' imprisonment.

The defendant objects to the imposition of any loss amount or the inclusion of any enhancements. He fails to address the substantial issue of obstruction of justice. The Government addresses each component of the Guidelines calculation in turn.

### A.  Applicable Loss Amount – U.S.S.G. § 2B1.1

The PSR calculates the loss amount as more than $25,000,000 but less than $65,000,000, resulting in a 22-level increase, pursuant to U.S.S.G. § 2B1.1(b)(1)(L).  (PSR ¶ 161).  This loss amount includes a total of $35.2 million, consisting of: (a) $7.3 million attributable to Counts One through Three (PSR ¶ 150); and (b) $25.2 million attributable to Count Four.

### 1.  Counts One to Three – Maiden Capital Investors

Amanat maintains that the base offense should not be increased at all because the "trial record" does not support more than $6,500 in actual or attempted losses.  (Amanat Mem. 4.)  This position is contradicted by substantial evidence introduced at trial.  The evidence established Maiden Capital's investment in Enable was more than $3.5 million.  (GX 503 (bank records reflecting that Maiden Capital wired funds to Enable); Tr. 998 (Maiden:  "I had just lost over three-and-a-half million dollars of approximately a ten-million-dollar fund at that point.").)  The evidence also established that Maiden Capital's investors sustained a total loss of nearly $8 million when the firm imploded once the Enable losses were revealed. (GX 1818.)  Maiden testified that the particular amount of losses sustained by Maiden Capital investors was $7.75 million (Tr. 1168).

While Amanat is correct that the Guidelines hold Amanat responsible only for the "reasonably foreseeable pecuniary harm that resulted from the offense," U.S.S.G. § 2B1.1, app. note 3(A)(i), that amount here is the $7.75 million in losses sustained by Maiden Capital investors following Enable's collapse.  The record is clear that Amanat knew Maiden Capital's relative size and, in particular, the importance to Maiden Capital of the funds Maiden invested in Enable.  (Tr. 635 ("Q: How did the one-week proposed time period of the loan factor into your decision about whether to make the investment, if at all?"  Maiden: "It was critical. $2 million at that point, I think my fund was 8 to 10 million in size so that was a big percentage . . . and I couldn't afford to just not get it back"; Q: "Did you discuss with Mr. Amanat the funding issues in your fund?" Maiden:

"I did, yes.").)

Where a defendant can reasonably foresee that his fraud could lead to the collapse or insolvency of a business, the full amount lost by investors is attributable to the defendant. *United States* v. *Rubashkin*, 655 F.3d 849, 868 (8th Cir. 2011) (including in a bank fraudster's loss calculation his insolvent company's inability to repay a loan because "[a]ny reasonable person could have foreseen that large scale fraud could lead to collapse and insolvency if discovered"); *United States* v. *Bernick*, 651 F. App'x 102, 105–06 (3d Cir. 2016) (holding bank director responsible for $9 million in losses sustained by bank even though he embezzled less than $400,000 because he should have known his actions would cause the bank's insolvency); *United States* v. *Robichaux*, 995 F.2d 565, 571 (5th Cir. 1993) (including in defendant's loss calculation the losses attributable to a company's insolvency where his fraud, misrepresenting securities he had assigned to that company as unencumbered assets, caused a favorable audit without which the loss from the insolvency would have been minimized).  Given Amanat's knowledge of Maiden Capital's size and the importance of the Enable investment, it was foreseeable to him that stealing $2 million from an $8 million fund could cause the firm to collapse and investors to lose all of their money.

The cases cited by the defendant do not help him.  In *United States* v. *Lacey*, 699 F.3d 710 (2d Cir. 2012), the Second Circuit actually affirmed the District Court's loss amount calculation, rejecting an argument that the District Court must determine the actual loss to victims and noting that a Court "must apply the greater of the actual or intended loss amount." *Id.* at 718.  The case was remanded only because the record was unclear as to the number of victims. *United States* v. *Simpson*, 538 F.3d 459, 464 (6th Cir. 2008), cited by Amanat for the proposition that the term "loss" under the Guidelines "does not encompass every harm resulting from a crime, no matter how attenuated the causal link," actually supports the Government's position.  In *Simpson*, the

defendant argued that unpaid premiums were too attenuated to count as foreseeable losses in a fraudulent insurance reporting scheme.  The Sixth Circuit disagreed and ruled that the unpaid premiums were part of the actual loss because they resulted from the fraud.  The portion of *Simpson* quoted by Amanat merely stands for the proposition that "consequential damages," like "additional monies that the carriers could have made by, for example, investing the unpaid premiums," do not count as actual loss. The foreseeable insolvency of Maiden Capital is not nearly as attenuated as potential investments.  Finally, in *United States* v. *Whiting*, 471 F.3d 792, 802 (7th Cir. 2006), Seventh Circuit struck unpaid medical claims following a foreclosure from loss because the Government had failed to show that the defendant's conduct caused the foreclosure.  Here, the evidence at trial demonstrated that Amanat's actions—including the Enable fraudulent activity— caused the $3.5 million loss that triggered the collapse of Maiden Capital.

Amanat next argues that the loss amount for Counts One through Three should be credited, pursuant to U.S.S.G. § 2B1.1(b), application note 3E, with money Amanat wired to Maiden Capital, some of which was sent to investors. While the record evidence demonstrated that Amanat wired approximately $570,000 to Maiden, of which approximately $500,000 was used to pay redemptions to investors in furtherance of the crimes charged in Counts One through Three, the evidence also established that these monies were not payments by Amanat to investors but a loan to Maiden Capital made to hide the ongoing fraud. Nonetheless, to be conservative, the Government does not object to offsetting the amount of the calculated loss by $500,000, resulting in a loss amount of $7.3 million for Counts One through Three.

### 2.   Count Four – Market Manipulation Conspiracy

The PSR calculates a loss of $25.2 million, using U.S.S.G. § 2B1.1, application note 3 (F)(ix) as a starting point for quantifying the loss amount from Maiden's manipulative trading. The application note provides, in relevant part, that "[i]n a case involving the fraudulent inflation

or deflation in the value of a publicly traded security or commodity, the Court in determining loss

may use any method that is appropriate and practicable under the circumstances." The application

note includes one example of a reasonable method:

> An example of one such method under which the actual loss
> attributable to the change in the value of the security is determined
> by (a) calculating the difference between the average price of the
> security during the period that the fraud occurred and the average
> price of the security during the 90-day period after the fraud was
> disclosed to the market, and (b) multiplying the difference in
> average price by the number of shares outstanding.

(*Id.* (quoted in PSR ¶ 151).)

Here, the PSR began by calculating the increase in market capitalization during the

manipulation period, defined as December 31, 2008, the day the manipulation agreement was

signed, until September 15, 2011, the date of the last Maiden Capital trade in KITD. (PSR ¶ 150,

152). The PSR next estimated how much of that increase was reasonably attributable to trading

by Maiden Capital in furtherance of the conspiracy. (*Id.*) The calculation adjusted for consistency

due to the 1:35 reverse split that occurred in March 2009. (*Id.*) This calculation results in a

reasonable estimate of $25.2 million in inflated market capitalization attributable to Maiden

Capital's manipulative trading in KITD during the charged conspiracy. (*Id.*)

As reflected in the PSR, the Government made clear to Probation that Isaza Tuzman's

market manipulation expert, Professor Ferrell, testified at trial that he believed a different stock

split calculation that reduced Maiden's percentage volume of KITD should be used. (PSR ¶ 153.)

Substituting Professor Ferrell's stock split figures would reduce the loss estimate to $11.5 million

attributable to Maiden Capital. The above methodology results in a loss amount for Count Four

of between $11.5 million and $25.2 million, depending on the stock-split methodology.

A defendant challenging the Government's loss figure has the burden of coming forward with

"persuasive evidence" to the contrary. *See United States* v. *Geevers*, 226 F.3d 186, 193-94 (3d Cir.

2000).  Amanat falls far short.  Amanat relies on Professor Ferrell, Isaza Tuzman's expert, to argue that any apparent loss to investors from Maiden's trading is explained by other forces and the loss should be zero.  Amanat is again wrong.

     *First*, Amanat incorrectly notes that the methodology outlined in application note 3(F)(ix) "requires the Court" to consider "the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market. (*Id.* at 7.)  There is no such requirement. Rather, the application note encourages the use of "*any method that is appropriate and practical under the circumstances*," and defines the approach outlined in the Guidelines as "[a]n example of one such method." (U.S.S.G. § 2B1.1, application note 3(F)(ix) (emphasis added).)   Here, because the accounting fraud charged in Count Six was in full swing at KITD in the 90 days after September 11, 2011, it would be unreasonable to use this time period as a benchmark against which to measure the impact of the prior market manipulation.

     *Second*, Amanat incorrectly argues that there is no amount of actual loss to investors who purchased KITD stock at an inflated price that can reasonably be attributable to Maiden because it is impossible to segregate the impact of other potentially confounding forces.  (Amanat Mem. 10.)  As support for this position, Amanat relies on Professor Ferrell's report, which included an event study.  The Government retained Torben Voetmann, PhD, a Principal at The Brattle Group, who has ample experience with event studies, to examine and consider Dr. Ferrell's work and prepare a report (the Voetmann Report).   The Voetmann Report takes Professor Ferrell's "approach and results as given." (Voetmann Report ¶ 17).   Dr. Voetmann concludes that there is at least $10.4 million in actual loss that can be attributed to Maiden's manipulative trading.

     Dr. Voetmann calculated the loss amount in three different ways, each designed to exclude market, industry and firm-specific factors that may have contributed to an increase in stock price. The most conservative approach focused on days Maiden traded where Dr. Ferrell acknowledged

there was both a "statistically significant positive abnormal return to the KITD stock price" and "potentially confounding positive news about KITD" could be excluded.  (Voetmann Report ¶ 30.) Dr. Voetmann identified 22 trading days on which KITD's actual stock price return was higher than the predicted return by a statistically significant amount according to Dr. Ferrell's event study. (Voetmann Report ¶ 28.)  Dr. Voetmann then removed the 11 of these days on which there was a potential alternative explanation – other than Maiden's manipulative trading – for the statistically significant price increase.  Using this conservative approach, Dr. Voetmann was able to isolate approximately $10.4 million in actual loss to investors who purchased inflated KITD shares directly attributable to Maiden's trading.

As detailed in the report, Dr. Voetmann offers the following opinions relating to the loss amount calculation contained in the PSR for Count Four:

a.  The Government's calculation for losses related to Count 4 is reasonable. Using Dr. Ferrell own analysis and event study to account for market, industry, and firm-specific factors, I estimate losses related to Count 4 to be between $10.4 million and $82.0 million. The Government's calculation of $11.5 million to $25.2 million in losses is within this range.

b.  The low end of my range represents a conservative estimate of the losses related to the market manipulation conspiracy under Count 4. It is based on only 11 trading days between December 31, 2008 and September 15, 2011.  These were the days on which the positive difference between the actual and predicted KITD stock price return was statistically significant with no confounding news events. Alternatively, the loss related to Count 4 based on only the 22 trading days on which the positive difference between the actual and predicted KITD stock price return was statistically significant, regardless of news events, is $15.4 million.  During this time, Maiden traded on 541 days out of a total of 694 trading days.

c.  The $82.0 million high end of my range is based on all 242 Maiden trading days on which the difference between the actual and predicted KITD stock price return was positive, regardless of statistical significance.

19

      d.   The Government's calculated loss related to Count 4 is conservative
           because it is at the low end of my range.

(Voetmann Report ¶ 7.)

The cases cited by Amanat relating to Count Four again fail to support his arguments.
Amanat cites *United States* v. *Tatum*, 138 F.3d 1344, 1346 (11th Cir. 1998), for the proposition
that there must be an intent to deprive a victim of the loss amount. *Tatum* has no relevance here.
The focus in *Tatum* was on whether a Guidelines application note relating to fraudulent
procurement cases should be applied to false statements made for the purpose of influencing the
FDIC, thus requiring consideration of actual loss suffered by FDIC and loss intended by
defendants. Here, there is no requirement that Amanat (or any co-conspirator) intended any loss
to investors. The Voetmann Report also makes clear that there was an actual loss of at least $10.4
million, even assuming as correct the entirety of Professor Ferrell's approach and results. Like
*Tatum*, *United States* v. *Krause*, 786 F. Supp. 1151, 1157 (E.D.N.Y. 1992), a case in which a
taxpayer falsely represented an inflated amount of income to protest the tax code, involved no
actual loss.

*United States* v. *Rutkoske*, 506 F.3d 170 (2d Cir. 2007), is also consistent with the approach
taken in the Voetmann Report. In *Rutkoske*, the Second Circuit held that a district court is required
to *consider* factors other than the fraud that may have contributed to a decline in share price. Dr.
Voetmann calculated that Maiden caused at least $10.4 million in actual loss to third-party
investors by causing statistically significant price increases in KITD on days where there were no
confounding news events.

Finally, the holding in *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 336 (2005), a civil securities
case in which the Court dealt not with a loss calculation under the United States Sentencing Guidelines

but with whether an inflated purchase price alone constituted the economic loss necessary to prove "loss causation" is far afield from the considerations at issue concerning market manipulation.

Dr. Voetmann emphasized that his approach "likely understates the true magnitude of loss amount due to the manipulation scheme" because it eliminates any loss amount that is not both exclusively attributable to Maiden and statistically significant.  (Voetmann Report ¶ 30.) The Government respectfully suggests that the Court adopt Dr. Voetmann's conservative $10.4 million figure as the loss amount for Count Four.  Combined with $7.3 million in loss amount for Counts One through Three, the total resulting loss amount is $17.7 million.  Because this amount is more than $9,500,000 but less than $25,000,000, a 20 level-increase to the loss amount pursuant to U.S.S.G. § 2B1.1(b)(1)(K).

**B. Enhancement Because Substantial Part of Scheme Committed From Outside the United States – U.S.S.G. § 2B1.1(b)(10)(B) or (C)**

The PSR applied a two-level increase, pursuant to U.S.S.G. § 2B1.1(b)(10)(B).  Under U.S.S.G. § 2B1.1(b)(10), this two-point enhancement is applied if either "a substantial part of the fraudulent scheme was committed from outside the United States" (§ 2B1.1(b)(10)(B)) or the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." § 2B1.1(b)(10)(C). Application Note 9(B) notes that the sophisticated means enhancement is ordinarily applied where the defendant used offshore financial accounts. Amanat argues that "nearly all of the fraudulent conduct during the charged conspiracy took place in North Carolina or possibly New York or New Jersey."  (Amanat Mem. 13.)

The two-point enhancement is properly applied because a substantial part of the fraudulent scheme was committed outside the United States.  Here, the evidence at trial established that Enable was based in Dubai, as was Irfan Amanat, who managed Enable and was largely

21

responsible for sending the fictitious Enable statements. (Tr. 238, 576, 582.)  Bank records entered into evidence also indicate that Enable maintained and used a bank account in Dubai.  (Tr. 4930-31).

### C.  Enhancement For Being Associated With An Investment Advisor – U.S.S.G. § 2B1.1(b)(19)(A)(iii)

The PSR also applied a four-level enhancement for the defendant being "a person associated with an investment advisor," pursuant to U.S.S.G. § 2B1.1(b)(19)(A)(iii).  Amanat argues that it "is blackletter law that this enhancement does not apply to an individual like Omar Amanat, who never worked at Maiden Capital."  In support of this assertion, Amanat cites *United States* v. *Longo*, an unpublished 2006 decision from the 11th Circuit which notes that a "person associated with an investment advisor includes partners, officers, or directors of an investment advisor and employees of an investment advisor."  184 F. App'x 910, 914 (11th Cir. 2006).

The record evidence at trial established that Amanat was far more than an employee of Maiden Capital—he was the owner. Specifically, Maiden testified that he agreed to transfer ownership of Maiden Capital to Amanat.  The agreement, which was admitted into evidence as Government Exhibit 1692, was between Cornucopia LTD, a vehicle that Amanat owned (Tr. 874, 1183-84), and Maiden Capital.  The agreement contained a series of onerous terms.  For instance, the agreement stripped Maiden of his role as Maiden Capital's sole Managing Member and installed Cornucopia in his place.  That change put Amanat, through Cornucopia, firmly at the helm of Maiden Capital.  The agreement stated:  "On the Closing Date, the Borrowers shall appoint the Lender or Lender's designee as the sole managing member of the Company until full repayment of the Loan under the Loan Documents. . . *Such appointment shall effectively give the Lender or Lender's designee control over operations and business decisions of the Borrowers*." (*Id.* (emphasis added).)  Maiden testified that the loan agreement meant that Cornucopia, originally

through Amanat's wife who signed as Cornucopia's "officer," was "the *owner* of Maiden Capital." (Tr. 876 (emphasis added).)  This record is more than sufficient to demonstrate that Amanat was associated with Maiden Capital for the purpose of this enhancement.

### D.  Enhancement for Obstruction of Justice – U.S.S.G. § 3C1.1

The PSR noted that the Government's position that a two-level enhancement should be applied for obstruction of Justice based on fabricated emails introduced during trial, but deferred to the Court on this enhancement.  (PSR ¶ 157.)  Amanat fails to even address the applicability of this enhancement.

U.S.S.G. § 3C1.1 provides for a two-point enhancement "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct."  Application note 4 sets forth examples of the types of conduct to which this adjustment is intended to apply.  Example 4(C) provide that the enhancement is to applies to "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding."  The obstruction enhancement has repeatedly been applied in cases where a defendant has introduced false evidence to the Court during or in relation to a Court proceeding.  *See*, *e.g.*, *United States* v. *Cusack*, 66 F. Supp. 2d 493, 499 (S.D.N.Y. 1999), *aff'd,* 229 F.3d 344 (2d Cir. 2000) (defendant submitted disguised handwriting exemplars in response to subpoena); *United States* v. *Maurer*, 76 F. Supp. 2d 353, 358 (S.D.N.Y. 1999), *aff'd,* 226 F.3d 150 (2d Cir. 2000) (defendant submitted a forged letter in connection with sentencing proceedings); *United States* v. *Case*, 180 F.3d 464, 465 (2d Cir. 1999) (defendant created and submitted false IRS forms to the Probation Department post-plea); *United States* v. *Fredette*, 15 F.3d 272, 275 (2d Cir. 1994) (defendant solicited co-defendant to provide a false

affidavit pre-trial).

As set forth in detail above, and as the Court found, "[s]ubstantial evidence was introduced at trial that Mr. Amanat fabricated emails that were introduced into evidence." (Tr. 7328.)  The obstruction enhancement clearly applies.  The fabrication is all the more severe in this case where the fabricated emails were produced to the Government during trial – in front of the jury – and were admitted before the Government had a serious chance to evaluate their authenticity.  Amanat fails to advance any argument for why the obstruction enhancement does not apply.  There is none.

## IV.  THE COURT SHOULD SENTENCE AMANAT TO A GUIDELINES SENTENCE

Under the factors set forth in 18 U.S.C. § 3553(a), the Government respectfully submits that a sentence within the Guidelines range of 168 to 210 months' imprisonment would be sufficient, but not greater than necessary, to serve the goals of sentencing.

The Probation Department recommends a significant sentence of 144 months' imprisonment, a modest variance from the calculated Guidelines range.

### A.  Nature and Circumstances of the Offenses, Seriousness of the Offenses, Need to Promote Respect for the Law, and Need for Just Punishment

A sentence win the Guidelines range is necessary in light of the nature and circumstances of the offenses, the seriousness of the offenses, the need to promote respect for the law, and the need for just punishment.  *See* 18 U.S.C. § 3553(a)(1) & (2)(A).

Amanat's offenses of conviction were serious.  The jury swiftly convicted him of four counts relating to two fraudulent schemes:  (a) the scheme to defraud Maiden Capital's investors (Counts One through Three), and (b) the scheme to manipulate KITD's stock (Count Four). Investors suffered millions of dollars in losses as a result of these brazen crimes.

What is more, these multi-million schemes went on for years, and they were inextricably intertwined—designed to hide the massive frauds that Amanat was perpetrating with his co-

conspirators.  The evidence at trial demonstrated that Amanat and his brother Irfan Amanat lied about the financial viability of their investment fund Enable.  These Enable-related lies resulted in Maiden investing his investors' money in Enable, and Isaza Tuzman investing KITD's money in Enable.  When Amanat's Enable-related lies were revealed to Isaza Tuzman, they lied to Maiden to induce him to invest more of his investors' money with Enable, which would benefit Amanat by allowing him to conceal the Enable fraud and would benefit Isaza Tuzman by allowing him to redeem a portion of KITD's investment in Enable.  When Maiden finally learned the truth about Amanat's Enable fraud, Amanat and Isaza Tuzman convinced Maiden to enter into the market manipulation agreement in December 2008.  The market manipulation scheme, of course, was designed to fraudulently prop up KITD's stock, which would help hide the frauds at KITD, Maiden Capital and Enable from their respective investors.  Amanat then helped Maiden lie to his investors about Maiden Capital's health.  Amanat's direct financial assistance helped Maiden meet investor redemptions to forestall the ultimate implosion of Maiden Capital, which in turn helped Amanat hide the Enable hole.  And, of course, all of the frauds were designed to fraudulently enrich Amanat—so that he could live the high life and continue to claim, falsely, that he was a successful businessman.

Simply put, Amanat's crimes were the result of a concerted effort, over years, to commit fraud after fraud to hide his lies and to line his own pockets.  They were *not* what Amanat claims in his sentencing submission:  "In the worst version of the events of the fraud, Omar was an individual whose brother's investment company failed and who helped Maiden buy time with his investors by loaning him money.  All of this was undisputedly done under circumstances where Omar believed Maiden's investors were being positioned for a windfall from the KIT Digital investment."  (Amanat Mem. 22.)  The evidence showed that Enable was a fraud.  Maiden Capital was a fraud.  KITD was a fraud.  And Amanat was right in the middle of these frauds.

A few of Amanat's emails make this clear:

- In a December 19, 2008 email, Omar Amanat wrote to Irfan Amanat: "[Tuzman] spoke w Maiden where they apparently discussed 'difficulties getting money out of Enable.' Maiden has tried to reach me and is asking for his $2mln back. In a post madoff world everyone is suspicious. This is a major problem and red flag for me. As u know. I don't have any ability to repay it. I only made the loan bc mahmood was promising to repay in a few weeks. Any monies out from mahmood need to first come to pay this down. This is a major disaster--of madoff proportions-- if maiden suspects fraud of some sort and notifies the authorities I'm cooked. All in all this is some pickle of a situation this time." (GX 2965-A (redacted version admitted at trial).)

- In a May 5, 2009 email, Amanat wrote to Isaza Tuzman and Maiden: "You wouldnt have had Maiden's $2.5 million in open market purchases which singlehandedly kept the stock up if I didnt spen[d] the time." (GX 3036.)

- In a July 15, 2011 email, Amanat wrote to Maiden: "Be aggressive today: say it doesn't matter who did what. Paint a stark nightmare scenario if your fund goes under. . . Madoff like trustee is appointed -- he will quickly realize all money was lost in KIT digital and everyone here will be sued. Securities laws violations have occurred. Criminal behavior jail time. Bottom line: Fund needs to be made whole or ship will sink." (GX 1785-D (redacted version admitted at trial).)

Tellingly, Amanat's sentencing memorandum completely ignores his egregious and obstructive conduct during the trial. As the Court recognized, Amanat's fabrication of evidence and lies to the Court were outrageous and intended to corrupt the trial itself.

- The Court: "Substantial evidence was introduced at trial that Mr. Amanat fabricated emails that were introduced into evidence. That evidence evinces a disregard and a disdain for the Court and for legal process." (Tr. 7328.)

- The Court: "[T]he issue about the legitimacy of these emails goes to the integrity of the proceedings. And it's not tangential evidence, it's critical evidence. It was obvious to everyone here once the emails were produced that I don't know if "game changer" is too strong a word, but they were highly significant evidence, evidence the government had not seen before." (Tr. 6256.)

Amanat makes no mention of his brazen obstruction of justice because he has none. In the middle of a trial about his years of lies, frauds, and cover ups, he tried to avoid conviction by engaging in yet another fraud. He committed a fraud on the Court, the jury, and the Government. But he was caught red-handed.

In sum, Amanat's crimes of conviction and his outrageous obstructive conduct during trial require a significant sentence.

## B. History and Characteristics of the Defendant

A substantial sentence is necessary in light of the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(2)(B)-(C).

Amanat notes that he has "no criminal history" (Amanat Mem. 22); contends that "much of the decision-making in this case seems the likely product of an improper relationship to stress and poor methods of coping with difficult situations" (*id.* at 26); asserts that he "has unmistakably made a number of mistakes in business and in life, but those mistakes are not the full measure of the man" (*id.* at 27); and asks the Court to consider his "significant charitable activities . . . throughout his life" (*id.* at 26). Amanat, however, ignores that he has repeatedly lied throughout his career—including in other federal courts—as he moved from one scheme to another. His claimed success in business is largely a fiction he developed to dupe victims.

For example, *In re: MarketXT Holdings Corp.,* a long-running bankruptcy action, brought to light more of Amanat's fraudulent conduct, including intentional fraudulent conveyances and the creation of fraudulent documents. *See In re: MarketXT Holdings Corp.,* 376 B.R. 390, 402-12 (S.D.N.Y. Bankr. 2007) (findings that entities affiliated with Amanat had engaged in fraudulent conveyances, including because there were various "badges of fraud" involving Amanat); *In re: MarketXT Holdings Corp.,* 426 B.R. 467, 474 (S.D.N.Y. Bankr. 2010) ("EIF and the Debtor's principal, Omar Amanat ('Amanat'), designed the transactions to deceive Softbank and other creditors as to the amount of proceeds and EIF's consideration."); *In re MarketXT Holdings Corp.*, 2009 WL 7216076 *4 (S.D.N.Y. Bankr. 2009) ("There is ample evidence on the record before the Court that Ashraf on behalf of the EIF Parties asked the Bingham firm to create documents to evidence transactions that either never took place in 2003 or that could not lawfully be doctored

or 'tightened' in 2005, and that an attempt to do so would constitute the furtherance of a fraud or crime. . . . It is of no importance whether Ashraf actually saw [Omar] Amanat backdate the documents. A request to an attorney 'for assistance in procuring fraudulent corporate documents' provides probable cause that the attorney was retained in furtherance of a fraud or crime.").

Recently, in *In re: Aman Resorts Group Limited*, 17-12811 (SCC) (S.D.N.Y. Bankr.), and *In re: Park Hotels and Resorts Group, Ltd.*, 17-12813 (SCC) (S.D.N.Y. Bankr.), United States Bankruptcy Judge Shelley C. Chapman made a criminal referral to the United States Attorney's Office for the Southern District of New York stemming from Amanat's orchestrating a fraudulent involuntary bankruptcy petition related to the Aman Resorts—after a previous fraudulent bankruptcy petition had been dismissed in Florida. (Nov. 30, 2017 Tr. 7-8 (Ex. C hereto) ("I want to start by saying that there are a lot of very serious allegations here, and some of them are more relevant than others, at the moment. But given the history of this case, both in terms of the original proceeding that was filed before me and that was pending at the time the involuntary was commenced at Florida, and given the fact that, as I've indicated before, for the benefit of some of you who haven't appeared at these cases before, that if there is not already, there will be a referral to the United States Attorney's Office, which is aware of these cases.").)

Cooperating witness Hugh Dunkerly has also pled guilty to committing bankruptcy fraud, in violation of 18 U.S.C. § 157, and admitted that he made false statements in court filings related to the Aman Resorts bankruptcy at Amanat's request. *See United States* v. *Hugh Dunkerly*, S2 16 Cr. 371 (RA). Specifically, Dunkerly testified as follows at a recent trial:

> Q.  While you were working at Fond Invest, did there come a time when you became involved with someone named Omar Amanat?
>
> A.  Yes.
>
> Q.  How did you become familiar with Mr. Amanat?

A.  Jason Galanis introduced me to Amanat.

Q.  In what context?

A.  Mr. Amanat was in an intense legal battle for a reasonably sized hotel chain called Aman Resorts with a Russian oligarch about control of this entity, and so between Jason Galanis and Mr. Amanat, they asked me, as the head of Fond Invest to represent and to fund what's called debtor in possession proceedings for -- to take back the hotel group for Mr. Amanat.

Q.  Was Fond Invest really a debtor in possession?

A.  No it wasn't.

Q.  Did it have any financial interest in Aman Resorts?

A.  No. That was a fraudulent claim.

Q.  In the course of making that fraudulent claim, were you involved in the filing of false documents in bankruptcy proceedings?

A.  I was.

(Trial Tr. 924, *United States* v. *John Galanis et al.*, 16 Cr. 371 (RA) (S.D.N.Y. May 31, 2018) (Ex. D hereto).)

Thus, in taking the "full measure of the man," the Court should consider Amanat's serial lies, deceit and fraud on courts to get ahead and conceal his crimes.

## C.  Deterrence

A substantial sentence is necessary to afford adequate deterrence and to protect the public from future crimes of this defendant.  *See* 18 U.S.C. § 3553(a)(2)(B)-(C).

Because investment fraud and securities fraud schemes are both highly lucrative and difficult to detect, significant punishment is necessary to deter others from similar conduct.  *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or

are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it.").

Moreover, considerations of specific deterrence are particularly relevant here. As noted above, Amanat has made a living telling lies, committing frauds, and lying to courts. He has not been deterred from such conduct. And significantly, even after he was indicted in this case and was on trial, he continued to engage in frauds and lies. He was not deterred from fabricating emails and putting them into evidence. The creation of false evidence during trial – when the adverse party has had no chance to investigate its authenticity before use – is a gravely serious threat to the criminal justice system. It simply must be deterred in the strongest possible terms.

A substantial sentence is thus necessary to send the message to white-collar criminals generally and to Amanat specifically that those who commit white collar crimes and seek to obstruct the legitimacy of criminal trials will be punished harshly.

**D. Unwarranted Sentencing Disparity**

Amanat cherry-picks sentences in other fraud cases to support his request for a below-Guidelines sentence. (Amanat Mem. 23-25). None of the cases that the defendant cites are similar. *See* 18 U.S.C. § 3553(a)(6) ("the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). Most significantly, to the Government's knowledge, none of the defendants in those cases introduce fabricated evidence at trial in a bold effort defraud the Court. And the fact that certain judges in this District sometimes vary downwards in fraud cases is certainly not determinative here where the defendant participated in multiple fraudulent schemes and then fabricated evidence to try and get away with it.

*     *     *     *     *

For the foregoing reasons, the Court should sentence Amanat to a Guidelines sentence, which is necessary to reflect the seriousness of his crimes and the immense harm he has caused

30

to KITD, Maiden Capital and the truth-seeking process itself.

Dated:   July 24, 2018
             New York, New York

                                        Respectfully submitted,

                                        GEOFFREY S. BERMAN
                                        United States Attorney

                        By:     _____/s/_____
                                        Damian Williams
                                        Andrea M. Griswold
                                        Joshua A. Naftalis
                                        Assistant United States Attorneys

31