

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 26, 2018

**BY ECF**
Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

      Re:    **United States v. Tuzman et al.,**
             **15 Cr. 536 (PGG)**

Dear Judge Gardephe:

      As directed by the Court (Dkt. No. 885), the Government respectfully submits this supplemental letter brief in further opposition to the argument advanced by defendant Omar Amanat ("Amanat") in his Rule 29 motion for judgment of acquittal that the Government "failed to identify any interstate wire contemplated or sent in furtherance" of Counts One (conspiracy to commit wire fraud, 18 U.S.C. § 1349) and Two (wire fraud, 18 U.S.C. §§ 1343 and 2) of Superseding Indictment S8 15 Cr. 536 (the "Indictment"). (*See* Def. Br. (Dkt. No.735) at 19-20.) The Court has asked the Government to "cit[e] evidence from the record demonstrating that the interstate wire element is satisfied, and to provid[e] legal authority supporting that assertion." (Dkt. No. 885, at 1.) As set forth below, the defendant's arguments in support of his motion are meritless, not only because he misstates the law but also because he ignores the substantial evidence introduced at trial that satisfies the Government's burden.[1]

Count One

      Amanat's claim the Government did not prove that an interstate wire was used in furtherance of the wire fraud conspiracy charged in Count One should be rejected because it relies on an incorrect statement of what the law requires. The Court properly instructed the jury that the two elements of a § 1349 conspiracy are: "[a] that the conspiracy charged in Count One existed, that is, that from or about March 2009 through in or about June 2012 an agreement or understanding between two or more people existed to commit wire fraud; and [b] that Omar Amanat willfully and knowingly joined and participated in that conspiracy during the time period charged in Count One." (Tr. 7166.) The law does not require the Government to prove an overt act — in the form of an interstate wire that furthered the conspiracy, or otherwise. *See United States* v. *Roy*, 783 F.3d 418, 420 (2d Cir. 2015) ("We . . . conclude that a conspiracy conviction

---

[1]     For the Court's convenience, the Government also refers the Court to its December 19, 2017 letter and to page 15 to 19 of its brief in opposition to the defendant's post-trial motions.

Hon. Paul G. Gardephe
December 26, 2018
Page 2

under § 1349 does not require proof of an overt act."); *United States* v. *Zemlyansky*, 908 F.3d 1, 10 (2d Cir. 2018) (same).[2]

The Government also established venue by a preponderance of the evidence. *See United States* v. *Ramirez*, 420 F.3d 134, 139 (2d Cir. 2005). For example, the July 15-16, 2011 meeting in Manhattan (the "NYC Meeting") is sufficient to prove venue in the Southern District of New York for Count One. Amanat participated in the NYC Meeting with Stephen Maiden and Kaleil Isaza Tuzman ("Tuzman"), both co-conspirators in the conspiracy to defraud Maiden Capital investors charged in Count One.[3] Maiden testified that the meeting took place at the KIT digital offices in midtown Manhattan. (Tr. 886). Maiden further testified that the primary purpose of the NYC Meeting was to "save Maiden Capital." (*Id.*) In particular, at the NYC Meeting, Maiden, Amanat, and Tuzman discussed how to provide Maiden with sufficient funds to pay Maiden Capital investors whose redemption requests could no longer be forestalled. In other words, the three co-conspirators met in Manhattan to discuss and continue their wire fraud scheme, deciding how to pay back the investors they had been defrauding for years to avoid the truth coming to light. Amanat recognized the grave stakes for the NYC Meeting. As the meeting began, he reminded Maiden: "Be aggressive today: say it doesn't matter who did what. Paint a stark nightmare if your fund goes under. . . . Securities laws violations have occurred. Criminal behavior jail time. Bottom line: fund needs to be made whole or ship will sink." (GX 1785-D).

Thus, there is no basis to grant Amanat's Rule 29 motion with respect to Count One.

## Count Two

Turning to Count Two, as an initial matter, the Government is not obligated to prove, beyond a reasonable doubt, an interstate wire originated or terminated in, or passed through, the Southern District of New York. *See*, *e.g., United States* v. *Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) ("The elements of a substantive mail or wire fraud are (i) a scheme to defraud (ii) to get money or property, (iii) *furthered by the use of interstate mail or wires*." (emphasis added)). The Court similarly instructed the jury. (Tr. 7169-70.) And with respect to the interstate wire element, the Court made the following clear:

> The interstate or foreign requirement means that the wire communication must pass *between two or more states*, as for example, a transmission of computer signals between New York and another state, such as New Jersey, California or a territory such as the U.S. Virgin Islands, or between the United States and another country.

---

[2] In any event, and as set forth below, the claim should be rejected because the record is replete with interstate wires.

[3] Isaza Tuzman was an uncharged co-conspirator in the Maiden Capital scheme charged in Counts One through Three of the Indictment.

> It is not necessary for a defendant to be directly or personally involved in any wire communication, so long as the communication is *reasonably foreseeable* in the execution of the alleged scheme to defraud in which the defendant is accused of participating. In this regard, it would be sufficient to establish this element of the crime if the evidence justifies a finding that a defendant caused the wires to be used by others. This does not mean that the defendant himself must have specifically authorized others to execute a wire communication. When one commits an act with knowledge that the use of a wire will follow in the ordinary course of business, or where such use of the wires can reasonably be foreseen, even though not actually intended, then he causes the wires to be used. The wire communication requirement may be satisfied even if the wire communication was done by a person with no knowledge of the fraudulent scheme, including the victim of the alleged fraud.

(Tr. 7176-77 (emphasis added).)

In a substantive wire fraud prosecution, "venue lies where a wire in furtherance of a scheme begins its course, continues or ends." *United States* v. *Gilboe*, 684 F.2d 235, 239 (2d Cir. 1982). This includes "the district where an electronic communication was received." *United States* v. *Royer*, 549 F.3d 886, 895 (2d Cir. 2008). "The Government bears the burden of proving venue by a preponderance of the evidence." *United States* v. *Lange*, 834 F.3d 58, 69 (2d Cir. 2016). "Venue may be proved by circumstantial evidence." *Id.* In addition, venue evidence need not demonstrate that a defendant knew or foresaw that a *particular* wire communication actually touched the Southern District of New York. Rather, venue is proper when the jury can conclude by a preponderance of the evidence that "it is foreseeable that such an act would occur in the district of venue." *United States* v. *Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003). "In challenging the sufficiency of the government's venue evidence, defendants 'bear[] a heavy burden, because the reviewing court is required to draw all permissible inferences in favor of the government." *United States* v. *Rutigliano*, 790 F.3d 389, 396 (2d Cir. 2015) (quoting *United States* v. *Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011). The Second Circuit has upheld convictions where venue was premised on jury drawing the reasonable inference that individuals send and receive wire communications to and from where they maintain an address, live or work. *See Lange*, 834 F.3d 58 (upholding the sufficiency of venue evidence based on the fact that the defendant in a boiler room scheme had seen a call list of potential victim investors that included addresses in the Eastern District of New York); *Royer*, 549 F.3d 886 (upholding sufficiency of venue evidence based on the fact that recipients to an online subscription service containing false stock information had addresses in the Eastern District of New York).

In this case, the Government presented sufficient evidence from which the jury could conclude (a) beyond a reasonable doubt that interstate wires were sent in furtherance of the scheme to defraud Maiden Capital investors; and (b) by a preponderance that at least one interstate wire touched the Southern District of New York.

Hon. Paul G. Gardephe
December 26, 2018
Page 4

As a threshold matter, the evidence plainly established that Maiden was based in North Carolina, and Amanat was primarily based in New York. The undisputed evidence showed that Maiden lived and worked in North Carolina. (*See, e.g.*, Tr. 790 (Maiden explaining that he "was at my home trading in Charlotte" in September 2009); Tr. 676 (Maiden Capital's office in Charlotte); GX 606 (Maiden Capital bank records reflecting address in Charlotte, North Carolina); Tr. 5897 (Maiden Capital in North Carolina). Similarly, there was also substantial evidence that Amanat principally lived and worked in Manhattan (and certainly no evidence that Amanat worked or resided in North Carolina). (*See, e.g.*, GX 1517-A (providing a West End Avenue, Manhattan address for Amanat); GX 653 (showing the Enable account Amanat directed Maiden to send $2 million of Maiden Capital funds was associated with a Manhattan address); GX 635 (Amanat making bank withdrawals and obtaining cashier's checks from bank locations in Manhattan from Enable-related account); GX 651 (Cornucopia, a vehicle controlled by Amanat, based in Manhattan); Tr. 886 (Maiden testifying about a July 2011 meeting with Amanat in Manhattan relating to saving Maiden Capital); Tr. 892 (Maiden testifying that Amanat met with Maiden Capital investor in New York); Tr. 636 (Maiden testifying about coming to New York to attend a charity event with Amanat); Tr. 240-42 (Joseph Mullin testifying about an Enable-related meeting with Amanat in Manhattan around March 26, 2012); GX 1786-AE (Maiden suggesting that he come to Manhattan to meet with Amanat and Tuzman).

*First*, with respect to the interstate wire element, the record contained numerous examples of particular interstate wires sent in furtherance of Count Two. For example, Amanat made numerous interstate wire transfers to Maiden Capital so Maiden Capital could pay its investor redemptions and forestall discovery of the fraud. Specifically, the Government introduced evidence that Amanat wired more than $500,000 to Maiden Capital in North Carolina in 2011 and 2012. Amanat directed these wires from two Enable-affiliated accounts: a JP Morgan Chase account (the "Chase Enable Account") and a First Republic account (the "First Republic Enable Account"). The evidence established the Chase Enable Account was associated with an address in Manhattan, and the First Republic Enable Account was associated with an address in New Jersey. (*E.g.*, GX 653 (Chase Enable Account bank records); GX 633 (First Republic Enable Account Records.) The records also reflect numerous interstate wires to Maiden Capital. For example, a $10,000 wire sent in June 2012 from the Chase Enable Account specifically notes Maiden Capital and "NC," (GX 653 at 6), a reference a jury could have concluded was North Carolina, the location of the Maiden Capital Account. The First Republic Account was also used by Amanat to send a series of wire transfers to Maiden in North Carolina. (GX 633 at 23, 24, 25, 29, 36, 41, and 50).

Amanat's argument that the wire transfers from Amanat to Maiden were not in furtherance of the scheme to defraud Maiden Capital investors but instead for "Mr. Maiden's general criminal activity," (Def. Br. at 20), is without merit. Maiden testified that he called Amanat after speaking to one of his investors (Alpine Capital) about a large redemption request that Maiden could not meet and asked Amanat to fund the redemption. (Tr. 873.) In explaining why Maiden called Amanat for this purpose, Maiden explained that Amanat "had a lot to lose, as Kaleil, as did I, if Maiden Capital failed as discussed, and as I told him there were criminal consequences." (*Id.*) Maiden further testified that he spoke on the phone to Amanat "often" about the issue of investor redemptions and, in particular, that Amanat "was very interested to make sure that the money was

Hon. Paul G. Gardephe
December 26, 2018
Page 5

being used for redemptions." (Tr. 886.) In fact, Maiden testified that Amanat was so focused on the issue of Maiden Capital redemptions that Amanat asked Maiden to put together a list of which Maiden Capital investors might request redemptions and need to be paid. (Tr. 901.) Thus, while Maiden may have used a small minority of the funds he received from Amanat to pay expenses other than redemptions, *see, e.g.*, GX 1785-K, Amanat's conclusory suggestion that Amanat provided Maiden with funds principally for his own financial survival and not to forestall the discovery of the Enable losses by Maiden Capital investors is not supported by the record and should be rejected.

Amanat also argues that because the Government introduced evidence that Amanat maintained at least one bank account – the First Republic Account – associated with an address in New Jersey, the jury was not entitled to draw any inferences about Amanat acting from Manhattan. (Def. Reply Br. at 6.) As New Jersey and North Carolina are different states, this argument is misplaced in the context of evaluating the sufficiency of the Government's proof on the interstate wires element.[4]

*Second*, the Government introduced sufficient evidence from which a jury could reasonably conclude by a preponderance that venue on Count Two was proper. As discussed above, the Government introduced significant evidence establishing that Maiden was based in North Carolina and Amanat was principally if not exclusively in Manhattan. In addition to the wire transfers, the Government introduced evidence that Amanat and Maiden frequently communicated by phone, email, and text in furtherance of the charged scheme. These communications are sufficient to establish venue. *See Lange*, 834 F.3d at 70 ("[W]e have held that venue lies both in the district where a telephonic communication in furtherance of a crime was made and where it was received."). For example:

- In GX 1785-F, an August 10, 2011 exchange between Maiden and Amanat, Maiden wrote, speaking of Maiden Capital investor Kris Peavy: "Peavy needs 150k. Thank u. U need me to send wiring instructions again?"

- In GX 1729, a November 17, 2011 email chain between Amanat and Maiden titled "Important – Wire," Maiden wrote: "You said you would send 250k once I emailed him to reregister. He won't ask a million questions – we traded emails on this before. Folks are expecting cash this week as I led them to believe that given you saying you'd send the 250. You can't fade on this stuff dude. I am communicating to investors based on what you tell me."

- Maiden also testified that he and Amanat "talked a lot" regarding the issue of how to deal with investors seeking redemptions. (Tr. 886).

The Government introduced more than one hundred text messages between Amanat and Maiden, nearly all of which concerned the Maiden Capital fraud. (*See, e.g.*, GX 1785 and 1786 series).

---

[4] As for venue, the weight of the evidence noted above established that Manhattan, and not New Jersey, was Amanat's primary base of operation.

Given the evidence that Amanat was principally based in Manhattan, a jury was certainly entitled to infer that Amanat was in the Southern District when he was speaking to Maiden by phone, or when Amanat sent or received at least one of the myriad of text messages furthering the scheme. In *Royer* and *Lange*, the Second Circuit upheld a conviction based on generalized evidence associating individuals with addresses in the Eastern District of New York. In both cases, the Circuit held such information was sufficient for a jury to infer by a preponderance that a wire communication with that individual touched that district. Analogously, in *United States* v. *Campos,* Judge Caproni recently found venue proper in the Southern District of New York because a co-conspirator's business was in Manhattan, and therefore "it was reasonably foreseeable to [the defendant] that wire communications in furtherance of the fraud would go into and out of the Southern District of New York. No. 16 Cr. 395 (VEC), 2017 WL 4402579, at *3 (S.D.N.Y. Oct. 3, 2017).

In addition to evidence from which a jury could infer that Amanat was in New York when communication with Maiden, the Government also introduced direct evidence that Amanat was in Manhattan in late March 2012 when he communicated sent and received some of the most incriminating text messages in furtherance of the scheme, including texts in which Maiden and Amanat discussed how to prevent the scheme from imploding. For example, in GX 1785-BN, a March 26, 2012 text message, Maiden tells Amanat "[i]f it doesn't happen it is all dead," and suggests they "jump on [a] call w[ith] k[aleil] now." Joseph Mullin, a former member of KIT digital's board of directors, similarly testified that he met with Amanat in an office in midtown Manhattan, around March 26, 2012, to discuss Enable. (Tr. 240-41 (viewing GX 1295, a March 26, 2012 email about Enable, and explaining that he met with Amanat in Manhattan "around the time of [the] email").) Based on this direct testimony about Amanat's location at this time, a jury could reasonably have concluded that Amanat sent and received the incriminating text messages exchanged with Maiden in the Southern District of New York. *See Lange*, 834 F.3d at 73.

Finally, the Government presented additional venue evidence in the form of interstate wire transfers initiated by Tuzman that commenced in Manhattan and that furthered the Maiden Capital scheme. The evidence showed that on March 1, 2011, Tuzman worked with Maiden to cause KITD, a Maiden Capital investor (and victim), to wire $250,000 in additional funds from its HSBC account, which was domiciled at the HSBC office at 452 Fifth Avenue in Manhattan, to Maiden Capital's North Carolina-based Bank of America account. (*See* GXs 606, 611, 619, 645, 649-A, 649-E, 2793.) Two days later, Maiden wired $288,101 to Tuzman's bank account. (*See* GXs 606, 611.) Maiden explained that these wires were designed to lure additional money into Maiden Capital, which was bankrupt largely because of the Enable losses, so that he could redeem Tuzman's personal investment. (*See* Tr. 824-31.) This conduct, similar to other wires into and out of Maiden Capital to meet investor redemptions, plainly furthered the wire fraud scheme charged in Count Two.[5] The fact that Tuzman was not charged in Count Two is of no moment.

---

[5] Amanat argues that this wire transaction was relevant only to Count Five. (*See* Amanat Br. at 27.) That is incorrect. While this wire transaction was powerful proof of Isaza Tuzman's fraud on KITD shareholders, it is also highly probative of the Maiden Capital scheme, which Tuzman participated in even though he was not charged with it. Indeed, as noted above, the

Hon. Paul G. Gardephe
December 26, 2018
Page 7

He was clearly a participant in the fraud on Maiden Capital investors (which included KITD itself), and, in any event, the jury was properly instructed that "the wire communication requirement may be satisfied even if the wire communication was done by a person with no knowledge of the fraudulent scheme, including the victim of the alleged fraud."  (Tr. 7177).  Because Maiden and Tuzman caused KITD, a Maiden Capital victim, to wire funds from Manhattan to Maiden's North Carolina bank account, the jury was entitled to conclude that the Government established venue by a preponderance of the evidence.

                        Respectfully submitted,

                        GEOFFREY S. BERMAN
                        United States Attorney

                By:     /s
                     Damian Williams
                     Andrea M. Griswold
                     Joshua A. Naftalis
                     Assistant United States Attorneys
                     (212) 637-2298/1205/2310

cc:       Defense Counsel (by ECF)

---

Government provided notice to the defense that it considered Tuzman an unindicted co-conspirator in the Maiden Capital fraud.