J42VTUZ1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          15 CR 536 (PGG)

5    KALEIL ISAZA TUZMAN,
     OMAR AMANAT,
6
               Defendants.                FATICO HEARING
7
     ------------------------------x
8
                                          New York, N.Y.
9                                         April 2, 2019
                                          12:45 p.m.
10

11   Before:

12                    HON. PAUL G. GARDEPHE,

13                                        District Judge

14                         APPEARANCES

15

16   GEOFFREY S. BERMAN,
          United States Attorney for the
17        Southern District of New York
     JOSHUA A. NAFTALIS
18   ANDREA M. GRISWOLD
          Assistant United States Attorneys
19
     AVI WEITZMAN
20   DAVID P. SALANT
     JUSTINE M. GOEKE
21        Attorneys for Defendant Tuzman

22   RANDALL W. JACKSON
     GRAINNE O'NEILL
23        Attorneys for Defendant Amanat

24   ALSO PRESENT:  LUKE URBANCZYK, Paralegal Specialist, USAO

25

1           THE COURT:  All right.  So we're going to be resuming

2      with the testimony of Mr. Voetmann.  I hope I pronounced that

3      correctly.

4           THE WITNESS:  Close.

5           THE COURT:  Close.  Sorry.

6           You remain under oath, sir.

7           THE WITNESS:  Thank you.

8           THE COURT:  Please proceed.

9           MR. JACKSON:  Excuse me, your Honor.

10          We don't have to address it now, but I do just want a

11     placeholder for later on discussing the fact that I do want to

12     clarify for the record some of what transpired today with

13     Mr. Amanat before court.

14          THE COURT:  Okay.  We can do that now if you want.

15          MR. JACKSON:  I just want to clarify, I know the Court

16     was required to enter a force order this morning.

17          THE COURT:  Right.

18          MR. JACKSON:  Mr. Amanat did not refuse to come to

19     court and, in fact, was eager to come to court.  He simply

20     notified -- he's in the SHU.  And he notified the people who

21     came by this morning that his hearing wasn't until 12:30, and

22     expressly told them he was not refusing to come to court.

23          And at that point they told him, Well, if you're

24     saying he's coming at 12:30, then we're going to mark you down

25     as refusing.

J42VTUZ1

1          And he said, I'm not refusing.  I want to go to court.

2     I'm just telling you the accurate time.

3          THE COURT:  So they came to him much earlier today, is

4     that what you're saying?

5          MR. JACKSON:  Yes, your Honor.

6          So he did not refuse; he's been eager to come to

7     court.  And I think there was just some confusion about what

8     transpired in the SHU communication.

9          He's there.  He has an injury.  But he has been eager

10    to come to court.

11         THE COURT:  I appreciate you saying that.

12         The reason, of course, why I issued the order is I did

13    regard it as critical for Mr. Amanat to be here.  But I'm glad

14    to hear the clarification you made, Mr. Jackson.

15         How is the foot, while we're on the subject?

16         DEFENDANT AMANAT:  It's still a displaced fracture, so

17    it's not healing.  And it requires surgery in the next two to

18    three weeks.  I don't know what date I'm going.

19         THE COURT:  All right.

20         Well, Mr. Jackson or Ms. O'Neill, if either one of you

21    think Mr. Amanat's medical problems are not being addressed

22    properly, you'll let me know.

23         MS. O'NEILL:  I will, yes, your Honor.

24         MR. JACKSON:  One other minor thing, Judge.

25         We've been requesting a kosher meal for Mr. Amanat,

J42VTUZ1

1    because all he got was a bologna sandwich yesterday.  We were

2    advised by the marshals we couldn't give him any food.

3         Yesterday we sent a notification to the MCC.  They

4    said it was logged in the system now, that for the hearing

5    today he would get a kosher meal.  He did not.  He got a

6    bologna sandwich again.

7         So if it's okay, I would like to at some point request

8    the Court allow him to have a snack so that he doesn't go until

9    6 p.m. without any food.

10        THE COURT:  All right.  That's approved.

11        MR. JACKSON:  Thank you, Judge.

12        THE COURT:  Now, have you and Mr. Weitzman talked

13   about how things are going to go this afternoon?  Because you,

14   Mr. Jackson raised some concerns.

15        MR. WEITZMAN:  Yes, we have.  And I think we're going

16   to be able to work it out.

17        If it's a convenient time, and I think there will be

18   breaks, because of the way we've organized the

19   cross-examination, by 3:30, 3, 4, whatever it is that it's a

20   convenient time, he will be permitted to cut in for an hour.

21        So I very much hope that we will be done by 3:30 or 4

22   with our cross-examination.

23        THE COURT:  Excellent.

24        All right.

25        MR. NAFTALIS:  Your Honor, I just wanted to flag for

J42VTUZ1                          Voetmann - cross

1   you, Ms. Griswold may be coming or may not be coming.

2   Something has come up which, unfortunately, has pulled her

3   away.  So I'll be handling the witness.  But she may come, and

4   it will be a surprise to both of us.

5              THE COURT:  Okay.

6              All right.  Mr. Weitzman, are you prepared to proceed?

7              MR. WEITZMAN:  We are, your Honor.

8              My colleague Mr. Salant will be beginning.

9              THE COURT:  All right.

10             MR. SALANT:  Good afternoon, your Honor.

11             David Salant, for Mr. Isaza Tuzman.

12             THE COURT:  Please proceed, Mr. Salant.

13  TORBEN VOETMANN, resumed.

14  CROSS-EXAMINATION

15  BY MR. SALANT:

16  Q.  Dr. Voetmann, good afternoon.

17  A.  Good afternoon.

18  Q.  Your firm was retained by the government in this case?

19  A.  Can you repeat the question?

20  Q.  Your firm was retained by the government in this case?

21  A.  That's correct.

22  Q.  Your assignment was to assist the Court in determining the

23  approximate loss amount to third-party investors in KIT Digital

24  related to the charged market manipulation conspiracy; is that

25  right?

1   A.  That's what I have in my report; correct.

2   Q.  To estimate that loss amount, you looked at days on which

3   KIT Digital's stock price increased beyond its predicted

4   return?

5   A.  I performed several tasks to check whether the amount the

6   government had produced was correct or was reasonable; correct.

7   Q.  And all of your tests were based on measuring the increases

8   in KIT Digital stock above its predicted return?

9   A.  Yes.

10  Q.  Yesterday you explained to us your general approach, which

11  was to take daily price returns in KIT Digital stock and to

12  remove market and industry movement; is that right?

13  A.  That's correct.  I used Dr. Ferrell's event study that

14  removed mark industry movements to get a reasonable return.

15  Q.  So the concept here is what is left is stock price movement

16  specific to the stock?

17  A.  It could be specific to the firm-specific news on that day.

18  Q.  So it's movement specific to the firm?

19  A.  Well, so as Dr. Ferrell stated, aside from stock

20  manipulation, there are three other factors:  Market, industry,

21  and firm-specific.  So those are the factors I considered.

22  Q.  So with those three factors considered, market removed,

23  industry removed, what remains is firm-specific, right?

24  A.  And part of that, as Dr. Ferrell stated, is a potential for

25  stock manipulation as well.

J42VTUZ1                     Voetmann - cross

1    Q.  So what remains is firm-specific price movement?

2    A.  As long as you assume in that definition you include

3    manipulation.

4    Q.  So you agree.  We are in accord?

5    A.  With that definition, I would agree with that.

6    Q.  Okay.  This is what you call the positive residual; is that

7    right?

8    A.  The days in which the actual return was above the predicted

9    return would be a positive residual.

10   Q.  You also call it abnormal return?

11   A.  That's the common used term, as well, in the academic

12   literature.

13   Q.  And in this context, what's meant by the term "abnormal

14   return" is that the daily return in the stock is unexplained by

15   the market and industry factors you removed, right?

16   A.  That's a fair statement.

17   Q.  And in general, your approach adds up all of these

18   residuals, right?

19   A.  Well, I went a step further.  I didn't just add up these

20   residuals.

21   Q.  Specifically, your report adds up the residuals under four

22   sets of conditions that you describe in your report; is that

23   right?

24   A.  There's one more step I think you're missing there.  I also

25   adjusted the residual for the proportion of Maiden Capital

1   trades on a given day.

2   Q.  Understood.

3        And taking into account the weighting of the residuals

4   you just described, what I explained before was correct?

5   A.  Yes, it's the residual, but you need to include in that

6   explanation that you adjust for the proportion of the Maiden

7   Capital to reference it to the first test that I did.

8   Q.  Understood.

9        Now, the charged conspiracy period that you looked at

10  was December 31st, 2008 to September 15th, 2011; is that right?

11  A.  That's correct.

12  Q.  You use those dates because those are the dates that were

13  identified in the presentencing investigation report, or PSR,

14  that were identified in that document?

15  A.  That's correct.  It was in paragraph 151 to 154.

16  Q.  You did nothing to determine for yourself whether the

17  manipulation scheme that was alleged actually began or ended on

18  that date, right?

19  A.  No.  My assignment was to examine the calculation the

20  government had put forward, and then take into account or

21  review the concerns that Ferrell had raised.  So the

22  government's calculation specifically addressed that period; so

23  that's the period I addressed as well.

24  Q.  So to be clear, you did nothing to determine for yourself

25  whether the start or end dates should have been those dates?

J42VTUZ1                          Voetmann - cross

1   A.  I was not asked to examine the start and end date.

2   Q.  And therefore you did not do so?

3   A.  I did not.

4   Q.  All right.

5       Each of the daily residuals you were adding up in your

6   report reflects an increase in KIT Digital stock over the

7   expected return, right?

8   A.  Yes.  I just want to be careful, when you say "adding up."

9       I make a calculation each day before I then sum them

10  up.

11  Q.  Okay.  Each of your estimates involves a summing up of

12  residuals, right?

13  A.  It's a summing up.  Not a residual, but the dollar amount

14  of that residual based on the value of KIT Digital on a

15  particular day.

16  Q.  Understood.

17      And so your methodology is based on the notion that

18  these positive residuals multiplied by market capitalization

19  and weighted, as you've just described, approximates the stock

20  price's inflation accounting for market and industry movement?

21  A.  Yes.

22  Q.  You used this measure of the aggregate inflation as your

23  measure of loss, right?

24  A.  No.  I went a step further.

25      Remember, I adjusted for firm-specific information.

J42VTUZ1                     Voetmann - cross

1   So depending on the day you are referring to, I would adjust

2   for firm-specific news, and I still also weighted it for Maiden

3   Capital trading.  So I only looked at days over that period

4   where there was Maiden Capital trades.

5   Q.  So having made all of those adjustments, you are using a

6   measure of stock price inflation as an estimate of loss?

7   A.  That's correct.  Because, as Dr. Ferrell wrote in his

8   report, the conspiracy scheme was intended to inflate the stock

9   price of KIT Digital.

10  Q.  Dr. Voetmann, you've been involved in many securities case,

11  right?

12  A.  I have.

13  Q.  You would agree that in a securities fraud case, the loss

14  amount typically measures stock price decline resulting from

15  the charged offense, right?

16  A.  In a typical class action there would be a corrective

17  disclosure; and in a typical class action, you would measure

18  the impact on that corrected disclosure date.

19  Q.  So in a typical securities case, you are looking at stock

20  price decline?

21  A.  I think that depends.  It's a very general statement.

22          So in a class action you might have information where

23  there is disclosure of omission -- misrepresentation that's

24  being revealed to the market.  When that truth comes to the

25  market, you might look at a decline.

1          But you could also look at other days where a company

2     is trying to inflate the price of a security, and then

3     inflating the price on a given day.  So it really depends,

4     depending on the class action you're looking at.

5     Q.  So let's make this very simple.

6          Would you agree that it is the reduction of price in a

7     security that harms the holders of the security?

8     A.  I don't think that's an adequate statement.  Because you

9     can also have a conspiracy scheme with the intent of increasing

10    the price to the benefit of the person who's committing the

11    conspiracy scheme.

12    Q.  Understood.

13         And so shareholders holding the stock in that

14    situation would, in fact, experience an increase in the value

15    of the shares they hold while the inflation occurs?

16    A.  The shareholders might experience an increase in return as

17    well.  But when the truth might come out about the conspiracy

18    scheme, they might lose that value that they have earned.

19    Q.  Precisely.

20         So in the context of market manipulation, for an

21    innocent shareholder to be harmed, they must buy the stock at

22    an inflated price and hold it while the inflation dissipates,

23    right?

24              MR. NAFTALIS:  Objection.

25              THE COURT:  Grounds.

J42VTUZ1                        Voetmann - cross

1          MR. NAFTALIS:  Is this a legal conclusion or is

2     this --

3          THE COURT:  I don't understand it to be a legal

4     conclusion.  You're not offering -- I mean this question

5     doesn't have to do with a legal conclusion, does it?  It

6     sounded like a factual question to me.

7          MR. SALANT:  Yes, your Honor.

8          THE COURT:  All right.  So that's the way I understand

9     it.  So I'm overruling the objection.

10    BY MR. SALANT:

11    Q.  Would you like me to ask it again?

12    A.  Sure.  Please.

13    Q.  In the context of market manipulation, for an innocent

14    shareholder to experience loss, they would need to buy the

15    stock at an inflated price and hold it while the inflation

16    dissipates; is that right?

17    A.  I think that depends.  Give me a minute.

18          I think that depends on what type of stock

19    manipulation are we talking about.

20          So in this case, we have a conspiracy scheme, as I

21    understand it, from reading the presentencing document and Dr.

22    Ferrell's report where the intent was to inflate the price to

23    the benefit of the person who committed that scheme.

24    Q.  I'll ask you the same question again.

25          For an innocent shareholder to experience loss, they

J42VTUZ1                        Voetmann - cross

1    would need to buy the stock at an inflated price and hold it

2    while the inflation dissipates.  Do you agree or disagree with

3    that?

4    A.   In a traditional class action, that is definitely the

5    definition we operate under when we calculate loss to an

6    investor.

7    Q.   And similarly, for an innocent shareholder to realize loss,

8    they must buy the stock at an inflated price and sell it after

9    the inflation dissipates, right?

10   A.   As a general definition.

11        But in this particular case, I did not look at the buy

12   and sell of these individual investors.  I was examining Dr.

13   Ferrell's concern with the government's calculation.  And I

14   made the adjustments and corrections that he suggested you

15   should make to their calculation.

16   Q.   Understood.  We'll get to all that.

17        But to be clear, your analysis does not measure any

18   price declines as a result of the charged market manipulation,

19   right?

20   A.   My analysis measures the benefit to the defendant in this

21   case from the Maiden Capital trades.

22   Q.   So I'll just ask the same question again.

23        Your analysis does not measure any stock price

24   declines as a result of the market manipulation; correct?

25   A.   I only looked at the positive residuals.  I did not look at

J42VTUZ1                     Voetmann – cross

1   negative residuals.

2   Q.  So that's correct?

3   A.  So I did not look at negative residuals, that's correct.

4   Q.  And indeed, Dr. Voetmann, you're aware that there was no

5   stock price drop at the conclusion of the market manipulation

6   scheme, are you aware of that?

7   A.  I've seen the data.  I'm not aware if at the conclusion

8   what the corrected disclosure was.  But I've seen the data.

9   The value of KIT Digital increased over the conspiracy period

10  from 5.25 all the way up to about $9 at the time of September

11  2011.

12  Q.  I'm not sure I understood your answer.

13          Following September 15th, 2011, was there a decline in

14  the stock price of KIT Digital?

15  A.  I did not look at that.

16  Q.  Let's take a look.

17          Dr. Voetmann, I'm handing you what's been marked as

18  Defendant's Exhibit F110.

19          Just for the record, Dr. Voetmann, I'll represent to

20  you that this chart was created using a spreadsheet produced by

21  the government to the defense prior to this hearing.  That

22  spreadsheet was entitled "Figure and Appendix C," and it was

23  produced under the Bates number USAO_Tuzman_ 0346174.

24          Dr. Voetmann, do you see the chart in front of you?

25  A.  I do.

J42VTUZ1                        Voetmann - cross

1    Q.  Do you recognize this chart?

2    A.  I have a similar chart not through December, but I have a

3    similar chart in my report.

4    Q.  So would you agree that this is a chart that takes the KIT

5    Digital closing stock price and extends it by three months past

6    what your chart showed?

7    A.  That's correct.

8    Q.  So I'll ask you again, in the three months following

9    September 15th, 2011, there was no collapse in KIT Digital

10   stock price, was there?

11   A.  Well, there was certainly an increase.  And I would note

12   that in the presentencing report, in the government's

13   calculation to see if their analysis -- their calculation was

14   reasonable, they mitigated for the three months or the 90-day

15   period after their calculation.  So they mitigated by taking

16   the average price of those 90 days versus the average price

17   during the conspiracy period.  So they accounted for that

18   increase in price for December 15th.

19   Q.  We'll discuss that later.

20        For now, you agree that following September 15th,

21   2011, the stock price of KIT Digital increased?

22   A.  So I can't exactly see on here when September 15 is, but,

23   yes, it appears that it increased.

24        But it also appeared that it might have fallen in the

25   month after September 15th, and then it spiked in

1    October/November, and then fell down in December.

2    Q.  All right.

3    A.  And I did not look at any news stories that might have come

4    out during that time period that could explain that increase.

5    Q.  Dr. Voetmann, it is fair to say that criminal market

6    manipulation is not your area of expertise; is that right?

7    A.  Well, I'm not an attorney and I don't present myself to

8    understand the criminal side of it.  But when it comes to the

9    economic analysis that might be used in such a case, I think

10   the experience I have in class actions and other cases would be

11   applicable.

12   Q.  As an econometrician, you have never published on the topic

13   of market manipulation, have you?

14   A.  I have not.

15   Q.  You've never written a report estimating loss amounts in

16   connection with market manipulation offenses, have you?

17   A.  Well, I have not filed as an expert report, but I have

18   worked for almost 20 years as a consultant.  And over those

19   years I worked on many projects that may have touched on

20   situations lake this.

21   Q.  You've never before presented a report like this one to a

22   court, have you?

23   A.  Again, I think that depends on -- you say such a report.

24   In terms of using an event study in a report, I've done that

25   many times.  When it comes to calculating returns, I've done

1    that many times.

2    Q.  The question is simple:  Have you ever presented a report

3    calculating losses in a market manipulation case to a court?

4    A.  Not to a court.

5    Q.  Have you ever before seen a report using this methodology

6    that you advance presented to a court?

7    A.  So are you talking -- so generally I've seen many reports

8    that have advanced the general accepted methodology of an event

9    study, as Dr. Ferrell recommended we should do here.  Event

10   studies have been around for 50 years; it's a very common

11   methodology.  And that certainly had been produced in many,

12   many reports and advanced to many courts.

13   Q.  Dr. Voetmann, to be clear, I'm not talking about an event

14   study, I'm not talking about Professor Ferrell's report.  Do

15   you understand?  I'm asking if the calculation of loss amount

16   proceeding in this way, if you ever seen that presented to a

17   court before?

18            MR. NAFTALIS:  Your Honor, objection.

19            I'm a little confused.  They did the exact same thing

20   at trial, and now they are impeaching the witness on their own

21   event study.  So I just want to use the Court's time

22   efficiently.

23            MR. SALANT:  Forgive me your Honor, I disagree.

24            THE COURT:  I'm sure you do.

25            But maybe you could help me understand.  As I

1    understand it, this witness's work is premised on a study that

2    Dr. Ferrell did.  So I think what Mr. Naftalis is saying, it

3    appears that you -- and maybe you're not.  It appears that

4    you're trying to impeach the work that Dr. Ferrell did.  So

5    maybe you can help me understand why that's not what you're

6    doing.

7              MR. SALANT:  Yes, your Honor.

8    BY MR. SALANT:

9    Q.  Dr. Voetmann, you used -- oh, pardon me.

10             MR. WEITZMAN:  Do you want us to address this to your

11   Honor now or through questioning?  Because I'm happy to address

12   it now.

13             THE COURT:  Why don't you give me your side of it,

14   either one of you, I don't care who wants to address it, but,

15   yes.

16             MR. WEITZMAN:  Professor Ferrell made very clear he

17   was not measuring loss amount, he was not identifying causation

18   with respect to whether any trades by Maiden caused a stock

19   price increase.  What he was doing was ruling out the

20   possibility that there was an abnormal stock price increase on

21   the days that Maiden testified he was manipulating the market.

22   That's a very different calculation than a loss amount

23   calculation, which he never did, never purported to do.

24             So it's not a critique of the event study; it's a

25   critique of how you use the event study and what its import is.

1        THE COURT:  All right.

2        Mr. Naftalis, do you want to respond?

3        MR. NAFTALIS:  Your Honor, I don't really understand

4   the distinction.

5        Dr. Ferrell got up there and said that he's the

6   foremost expert in event studies, and this is the way you

7   figure out if the market has been manipulated.  This witness

8   accepted that as true, and then basically added a column and

9   did some math as to what does Dr. Ferrell's analysis show.

10        We're trying to eliminate issues for your Honor.  We

11   took their methodology to do some math.  We really want to not

12   fight over things that don't need to be fought over.  But this

13   is literally Dr. Ferrell's analysis.

14        MR. SALANT:  Your Honor, may I respond?

15        MR. NAFTALIS:  It's just turned into dollars and

16   cents.  They basically are doing the cross I did of Dr. Ferrell

17   against our witness, when all we are basically doing is using

18   their analysis.

19        We're happy to have them critique their own analysis,

20   but then they presented something to the jury that doesn't make

21   any sense.

22        So we just want to get to, sort of, what the issue is

23   as to how you calculate loss.  And if there really are issues

24   that your Honor needs to decide, I would love to do that.  But

25   I don't know if it's efficient to, sort of, critique Dr.

J42VTUZ1                        Voetmann - cross

1   Ferrell through this witness, especially since we can't

2   cross-examine Dr. Ferrell because we're not producing him

3   again.

4           THE COURT:  Mr. Jackson, do you wish to be heard?

5           MR. JACKSON:  Thank you, your Honor.  Yes.

6           I just want to point out this witness said yesterday

7   explicitly that he did not do an event study.  And so the

8   question of his analysis is not the question of the validity of

9   event studies; it's the question of what exactly he did.  And

10  the event study is the baseline upon which we all agree.

11          THE COURT:  He's not being asked about what he did

12  now.  What he's being asked about is whether he's familiar with

13  whether what he did has ever been presented to a court before.

14  Those are the questions that we've been hearing over the last

15  few minutes.

16          MR. JACKSON:  Exactly, your Honor.

17          I think that that's a very separate inquiry from the

18  inquiry about whether what Professor Ferrell did is valid.

19  That goes to the core of what we're supposed to be determining

20  today.

21          THE COURT:  All right.

22          Well, my advice would be if you could craft your

23  questions more so that they focus on what this witness did so

24  that we don't have a dispute about whether you're

25  cross-examining him about something that Professor Ferrell did,

J42VTUZ1                         Voetmann - cross

1    because that seems to be the point of dispute between the

2    parties.  So I think if your questions are crafted so that it's

3    perhaps clearer that you're asking him about things that he

4    did, maybe we can avoid the dispute.  That would be my advice.

5             MR. SALANT:  Thank you, your Honor.

6    BY MR. SALANT:

7    Q.  Dr. Voetmann, I'll try and tie this issue up in one

8    question:  The math that you did to estimate loss amount that

9    you present in your report, have you ever seen another report

10   in a market manipulation case using the method that you used

11   here?

12   A.  I'll try to answer that in two steps.

13            One, I have not done a stock manipulation case myself

14   as a witness in terms of being on the stand calculating the

15   loss amount.  I have worked on manipulation cases over the

16   years.

17            But secondly, I have seen the idea that you are trying

18   to isolate what is the factor that drives a stock price up or

19   down.  And as Dr. Ferrell stated, aside from stock

20   manipulation, there are three other factors:  Industry, market,

21   and firm-specific.  And so he's pointing to four factors.

22            In my analysis, what I did was controlling for three

23   of those four, leaving a fourth left, and there is a plausible

24   causal effect there that that could be stock manipulation.

25   Q.  And following that, you took a three-step process where you

J42VTUZ1                     Voetmann - cross

1    took Professor Ferrell's results, you applied Maiden's share of

2    buy volume, and you multiplied by the total number of shares

3    outstanding.  That was a step you took in your analysis.

4    A.   Those are the three steps:  The residual; the portion of

5    Maiden Capital; and then, in addition to that, I adjusted for

6    whether or not there was confounding information to

7    firm-specific.

8    Q.   So that is my question.  Those three steps and the steps

9    you describe, have you ever seen them taken before to estimate

10   loss in a market manipulation case?

11   A.   I'll answer again.  So I have worked on market manipulation

12   cases, and I worked on many securities class actions.  And this

13   particular step we just talked about is a very common procedure

14   you use when you are evaluating the impact on potential

15   misrepresentations or omission of information in class actions.

16   So those steps are very similar.  I think it's a very generally

17   accepted methodology in steps you take when you're examining

18   the impact on a security from such information.  You're trying

19   to isolate the factor that might drive that security.

20           And similar to that here, as Dr. Ferrell and I agree

21   on, you have the -- aside from stock manipulation, known

22   conspiracy scheme, you have the market industry and

23   firm-specific.  And I adjusted for those three, leaving out --

24   left with what potentially could be the manipulation.

25   Q.   All right.  Thank you.

1              Dr. Voetmann, yesterday you testified that you were

2       not personally paid by the government for your testimony in

3       this case, but your firm was.

4       A.   That's correct.

5       Q.   How much is your firm being paid for its engagement in this

6       case?

7       A.   Well, Brattle, as most consulting firms, we bill by the

8       hour.  So depending upon how many hours we have worked on the

9       case, that's how much we have been paid.

10             Sitting here today, I don't know how many hours I

11      actually put in on the case.  It's been going on for almost a

12      year now.

13      Q.   What is your hourly rate?

14      A.   675.

15      Q.   Are others from your firm working on this case?

16      A.   I had some analysts helping me out, putting some charts

17      together and helping me review some of the reports, the news

18      articles.

19      Q.   And do you have a sense of how much your firm has invoiced

20      in this case?

21      A.   So I actually do not.  One of my colleagues on the case is

22      handling the invoices with the government, so I actually have

23      not seen the invoice.  I know how much time I spend on it, but

24      I don't know how much time the team has spent.

25      Q.   You're a partner in your firm, a principal, you said?

J42VTUZ1                          Voetmann - cross

 1    A.   That's right.

 2    Q.   You receive some portion of residual profits?

 3    A.   That's correct.

 4    Q.   And so some share of what the government pays your firm in

 5    this case goes to the firm's bottom line, right?

 6    A.   I would assume so, assuming there's a profit out of this

 7    case, yes.

 8    Q.   And that would go to your bottom line, right?

 9    A.   Well, yes, I would -- it's in one general pool from all

10    cases that the firm works on.  And as a partner, I get a share

11    of that pool.

12    Q.   Dr. Voetmann, are you aware that as of December 31st, 2008,

13    the first day of the period you studied, KIT Digital's market

14    capitalization was just above $17 million?

15    A.   Yes.

16    Q.   Do you have an understanding of the term micro-cap stock?

17    A.   I do.

18    Q.   Do you understand that a micro-cap stock is a stock with a

19    market cap between 50 and $300 million?

20    A.   Generally, that's in that range.

21    Q.   So KIT Digital at the time of the beginning of your study

22    was smaller than a micro-cap stock?

23    A.   Yes, it was very small at the time.

24    Q.   Some people call this a nano-cap stock, right?

25    A.   I'll take your word for it.

J42VTUZ1                         Voetmann - cross

1   Q.  Trading dynamics are different for nano and micro-cap

2   stocks than for large-cap stocks, right?

3               MR. NAFTALIS:  Objection, your Honor.

4               THE COURT:  Grounds.

5               MR. NAFTALIS:  They put forward an event study of KIT

6   Digital, a "nano-cap."  And now they are impeaching the fact

7   that there was an event study of a nano-cap.

8               I just don't know what the point of their cross is at

9   this point.

10              There obviously are issues we can disagree on, but

11  critiquing whether this is a proper methodology has, sort of --

12  that happened a year and-a-half ago.  Whether an event study

13  can study nano-caps, that came in at trial.  We've adopted

14  their methodology to try to help your Honor reach a reasonable

15  estimate of loss.  But if we're going to go through whether

16  event studies can properly be used with this type of a firm --

17  Dr. Ferrell says you should use event studies, and then we take

18  his event study and reach a conclusion.

19              So, again, we're happy to be here for whatever your

20  Honor wants; we just don't understand what the cross is

21  supposed to do.

22              MR. SALANT:  May I respond, your Honor?

23              THE COURT:  Yes.

24              MR. SALANT:  This line of cross-examination is not

25  intended to impeach or evaluate the event study in any way; it

1    is to examine the steps that Dr. Voetmann took with the results

2    of the event study in order to calculate loss amount, which was

3    not within the scope of Professor Ferrell's event study.

4              There are similar concepts at play, but this is

5    intended as a different line of cross-examination.

6              THE COURT:  That may be.  But I will say that the

7    question that drew the objection seemed -- it seemed to be

8    raising doubt about whether -- I mean maybe I misinterpreted

9    the question, but it seemed to me that it was intended to

10   suggest that an event study of the sort that was done here

11   couldn't properly be done on a nano -- a micro-cap or nano-cap

12   type stock.  Maybe I misunderstood what you were getting at.

13             MR. SALANT:  It certainly wasn't intended that way,

14   your Honor.

15             THE COURT:  Okay.

16             I'm going to overrule the objection.

17             You can proceed.

18   BY MR. SALANT:

19   Q.  Dr. Voetmann, are you aware that KIT Digital stock was

20   first listed on the NASDAQ global market exchange in August

21   2009?

22   A.  Yes.

23   Q.  Prior to that, it was listed on the NASDAQ OTC bulletin

24   board, right?

25   A.  Yes.

J42VTUZ1                    Voetmann - cross

1   Q.  On balance, stocks that are not listed on national or

2   listed exchanges are less liquid than those listed on

3   exchanges?

4   A.  As a general matter, there's a reason why they are listed

5   OTC.  They may or may not trade as frequently as larger stocks.

6   But there are certainly situations where even small-cap have

7   the general interest of the market and they trade frequently on

8   an OTC.  So it really depends on the security you're looking

9   at.

10  Q.  And just to define our terms, in this context "liquidity"

11  means whether the stock could be easily traded?

12  A.  As a general definition, that's often what we refer to.

13  Q.  Do you know how liquid or illiquid KIT Digital stock was

14  prior to it being listed on the NASDAQ in August 2009?

15  A.  It's not part of what I examined.  What I did exam was the

16  level of volume of trades that occur through the entire

17  conspiracy period.

18  Q.  And having done so, did you reach any conclusions as to

19  whether KIT Digital stock was liquid or illiquid?

20  A.  Well --

21           MR. NAFTALIS:  Objection to form.

22           THE COURT:  Sustained.

23  Q.  Dr. Voetmann, I'll try and make this portion very brief.

24           In your report, did you do any analysis to determine

25  if the market for KIT Digital was efficient while it was

J42VTUZ1                          Voetmann - cross

1     trading over the counter?

2     A.   The general assumption of applying an event study is that

3     the market is deficient.  So I followed the guidelines from Dr.

4     Ferrell as he implemented his event study.  I tested his event

5     study, I replicated his event study.  So that's the extent I

6     was comfortable using his event study.

7     Q.   And you took no steps beyond that?

8     A.   I did not.

9     Q.   Earlier we discussed that your firm was retained by the

10    government in this case to assist the Court in determining the

11    approximate loss amount to third-party investors in KIT

12    Digital.  Do you recall that?

13    A.   Yes.

14    Q.   By "third-party investors," you meant investors who are not

15    defendants in this case, right?

16    A.   I believe that's a fair statement.

17    Q.   You testified yesterday that your analysis was confined to

18    trading by an entity called Maiden Capital.

19    A.   Yes.

20    Q.   In your report, you did not study trading activity in KIT

21    Digital stock by any other person.

22    A.   So I believe I wrote in my report that it's Maiden and

23    Saxon and then combined those two, what we refer to as Maiden

24    Capital.

25    Q.   And other than those two entities, you did not study

J42VTUZ1                        Voetmann - cross

1   trading by any other particular person?

2   A.  I did not.

3   Q.  So you did not consider when other third parties bought or

4   sold KIT Digital?

5   A.  No, in the sense that I focused on what trades did Maiden

6   Capital make where they benefited from the trades, which their

7   trades obviously would have been with a third-party investor.

8   Q.  That's a fair point.

9           You did not identify any third-party shareholders

10  trading in KIT Digital at all?

11  A.  As a general matter, when you're looking at volume and

12  securities, the data you have access to, the data that Dr.

13  Ferrell and I both used from Bloomberg, you don't get the

14  identifier of the third-party investors, you get aggregate

15  volumes.  So therefore, no, I would not know the entity of

16  those additional investors.

17  Q.  And so therefore your report does not identify any person

18  who lost any money trading KIT Digital, right?

19  A.  Well, no, not a specific name of an individual investor.

20          What my analysis does, the test I did to see if the

21  government's calculation was reasonable, comes up with an

22  amount, a range, that had KIT Digital not traded or had they

23  not engaged in the alleged conspiracy scheme, those investors,

24  had they not sold to KIT Digital, they could have gained those

25  returns that KIT Digital or Maiden Capital now earned.

1    Q.  You did not identify any party who lost any money in KIT

2    Digital in your report, did you?

3    A.  I identified the amount of potential losses that a

4    third-party investor could have earned, but not the name of who

5    that third-party investor could be.

6    Q.  Are you aware that Stephen Maiden bought many shares of KIT

7    Digital between December 2008 and September 2011?

8    A.  I believe this came up in Dr. Ferrell's transcript I read,

9    if I remember correctly.

10   Q.  Stephen Maiden or his entities bought millions of shares of

11   KIT Digital, right?

12   A.  I'm aware of that, yes.

13   Q.  That would mean that Maiden himself was a purchaser of

14   stock at inflated prices, right?

15   A.  Well, so I have to understand.  I need to look at my data.

16   If the volume identified by Dr. Ferrell as Maiden Capital data

17   did not include Stephen Maiden's volume as well.

18   Q.  Under your analysis, Maiden Capital or his entities were

19   purchasers of stock during the inflation period?

20   A.  Conspiracy period, yes.

21   Q.  Did you take any steps to remove Maiden or his entities'

22   share of losses from your loss estimate?

23          MR. NAFTALIS:  I hate to interrupt.

24          Are we talking about Stephen Maiden individually or

25   are we just using Maiden interchangeably with Maiden Capital?

1          THE COURT:  I think there's some confusion between the
2   questioner and the witness.  Because the witness, I believe, is
3   endeavoring to separate Maiden Capital from Maiden as an
4   individual, and I'm not sure your questions are acknowledging
5   that distinction.
6          So if you could, in your questioning, focus or make a
7   distinction between Maiden Capital and Maiden as an individual,
8   that would be helpful.
9          MR. SALANT:  Yes, your Honor.
10  BY MR. SALANT:
11  Q.  Dr. Voetmann, did you take any steps to remove Maiden
12  Capital's share of the losses from your loss amount estimate?
13  A.  I'm not sure I follow.  You said Maiden Capital shares?
14  Q.  Maiden Capital's share of the losses.
15  A.  I calculated the overall losses or I tested the overall
16  losses the government calculated, focusing entirely on the
17  aggregate Maiden Capital volume that was produced and presented
18  to me by Dr. Ferrell.
19         MR. JACKSON:  Excuse me, your Honor.  I can't hear the
20  witness.  Could we ask him to repeat the answer?  Maybe just
21  move slightly closer to the microphone.
22         THE COURT:  Yes.  Can you answer that question again?
23  Do you need it read back or do you want to hear it again?
24         THE WITNESS:  I think I'm good.
25         THE COURT:  Okay.

J42VTUZ1                        Voetmann - cross

1    A.  So again, in my analysis, the materials I had access to

2    included spreadsheets from Dr. Ferrell that listed all the

3    Maiden Capital volumes.  And so for the purpose of my analysis,

4    I incorporated and included all the Maiden Capital volume of

5    shares, and that's the basis for the loss calculation, the test

6    of the government's calculation, that I did.

7                   (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J423TUZ2                          Voetmann - Cross

1   BY MR. SALANT:

2   Q.  The step you took in your analysis was to multiply the

3   daily residual by the total number of shares outstanding,

4   right?

5   A.  Well --

6   Q.  That was one step you took in your analysis?

7   A.  That's the second step in my three steps.  The first step

8   is the residual itself.  The second step is figuring out, okay,

9   what is the value on a given day of that residual, depending on

10  how many shares are outstanding.  And then the third step is

11  what we're talking about here, I took the Maiden Capital volume

12  relative to the total buy volume on a given day.

13  Q.  In the second step where you multiply by all shares

14  outstanding, did you remove any shares that were held by Maiden

15  Capital?

16  A.  These are reported shares outstanding by Bloomberg, so

17  that's the number I took.  I did not take any further

18  adjustment to those shares.  In the typical case, the report of

19  shares outstanding would reflect all shares outstanding held by

20  everyone in that security.

21  Q.  Are you aware that during the conspiracy period you

22  studied, Kaleil Isaza Tuzman and his investment entities were

23  the largest shareholders in KIT Digital?

24  A.  I don't recall if I saw that.  That's -- I may have read

25  that.

J423TUZ2                    Voetmann - Cross

1   Q.  Are you aware that the public -- the company publicly

2   disclosed that as of December 31, 2008, the first day in your

3   conspiracy period, Kaleil and his investment entities held

4   57.82 percent of the company's total outstanding shares?

5   A.  I'm not aware of that, but I know they traded 61 percent of

6   the shares that day.

7   Q.  Are you aware that on August 18, 2009, an entity controlled

8   by Kaleil purchased an additional $4 million worth of KIT

9   Digital common stock?

10  A.  It is not part of the test I did, so I am not aware.

11  Q.  Are you aware that Kaleil or his entities made further

12  purchases of KIT Digital common stock during the conspiracy

13  period you studied?

14  A.  Only to the extent they are part of the Maiden Capital

15  volume.  I am not aware of other trades they may have outside

16  of Maiden Capital.

17  Q.  Assuming that these trades actually did happen, would you

18  agree that Kaleil Isaza Tuzman was a large shareholder of KIT

19  Digital stock in the period of December 31, 2008 to

20  September 15, 2011?

21               MR. NAFTALIS:  Objection to form.

22               THE COURT:  Sustained.

23               MR. NAFTALIS:  Also foundation on a lot of this.

24               THE COURT:  Well, I've sustained the objection as to

25  form.  So, if you want to continue, you'll need to change the

1   form of the question.  And then depending on the question, I'll

2   decide whether there is adequate foundation or not.

3   Q.  Dr. Voetmann, in your report you make numerous references

4   to the PSR.  Do you recall that?

5   A.  The presentencing report, yes.

6   Q.  The PSR in this case calculated a loss amount for Count

7   Four of between 11.5 and 25.2 million, right?

8   A.  That's correct.

9   Q.  Yesterday you were asked if you felt the government's

10  result was reasonable.  Do you remember that?

11  A.  Yes.

12  Q.  You were not asked if you reviewed the government's

13  methodology in reaching that result, were you?

14  A.  Can you repeat that question?

15  Q.  You were not asked whether you agreed with the methodology

16  used to reach that result.

17  A.  I was not asked that.  I did observe, though, that in

18  Dr. Ferrell's concerns with the government's calculation, he

19  did not state that he was concerned with their methodology for

20  calculating it, other than he had concerns about the

21  adjustments that needed to be made.

22  Q.  Do you recall when you were engaged by the government,

23  before or after April 27 of 2018?

24  A.  I don't have the exact date, but I believe it was after.

25  Q.  Did you review the methodology used to calculate loss in

1    the PSRs?

2    A.   I read the PSR.  To that extent, I reviewed it.

3    Q.   So, you would agree that what the PSR is doing is taking

4    the total change in KIT Digital's market cap, and multiplying

5    it by Maiden's share of volume.  Two steps?

6    A.   I don't have the PSR in front of me, but I thought there

7    was a third step that they also mitigated by looking at the

8    90-day period afterwards.  To the extent that the price went up

9    as we saw in the chart earlier.

10   Q.   As an econometrist, do you endorse the method employed by

11   the PSR?

12   A.   I wasn't asked to endorse it.  But the concept of looking

13   at how much a market cap change happened over time, that's a

14   common calculation in terms of finance.  So in that sense, it's

15   a common methodology to calculate how much the value of a

16   company changed from one year to the next.

17   Q.   So as a professional, you endorse the method that is

18   advanced in the PSR or not?

19   A.   I don't think that's what I said.  I said that the concept,

20   the principle of looking at how much does the value of a

21   company change from one date to another, as the government

22   calculated the increase in market cap from December 2008 to

23   September 2011, that's a common calculation one might study,

24   and to apply a proportionate to a certain volume, that's also

25   not an uncommon calculation.

1      But I'm not suggesting that I'm advancing the

2   methodology.  I was more asked to, I was asked to see if I did

3   some tests addressing the concerns by Ferrell, would I agree

4   that the amount they calculated was reasonable.

5          MR. NAFTALIS:  If we're going to continue this line, I

6   wanted to object.

7          MR. SALANT:  I don't have anymore questions on it.

8          MR. NAFTALIS:  Just to put it on the record.  The

9   general chronology is there was a PSR, the defendant said

10  that's not good enough.  Ferrell puts in a report that says

11  that's how to do it.  We do it.  Impeaching the PSR, I am not

12  sure why that's relevant, and if we're going to go back to

13  those issues.

14         THE COURT:  He just said you don't have anymore

15  questions on that one, right?

16         MR. SALANT:  No, your Honor.

17         THE COURT:  Go ahead.

18  Q.  Let's please look at the chart on page 12 of your report

19  you presented to this court.  I believe it's marked as

20  Government Exhibit V1, and I'm looking at page 12.  This is

21  that chart; is that right?

22  A.  That's correct.  This is the chart that's in the report

23  itself.

24  Q.  So you've estimated a loss amount range of 10.4 million to

25  82 million, right?

1   A.   That's correct.

2   Q.   That's quite a large range.

3   A.   It is quite a large range.

4   Q.   Let's start with your highest estimate of 82 million.  You

5   do not actually believe this to be a precise measure of the

6   loss calculated by Maiden's trading, do you?

7   A.   I believe I said yesterday that it's the high end, but in

8   this calculation, I did not account for the company specific

9   information.  And so, if you were to account for that, it may

10  reduce that 82 downward.

11  Q.   I'd like to focus on a different issue.  Yesterday you

12  testified that your two high estimates of 82 and 68 million

13  were calculated without regard to the statistical significance

14  of daily residuals.  Do you recall that?

15  A.   I do.

16  Q.   I'd like to break down exactly what that means.  Yesterday,

17  you explained what the daily residuals were.  You also

18  explained how T statistics are calculated to assess whether

19  residuals for given trading are statistically significant.

20  This is Professor Ferrell's data upon which you rely, right?

21  A.   I don't think I defined T statistic yesterday, but we

22  talked about the significance, sure.

23  Q.   Statistical significance is an incredibly important concept

24  in econometrics, isn't it?

25  A.   It is very important, yes.

1    Q.   Statistical significance gets at the question of whether an

2    observed result is the product of chance or not, right?

3    A.   It does address that.  It addresses the question of whether

4    or not it's more likely than not that the information disclosed

5    to market caused the price change, if it is a statistical

6    significant price reaction.  Which is why I introduced both the

7    high end test and the low end test.

8    Q.   We're speaking just about your high end test right now.

9    So, would you agree that results that are found to be

10   statistically significant are results that are unlikely to be

11   due to chance?

12   A.   That's the general definition, common language definition

13   of statistically significant.

14   Q.   Another way people put it is that a statistically

15   significant result is statistically different from zero.  Is

16   that fair?

17   A.   I think that's fair.  I mean, typically the definition is

18   that you're more likely than not that you can associate the

19   event that you're looking at, the factor you are looking at, to

20   have explained the price reaction.  But there's still -- if

21   you're using 5 percent as your level of statistical

22   significance, there is still a 5 percent chance there is not

23   that factor.

24   Q.   You say 5 percent, you are referring to the thresholds at

25   which statistical significance can be tested?

1   A.   That's a common level of threshold we use in cases like

2   this.

3   Q.   To the econometrician like you, a statistically significant

4   result is more meaningful than a result that is not

5   statistically significant.

6   A.   I don't know I would agree with that.  The question is what

7   are you analyzing and what are you examining.

8        So, in this case, we are examining all the trades by

9   Maiden Capital, and we are trying to assess whether or not

10  those trades might have impacted the security.

11       And so, you can have a residual that is, like, say

12  94 percent level of significance, so that would not qualify as

13  statistically significant, but nonetheless it's very close to

14  being statistically significant.  In fact, there is different

15  levels that econometricians would use, 5 percent, 10 percent,

16  1 percent.  So, it's not a bright line rule always that you

17  just cut off at 5.

18       So, that's why, when I examined the first row here, I

19  wanted to get a sense for if you are considering the conspiracy

20  scheme as the manipulation of the stock, and so each time they

21  have an intent to manipulate the security, what would be the

22  impact, the maximum impact, if you included all those days.

23  That's what that $82 million was.

24  Q.   To be clear, the 82 and 68 are not ones that are 94 percent

25  in a 95 test.  They are done without regard to statistical

1    significance at all.

2    A.   These are all the days where there is a positive residual.

3    Correct.

4    Q.   You've written many articles in peer-reviewed journals,

5    right?

6    A.   I have.

7    Q.   Those articles you always report on the statistical

8    significance of your results, right?  We have them.  We can

9    look at them if you'd like.

10   A.   I think I use two terms.  I use statistically significant

11   and at time we also refer to marginal significance.  Marginal

12   significance is something that's close to being statistically

13   significant.

14   Q.   Marginal significance makes no appearance in your report

15   today?

16   A.   That's right.  Statistically significant does.  That's why

17   I did the high end test and the low range, the scenario three

18   and four.

19   Q.   So to be clear, your 82 and $68 million estimates were

20   calculated without regard to the statistical significance of

21   the daily results.

22   A.   This is -- yes, this is looking at all the days where there

23   was a positive residual.  In the first instance, the first row,

24   I did not account for the third factor that Dr. Ferrell

25   suggested I should, which is the confounding information.  So

J423TUZ2                    Voetmann - cross

1    in that sense, we are taking every day as a potential for the

2    conspiracy scheme to work.

3           In the second row, here, I did the test or went

4    through potential confounding information, and to be

5    conservative, any day where there might have been confounding

6    information, I excluded those days and that's where we reduced

7    it to 68.2.  That was my first two tests of the high end of the

8    conspiracy schemes, manipulation of the stock if you are

9    counting every day they engaged in trading.

10   Q.  Understood.  And so, if we were to confine our attention to

11   only statistically significant daily results, we would have to

12   eliminate your first and second estimates?

13   A.  If the Court finds that that's the only days that matters

14   for manipulation, then you would focus on row three and four.

15   Q.  That's 15 and 10 million?

16   A.  That's correct.

17          MR. SALANT:  Your Honor, my speaking time has come to

18   an end.  I would like to tender the witness with your

19   permission.

20          THE COURT:  Yes.  Mr. Weitzman.

21          MR. SALANT:  Thanks.

22          THE WITNESS:  Thank you.

23   CROSS-EXAMINATION

24   BY MR. WEITZMAN:

25   Q.  My colleague just focused on the first and second of the

J423TUZ2                    Voetmann - cross

1    high-end loss amount you calculated, the 82 and $68 million.  I

2    am going to stay on that just for a moment.

3              In addition to neither of those high end loss

4    estimates incorporated as statistical significance analysis, I

5    think you were about to testify that neither of them actually

6    incorporate -- the first one didn't incorporate an analysis of

7    confounding news, correct?

8    A.  That's correct.  Can I correct one thing you just said?

9    Q.  Yes.

10   A.  In one and two, all the days that I included in three and

11   four are also included.  So to that extent, the statistically

12   significant days I included in one and two.

13   Q.  But it doesn't exclude non-statistically significant days

14   in number one and number two?

15   A.  That's correct.

16   Q.  Number one doesn't exclude days on which there are

17   confounding news, correct?

18   A.  That's correct.

19   Q.  Let's talk about --

20             THE COURT:  I'm confused.  So, I thought it was one

21   that did not exclude confounding news, but two did.  Maybe I'm

22   confused.

23             THE WITNESS:  So one does not exclude confounding

24   news, but the second row you see N confounding news, that means

25   I excluded confounding events.  So any day where there might

J423TUZ2                    Voetmann - cross

1    have been confounding news, I just gave the benefit of the

2    doubt to be conservative, I removed all those days.

3            MR. WEITZMAN:  I thought I asked him only about the

4    first line.  If I didn't, I apologize.

5    Q.  Sir, you wrote an article in -- let me just put it on the

6    screen.  I'm going to mark this as Exhibit F111, Defendant's

7    F111.

8            Do you recognize this article by the Brattle Group

9    called "Correct Application of Event Studies in Securities

10   Litigation"?

11   A.  Yes, I wrote this and I believe you can refer to it as a

12   marketing article.  I think more of a short article.

13   Q.  You tried to be as accurate as possible in your marketing

14   pieces?

15   A.  I do, of course.

16   Q.  It incorporates your expertise about event studies,

17   correct?

18   A.  Of course.

19           MR. WEITZMAN:  We offer Defendant's Exhibit F111.

20           THE COURT:  Any objection?

21           MR. NAFTALIS:  No, your Honor.

22           THE COURT:  F111 is received.

23           (Defendant's Exhibit F111 received in evidence)

24   Q.  Turning to page four of F111, I'm sorry, page five, the

25   highlighted portion states "Traditional event studies enable

J423TUZ2                         Voetmann - cross

1    experts to disentangle fraud from non-fraud related information

2    on disclosure days using daily returns, failing to distinguish

3    the fraud versus non-fraud causes of price decline is a

4    critical error.  This becomes even more difficult where there

5    are multiple confounding disclosures on the same day.  Courts

6    have recognized the possibility of studying intraday returns

7    when this is the case."

8            Do you see that?

9            MR. NAFTALIS:  Objection, relevance.  Again they are

10   impeaching their own witness.

11           MR. WEITZMAN:  Your Honor, this is a false criticism

12   and I'm -- it's really a false record that's being created by

13   what Dr. Ferrell did.  He didn't look at confounding news, and

14   that was their criticism of him.  That was their

15   cross-examination of him.  There was no analysis of loss amount

16   by Dr. Ferrell.

17           MR. NAFTALIS:  Our point is they put forward a

18   methodology which they put to the jury, and now they are saying

19   it's not right.

20           THE COURT:  I understand that point, which you've made

21   about six times.  But it really I think would just be more

22   efficient to allow them to ask their questions, create the

23   record they want, and then I will rule.  I have absorbed the

24   fact that you believe that they're now criticizing what

25   Dr. Ferrell did.  I understand that.

1           MR. NAFTALIS:  I apologize, your Honor.

2           THE COURT:  You made your record.  I would just like

3      to get through this and complete it and so we can move on to

4      other issues we have in the case.

5           MR. WEITZMAN:  Thank you, your Honor.

6      Q.  Do you agree with me, sir, that not excluding confounding

7      news from the very first line of this analysis, the $82

8      million, is what you previously called a critical error?

9      A.  Right.  That's exactly why I included the second line.

10     Q.  Fair enough.  On the first line, that's subject to critical

11     errors, correct?

12     A.  I'll pause there and answer that.  Not entirely, because

13     the assumption in that first line is that the confounding news,

14     if you were to look at it, and if you had attempted to parse it

15     out, would not have had an impact.  So it depends how you read

16     the confounding news on that line.

17          I would also state that the article you just

18     referenced, Dr. Ferrell, as I cite in my footnote nine of my

19     report, actually wrote an article in the Journal of Corporate

20     Law where he made that exact same distinction between fraud and

21     non-fraud news that you need to parse out.  So I agree with

22     him.

23     Q.  You agree that one must parse out the fraud elements of an

24     announcement from other non-fraud elements of the announcement,

25     right?

1    A.  Yes.

2    Q.  Can you answer that question?

3    A.  Yes.  So you have to look at row one and two combined.

4    Q.  Sir --

5              THE COURT:  Let him finish his answer, please.

6    A.  So in this case, as I wrote in my report, I did not attempt

7    to parse out the confounding news.  So instead I wanted to look

8    at the two extremes, one if you assumed you didn't have to

9    parse anything out, and one if you assumed you excluded

10   everything that could be confounding.  So you're getting an

11   interval where a damages would be in that range.  So had I

12   attempted to parse it out as I wrote in that article, I would

13   be somewhere in between 82 and 68.2.

14   Q.  Just to understand what confounding news is in your

15   definition.  Confounding news is the fraud related information

16   in a disclosure versus the non-fraud related information,

17   correct?

18   A.  It's -- that's the definition written here.  It is parsing

19   out what could be attributable to something that may not be --

20   that may be non-fraud.

21             But again, I think the answer still stands that you

22   have to look at those two ranges.  I did not engage in the

23   exercise of parsing it out.  Instead, I gave the Court the

24   range, and explained that if you attempted to parse it out and

25   you went through every single day and attempted to parse it

out, you would get somewhere in between these two numbers.

Q.  Focusing on the first, so we understand what that is.  It doesn't, this $82 million doesn't exclude non-statistically significant events, correct, or results?

A.  It includes the statistical significant events and the non-statistical significant events.

Q.  And the first line, 82 million, doesn't exclude days on which there was confounding news?

A.  That's correct.

Q.  The second day and the fourth day do purport to exclude days with confounding news, correct?

THE COURT:  The second day and the fourth day?

Q.  Sorry the second line and the fourth line with the $68 million and $10 million results?

A.  Yes.

Q.  Those purport to exclude days on which there were confounding news, correct?

A.  So you see the words non-confounding news, that's why those two lines I was conservative, and any identified day where there might be confounding news, I excluded those days entirely.  I did not attempt to parse anything out.

Q.  Just for the sake of brevity, I am really not trying to cut you off, but we do have limited time.  If possible, if you can answer my question yes or no, can you try?

A.  If it's a yes or no question, I'll try to answer yes or no.

J423TUZ2                          Voetmann - cross

1            THE COURT:  But if it is not a yes or no question, you

2       should not feel limited.

3            THE WITNESS:  Thank you.

4            THE COURT:  We have no jury here.  It's more important

5       that I understand his opinion in its complexity, and so, I

6       don't want the witness to feel inhibited.  If you are presented

7       with a yes or no question, obviously you should try to answer

8       it yes or no.  But if you believe that the question cannot

9       fairly be responded to in a yes or no fashion, you are welcome

10      to indicate that.

11           THE WITNESS:  Thank you.

12           MR. WEITZMAN:  Thank you, your Honor.

13      Q.  Did you, in order to analyze whether news were confounding

14      or not, did you review all of the articles yourself on Factiva?

15      A.  Not on Factiva.  But certainly the articles I reviewed, the

16      majority of articles that was identified on the KIT Digital

17      which was just a subset of Factiva of 866 articles.

18      Q.  How did you choose what subset of the 800 Factiva articles

19      that you downloaded that you would review?

20      A.  So I worked with my team that I mentioned earlier, and we

21      discussed how to review those articles.  And so with that, we

22      worked our way through all 866 articles as a joint effort.

23      Q.  How many articles did you personally review?

24      A.  Hundreds.  I looked at the ones that was critical, the ones

25      that someone was not sure how to interpret, they would bring

1    that to my attention, I would look at it.

2    Q.   Otherwise you relied on the team, if they didn't bring it

3    up to you?

4    A.   It is a very good team, so yes.

5    Q.   Did you review the company's prior annual and quarterly

6    reports to determine whether there was confounding news?

7    A.   Well, to the extent that they certainly in the articles

8    that came up on Factiva includes press releases, surrounding

9    their annual and quarterly reports.  So to the extent that's

10   what you're referring to, I read those.

11   Q.   Other than press releases that are picked up in Factiva, is

12   it fair to say you did not separately review yourself the

13   company's quarterly and annual filings with the SEC?

14   A.   Yes, all of them came up.

15   Q.   Did you review the company's form 4 filings with the SEC?

16   A.   They, again, Factiva picks up on all sorts of news, and

17   they picked up when you're offering securities and when

18   companies file forms.  So to the extent it came up there, I

19   would have reviewed it.

20   Q.   If it wasn't picked up in Factiva, you did not review it?

21   A.   I did not.

22   Q.   Did you review research analyst reports published about KIT

23   Digital?

24   A.   In fact, yes.  I noted that there was about 10 reports from

25   non-major investment banks, and so, they didn't seem to have

1   any new information other than what was in the Factiva

2   searches, so I didn't rely on those.

3   Q.  So your recollection is that you reviewed about 10 analyst

4   reports about KIT Digital?

5   A.  It's my recollection it was about 10 reports that during

6   the 2008 and 2011 time period, that came out that you could

7   purchase from Thomson and none of them were from investment

8   banks to my recollection.  They didn't provide any additional

9   news, is other than what's already provided to me by Factiva.

10  Q.  I'm handing you what's been marked as Government Exhibit

11  3302, 3304, and 3305.

12          MR. WEITZMAN:  For the record, these are research

13  analyst reports in the dozens, maybe hundreds, published by KIT

14  Digital that the government produced in discovery.  Can I ask

15  Mr. Naftalis to hand them up to the witness.

16  Q.  I'm just going to ask you a simple question, sir.  Did the

17  government provide you a copy of those exhibits of research

18  analyst reports published by KIT Digital?

19  A.  No, they did not.

20  Q.  So the research analyst reports that you reviewed, were

21  those the ones that you were able to find in your Factiva data

22  set?

23  A.  That's correct.

24  Q.  Other than the Factiva data set, you did not review

25  research analyst reports.  Is that fair to say?

1    A.  That's correct.

2    Q.  Is it fair to say that what I handed up to you amounts to

3    thousands of pages of research analyst reports?

4    A.  Yes, although, I've seen this in many other securities

5    class action cases.  The definition of what is a research

6    analyst report, among these reports you handed me are many

7    reports that's written by a computer, that is not a person

8    analyst that actually wrote the report.  It is just taking some

9    data and then running some numbers and spitting out a report.

10   So I would exclude all those, I would not personally consider

11   those research analyst reports.  Like Thomson Reuters screen

12   events, that's not an analyst report, that's a conference call

13   transcript.  So there is a lot of these reports that I would

14   have to look at to see if it in fact would be a research

15   analyst report.

16   Q.  Okay.  Fine.  Other than some of the reports that are

17   computer spit out, you see a lot of research analyst reports

18   there in those exhibits that you never reviewed; is that fair

19   to say?

20   A.  I see some that I have not reviewed.  And --

21   Q.  If you don't mind --

22             THE COURT:  Please.  Please do not interrupt him.

23             MR. WEITZMAN:  I thought he was done, your Honor.

24   A.  This first stack of three is also all after the period of

25   the conspiracy period.  So I would exclude this whole stack.

1                  THE COURT:  And that is 3302.  So 3302 you don't think

2      is relevant because of the time period?

3                  THE WITNESS:  It is outside the conspiracy period.

4      And the third –- the second one appears to be within the time

5      period, and I again state that the majority of these reports

6      are not covered by actual analysts.

7                  And the exhibit 33 –- this was Exhibit 3304, and 3305

8      also appears to be within the time period, and again, a lot of

9      them are not by actual equity analysts.

10                 And finally, I would say as well, if you look at each

11     of the date of these reports, which I have not done, but if you

12     overlay that with Factiva news, it is not unlikely, although I

13     have not done it, but it is not unlikely that these days would

14     have been picked up in my confounding news analysis event

15     regardless.

16     Q.  Sir, you are precise in your testimony, correct?  It's

17     important to be precise in your testimony, right?

18     A.  Yes.

19     Q.  So let's turn to Government Exhibit 3302.  You testified a

20     moment ago, perhaps too swiftly, saying none of the dates –-

21                 THE COURT:  Please don't comment on his testimony.

22                 MR. WEITZMAN:  Yes.

23     Q.  You testified a moment ago that none of the analyst reports

24     in Government Exhibit 3302 are during the conspiracy period you

25     looked at.  Would you turn to page two, three, four, five, and

J423TUZ2                        Voetmann – cross

1    six of the index?

2    A.   You're correct.  I spoke a little too swiftly.  On the

3    second page -- the first page and the second page are outside.

4    So the first page and second page are reports in this stack are

5    outside, but under page three you start covering some of the

6    reports in the conspiracy period, so I apologize.

7    Q.   Page three, four and five include analyst reports from

8    April 2011 through September 20, 2011, correct?

9    A.   That's correct, I apologize.  I only looked at the cover

10   page, not realizing it went on for four or five pages.

11   Q.   We'll look at specific analyst reports in a moment.  Let me

12   ask a few questions further about your methodology.  I want to

13   be very clear I am not talking about Dr. Ferrell's methodology.

14   I am talking about what you did.

15          You examined, in order to calculate this loss amount,

16   you used the proportion of Maiden buy volume relative that

17   total market buy volume.  That was part of your calculation,

18   correct?

19   A.   That's correct.

20   Q.   And your logic, if I understand it correctly, is that

21   Maiden's buying volume put upward pressure on the stock price

22   causing it to rise.  Is that right?

23   A.   That would be one reason.

24   Q.   Did you do any analysis to determine whether Maiden's

25   trading actually caused the stock to rise?

1   A.  Yes, in the extent that you're looking at residual returns

2   and you filter out any other factors, again, that Dr. Ferrell

3   pointed to, aside from market manipulation, market, industry,

4   and firm specific, so you're left with the plausible effect of

5   stock manipulation.

6   Q.  And the only stock trading you looked at in the sense of

7   evaluated in your event study was Maiden's stock trade,

8   correct?

9   A.  So I didn't quite follow the question.

10  Q.  You only looked at Maiden's stock trading.  That's all you

11  looked at.

12  A.  I look at the proportion of Maiden Capital volume on each

13  day.

14  Q.  You didn't examine whether Maiden's trading in that day

15  actually caused an increase in the stock price of KIT Digital,

16  correct?

17  A.  I think I'll repeat the same answer as before.  That the

18  concern raised by Ferrell is, asides from stock manipulation,

19  you need to factor out market, industry, and firm specific.

20  And so, my analysis is typical event study, I filtered out

21  market, industry, and stock specific, leaving with, as I agreed

22  with Dr. Ferrell, the potential of plausible explanation that

23  is the conspiracy scheme to manipulate the stock that caused

24  that additional residual.

25  Q.  Sir, there are ways to determine to look at blue sheets and

1   look at actual stock trading that occurred on a particular day,

2   to determine if the trading pushes the stock price up?

3           THE COURT:  I don't know what blue sheets are.

4           MR. WEITZMAN:  Yes, your Honor.

5   Q.  Do you know what blue sheets are, sir?

6   A.  I worked with blue sheets before.

7   Q.  Can you define blue sheets?

8   A.  So you can get a record of all the intraday trades of the

9   all the individual traders on a given day.  To the extent

10  that's what you are referring to.  That part of it will help

11  you understand intraday when certain buy orders were submitted,

12  and if you have the date available to you, you can examine the

13  price response intraday.

14  Q.  Did you do any analysis to see the price response each day

15  as a result of Maiden Capital's trading?

16  A.  I did not examine any blue sheets.

17  Q.  Are you aware that the government produced all the blue

18  sheets for KIT Digital in this case to the defense?

19          MR. NAFTALIS:  Your Honor, I want to register another

20  objection.  This was another line of cross we pursued with

21  Dr. Ferrell.

22          THE COURT:  Okay.  Overruled.  Continue.

23  Q.  Are you aware that the government produced blue sheets in

24  this case to the defense?

25  A.  I'm not aware and I have not received the blue sheets.

1   Q.  So you've done no analysis to actually examine on an

2   intraday basis whether Maiden Capital's trading was pushing the

3   price of KIT Digital stock up, correct?

4   A.  That's correct.

5   Q.  And you did no analysis to determine who was the

6   counterparty on Maiden Capital's trading either, correct?

7   A.  Since I didn't have the blue sheets, I would not have the

8   ability to do that.

9   Q.  Did you request the blue sheets from the government?

10  A.  I did not.

11  Q.  Did you discuss the possibility of relying on blue sheets

12  to do such an examination?

13  A.  I don't recall discussing that.

14  Q.  One thing that your methodology doesn't do, let me reframe.

15  I apologize.

16          You look at Maiden's buy volume; is that fair to say?

17  A.  Yes.

18  Q.  You didn't look at Maiden's sell volume, correct?

19  A.  No.  I have access to all the sell volume as well and it is

20  part of the exhibits that Dr. Ferrell produced as well.

21  Q.  You didn't discuss in your report Maiden's sell volume,

22  correct?

23  A.  I did not.

24  Q.  In fact, in tab C2 of your report, which is marked as

25  Exhibit C1, I'll put it on the screen, zoom in.  There is a

J423TUZ2                         Voetmann - cross

1   column here that's marked column 11 and it says Maiden volume

2   share.  Do you see that?

3   A.   I do.

4   Q.   When you're talking about volume share in that column, you

5   are actually only talking about the buy volume shares, correct?

6   A.   That's correct.  It is under the assumption of or because

7   that the conspiracy scheme was the intent of inflating the

8   stock, so I focused on that side of the trade.

9   Q.   Are you aware, sir, that Maiden sold millions of shares of

10  KIT Digital stock?

11  A.   I am.

12  Q.   Are you aware -- let's put a precise number on it.  Are you

13  aware that between December 31, 2008 and September 15, 2011,

14  Maiden sold 3.8 million shares of KIT Digital stock?

15  A.   Sorry.  I don't recall the exact number.  I'm not sure if

16  you can repeat the question again.

17  Q.   Sir, this is -- sorry.  This is some of the data that

18  accompanied your report.  Recognize this?

19            THE COURT:  You need to indicate for the record.

20            MR. WEITZMAN:  Defendant's Exhibit F112.

21  A.   Yes.  This is the printout of the data I received.

22            MR. WEITZMAN:  For the record, we provided a copy of

23  this to the government last night.  We offer Defendant's

24  Exhibit F112.

25            THE COURT:  We have to indicate for the record what,

1    as I said, what it is that we're looking at.  What is Defense

2    Exhibit F112?

3              Do you recognize it?

4              THE WITNESS:  Yes.  Sorry.

5              THE COURT:  Can you tell us what it is, please.

6              THE WITNESS:  Yes.  It is the data that provided the

7    information on the Maiden trading volume, both the buy volume,

8    sell volume, and total daily volume.

9              THE COURT:  And you're offering 112?

10             MR. WEITZMAN:  I am, your Honor.

11             THE COURT:  Any objection?

12             MR. NAFTALIS:  No, your Honor.

13             THE COURT:  Defense Exhibit F112 is received.

14             (Defendant's Exhibit F112 received in evidence)

15   Q.  Turning to the last page, for the record, we added at the

16   bottom and provided to the government in advance, we did an

17   Excel addition function.  And this reflects that from

18   December 31, 2008 to September 15, 2011, the Maiden sell volume

19   was about 3.8 million shares.  Do you see that, sir?

20   A.  I see the number 3.825, yes.

21   Q.  You made an assumption I think you said a moment ago that

22   the intent of the market manipulation scheme was to inflate the

23   price of the shares, correct?

24   A.  That's what I understood from the materials I reviewed, the

25   PSR and the Ferrell report.

J423TUZ2                      Voetmann - cross

1   Q.   Besides that assumption, that it was to inflate the price

2   of KIT Digital stock, you didn't conduct any examination to

3   determine what actual effect Maiden Capital had, between the

4   buy and sell activity, on the price of KIT Digital stock,

5   correct?

6   A.   My analysis is only focused on the buy volume.  I did have

7   a comment in my report that it is possible that Maiden might

8   have traded and the stock would have gone in the opposite

9   direction.  But, other than that, I didn't focus specifically

10  on the sell side of it.

11  Q.   What caused you to have a comment that Maiden's trading

12  might cause an effect in the opposite direction, meaning a

13  decline in the price of KIT Digital stock?

14  A.   So again, I wanted to consider the possibility that you

15  could have a day where the price actually fell, but because of

16  the trades by Maiden Capital, it did not fall as much as it

17  would have otherwise.  So it's even though there is a fall, you

18  can argue that Maiden Capital's trading mitigated the decline

19  in the value on that day.  So that could be -- I did not

20  account for that as a way of thinking about how that would

21  affect any view of potential losses here to themselves or

22  others, but I just made that observation that that could also

23  be a possibility.

24  Q.   Sir, you examined a residual return, correct?

25  A.   That's correct.

1   Q.  A residual return is against a predictive return, correct?

2   A.  That's the definition.

3   Q.  So, there are, if one has a negative residual, that means

4   that the stock price declined against the predictive return,

5   correct?

6   A.  The actual return was less than the predictive return

7   taking into account the market and industry effects.

8   Q.  Are you aware, sir, that examining Maiden's buy and sell

9   activity results in a net negative actual return as compared to

10  the predictive return?

11  A.  I'm not following your statement nor do I follow the

12  analysis you are describing.

13  Q.  Let me work through it more slowly then, sir.

14         Would you agree there is a different economic impact

15  on the price of a stock if you're solely a buyer, as compared

16  to whether you are a buyer and a seller of that stock?

17  A.  It really depends on the circumstances of the situation you

18  are examining.

19  Q.  If one is a net seller of a stock on a given day, would you

20  agree with me that that will put downward pressure on the price

21  of the stock?

22  A.  In this hypothetical, are you talking about one individual

23  or what's the framework for the -- could you give me more

24  framework for the question.

25  Q.  Let's talk first in the instance of one individual.  Is one

 1  individual who is a net seller of the stock a likely inflater

 2  of the stock price?

 3  A.  So again, that depends.  You referred to blue sheets

 4  earlier.  This individual in your hypothetical, what comes to

 5  mind could have been a net buyer in the early day of the trades

 6  and then turned to be a net seller in the afternoon.  So in

 7  that sense you could both have inflation effects and a

 8  deflation effect.

 9  Q.  So the buying activity can cause an inflation, and the

10  selling activity can cause a deflation.  Is that your

11  testimony?

12  A.  In this hypothetical, that could be one outcome.

13  Q.  Okay.  Did you review Maiden's testimony in connection with

14  your expert report?

15  A.  Maiden's, I did not.

16  Q.  Are you aware that Maiden has testified that he was a

17  terrible day trader who lost his clients a lot of money?

18          MR. NAFTALIS:  Objection, foundation.

19          THE COURT:  Sustained.

20  Q.  Did you talk to the prosecutors about Maiden's testimony in

21  this case?

22  A.  I don't recall talking about that.

23  Q.  Was examining Maiden's trading patterns important to your

24  analysis in any way?

25  A.  I don't think so.  Because, again, you're looking at the

1   effects on the buy side if you have a conspiracy scheme to

2   manipulate the stock to inflate the stock.  Whether or not some

3   individual, despite maybe the conspiracy scheme, didn't come

4   out on top, maybe speaks more to their trading ability than it

5   talks about the scheme.

6   Q.  Okay.  So, let's get granular.  I'm putting on the screen

7   Government Exhibit V1 which is your expert report and the data

8   behind it.  I'm turning to page C5.  Let's focus in particular

9   on November 16, 2009.

10  A.  November 6 or November 16?

11  Q.  November 16, wrong date.  On November 16, sir, 2009, this

12  is -- do you recall that this is one of the 11 days that you

13  include within the $10 million loss amount calculation?

14  A.  I believe that's the case.

15  Q.  You know that because it's in the fourth column, the final

16  column over here, where it says Maiden trading days no news and

17  significant price increase, correct?

18  A.  Yes, it was part of Dr. Ferrell's Exhibit 3923.

19  Q.  And the number .88, that's a reference to your attribution

20  of $880,000 of loss amount on November 16, 2009, correct?

21  A.  That's correct.

22  Q.  Are you aware, sir, that Maiden bought approximately 5500

23  shares of stock on that day?

24  A.  What I see in this chart here is that they traded

25  14 percent.  It is hard to see without the column headings, but

1     the fifth column from the right, Maiden Capital traded

2     14 percent of all the volume that day.

3     Q.  When you say traded 14 percent of all the volume that day,

4     you're looking at his buy volume?

5     A.  That's correct.

6     Q.  Let's go to Maiden's trading for November 16, previously

7     marked Defense Exhibit F112.  Let's turn to November 16 which

8     is page 16 of the document.

9     A.  Second to last row?

10    Q.  That's the wrong year.  November 16, 2009 is page 10 of the

11    document.  Do you see the trading volume for Maiden on

12    November 16, 2009?

13    A.  I do.

14    Q.  Do you see that Maiden on that date purchased 5500 shares

15    of stock?

16    A.  Yes.

17    Q.  And he sold over 10,000 shares of stock on that date,

18    correct?

19    A.  Yes.

20    Q.  So, fair to say that Maiden sold twice as many stock

21    almost, shares of stock, in KIT Digital, on November 16, 2009,

22    than he bought, correct?

23    A.  That's right.

24    Q.  You've done no analysis to determine how it could be that

25    Maiden's net selling activity could cause price inflation,

1   correct?

2   A.  So, again, the analysis here is to determine how the

3   conspiracy scheme to inflate the price, how that would work.

4   And here, this will be working with the buy volume, meaning

5   when they engaging in buying the shares.

6          So again, it's hard to say the net outcome of the

7   precision of buy and sell.  But certainly we know that the buy

8   side of this trade, these two trades, would have likely or

9   potentially worked to inflate the price.

10  Q.  When you say we know that the two buy volumes would likely

11  have a potential for inflating the price.  What piece of

12  evidence are you relying on to determine that these purchases

13  inflated the price?

14  A.  So --

15  Q.  I'm sorry.  If I can just modify my question.  Other than

16  your event study, because I think you've told us about that.

17         Did you look at Maiden's -- I guess the question is

18  did you look at any, did Maiden ever testify he inflated the

19  stock?

20         THE COURT:  He just said he didn't review Maiden's

21  testimony.  So to ask him about Maiden's testimony seems

22  pointless.

23  Q.  Are you aware of any documents that show that Maiden --

24  e-mails, for example, or text messages -- where Maiden said

25  that he is inflating the stock on November 16, 2009?

J423TUZ2                          Voetmann – cross

1          THE COURT:  Did you read e-mails and text messages?

2          THE WITNESS:  I did not.

3   Q.  Sir, let's turn to another day.  June 10, 2010.  Putting

4   back up Defendant's Exhibit -- I'm sorry.  Government Exhibit

5   V1.  That's page C8.  Do you see the date June 10, 2010?

6   A.  Yes.

7   Q.  This is another day that you include in the $10.4 million

8   loss amount, correct?

9   A.  That's correct.

10  Q.  On that day, are you aware what Maiden's buying activity

11  and sell activity was?

12  A.  Well, as you can see, column 11 there it says zero.  It's

13  because we cutting off the digits, but it would have been a

14  very small number of trades relative to the volume at that day.

15  Q.  So, just so I understand.  There is a loss amount in

16  count -- in your fourth column, the $10.4 million, when you

17  attribute Maiden's volume share to a near zero percentage of

18  trading on that date.  Is that correct?

19  A.  That's correct.  I proportioned it to their buy volume on

20  every single day when there was a positive residual.

21  Q.  On that date, for example, it contributes to $10,000 worth

22  of loss amount in your analysis?

23  A.  Very small amount.

24  Q.  Okay.  And are you aware, sir -- let's put it up.  I can

25  just show you.  Show you Defendant's Exhibit F112, and if you

1  can turn to page 14 of that, looking at June 10, 2010.  This is

2  your trading data, correct, that you relied on?

3  A.  The they provided to me, yes.

4  Q.  Do you see that Maiden's buy volume on this date and

5  Maiden's sell volume are quite disproportionate, correct?

6  A.  That's correct.

7  Q.  Maiden bought only 300 shares on June 10, 2010, and sold

8  45,800 shares that day, correct?

9  A.  That's correct.

10  Q.  That's a 150-to-one ratio of sales to buys, right?

11  A.  I haven't done the calculation.

12  Q.  Okay.  Fair enough.  Even though he's a net seller to this

13  degree, you include in your analysis of the $10.4 million that

14  he's artificially inflating the price of the stock and causing

15  a loss; is that fair to say?

16  A.  That's correct.  Can we stay on this page for one minute?

17  I'd like to give an answer to explain that.

18        So if you look at the four days, five days prior to

19  the day in question, you notice that he is an extensive buyer,

20  proportionally to sell.  He bought a lot more shares than he

21  sold.  On those five days, the price was not statistically

22  significant, but nonetheless, it's possible, if one were to go

23  down this path, you asked me earlier if you examined the blue

24  sheets.  Based on all that pressure, buy volume pressure he did

25  leading up to the date you asked me about, that he has reached

J423TUZ2                      Voetmann - cross

1  the price level where now he wanted to sell, and so you can see

2  that sell amount you have there, I haven't done the math, but

3  the 45,800, almost line up with the five days' prior purchases.

4  Q.  You haven't examined the blue sheets to make that

5  determination, correct?

6  A.  No, but you can observe what you see on the sheet you put

7  in front of me that there are a lot of pressure on the price

8  when we go with this analogy.  You picking up a day that is

9  statistically significant, and it happened to be a day where

10  there is a posted price and he has a low buy because he's

11  offloading or selling shares purchased just shortly before

12  that.

13  Q.  I think you testified earlier that the sell activity will

14  have a deflationary impact on the price, correct?

15  A.  Well, you have to put this in context of all the shares, of

16  course, that day.

17  Q.  I understand that.  His selling activity is not going to

18  inflate the price on that day, correct?

19  A.  That's correct.  But what I'm arguing here is I'm trying to

20  explain to you the days leading up to the day where he decides

21  to sell, you have a net buy, and you have a large net buys in

22  those five days leading up, so it is possible in your

23  hypothetical, it is possible that would have led to a higher

24  price after those five days.  And he now decides to sell, given

25  the price that it was at.

J423TUZ2                        Voetmann - cross

1    Q.  Sir, none of the five days prior were statistically

2    significant days that were included in your $10 million

3    analysis, correct?

4    A.  That's correct.  But it was included in my earlier analysis

5    we talked about earlier, for this exact purpose, that I don't

6    know if the Court will decide that you need to have a

7    statistical day or not.  But it's certainly the case here that

8    you have a lot of trades on days where there is positive

9    residuals, whether they're significant or not.

10   Q.  In your analysis, you make an assumption that every trade

11   Maiden makes, every purchase he makes, is with a market -- part

12   of a market manipulation scheme, correct?

13   A.  That's how I understand the conspiracy scheme was meant to

14   be.

15   Q.  That's the assumption you're making to make these

16   conclusions that you just talked about, right?

17   A.  That's correct.

18   Q.  If there are days on which Maiden is not engaging in

19   manipulative trading and he's just buying the stock, that

20   assumption would be incorrect, correct?

21   A.  I have not made that distinction in my analysis.  I am

22   assuming every day -- if there are days where they did not buy

23   but they sold, I did not include that in my analysis.

24   Q.  You are making an assumption that every single share

25   purchased on every day by Maiden is part of a manipulation

1   scheme, but every share sold by Maiden is not part of a

2   manipulation scheme.  Is that your testimony?

3   A.  I don't think that's -- I wouldn't characterize it like

4   that.  There may be there very well may be a connection.  You

5   might have a scheme to inflate with the purpose of selling.  To

6   capitalize on those sales so whether they're connected or not

7   in that sense, that's possible.

8   Q.  Okay.  You certainly don't analyze whether the sale

9   activity by Maiden caused any inflation or deflation of KIT

10  Digital stock, correct?

11  A.  I did not include the sales, no.

12  Q.  Are you aware that there are many days on which Maiden is a

13  net seller that you incorporated through your buy volume

14  column?  Are you aware of that, sir?

15  A.  You can just look at this table here.  There are days where

16  there are net sellers, but again, the premise is, the activity

17  to run the conspiracy scheme was to manipulate the stock to

18  inflate the price.  And that is typically done by buying the

19  security.  It's possible that they wanted to capitalize on

20  that, and that's why they are net sellers after they bought

21  the -- pressured the price up.

22          In finance, it is common when you study day trading or

23  high frequency trading that people will come in and out on the

24  same day, and they will try to make a profit on those trades on

25  a single day.  So they will buy and sell on the same day.

1    That's not an uncommon practice.

2    Q.  That's right.  That's called day trading?

3    A.  Day trading or high frequency trading or whatever phrase

4    you want to put on it.

5    Q.  When you buy and sell trying to make money on intraday

6    trades, that's not necessarily manipulation; am I correct?  In

7    your understanding of manipulation of a stock?

8            MR. NAFTALIS:  Objection.

9            THE COURT:  Sustained.

10   Q.  Sir, as an economist do you view --

11           THE COURT:  Is this really worthwhile?  I just really

12   I have to ask whether this is worthwhile.  We had a trial here.

13   We had a man testify that he was manipulating.  So I'm just

14   wondering whether this is useful or not.  If you believe it's

15   useful, by all means, proceed.  But, you know, I want you to be

16   sure that this is useful that this is going to help me.

17           MR. WEITZMAN:  I do think it calls into question the

18   methodological issues and assumptions made, but I think our

19   point can be made on the briefs.

20           THE COURT:  I notice we are at 2:30.  Maybe this a

21   good time for a break.  So, let's take a break.  And again,

22   when are you going to come on board, Mr. Jackson?

23           MR. JACKSON:  What time is convenient?

24           MR. WEITZMAN:  Can we talk?

25           THE COURT:  So we'll take a recess.

1            You can step down.

2            (Recess)

3            THE COURT:  All right.

4            Mr. Jackson, are you taking over?

5            MR. JACKSON:  Briefly, your Honor.

6            MR. WEITZMAN:  Yes, your Honor.  I'm shortening my

7    cross-examination.  I hope to be done today, if I can get back

8    on by 3:45 or 4, although no assurances.

9            THE COURT:  All right.  Please proceed, Mr. Jackson.

10            MR. JACKSON:  Thank you, your Honor.

11   CROSS-EXAMINATION

12   BY MR. JACKSON:

13   Q.  Good afternoon, Dr. Voetmann.

14   A.  Good afternoon.

15   Q.  Dr. Voetmann, can I just start off by asking you -- I'm

16   going to try to make my questions as clear as possible, but I'd

17   like to respectfully ask if there's anything that I'm asking

18   that you don't understand or that you think phrases the

19   question in a way that you can't answer it, please let me know

20   and I'll attempt to rephrase, if that's okay.

21   A.  Okay.

22   Q.  So let me just start by asking you, one of the things that

23   you say in your report is that the U.S. Attorney's Office asked

24   you to do an analysis in the case to determine the approximate

25   loss to third-party investors in KIT Digital; correct?

1    A.  That's correct.

2    Q.  At the time that that request was made of you, did the U.S.

3    Attorney's Office explain to you what the term "loss" meant in

4    the context of the analysis they were asking you to do?

5    A.  I can't recall if we discussed the exact definition of

6    "loss."  We talked about it in the context of loss, the way it

7    was described in the PSR, the presentencing report.

8    Q.  Okay.  So to be clear, you don't remember if there was a

9    specific conversation, but your recollection is that there was

10   some discussion about the concept of loss in the PSR?

11   A.  That's correct.  We discussed -- or I received their PSR

12   and we discussed specifically paragraph 151 to 154, which

13   describes the approximate loss that the government had

14   calculated.

15   Q.  Now, in the academic literature around the question of

16   loss, the nature of the meaning of the term "loss" is itself

17   subject to discussion; correct?

18   A.  I think that's a fair statement.  Different academic

19   articles might define "loss" in a particular context

20   differently.

21   Q.  Before you began your analysis that the U.S. Attorney's

22   Office asked you to do, did you come up with your own working

23   understanding of what definition of "loss" you were working

24   with in this case?

25   A.  I think I -- yes, I came up with that understanding after I

J42VTUZ3                           Voetmann - cross

1   reviewed not only the PSR, but also the Dr. Ferrell report

2   raising some concerns about the loss calculation.

3   Q.  So you did come up with your own working understanding

4   before you conducted your analysis after you looked at those

5   preliminary materials?

6   A.  That's correct.

7   Q.  Can you please give us what the working definition of

8   "loss" was that you proceeded under in conducting your

9   analysis?

10  A.  The definition that I came up with and I applied here was

11  to calculate the impact that Maiden Capital trades,

12  proportional to all trades, would have had on the residual

13  returns after you adjust for market and industry and

14  company-specific information.  So that's the definition I went

15  under.

16  Q.  Now, just to be very clear, you said -- let me ask you

17  something before we unpack that for one second.

18          Is there any article or case or book or other

19  authority that you were using as a reference point for that

20  specific definition of "loss"?

21  A.  I think there's multiple questions there, but if I answer

22  the first half, if I understood your question.

23  Q.  Please.  However is appropriate.

24  A.  So I think there are a number of academic articles.  I

25  can't recite all the academic articles.  But there are academic

1      articles, both in the financial community, finance community,

2      as well as in the law community.  Dr. Ferrell had published a

3      couple of articles that specifically addressed the calculation

4      of loss or fraud-related loss which I cited in my footnote 9.

5                So to that extent, yes, I considered those or had

6      those in mind.  I can't tell you that I'm familiar with every

7      single article that's out there, but I believe they are a basis

8      for how you unpack residual returns to a potential

9      fraud-related and nonfraud-related activity.

10     Q.  Okay.  And so the working definition that you came up with

11     based on this sort of generalized understanding, did you

12     discuss that with the government before you conducted your

13     analysis?

14     A.  I don't believe I did.  They asked me to review the PSR, as

15     well as Dr. Ferrell's report that raised concern with their

16     calculation, and then come up with a methodology on my own that

17     would test whether their calculation, the amount that the

18     government calculated, was reasonable.

19     Q.  Okay.  So I'm correct that you did not share your working

20     definition of "loss" with the government, right?

21     A.  We certainly had a few calls.  I can't recall as I sit here

22     what we discussed exactly on those calls.  I might have

23     explained my approach to them.

24     Q.  Okay.  But you don't remember ever specifically telling

25     them what definition of "loss" you were using, do you?

1   A.  No, I don't.

2   Q.  Okay.  And you don't specifically remember them telling you

3   what definition of "loss" you should use in this case; correct?

4   A.  That's correct.

5   Q.  Okay.  Now, one of the things that you talk about in some

6   of the articles that you've written is your analysis of the

7   impact of certain cases, including Supreme Court cases, on the

8   type of analysis that you do; correct?

9   A.  I'm not exactly sure what you're referring to, but --

10  Q.  Well, the questions that are involved in the types of

11  determinations that you're talking about in the cases in which

12  you testify are impacted by the state of the law to some

13  degree; correct?

14  A.  Yes.  Well, from my side, I always apply generally accepted

15  methodologies that can be used to conduct an analysis, like in

16  this case, event studies that have been around for 50 years.

17  And the idea of using principles to proportion based on a

18  volume is also a common practice.

19          So, yes, I applied generally accepted methods that's

20  used in the finance literature to my analyses.

21          Now, there are court decisions that might suggest how

22  you go about using some of those or how they might be applied

23  in a specific context, but that's generally what I rely on.

24  Q.  Right.

25          And you cite some of those court decisions in some of

J42VTUZ3                           Voetmann - cross

1   the articles that you've written about the correct application

2   of event studies in securities litigation; correct?

3   A.   Yes, the one I think you're referring to, I don't want to

4   speculate, but --

5   Q.   I'll get to that.  But the answer is yes; correct?

6   A.   I cite *Halliburton* as an example, correct.

7   Q.   Right.  You cite some case law; correct?

8   A.   That's correct.

9   Q.   And the *Halliburton* case that you just mentioned is a

10  Supreme Court case; correct?

11  A.   Right.

12  Q.   One of the other critical Supreme Court cases in terms of

13  the calculation of loss in your field is the *Dura*

14  *Pharmaceuticals* case; correct?

15  A.   That's correct.

16  Q.   And in *Dura Pharmaceuticals*, you are aware that the Supreme

17  Court specifically stated that the loss calculation method that

18  you used in this case was an illogical loss calculation method;

19  correct?

20  A.   Sorry.

21          MR. NAFTALIS:  Objection, your Honor.

22          THE COURT:  Overruled.

23  A.   Sorry.  I don't know if I heard you correctly, but did you

24  say that that decision said that my methodology was not

25  correct, is that what you -- was that the question?

1    Q.  Yes.

2    A.  I don't know if that decision stated that specifically, but

3    I know that it states for securities class -- you're talking

4    about *Dura*.  For securities class actions, it talks

5    specifically about how you should go about calculating losses

6    for shareholders in a securities class action.

7    Q.  Right.  And it addressed the specific methodology that you

8    deployed in this case; correct?

9    A.  No.  It addresses the concept of in-and-out trades, as well

10   as buy-and-sell transactions.  You have to have a buy

11   transaction that has to have passed a corrective disclosure in

12   order for it to be part of a securities damages calculation, a

13   trade.

14   Q.  I want to get to the corrective disclosure part in a moment

15   in terms of the type of economic analysis that you do.

16          But before we get to that, okay, I'm correct, right,

17   that the loss calculation method that was at issue in the *Dura*

18   case was a loss calculation methods that depended on

19   determining the loss on the basis of the inflation of the value

20   of manipulated shares; correct?

21   A.  In that case, yes.

22   Q.  Right.  And that's exactly what you did in this case;

23   correct?  You determined loss based on the inflation in the

24   value of the shares; correct?

25   A.  I think there's a big distinction here that --

1   Q.  I want to unpack the distinction and I want you to give a

2   fulsome answer.  I promise you I'm going to give you the

3   opportunity to do that.  But it's important that I understand

4   what you did.

5           THE COURT:  Well, I agree that it's important you

6   understand what he did, but I'm becoming uncomfortable because

7   the witness is not really here to talk about *Dura*

8   *Pharmaceuticals* or talk about *Halliburton*.

9           You're welcome to brief the issue of whether you think

10  the methodology that was applied here is inconsistent or -- is

11  inconsistent with *Halliburton* or *Dura Pharmaceuticals* or was

12  criticized in those cases, you're welcome to do that.  But it's

13  not particularly useful for me to hear from an economist what

14  he thinks about Supreme Court decisions.  That's not really why

15  he's here.

16          So you're welcome to explore with him what he did and

17  how he did it and what his methodology is, but I don't want to

18  get into case interpretation or what *Dura Pharmaceuticals* says

19  or doesn't say.  That I'm not interested in; that I will not

20  hear, not today.

21          I mean, again, if you want to brief the issue, that

22  I'm more than welcome to read.  But that's not really our

23  purpose today.

24          MR. JACKSON:  Judge, I couldn't agree more, that that

25  would be an improper use of the Court's time.  And we have

1    cited that case and we intend to brief it after this to explain

2    exactly what the issue is.

3           The reason that I'm raising this is for a very

4    particular, very limited reason that only requires one or two

5    more questions, I promise I will move on.  I think it will be

6    apparent to the Court I'm not asking any interpretation, I just

7    want to be clear in terms of what this witness's understanding

8    was and whether or not it was factored into just in terms of

9    the economic analysis that was done in the *Dura* case.  But I'm

10   not asking any interpretation, and that relates to the one real

11   topic of my cross-examination.

12          If I could give the --

13          THE COURT:  I'll hear the question and then I'll tell

14   you whether I'm going to allow it.

15          MR. JACKSON:  Thank you.  Thank you, your Honor.

16   BY MR. JACKSON:

17   Q.  So stepping aside for a moment, okay, from *Dura*, your

18   calculation here was based on the inflation of the value of the

19   stock that you assumed occurred because of the market

20   manipulation; correct?

21   A.  Correct.

22   Q.  So your calculation of loss -- and let's go back to the

23   point that you raised a moment ago where we talked about

24   corrective disclosures.  The corrective disclosure method of

25   analyzing loss is the more typical method of determining loss

1    in a market manipulation case; correct?

2    A.   I don't know if I have an answer for that.  I would tend to

3    believe that the -- when we talk about securities class action,

4    we have a misrepresentation, and you have a constant inflation

5    throughout an extended period of time, and then you have a

6    correction of that misrepresentation, is different than what

7    you're seeing here, where there is a constant scheme of stock

8    manipulation that occurred on a daily basis almost.

9    Q.   Okay.

10           MR. JACKSON:  I'm going to move to strike that last

11   part, your Honor, because I think the witness has no foundation

12   for "constant scheme."

13           THE COURT:  That's denied.

14   Q.   Now, the question that I'm asking you is in the calculation

15   of market manipulation loss amounts.  The vast majority of

16   cases will involve the analysis of the corrective disclosure,

17   am I correct about that or do you not know?

18           THE COURT:  Are you asking him for the vast majority

19   of reported decisions talk about or involve an analysis of

20   corrective disclosures?  Is that what you're asking him?

21   Because I don't know that he's really competent to tell us

22   about what the case law -- with what frequency certain measures

23   of damages are discussed in the case law.  I don't know that

24   he's competent to do that.

25           MR. JACKSON:  Yes, your Honor, I agree, he's not

J42VTUZ3                        Voetmann - cross

1  competent.

2  BY MR. JACKSON:

3  Q.  But I'm not asking about the case law.  I mean from the

4  standpoint of an economist attempting to determine how much

5  loss is involved in cases of market manipulation, it is by far

6  the case that the majority of analysis that is done is based on

7  analysis of corrective disclosures; is that correct?

8  A.  There's a lot of case law that I'm not familiar with.

9  Q.  So you don't know the answer?

10  A.  But let me just state one for the record.  I have worked on

11  a number of manipulation cases that involve other types of

12  manipulation, like FX and benchmark rates.  In those cases, we

13  are doing all sorts of analyses that may not fit into that

14  definition that you are defining right now for this case.

15  Q.  Fair enough.

16          Now, in this case, you looked at the PSR; correct?

17  A.  Yes.

18  Q.  Why did you look at the PSR?

19  A.  Well, the government asked me to review the loss amount

20  that they had calculated; and then, based on my analysis, to

21  confirm or determine whether that was a reasonable amount.

22  Q.  Was there any information from the PSR that was critical to

23  your analysis?

24  A.  Yes.  Certainly the conspiracy period they defined.  So

25  they made a number of definitions that was relevant, just to

J42VTUZ3                      Voetmann - cross

1    make sure I examined the right sets of buy transactions or buy

2    trades by Maiden Capital.  They also defined "Maiden Capital"

3    for me.

4    Q.  Did you have a discussion with the government about whether

5    or not you could do a loss calculation in this case on the

6    basis of a corrective disclosure?

7    A.  I don't believe I did.

8    Q.  Did you see in the PSR a methodology defined as an example

9    that was given in the guidelines of how a loss calculation

10   could be done in a case like this?

11        THE COURT:  I don't understand the question.

12   Q.  You referred earlier to paragraph 151 of the PSR; correct?

13   A.  Correct.

14   Q.  And this is the paragraph you were referring to; correct?

15   A.  That's right.

16   Q.  Where it says:  According to the government, the loss

17   amount for Count Four is 25.2 million, pursuant to USSG 2B1.1,

18   application note 3(F)(ix).  And then it says:  In a case

19   involving the fraudulent inflation or deflation in the value of

20   a publicly traded security or commodity, the court, in

21   determining loss, may use any method that is appropriate and

22   practicable under the circumstances.

23        An example of one such method under which the actual

24   loss attributable to the change in the value of the securities

25   determined by calculating the difference between the average

1  price of the security during the period that the fraud occurred

2  and the average price of security during the 90-day period

3  after the fraud was disclosed to the market and, B, multiplying

4  the difference in average price by the number of shares

5  outstanding.

6          You saw that in paragraph 151; correct?

7  A.  That's correct.

8  Q.  Did you discuss with the government whether or not that

9  would be an appropriate method of calculating loss in this

10  case?

11  A.  My understanding is that's the --

12  Q.  No, no, no.  I'm only asking you did you discuss with the

13  government whether or not that would be an appropriate method

14  of determining loss in this case?

15  A.  I didn't discuss that specifically with them.

16  Q.  I'm correct, aren't I, that in terms of market

17  manipulation, there isn't necessarily a loss in every situation

18  of market manipulation?

19  A.  As a general matter that could be the case.

20  Q.  There could be a number of cases where there's no loss at

21  all, even where there was market manipulation; correct?

22  A.  You need to define that more.  Are you talking about a

23  whole scheme or just a specific day, a particular trade?

24  Q.  I'm talking about generally.

25          THE COURT:  Well, generally isn't helpful.  So you

1   need to be more specific.  He needs to know whether you're

2   talking about a single day, a longer period of time.  He needs

3   to know the context in which you're asking the question.

4            MR. JACKSON:  Absolutely, your Honor.

5   Q.  Let's imagine a day on which a person manipulates the

6   market and inflates the value of some shares from $5 to $10,

7   okay.  Is it your testimony that that would always result in a

8   loss to investors?

9   A.  Depends on the circumstances.  So if there's an inflation

10  of $5, and if I subsequently purchased at $10, I would have

11  paid for a share that's only worth 5.  So I would -- when the

12  truth comes out or the information about that fraud is revealed

13  in a general sense, then I would have overpaid for my

14  investment.

15  Q.  I just want to repeat my question.

16           Is it your testimony that in a situation where the

17  price of a share was inflated from $5 to $10, that it would

18  always result in a loss to the purchaser?

19           THE COURT:  Well, I think he's given you an example.

20  I think he has answered the question in the sense that he's

21  provided certain parameters that are not in your question.

22  Maybe they are implicit in your question, I don't know.

23           But he's answered your question applying certain

24  parameters.  The parameters that he used is that if an investor

25  bought the security at $10, and the $10 price reflected

1    manipulation from $5 to $10, then he would have overpaid $5 for

2    the security.  So that's the context in which he's answered

3    your question.

4            Obviously you're welcome to pursue that.  But you seem

5    to be striving for a more general answer, and I don't know

6    whether he can give you a general answer or not.

7            MR. JACKSON:  Let me try to pursue that, your Honor.

8    I think that's helpful.

9    BY MR. JACKSON:

10   Q.  So what you're saying is there could be a situation where a

11   person has bought this $10 share and, therefore, based on the

12   fact that it was inflated by $5, according to your theory, they

13   have realized a loss at the moment that they purchase a $10

14   share of $5.  Am I correct?

15   A.  Well, they would have overpaid by the $5.

16   Q.  Okay.  But is that --

17   A.  And not realized it.  I think you're back to *Dura* now.

18           You don't realize that until it's disclosed at this

19   fraud.  So he might sell it the next day for 10, in which that

20   individual have not had a loss; but the subsequent purchaser,

21   who then sitting on a security that's now inflated by $5.

22   Q.  I'm glad you said that.  So you said going back to *Dura*,

23   they haven't realized a loss, but they purchased something that

24   you believe is worth less than what they paid for it.

25   A.  That's correct.

1    Q.   But the original seller who bought it at 10, and in your

2    hypothetical sold it before any price drop never realized any

3    loss; correct?

4    A.   That's correct.

5    Q.   Now, did you, in your analysis, undertake -- attempt in any

6    way to determine whether anyone actually realized a loss as a

7    result of the market manipulation in the sense that you just

8    described?

9    A.   Not directly.

10   Q.   Okay.  It is entirely possible, correct, that no one

11   realized a loss as a result of the market manipulation in this

12   case?

13   A.   I'm not sure I follow the logic of the question, so I'm

14   trying to see if I understand it.

15   Q.   Please do.

16   A.   If I'm engaged in a conspiracy scheme to manipulate, and I

17   am engaging in elevating or inflating the price, whoever is

18   buying those securities that you are inflating the price of

19   will have purchased something that is not worth what it should

20   have been worth had the scheme not existed.

21   Q.   Right.

22   A.   So that's a way of quantifying the loss that they had.

23   Q.   Right.

24        And you're aware that in the *Dura* case that you just

25   referenced, the Supreme Court said that's not the realization

J42VTUZ3                    Voetmann - cross

1   of the loss?

2            MR. NAFTALIS:  Objection, your Honor.

3            THE COURT:  Sustained.

4   Q.  Now, is it --

5            THE WITNESS:  Can I answer that question?

6            THE COURT:  No, I sustained the objection.

7            When I sustain the objection, that means you don't

8   answer the question.

9            THE WITNESS:  Sorry.

10  BY MR. JACKSON:

11  Q.  You draw a distinction.  The distinction that you drew a

12  minute ago, where you talked about purchasing at an inflated

13  amount versus realization of the loss, those are two separate

14  concepts under your analysis; correct?

15  A.  If I heard you -- I think you're using two different

16  definitions of loss.  There's a loss and a realized loss.  And

17  you refer to *Dura*, I believe, in that, I haven't read it in a

18  while, but if you go back and read it, they are very explicit

19  talking about realized losses.

20  Q.  Okay.  Now, to go back to your hypothetical, right, it's

21  possible that a person could purchase a share at $5 -- I'm

22  sorry, at $10 that had been inflated artificially, improperly

23  by $5 to $10.  And before they take any action, the true price

24  of the share could rise to $10; correct?

25  A.  I'm not sure I follow.

1    Q.  Is that confusing?  That's why I started out the way I did.

2              Let me give you an example.

3              THE COURT:  I must say, I don't know what "true price"

4    means, but --

5              MR. JACKSON:  I agree, your Honor.  And I'm attempting

6    the -- I think that's the language of the witness when he

7    talked about the true price of the share.

8              But let me try to unpack that.

9    Q.  Let's imagine a scenario, right, where you have a company,

10   an electronics company, okay.  Electronics company, okay?

11   A.  Okay.

12   Q.  And its shares are trading at $5 a share.  Through

13   artificial manipulation, the price of the shares goes up to

14   $10.  Let's assume it's a legal artificial manipulation.  It

15   goes up from $5 to $10, okay?

16             Now, before the next day's trading begins, an

17   announcement is made by the company that they have developed a

18   device that is so revolutionary to the technology world, it

19   will be twice as revolutionary as the iPhone.  The demand for

20   this product is immediately recognized by all news sources as

21   something that's going to be enormous.

22             The actual value of the shares the next day rises as a

23   result of this new information, and the shares the next day are

24   trading at $15.  It's possible in such a situation that the

25   original market manipulation would have no impact on any

1    realized transaction that occurs in the market, right?

2    A.  I think that's exactly what Dr. Ferrell was concerned with,

3    that you have to adjust for that firm-specific event that took

4    place, in your case a super iPhone.  And so therefore, you need

5    to perform an event study on a daily basis, and you need to

6    adjust for market industry and firm-specific events and filter

7    out what is the residual.  And so in this case, on the first

8    day you still have an inflation that occurred from the scheme.

9    Q.  Okay.  Understood.

10            What I'm asking you is -- and maybe just to put a

11   finer point on that, is it your theory that in that

12   hypothetical, the person who has the share the next day that's

13   selling for $15, realized a loss of $5 on the first day when

14   the shares went up by $5?

15   A.  Yes.  So let's -- in this hypothetical, if you're looking

16   at a price on day one in your hypothetical that went from 5 to

17   10, so we're now looking at $10 at the close of day one, and

18   then on day two it goes to 15 in your hypothetical; correct?

19            Now, on day two, in the but-for world, the price

20   should have been 5 still and, therefore, that investor would

21   have had gains of $10 instead of just the $5.  So he has been

22   defrauded, so to speak, for the conspiracy to inflate the

23   price.

24   Q.  You're talking about the person who purchased at 10, who

25   should have been able to purchase at 5?

1  A.  Should have been able to purchase at 5.

2  Q.  Okay.  But I'm just talking about the person who purchased

3  at 5, okay.  The person who purchased at 5, and the next day

4  it's at 15 as a result of factors above and beyond the market

5  manipulation, is there a loss?

6            THE COURT:  I'm sorry.  I'm confused.

7            MR. JACKSON:  Judge, I'm going to move on from this

8  point.  I think we have enough information.

9  Q.  The manipulation period as we've already discussed ended in

10  2011, as you understand it; correct?

11  A.  September 15th, 2011.

12  Q.  And the price of the stock did not collapse after that?

13  A.  We looked already at an exhibit where it showed that the

14  price was moving around that time, and then it ended up higher

15  three months later.

16  Q.  The fact that the price at the conclusion of what you

17  understand to be the manipulation period didn't drop

18  dramatically is some evidence of the possibility that there was

19  no loss to investors; correct?

20  A.  I'm not sure I'm able to answer that other than to say that

21  how much did the market understand in that three-month period

22  we're looking at that the conspiracy might have impacted the

23  stock.  I've done no analysis to verify or confirm what that

24  amount would be.

25  Q.  Apart from the Factiva news -- apart from the Factiva news

1    analysis, you weren't looking at any other confounding

2    information; correct?

3    A.   Yes, I wasn't looking for any other additional materials

4    that could be confounding information.

5    Q.   It's fair to say, correct, that there could be other

6    factors that impact the price of a stock beyond the

7    information -- beyond the market manipulation that occurred and

8    beyond the information in the databases that you are looking

9    at; correct?

10   A.   It's hypothetically possible, though Factiva is the most

11   common database that covers the vast majority of articles that

12   is available to investors and the public.  So is it possible?

13   Yes.  But I believe that Factiva had the broadest range of

14   covering all the news that came out.

15   Q.   It's also the case that the stock market in general

16   throughout the time period identified as the manipulation

17   period rose significantly during that time period, right?

18   A.   Exactly.  And that was one of the four concerns Ferrell

19   had, that you should adjust for that increase in the market.

20   Q.   I'm not asking you any analysis of it, but I'm just asking

21   you the question:  Are you familiar with the Second Circuit's

22   case in *United States v. Rakawski*?

23   A.   No, I'm not.

24   Q.   You didn't discuss the *Rakawski* case at all with the

25   prosecutors in this case; correct?

J42VTUZ3                         Voetmann – cross

1    A.   I don't believe so.

2              MR. JACKSON:  May I have one moment, your Honor?

3              THE COURT:  Yes.

4              (Counsel conferred)

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J423TUZ4                        Voetmann - Cross

1    BY MR. JACKSON:

2    Q.  Just a couple more questions for you, Dr. Voetmann.

3            Dr. Voetmann, you would agree that there were days

4    that you looked at during the course of your analysis where the

5    market cap of KIT Digital rose significantly even when there

6    was no Maiden trading, correct?

7    A.  So, let me just -- there's 22 days you said significantly,

8    correct?

9    Q.  Yes.

10   A.  There was 22 days when there was a statistically

11   significant price increase, according to Dr. Ferrell's event

12   study, and your question was about those 22 days?

13   Q.  No.  My question is, during the time period, the alleged

14   manipulation period, there were a number of days you saw where

15   the market cap of KIT Digital rose significantly, even when

16   Maiden was doing no trading, correct?

17   A.  There was five days of what you're speaking of.  Five days

18   of the 22 when there was no buy volume, and there was a

19   significant price increase, and I excluded those.

20   Q.  Why did you exclude them?

21   A.  Because there was no trades.  And this goes to my analysis

22   of examining the low end of the government's number, to see if

23   it was reasonable.  So, when I was just focusing on those 22

24   days, I excluded those five days that you referred to.

25   Q.  Now, you referred to your analysis the $10 million as a

1    conservative analysis, correct?

2    A.  That's correct.

3    Q.  But, as we've already discussed, the $10 million figure

4    that you calculate, is not the lowest possible amount of loss

5    that could have been experienced by investors in this case,

6    correct?

7    A.  No basis to -- I don't know how I should answer your

8    question.  Based on my analysis, my test, that's the low end of

9    the range in my opinion.

10   Q.  Okay.

11           MR. JACKSON:  I have no further questions for this

12   witness, your Honor.

13           THE COURT:  All right.

14           THE WITNESS:  Your Honor, can I go to the restroom?

15           THE COURT:  We're going to take a brief recess for the

16   witness.  So, we'll be back shortly.

17           (Recess)

18           MR. WEITZMAN:  May I inquire?

19           THE COURT:  Are we prepared to proceed?

20           MR. WEITZMAN:  Yes, your Honor.

21           THE COURT:  Okay.

22           MR. WEITZMAN:  Thank you.

23   BY MR. WEITZMAN:

24   Q.  Dr. Voetmann, you're familiar with the efficient market

25   hypothesis?

1   A.   I am.

2   Q.   You're.  That hypothesis posits that the price of a stock

3   in an efficient market should reflect all information and true

4   value of the stock on that given day.  Is that a

5   characterization, fair characterization?

6   A.   It is a common characterization.  Although there is some

7   debate in the literature whether it is the true value of the

8   stock, the fundamental value, but it should reflect all

9   available information.

10  Q.   In a market manipulation scheme such as the one charged

11  here, the allegations were that Maiden was engaged in volume

12  purchases of KIT Digital stock in order to pump up the price of

13  KIT Digital stock, correct?

14  A.   That's my understanding of the allegation.

15  Q.   And is it fair to say that an efficient market, after that

16  pumping up of the price of the stock and the volume purchases

17  end, the market should adjust to the true value of KIT

18  Digital's stock in an efficient market?

19  A.   Again, I think you have to be careful with the terminology

20  of true value.  But it should adjust to at least its

21  understanding of the information it learned about the

22  conspiracy scheme.

23  Q.   Putting aside any corrective disclosure, meaning any

24  disclosure of market manipulation, if Maiden isn't pumping up

25  the price of the stock, in an efficient market, should the

1    stock adjust on its own?

2    A.  Yes.

3    Q.  How quickly is the stock in an efficient market supposed to

4    adjust on its own after the conclusion of a manipulation

5    period?

6    A.  Well, so, excuse me, I want to make sure I understand your

7    question.  But if I understand it, are you saying that the

8    market now, in your scenario, your market now learns the truth

9    about the extent of the conspiracy scheme?  And at that point,

10   when the market fully gets the information about the scheme,

11   that it would adjust to that information?

12   Q.  No, I'm not talking about a corrective disclosure like an

13   indictment or anything of the sort.  I'm talking about how

14   would the -- how is the market supposed to react after the

15   manipulation ends?  What is supposed to happen to the price of

16   the stock?

17          THE COURT:  Where there been no disclosure of the

18   manipulation.  Right?

19          MR. WEITZMAN:  Right.  No more volume purchases by

20   Maiden.

21   Q.  What is supposed to happen to the price of the stock?

22   A.  So if clearly the market does not know anything about the

23   conspiracy, the stock would possibly, as you see in this chart,

24   continue on trading at this level.

25   Q.  Do you know any example, do you have any examples of market

1    manipulation where, at the conclusion of the manipulation

2    period, without a corrective disclosure, the market didn't

3    adjust to the true price in an efficient market?

4    A.  As I sit here today, I don't have an example to offer you,

5    no.

6    Q.  Is it fair to say in the economic literature, economists

7    say that even without a corrective disclosure, following the

8    termination, the ceasing the manipulation, the stock price

9    should adjust to its true value?  Are you aware of that?

10   A.  I would have to see the literature to assess that.  If you

11   follow general principles of finance, the market would continue

12   on with no knowledge of the conspiracy scheme.  So, there's no

13   adjustment or reaction to occur when the scheme ended in your

14   hypothetical.

15   Q.  It's your testimony that your assumption is that, barring a

16   corrective disclosure that reveals the manipulation, the market

17   would not adjust in an efficient market.  That's your

18   testimony?

19   A.  If I understand your assumption correctly that no one knows

20   about the conspiracy scheme, no one is familiar with it, no

21   investors, no buyers, then they would not be able to -- the

22   market would not be able to adjust to the any information.

23   Q.  Have you heard of a pump and dump scheme?

24   A.  Yes.

25   Q.  Are you aware in pump and dump, let's say a boiler room

1    pump and dump, the boiler room props up the price of the stock,

2    correct?

3    A.  Yes.

4    Q.  When the boiler room disbands, what happens to the price of

5    the stock without a corrective disclosure?

6    A.  Dump and pump.  It might fall.

7    Q.  Isn't it a certainty, a near certainty it will fall once

8    the pumping ends?

9    A.  After the scheme, yes.

10   Q.  In those situations, there's no corrective disclosure.  The

11   price just resolves itself.  It goes down, right?

12   A.  But I'm not sure if that analogy fits to this KIT Digital.

13   Q.  Okay.  Let's move on.  You defined loss when Mr. Jackson

14   asked you, and I think I quoted it correctly, but correct me if

15   I'm wrong.  The loss is the -- you calculate the impact

16   Maiden's trading had on residual returns for KIT Digital after

17   adjusting for market and industry.  Is that correct?

18   A.  And for firm specific.

19   Q.  And firm specific.  Thank you.  Now, when you say the

20   impact that Maiden's trading had on residual returns, that's

21   not exactly what you did, right?

22   A.  It's the proportional Maiden trades of the residual return.

23   Q.  But to be clear, you only looked at positive residual

24   returns, correct?

25   A.  In my assessment of the --

1          MR. NAFTALIS:  Asked and answered.

2          THE COURT:  You may answer.

3     A.  As my figure 12 shows, the test I did for the government's

4     loss calculation, I tested only the positive residuals.

5     Q.  There were negative residuals on days that Maiden was

6     trading, correct?

7     A.  Yes.

8     Q.  And you didn't incorporate those at all in your analysis,

9     right?

10    A.  I'm not -- so --

11    Q.  In your calculations?

12    A.  I did not incorporate the negative residuals.  I don't

13    believe it would be appropriate to offset any gains with that

14    loss that comes from a negative residual.

15    Q.  What is your basis, when you say it's not appropriate, are

16    you talking about as a legal matter it's not appropriate?

17    A.  No, from an economic matter, if you are engaged in -- as an

18    economist looking at a conspiracy scheme, if you engaged in

19    trying to inflate the value but somehow your scheme does not

20    work and it goes in the opposite direction, I would not factor

21    that in, in my assessment of how poorly you executed the

22    scheme.

23    Q.  So from a legal perspective, you're not opining as to

24    whether it is appropriate to look at any deflationary effect

25    Maiden's trading may have had, right?

J423TUZ4                        Voetmann - Cross

1    A.  I'm not an attorney and I don't have a legal opinion, no.

2    Q.  Did anybody tell you to ignore negative returns?

3    A.  No.  But just from the answer I just gave, that would be

4    the economic reason for why not to include them.

5    Q.  You made an assumption that Maiden's trading contributed to

6    abnormal price increases in KIT Digital stock, correct?

7    A.  That was the intent of the conspiracy scheme as I

8    understand.

9    Q.  Did you exclude the possibility that Maiden's trading also

10   contributed to abnormal price declines?

11   A.  I think that was the question you just asked previously.

12   Q.  It's not exactly.  I'm just wondering whether -- not did

13   you exclude the analysis, but did you exclude the possibility

14   that his trading caused KIT Digital's stock price to abnormally

15   decline?

16   A.  Sorry.  Can you define "his"?  You mean Maiden Capital?

17   Q.  Maiden.

18   A.  I did not include in my test any negative residuals.  As I

19   just previously explained, from an economic reason, I don't

20   think that would be appropriate.

21   Q.  Do you know what the effect would have been on the loss

22   amount calculation had you included negative residuals on days

23   that Maiden was buying or selling KIT Digital stock?

24   A.  I do not.  I do not see a reason to perform such

25   calculation.

1  Q.  You didn't have anybody on your team attempt that

2  calculation?

3  A.  I did not.

4  Q.  Would it surprise you to learn that it would be a negative

5  loss amount?

6  A.  If you say so.  I haven't seen any analysis to support

7  that.

8  Q.  One of the things I want to focus in particular now on the

9  11 days that comprised the $10 million figure.  I provided a

10  copy of this to the government yesterday.  This is KIT Exhibit

11  F113.  And what we've taken here, Dr. Voetmann, is your

12  appendix, and taken out all the data of the days that don't

13  comprise the 11, and incorporated it into the 11 days that you

14  rely on for the $10.4 million figure.

15          MR. WEITZMAN:  We offer KIT Exhibit F113.

16          THE COURT:  Any objection?

17          MR. NAFTALIS:  No, your Honor.

18          THE COURT:  F113 is received.

19          (Defendant's Exhibit F113 received in evidence)

20  Q.  Let's start with some of the days on this chart.  May 10,

21  2011.  That's your very last day on this chart, right?

22  A.  Do you mind pushing it up a little bit?

23  Q.  I'm sorry about that.  May 10, 2011.  I can also hand you a

24  copy?

25  A.  I just can't see the last column now.

1    Q.   Yes.

2    A.   Now I can't see the first.

3    Q.   You're right.   Okay.

4    A.   There you go.

5    Q.   Can you read this clearly, sir?

6    A.   I believe I can.

7    Q.   Now, on that date, you attribute $16,000 of loss to

8    Maiden's trading, correct?

9    A.   You're looking at May 10, 2011?

10   Q.   May 10, 2011.

11   A.   The last row?

12   Q.   Yes.

13   A.   Yes.

14   Q.   You concluded on that date that -- just to be clear, Maiden

15   on that date is less than a 1 percent trader, buyer of KIT

16   Digital stock on that date, right?

17   A.   That's correct.

18   Q.   And on that date, May 10, 2011, the company's trading on

19   the Nasdaq, correct?

20   A.   That's correct.

21   Q.   There is a large volume of trading at that time.   Do you

22   know any study, economic study, that supports the conclusion

23   that being less than a 1 percent trader in a stock can

24   manipulate the market in that stock?

25   A.   So again, I think you have to take it into context of the

1    entire period.  I don't know of any study that would zoom in on
2    just one day like this.  It is possible there are studies out
3    there.  You have to take it into the context of the entire
4    period.  As the example you provided earlier today, it is
5    possible that there a lot more trades by Maiden leading up to
6    this date.  I have not looked at that.
7    Q.  But you are including this date, May 10, as a date that
8    causes the loss.  Correct?
9    A.  Yes, and I included specifically because I wanted to test
10   the low end of the government's calculation, and then focus on
11   the days that Dr. Ferrell had highlighted, which included these
12   11 days.
13   Q.  Are you aware, sir, that on May 10, 2011, Maiden was a
14   net -- I'm sorry.  Maiden -- withdraw that.
15            Are you aware, sir -- let me withdraw again.
16            When the company's listed on the Nasdaq, it was a
17   relatively liquid stock, correct?
18   A.  It would be more liquid than appears to be.
19   Q.  Putting aside Maiden's trading, do you have any economic
20   literature to support that a small trader, less than 1 percent
21   on a given day, can manipulate the stock when there is abundant
22   trading in the real market between others?  Do you have any
23   literature to support that?
24   A.  I have literature to support looking at how volume affects
25   stock prices.  There are literature studies volume

1   specifically.  Here what I'm doing is to focus on the

2   conspiracy scheme to manipulate, and proportion out what Maiden

3   Capital attempted to do.

4   Q.  When you say that there is academic literature on how buy

5   volume manipulates the market.  It is more than 1 percent of

6   the buy market in a highly liquid well-traded stock, right?

7   A.  Economic studies would not focus on just one security.

8   Typically we would do a broader set of securities and broader

9   set of volumes.  So I don't have the answer for you right now

10  whether that exists or not.

11  Q.  You concluded that on May 10, 2011, any price increase is a

12  reaction to Maiden's supposed pumping up of the stock, correct?

13  A.  I concluded that only 1 percent of the price increase is

14  associated.

15  Q.  Your conclusion causally is the price increase -- the

16  statistically significant price increase is due to Maiden's

17  trading.  Not market, industry, firm specific, or confounding

18  events, correct?

19  A.  That's correct.  So we left, as Dr. Ferrell said, aside

20  from manipulation, we are left with that as a plausible causal

21  relation.  And of that increase, I only take 1 percent to

22  allocate to the loss.

23  Q.  Now, in order to determine whether there was any company

24  specific or confounding news, you relied on this Factiva

25  database as you testified, correct?

J423TUZ4                        Voetmann – Cross

1    A.  Correct.

2            MR. WEITZMAN:  I'm putting on the screen Defendant's

3    Exhibit F114.  For the record, this is the Factiva database

4    that Dr. Voetmann relied on or produced.  The only change we

5    made is we carried over the top headline so we can all

6    understand what each of the columns are.  Otherwise it is the

7    exact same information.  We provided this to the government

8    yesterday.  We offer Defendant's Exhibit F114.

9            THE COURT:  Any objection?

10           MR. NAFTALIS:  No, your Honor.

11           THE COURT:  F114 is received.

12           (Defendant's Exhibit F114 received in evidence)

13   Q.  Let's take a look at May 10, which is May 10, 2011 in this

14   document.  That is page 14 of Defense Exhibit F114.

15           Did you review all the articles dated May 10 on this

16   date?

17   A.  I have to look at the article to confirm if I reviewed

18   them.  But they look familiar, the titles of the articles, the

19   headlines in that second column look familiar.

20   Q.  You concluded that only one article is new news; is that

21   correct, the line 662?

22   A.  Right.  Because if we looked at earlier articles, you'll

23   see when they talk about the earnings and the losses in Q1,

24   these articles provide information about Q1 results, and that

25   had previously been disclosed.  So from a confounding news

1    analysis, as we typically do in securities class actions, you

2    would conclude that there is no new information to the market

3    on that day.

4    Q.  Sir, it's important to determine to have access to all

5    potential confounding information before you reach a conclusion

6    as to whether there is confounding information out there.

7    That's tautological actually, right?

8          Do you still have Government Exhibit 3302, the analyst

9    reports?

10   A.  I do.

11   Q.  Can I ask you to turn to page 520 of that on the bottom.

12   Double sided so I can put it on the screen.

13         MR. WEITZMAN:  We offer Government Exhibit 3302.

14         MR. NAFTALIS:  No objection.

15         THE COURT:  3302 is received.

16         (Government's Exhibit 3302 received in evidence)

17   Q.  Page 520 is a Maxim Group research analyst report dated

18   May 10, 2011?

19   A.  Hmm-hmm.

20   Q.  Do you see that?

21   A.  I do.

22   Q.  This research report dated May 10, 2011 isn't listed on

23   your Factiva sheet as one of the documents you reviewed,

24   correct?

25   A.  That's correct.

1  Q.  Let's go to June 10, 2010, which is right over here.  On

2  that date, again, you reached the conclusion that Maiden's

3  0 percent trading was the cause of a statistically significant

4  increase in KIT Digital stock, correct, and then you weighted

5  that.

6  A.  No, I don't think I conclude -- so, this is a statistically

7  significant day, and on that day, because Ferrell points to

8  that day as an important day, I weighted that with the Maiden

9  trades that day.  Correct.

10 Q.  Is it your testimony that Maiden did not cause a

11 statistically significant increase in the price of KIT Digital

12 stock on June 10?

13 A.  So, given on that day we have accounted for market,

14 industry, and firm specific factors, the conspiracy scheme may

15 be a plausible causal effect on the residual, as it could be

16 that is what drives the residual return that day.

17 Q.  I'm sorry.  I couldn't understand what you said.  Can you

18 say that again?

19 A.  Sure.  On that day, June 10, it's a statistically

20 significant price reaction that day.  And in my analysis, we

21 have here, we have excluded market, industry, and firm specific

22 events.  So as Dr. Ferrell said, aside from the manipulation,

23 if you control for those factors, it is plausible that there is

24 a causal relation between the manipulation and that price

25 response.

1    Q.  Dr. Ferrell never said in his report that there was a

2    plausible relationship between the man -- between Maiden's

3    trading and the stock -- a statistically significant price

4    increase; isn't that correct?

5    A.  He said that aside from manipulation.  You have the

6    government should have controlled for market, industry, and

7    firm specific information.

8    Q.  You read that statement "aside from manipulation" as a

9    conclusion by Ferrell that the only alternative to market,

10   industry, and company specific, is market manipulation by

11   Maiden?  Is that your testimony?

12   A.  I'm -- that's why I used the word plausible.  He's stating

13   four factors, so it could be, as he stated, there is four

14   factors that it could be driven by the conspiracy scheme.

15   Q.  So, other than Dr. Ferrell's statement that you're

16   interpreting in that way, you're relying solely on that to

17   render a conclusion or an assumption that it's plausible that

18   Maiden's trading caused this statistically significant price

19   increase?

20   A.  So for this test of the government's amount of losses, this

21   is how I wanted to test the low end of their range, by focusing

22   just on these 11 days and proportion that out by their volume.

23   In that sense applying an event study, applying proportional

24   principles from those two, which are commonly done, that's how

25   you would calculate the loss.

J423TUZ4                       Voetmann - Cross

1    Q.  I'm sorry.  I have to ask that question again.  Aside from

2    Dr. Ferrell's statement that you interpreted in your way,

3    that's the basis for your assumption?

4              MR. NAFTALIS:  Objection.

5              THE COURT:  Sustained.

6    Q.  Aside from Dr. Ferrell's statement that you quoted, that's

7    the basis for your assumption that Maiden's market manipulation

8    is the only alternative to -- is the only reason for a

9    statistically significant price increase when market, industry,

10   and company news are excluded?

11             THE COURT:  Sustained.

12   Q.  So on June 10 -- let me withdraw that.

13             Did you do any analysis that determined how efficient

14   the market in KIT Digital stock is?

15   A.  No.

16             MR. NAFTALIS:  Your Honor, asked and answered.

17   Q.  Can you turn to Government Exhibit 3304, which is what I

18   provided to you.  This is another one of the research analyst

19   reports.  And it's produced by the government.

20             MR. WEITZMAN:  We offer Government Exhibit 304.

21             MR. NAFTALIS:  No objection, your Honor.

22             THE COURT:  3304 is received.

23             (Government's Exhibit 3304 received in evidence)

24   Q.  If you would turn to page 115.  This is a research analyst

25   report issued on June 9, 2010, by Merriman Curhan Ford by

1    managing director Richard Fetyko.  Do you see this document?

2    A.  I do.

3    Q.  Are you were you aware this document wasn't captured in

4    your Factiva database on here?

5    A.  I see the date here on June 10, 2010.  Is that the date?

6    Q.  That is the date.  Do you know when on June 9, 2010,

7    Merriman Curhan Ford released its research analyst report about

8    KIT Digital?

9    A.  I do not.

10   Q.  Do you know whether the effect of the June 9, 2010,

11   research report released by Merriman Curhan Ford was totally

12   impacted in the price of the stock on June 9?

13            MR. NAFTALIS:  Your Honor, asked and answered and

14   foundation.  He said he didn't look at these reports, so I

15   think he has no foundation to answer any of these questions.

16            MR. WEITZMAN:  Well, the point is that he hasn't done

17   this analysis, your Honor.  That's the record I need to

18   establish.

19            MR. NAFTALIS:  I think we got that in the first part

20   of the testimony.  He did not look at these reports, but he

21   testified all the information in the analyst reports is in the

22   news reports that he looked at.

23            THE COURT:  That's my recollection of the record.

24            MR. WEITZMAN:  Your Honor, I don't think he testified

25   that all the information in the research analyst reports are in

J423TUZ4                    Voetmann - Cross

1    the news reports.  He decidedly did not testify to that.

2              THE COURT:  Well, I disagree.  That's my recollection.

3    He did testify to that.  He testified, well, he testified on a

4    number of things about these exhibits.  First of all, he said

5    that many of the reports were computer generated.  He didn't

6    consider them analyst reports at all.  He said with respect to

7    the exhibits that did contain analyst reports, he believed that

8    they likely were picked up by Factiva, or more precisely, that

9    the information contained would have been picked up by Factiva.

10   That's my recollection of what he testified to as to these

11   exhibits.

12             MR. WEITZMAN:  Okay.

13   Q.  Dr. Voetmann, I'm putting up your Factiva, which is

14   Defendant's Exhibit F114.  Do you see June 9, 2010 on Factiva

15   and June 10, 2010?

16   A.  I do.

17   Q.  Is it correct to say that the Merriman Curhan Ford research

18   analyst report is not referenced on your Factiva database?

19   A.  No, I think that's incorrect.  You look at row 325.  It

20   says by Merriman, specifically referencing to this report.

21   Q.  The report itself isn't on the Factiva database, correct?

22   A.  I don't have the article in front of me, what was included

23   in the article.  But it probably have -- I don't want to

24   speculate.  It normally would have included a description of

25   what was the published by Merriman.

1   Q.  Do you see that you noted beside that article, line 325,

2   that this is a piece of new information, correct?

3   A.  Yes.

4   Q.  And do you see the title of the article is "KIT Digital

5   Pullback Presents Buying Opportunity Says Merriman."  Correct?

6   A.  Yes.

7   Q.  You don't know when that article was published on June 9,

8   2010, right?

9   A.  I don't have the -- if we had the article we might,

10  sometimes they'll provide the time stamp of the article.

11  Q.  Do you know, did you do an analysis to determine whether

12  the articles were published before or after the close of

13  trading?

14  A.  I didn't do a systematic analysis.  I don't recall right

15  now.  But looking at the article, as we reviewed the articles,

16  we would have taken in all the information in those articles.

17  But I can't recall that article specifically.

18  Q.  Not all articles have time stamps on them?

19  A.  That's correct.

20  Q.  If the article was in fact published on June 9, 2010, after

21  the close, or near the close of the trading day, it might still

22  have an effect on trading on June 10, correct?

23  A.  It's possible.  I'd have to look at the article.

24  Q.  Do you agree with me when a research analyst gives a

25  recommendation or says something is a buying opportunity, that

J423TUZ4                          Voetmann - Cross

1    may be confounding to the price of the stock?

2    A.   I would have to read the article to determine what was in

3    that article.

4    Q.   Okay.  I'm showing you what's been marked as Government

5    Exhibit 3304.  This is the actual research analyst report.  And

6    it says --

7                THE COURT:  If there is a particular page in 3304,

8    right.

9                MR. WEITZMAN:  On page 115.  The Merriman Curhan

10   article.  Research analyst report on June 9.

11   Q.   It states: "we reiterate our buy on KIT Digital and our 16

12   to $18 valuation range.  The recent stock pullback offers

13   investors an attractive entry point on this pure play on the

14   adoption of online and mobile video."

15               Do you see that?

16   A.   I do.

17   Q.   You can't rule out the possibility that this article, this

18   research analyst recommendation for investors to come into the

19   stock, is confounding news, can you?

20   A.   Well, I -- based on my professional experience, often

21   reading analyst reports, as well as looking at news articles,

22   as I sit here right now, I did not see this report itself.  But

23   I would have to look at the news articles to see if Merriman in

24   fact have made these statements earlier, in which case it would

25   be a new report, but it may not contain new information so

1     that's a judgment call on my part.

2     Q.  Is the fact that a research analyst, sir, makes --

3            THE COURT:  I suspect the fact it says "we reiterate"

4     suggests that they've said it before, right?

5            THE WITNESS:  It's possible, yes.

6     Q.  Do you recognize, do you acknowledge that when research

7     analysts recommend people to buy a stock, it could be

8     confounding news?

9     A.  It really depends on how they make that recommendation.

10    Q.  Okay.  So it is a case-by-case basis?

11    A.  It is.

12    Q.  You have to research and read the research analyst reports

13    on a case-by-case basis to make that determination, right?

14    A.  To assess whether there's any new information in that

15    report, it might be a new report, but oftentimes when

16    analysts -- equity analysts does is restating what was

17    discussed on a conference call or what was previously published

18    by the company in a press release.  And so many of these

19    reports, even though they are analyst reports, may in fact not

20    contain any additional new information that would therefore

21    make it a confounding piece of news.

22    Q.  Okay.  Turning to your Exhibit A, I'm sorry, your report,

23    Government Exhibit V1.  And I'd like to turn to April 12, 2011.

24           THE COURT:  I'm sorry, you said V1 and then you said

25    turning to April 12.  I don't know what you're talking about.

1              MR. WEITZMAN:  April 12, 2011 is on page C13 of

2    Government Exhibit V1.  I'm sorry.  I have the wrong date.  Let

3    me find the right date and then I'll come back to it.

4    Q.  Did Factiva, do you recall whether Factiva posts articles

5    from Seeking Alpha?

6              THE COURT:  From what?

7              MR. WEITZMAN:  A website blog called Seeking Alpha.

8              THE COURT:  Seeking Alpha?

9              MR. WEITZMAN:  Yes.

10   Q.  Do you recall seeing any Seeking Alpha articles on Factiva

11   database?

12   A.  I don't recall seeing Factiva -- I'm very familiar with

13   Factiva -- no, I'm sorry, Seeking Alpha.  It is a common blog

14   that a lot of people using to post information, whether it's

15   verified or not.  But a lot of investors post anonymously on

16   this blog, so that's a common -- Seeking Alpha is a common

17   venue to post information.

18              But I don't recall, as I sit here, Seeking Alpha, that

19   the -- since I'm familiar with it, I would have picked up in

20   the Factiva searches, but I don't recall the name coming up.

21   Q.  Are you aware that Seeking Alpha is a blog that is often

22   used to obtain information, whether true or false, or

23   disseminate information regarding small, micro, and nano cap

24   stocks?

25   A.  And as well as very large stocks.

1   Q.  Very large stocks, too?

2   A.  Yes.

3   Q.  You are aware that Seeking Alpha has some reasonable

4   measure, some large measure of readership, correct?

5   A.  Well, as I understand it, it changes all the time, but you

6   can be a premier subscriber where you get these blogs before

7   it's disseminated to the market.  Or it can be just someone who

8   is subscribing to the blog when they come out.  So I understand

9   they have different levels of access to the information that

10  might come out.

11  Q.  Okay.  But it's read by investors, correct?  Certain

12  investors?

13  A.  Certain investors, the majority of Seeking Alpha readers,

14  as I understand it, since I've studied it, is typically short

15  sellers or people engaging in short selling activity.

16  Q.  What about day traders?

17  A.  Well, day traders might also read that, yes.  But I would

18  also say it's not, I don't believe and I don't think it is a

19  common disseminated to all investors.  But --

20  Q.  Have you heard or read any studies that identified Seeking

21  Alpha as market moving at times?

22  A.  I've seen a few studies where Seeking Alpha have moved the

23  market allegedly by posting inadequate or incorrect

24  information.  So at times, because you can post a blog without

25  the owners of whoever runs Seeking Alpha actually verifying

1    information, so there is different levels of blog posting.  One

2    is no verification, but there is also other times of blog

3    postings where it is somewhat verified.

4    Q.  Seeking Alpha wasn't captured in your Factiva search,

5    correct?

6    A.  Like I said, I don't recall Seeking Alpha as a term that

7    came up in any of the headlines or the lead paragraphs.  So, to

8    the best of my knowledge, I don't believe it was.  But it is

9    possible it was somewhere in some article.

10   Q.  On June 20 -- you include June 25 in your trading?

11              THE COURT:  In his what?

12              MR. WEITZMAN:  I'm sorry.  Just one second.

13   Q.  You included June 25, 2009 as one of the 11 days that

14   comprised the $10 million loss amount, correct?

15   A.  It was one of the days that was statistically significant.

16   Correct.

17   Q.  And are you aware, sir, that the day before June -- on

18   June 24, 2009, KIT Digital filed for a registration of public

19   offering of common stock?

20   A.  I recall seeing an article about them registering.

21   Q.  Okay.  Let's put up your report, Government Exhibit V1.

22   And let's go to June 25 and June 24, 2009.  Which is page C3.

23   Is that up on your screen?

24   A.  June 25 you said?

25   Q.  I apologize.  That's the wrong document.  I was looking for

1    your Factiva report which is Defendant's Exhibit F115.  Putting

2    up June 24 and June 25, 2009, which is page one of Defendant's

3    Exhibit F114.

4              Do you see June 24 and June 25 -- June 24, 2009?

5    A.  I do.

6    Q.  There's no news reported on June 25, 2009, correct?

7    A.  That's correct.

8    Q.  The only news that one sees is news on June 24, 2009,

9    correct?

10   A.  Yes, that's the news about the filing for a public offering

11   of common stock, plus the registration for public offering of

12   common stock.  So there's four articles.

13   Q.  Do you know what time of day the June 24 news stories were

14   published?

15   A.  I would have to go back and look at the articles again.

16   Q.  Well, one of the articles on June 24 is an article reported

17   on market news publishing, correct?  June 24, 2009?

18   A.  That's correct.

19   Q.  I'm putting on the screen what's marked as Defendant's

20   Exhibit F115.  Is this the article that was reported on

21   Factiva?

22   A.  That appears to be, yeah.

23   Q.  And the date and time stamp on that article is June 24,

24   2009, at 1500 hours, correct?

25   A.  Yes, so 3 o'clock in the afternoon.

1    Q.  Have you done any analysis to determine whether the

2    confounding news regarding the filing of a public offering of

3    common stock was fully price impacted within the one hour

4    remaining of trading after this was published?

5    A.  I have not.  But as a general matter of principles, if you

6    talk about market efficiency, you would expect that an hour

7    would be sufficient to incorporate that information.

8    Q.  That's an assumption you are making, having not studied it

9    with respect to KIT Digital, correct?

10   A.  Having studied many offerings and having studied, written

11   many articles about market efficiency using event studies,

12   that's a common assumption and a lot of textbooks as well as

13   articles would support a notion that the market would respond

14   rapidly and instantly to information.  So an hour might be

15   sufficient to incorporate that information.

16   Q.  Sir, that article was dated June 24, 2009, right?

17   A.  June 24, 2009.

18   Q.  3 p.m.

19   A.  Right.

20   Q.  What market was KIT Digital trading on at that time?

21   A.  So it was around the same time when they moved over to

22   Nasdaq, so I don't recall right now if they had already moved

23   to Nasdaq.

24   Q.  It was trading in the over-the-counter market, correct?

25   A.  Sure.

1    Q.  Didn't you testify --

2             THE COURT:  Do you know whether it was trading on the

3    over-the-counter market or on Nasdaq?  Do you know as of the

4    date of June --

5             THE WITNESS:  I don't recall as of this date.

6    Q.  Does it refresh your recollection that KIT Digital was

7    listed on the Nasdaq as of August 13, 2009?

8    A.  That sounds about right.

9    Q.  So June 24, 2009 was before KIT Digital got listed on the

10   Nasdaq, correct?

11   A.  Yes.

12   Q.  And when it is an over-the-counter stock, you testified

13   earlier it is a less liquid stock?

14   A.  It is less liquid, but in the sense it's about to go to

15   Nasdaq, it might have risen to a level where it's become more

16   liquid.  I haven't done any market efficiency studies.  Just

17   because you're trading OTC does not mean that you wouldn't have

18   an efficient market and the market wouldn't respond to

19   information about a stock.

20   Q.  Let's turn to June 10.

21             In an effort to speed this up, your Honor, I'll move

22   on.

23             June 10, 2010.  I'm sorry.  Not June 10.  Actually, if

24   we can do June 10, 2010.  We looked at June 10, 2010 earlier,

25   correct?

1   A.   I believe so.

2   Q.   That's a day of trading when there's a very low number of

3   shares purchased by Maiden, correct?

4   A.   Correct.

5   Q.   And June 10, 2010 is on your list as one of the 11 days,

6   correct?

7   A.   Correct.

8   Q.   Now, showing Defendant's Exhibit F114, and turning to

9   June 10, 2010, there is one article on June 10, 2010, titled

10  "Index PX Rose by 2.2 9 percent on Thursday," correct?

11  A.   Hmm-hmm, yes.

12  Q.   There are no other articles on June 10, 2010, correct, that

13  you analyzed?

14  A.   That's correct.

15  Q.   Putting up on the screen what's been marked as Defendant's

16  Exhibit F116.  This is what's called a Form 4 for trading by

17  Isaza Tuzman in KIT Digital dated June 10, 2010.

18           MR. WEITZMAN:  We offer Defendant's Exhibit F116.

19           THE COURT:  Any objection?

20           MR. NAFTALIS:  No, your Honor.

21           THE COURT:  F116 is received.

22           (Defendant's Exhibit F116 received in evidence)

23  Q.   Is it correct to say, sir, that trading by the CEO,

24  purchases stock by the CEO of a publicly traded company can

25  have a market moving effect?

1    A.  Do you mind scrolling down so I can see the top half.

2    Q.  Yes.

3    A.  Okay.

4    Q.  Let me, if I can rephrase, sir.  You didn't evaluate this

5    Form 4 to determine whether it was confounding, correct?

6    A.  If you mind going back to the previous exhibit, there was

7    a -- on the next day, there was an article pick up by the

8    public press that he had in fact purchased those shares.  And

9    so the market incorporated that on June 11, that's when they

10   learned about this order that was placed on the 10th.

11   Q.  Excuse me.  Sir, the market has access to SEC filings,

12   correct?

13   A.  We all have access to SEC filings.

14   Q.  Are you aware that the June 10 filing by Mr. Isaza Tuzman

15   purchasing stock was filed in the morning on June 10, 2010, not

16   at the end of the day?

17            THE COURT:  How would he know that?

18            MR. WEITZMAN:  Let's establish it, your Honor.

19            THE COURT:  Does the Form 4 indicate the time it was

20   filed?

21            MR. WEITZMAN:  No.  I apologize, your Honor.  I'm

22   going to put up Defendant's Exhibit F117.

23   Q.  Do you recognize this document, sir?

24   A.  I do.

25   Q.  Does the SEC capture the date and time that filings are

1   made on Edgar?

2   A.  It captures the -- if you look, your Honor, the accepted to

3   the left.  It says accepted the filing at 10:57.

4           I have to go back, that may or may not be the time

5   that's actually released on Edgar.  But it's been accepted into

6   Edgar.

7   Q.  So, your testimony is that any price impact resulting from

8   this filing could only be impacted on June 11, 2010.  Is that

9   your testimony?

10  A.  My testimony is that the press picks up this filing on

11  11th.  The question is still whether this -- and I've seen

12  situations in Edgar where it's been accepted, but it might not

13  have been publicly available at that time.  So if we know the

14  time when it was made publicly available, that would be

15  important.

16          But that's my testimony, that it was picked up by the

17  press on the 11th.

18  Q.  Sir, it was picked up by the press that you reviewed on

19  Factiva, correct?

20  A.  Correct.

21  Q.  Okay.  Let's put up Defendant's Exhibit F118.  Do you

22  recognize an M2 press wire?  Do you recognize that as a press

23  wire?

24  A.  It says it is a press wire.

25  Q.  This is the article you're referring to on your Factiva

1   database, right, on June 11.  Do you see that?

2   A.  I do see that.

3   Q.  Okay.  And you coded this as a June 11 report, correct?

4   A.  There is a date right there where you're highlighting that

5   says June 11, 2010.

6   Q.  Do you see a bit below that that it's reported by a website

7   titled insidercow.com on June 10, 2010, at 10:57 a.m.?

8   A.  I do.

9   Q.  10:57 a.m. is the exact time that it was accepted for

10  filing by the SEC in Defendant's Exhibit 117, correct?

11  A.  Correct.

12  Q.  Is it fair to say that the Form 4 that Mr. Isaza Tuzman

13  filed on June 10, in the morning, was publicly reported on

14  June 10 in the morning?

15  A.  It seems to be.  Assuming that website is correct, it seems

16  to be the case that it would have been available at 10:57.

17  Q.  That would be a confounding piece of news that you did not

18  evaluate on June 10, correct?

19  A.  Yeah, again, I used my professional judgment looking at

20  Factiva.  In this case had I had access to the additional

21  article you found, it's possible I would have changed that

22  mark.  But if you look at that exhibit, again, with 11 days, I

23  believe that day had a very minor if almost no impact on the

24  10.4 million.

25  Q.  Okay.  So let me move on because I think there are many

1    days we need to discuss.  Another day among the 11 that you

2    identified is May 10, 2011.

3              I'm sorry.  Do you see that?  That's the final date

4    we've spoken a bit about that already, right?

5    A.  Yes.

6    Q.  Are you aware that on May 10, 2011, a date that you

7    included in your appendix as one of the 11 days, is a date that

8    KIT Digital filed a 10-Q?

9    A.  I have to look at the list of articles again.

10   Q.  Okay.  I'm marking Defendant's Exhibit F119.  And this is

11   May 10, 2011, and it is a KIT Digital form 10-Q, do you see

12   that?

13   A.  I do.

14   Q.  So you now understand that on May 10, 2011, there was a

15   form 10-Q filed.  Is that correct?

16   A.  I see a form 10-Q here in front of me.

17   Q.  Marking Defendant's Exhibit F120.  Does this indicate to

18   you that the May 10, 2011, filing of the 10-Q by KIT Digital

19   was filed or accepted for filing at 10:44 a.m. that day,

20   correct?

21   A.  That's correct.

22   Q.  You didn't review this 10-Q to determine whether it was

23   confounding, correct?

24   A.  I'd have to look at the articles on Factiva to see if they

25   picked up the information in this article.

J423TUZ4                         Voetmann - Cross

1   Q.  My question is a bit different.  My question is whether you

2   reviewed this quarterly report to determine whether any

3   information in the quarterly report was confounding?

4   A.  I did not.

5   Q.  Putting on the screen what's been marked as Defendant's

6   Exhibit F121.  Which is a May 10, 2011, article titled "Shares

7   on Prague Bourse Slightly Fall While CEZ KIT Digital Grow."

8            Do you see that?

9   A.  The title, yes.

10  Q.  You see in the second line, the middle of the page, it says

11  KIT Digital put on more than 7 percent to -- I'm sorry I don't

12  know the Czech -- I think Czech korunas -- 200 after announcing

13  its first quarter results.

14           Do you see that?

15  A.  I do.

16  Q.  Fair to say that there was press out there that suggested

17  that investors reacted positively to the issuance on May 10,

18  2011 of KIT Digital's quarterly report?

19  A.  Like you, I don't know if 200 koruna is a lot or small.

20  Or --

21  Q.  7 percent.

22  A.  If it is 7 percent, it would suggest they were positive by

23  the news.

24  Q.  Notwithstanding that, you concluded there was no

25  confounding news on May 10, 2011, that could explain a

 1  statistically significant price increase?  Is that fair to say,

 2  that's what your chart reflects?

 3  A.  So based on the available information on Factiva, that's

 4  what I concluded, correct.

 5  Q.  Let's go to September 20, 2009.  I'm sorry.  September 21,

 6  2009, which is on your chart, correct?

 7  A.  Correct.

 8  Q.  On September 21, 2009, you concluded there was no

 9  confounding news that might effect the stock price on that

10  date, correct?

11  A.  Again, based on the Factiva available articles.

12  Q.  There were articles that weren't available on Factiva,

13  correct?

14  A.  There might be.  There might -- I think I testified earlier

15  there are other sources, but Factiva covers the majority of all

16  the news outlets.

17  Q.  One such news article is an article dated September 21,

18  2009, at 11:40 a.m., Eastern Time, that is titled -- that is

19  the smallcapsentinel.com, "The Explosion of Digital Media."  Do

20  you see that?

21  A.  Yeah, I'm not familiar with smallcapsentinel.com.  It might

22  be a blog, but I'm not familiar with it.

23  Q.  Do you understand that KIT Digital was in the digital media

24  business?

25  A.  Yes.

1    Q.  In the first line of that article, it states, "For many of

2    us, we need look no further than our own homes and wallets to

3    confirm the ever expanding market for digital video."

4             Do you see that?

5    A.  I do.

6    Q.  And in the second paragraph, it references KIT Digital as

7    one of the companies that's in the digital media space,

8    correct?

9    A.  Among other companies as well, yes.

10   Q.  Now, this is not one of the articles that was captured for

11   September 21, 2009, in your Factiva database?

12   A.  Like I said, I'm not familiar with smallcapsentinel.

13   Q.  Let's go to September 21, 2009.  This is Defendant's

14   Exhibit F114.  You have no articles listed on your Factiva

15   database for September 21, 2009, correct?

16   A.  Correct.

17   Q.  And you have no articles or reporting for September 20,

18   2009, either, correct?

19   A.  I don't see September 20 either.

20   Q.  So you concluded there is no confounding news on

21   September 20, 2009 or September 21, 2009, correct?

22   A.  That's correct.

23   Q.  Okay.  If I can have -- do you have Government Exhibit 3305

24   there?

25             MR. WEITZMAN:  I don't recall if this one was also

1    offered, but we offer Government Exhibit 3305 which is the

2    research analyst reports produced by the government.

3            MR. NAFTALIS:  No objection.

4            THE COURT:  3305 is received.

5            (Government's Exhibit 3305 received in evidence)

6    Q.  If you turn to page 305 to 311 of the document.  This is a

7    September 20, 2009, research analyst report, correct, about KIT

8    Digital.

9    A.  That's correct.  This is a -- yes.

10   Q.  This isn't one of those computer generated reports.  This

11   is an actual research report, correct?

12   A.  I don't see a name of the author of the report on here,

13   which is typically an indication.

14   Q.  I'm sorry.  I couldn't hear you.

15   A.  I don't see a name of the author of the report, which is a

16   common indication that it might be a computer generated.

17   Q.  Okay.

18   A.  So I don't see that anyone actually, other than the service

19   NEC Price Target Research.  This might very well be a computer

20   generated report.

21   Q.  You don't know whether it's computer generated or not?

22   A.  I have to go search the name of this Price Tag Research is

23   not something that comes up.  I'm not familiar with them as a

24   research analyst, it is not a common research analyst.  So this

25   appears, could easily appear to be a computer generated report.

J423TUZ4                    Voetmann - Cross

1   Q.  In any event, sir, this was issued on September 20, 2009,

2   correct?

3   A.  That's the date of it, yes.

4   Q.  There is a commentary at the very first line, "KIT Digital

5   has a firm overall rating of B (positive)," correct?

6   A.  That's correct.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J42VTUZ5                          Voetmann - cross

1   BY MR. WEITZMAN:

2   Q.  The commentary continues.  This wasn't captured in your

3   Factiva database search; correct?

4   A.  That's correct.

5   Q.  So you didn't do an analysis of this to determine whether

6   it was confounding or not; correct?

7   A.  That's correct, I did not include -- and I typically don't

8   include computer-generated reports where there's no real

9   opinion other than they have -- as you can see in the chart

10  there's a good indicator that -- just studied historical data,

11  historical price information to come up with a prediction.  So

12  that's the computer-generated part of it.

13          So there's no analyst that actually make -- typically

14  in these types of situation, no analyst have actually talked to

15  the company or participated in conference calls or activities

16  that would give them information about KIT Digital, it's simply

17  based on just financial data.

18  Q.  Sir, are you making a determination right now that it's not

19  confounding just on the fly, like that?

20  A.  No, no.  We were talking about --

21          THE COURT:  No, he's telling you, as he has many times

22  already, that he doesn't regard these computer-generated

23  reports as worth considering.  I think that's what he said a

24  number of times now.

25          MR. WEITZMAN:  I'm not sure whether this is a

1   computer-generated report.

2           THE COURT:  He has indicated that there are a number

3   of markers that suggest to him that it is a computer-generated

4   report.

5           MR. WEITZMAN:  Okay.

6   BY MR. WEITZMAN:

7   Q.  On one of your other -- one of the other days that you

8   include in your 11 is May 20th, 2010; correct?

9           I'm sorry, I may have missed your answer.

10  A.  No, I don't see -- oh, May 20th, 2010.

11  Q.  Yes.

12  A.  Correct.

13  Q.  Are you aware, sir, that on May 20th, 2010, KIT Digital

14  filed an 8-K announcing the acquisition of Benchmark Broadcast

15  Systems?

16  A.  I'll have to look at my list of Factiva articles, if it was

17  showing up.

18  Q.  This is marked Defendant's Exhibit F123.  It's an 8-K dated

19  May 20th, 2010 for KIT Digital.

20          Sir, you didn't review this document -- put aside

21  Factiva.  You didn't review this document to determine whether

22  it was confounding; correct?

23  A.  Excuse me.  Did you say May 10 or May 14?

24  Q.  No.  The filing is May 20.  Do you see that on the top

25  page, sir?

1    A.   Okay.  And on the article here, the first line there, right

2    below the name of KIT Digital, it says May 14th, 2010.

3    Q.   Does that confuse you as to what date this was actually

4    filed on the SEC EDGAR system?

5    A.   Maybe they wrote the 8-K and then they filed it on the

6    20th.  But this would be a week earlier.

7    Q.   Okay.  But, in any event --

8                THE COURT:  Please don't talk over each other.

9                MR. WEITZMAN:  I wasn't intending to, your Honor.

10               I apologize.

11   Q.   In any event, you understand that this 8-K was filed, made

12   publicly available, on May 20th, 2010?

13               MR. NAFTALIS:  Your Honor, objection.

14               THE COURT:  Sustained.

15               MR. NAFTALIS:  If we could just look at the last page

16   of this document, where there is the press release from May

17   17th.  Obviously you issue 8-Ks days later with press releases.

18   The day of the 8-K isn't indicative of when the press release

19   came out.  Here it says May 17th is when the press release came

20   out on the second-to-last page.

21               So if we're going to keep doing this, I think it would

22   be nice to show the witness all the -- rather than flashing

23   pages and trying to get quick answers, give him the document

24   and let him look through it.

25               MR. WEITZMAN:  I'm happy to give him the document,

```
 1    your Honor.  I did not appreciate the May 17th press release

 2    that's attached to the 8-K.  So I will withdraw this exhibit.

 3            MR. NAFTALIS:  It might help also to give the witness

 4    actually the documents of the Factiva, because sort of game is

 5    to flash things and ask him if it's on Factiva.

 6            MR. WEITZMAN:  Your Honor, it's not a game.  I

 7    actually asked him if he would like his Factiva database

 8    spreadsheet, and he said no, he can see it on the screen.

 9            MR. NAFTALIS:  You keep going back and forth with the

10    thing you want him to look at, and then hiding the Factiva.

11    Let's just give him a hard copy so it's an efficient use of

12    time.

13            THE COURT:  Proceed.

14            MR. WEITZMAN:  Thank you, your Honor.

15            Your Honor, I'm trying to cut some stuff, so if you'd

16    just indulge me for a moment.

17            (Pause)

18    BY MR. WEITZMAN:

19    Q.  If we can turn to July 2nd, 2010.  That's another one of

20    the 11 days you identified in your loss amount calculation; is

21    that correct?

22    A.  Right.

23    Q.  Maiden bought -- well, withdraw that.  On May 11th -- I'm

24    sorry, July 2nd -- withdrawn.

25            On July 2nd, 2010, you calculate approximately $1.64
```

1   million of loss amount on that date.

2   A.   Correct.

3   Q.   Is that correct?

4        Let's turn to your Factiva database.

5        Would you like a copy of your Factiva document, sir?

6   A.   If we have many more days to go through, it would be nice

7   to have it.

8   Q.   Okay.

9        THE COURT:  You know, that raises another question,

10   which is how much longer is this examination going to go on?

11   Because I have another matter.  Well, if it's really going to

12   be five minutes, fine; if it's going to be a half an hour, not

13   fine.  So if you're going to commit to five minutes, meaning

14   this is over at ten of, we'll proceed.  But absent that, we're

15   not going to proceed any further.

16        MR. WEITZMAN:  I appreciate that, your Honor.

17        How about can I commit to regrouping --

18        THE COURT:  No.  All right.  Forget it.

19        We're done for today.  We'll have to set another date.

20        MR. WEITZMAN:  Your Honor --

21        THE COURT:  We're done.  We are done.  Done.

22        MR. WEITZMAN:  I have another document.

23        THE COURT:  Did you hear me?  We're done.

24        MR. WEITZMAN:  Yes, your Honor.

25        THE COURT:  We are adjourned for today.

1          We're adjourned.

2          MR. WEITZMAN:  I'm adjourning.

3          I just would like there not to be a misimpression

4     about what I was about to say, your Honor.

5          THE COURT:  We're adjourned.

6          You can step down.

7          THE WITNESS:  Thank you.

8          (Witness excused)

9          THE COURT:  I'll hear the next matter.

10         The parties will clear the tables.

11                              *    *    *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                            INDEX OF EXAMINATION

3      Examination of:                                Page

4      TORBEN VOETMANN

5      Cross By Mr. Salant  . . . . . . . . . . . . 239

6      Cross By Mr. Weitzman  . . . . . . . . . . . 276

7      Cross By Mr. Jackson . . . . . . . . . . . . 306

8                            GOVERNMENT EXHIBITS

9      Exhibit No.                                 Received

10      3302   . . . . . . . . . . . . . . . . . . 341

11      3304   . . . . . . . . . . . . . . . . . . 344

12      3305   . . . . . . . . . . . . . . . . . . 364

13                           DEFENDANT EXHIBITS

14      Exhibit No.                                 Received

15      F111   . . . . . . . . . . . . . . . . . . 278

16      F112   . . . . . . . . . . . . . . . . . . 293

17      F113   . . . . . . . . . . . . . . . . . . 336

18      F114   . . . . . . . . . . . . . . . . . . 340

19      F116   . . . . . . . . . . . . . . . . . . 356

20

21

22

23

24

25