**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------X
                                                            :
UNITED STATES OF AMERICA,                                   :
                                                            :
         v.                                                 :
                                                            :
KALEIL ISAZA TUZMAN and OMAR                                :    No. 15 Cr. 536 (PGG)
AMANAT,                                                     :
                                                            :
         Defendants                                         :
                                                            :
                                                            :
------------------------------------------------------------X
```

**SUPPLEMENTAL SENTENCING SUBMISSION IN CONNECTION**
**WITH THE APRIL 1, 2019 *FATICO* HEARING ON LOSS CALCULATION**

Randall W. Jackson
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York
10019

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................3

I.   The Supreme Court and the Second Circuit Have Rejected the Methodology that Dr. Voetmann Utilized Here ......................................................5

II.  Even If Voetmann's Methodology Could Be Used To Calculate Loss in a Market Manipulation Case Like This One, Voetmann Failed to Appropriately Deploy His Own Improper Methodology ..................................14

III. The Correct Loss Amount for Count Four is Zero..................................18

CONCLUSION ........................................................................................................19

## **PRELIMINARY STATEMENT**

This is a case in which the Government has reversed the appropriate process for arriving at a just outcome in sentencing. Rather than taking an objective look at the evidence and determining what the appropriate loss calculation should be, the Government has started out with the loss calculation it wants for Mr. Amanat and then sought out expert support, no matter how legally erroneous, for that desired loss calculation. In our June 18, 2019 Sentencing Submission, we emphasized that the process by which the Government had submitted its loss calculation to the Court was improper and that the substantive calculations that the Government had proposed were both legally and logically bankrupt. We will not rehash our prior arguments in this submission, but it remains the case that the loss calculations in the final PSR were submitted to the Court without Mr. Amanat having had an ability to voice any objections to its opaque methodology. It further remains the case that the Government subsequently arrived at a new methodology months after the submission of the final PSR and after Mr. Amanat had already submitted his sentencing submission. These procedural failures alone should be reason enough to reject the Government's loss calculations. Nevertheless, the Court held a *Fatico* hearing on April 1-2, 2019, at which the Government called two witnesses, Dr. Cathy Niden and Dr. Torben Voetmann. Only Dr. Voetmann's testimony was directly relevant to Mr. Amanat's testimony.

The only reasonable conclusion on the basis of the evidence that has been submitted is that the loss amount on Count Four is zero. As we emphasized in our

June 18 submission, the Supreme Court and the Second Circuit have explicitly rejected the methodology that Dr. Voetmann purports to have used in this case. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 340 (2005) ("in cases such as this one (*i.e.*, fraud-on-the- market cases), an inflated purchase price will not itself constitute or proximately cause the relevant economic loss. For one thing**,** as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value."); *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007) (vacating sentence and observing "we see no reason why considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss caused by a fraud is a critical determinant of the length of a defendant's sentence"). The Government, in its July 24, 2018 Sentencing Submission, refused to seriously deal with *Dura* or *Rutkoske*; instead the Government casually offered two meaningless sentences on these cases that failed to coherently explain why they are not controlling. (Gov. 7/24/18 Sub. At 20).

   This is not a casual matter for Mr. Amanat – the Government's grossly overstated loss calculation threatens to suggest a sentence that would separate him from his children and the rest of his family for an amount of time that would be tragic. Indeed, given Mr. Amanat's health, the loss calculation the Government is improperly pressing threatens a life sentence. That is all to say that this is not a time for experimental loss theories divorced from logic and the law. There was no

loss associated with the market manipulation scheme that was the subject of Count Four, and the Court should not accept the Government's strained attempt to cobble together an after-the-fact justification for its pre-determined theory of loss.

## I. The Supreme Court and the Second Circuit Have Rejected the Methodology that Dr. Voetmann Utilized Here

In *Dura*, the central question was whether a plaintiff in a civil securities fraud case could establish loss on the basis of allegations that "the price on the date of purchase was inflated because of the misrepresentation." *Dura*, 544 U.S. at 342. The Supreme Court concluded that the answer was "no," observing that that normally, in "fraud-on-the-market cases . . . an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." *Id*. The unanimous Court explained that "**as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss**; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value." *Id*. (emphasis added). The Court further explained that:

> Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price might mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other

> events, which taken separately or together account for some or all of that lower price. (The same is true in respect to a claim that a share's higher price is lower than it would otherwise have been — a claim we do not consider here.) Other things being equal, the longer the time between purchase and sale, the more likely that this is so, *i. e.,* the more likely that other factors caused the loss.

*Id.* at 342-43. The Court emphasized that "[g]iven the tangle of factors affecting price, the most logic alone permits us to say is that the higher purchase price will *sometimes* play a role in bringing about a future loss." *Id.* at 343. Based on this analysis, the Court rejected the Ninth Circuit's "inflated purchase price approach" and held that a plaintiff could not establish a securities fraud case on a theory that a fraudulently inflated purchase price constituted a loss. *See id.* at 345-46.

In *Rutkoske*, the Second Circuit explicitly rejected the argument that the Government advanced in its July sentencing submission – namely that the analysis of *Dura* should not apply in a criminal case. *See Rutkoske*, 506 F.3d at 179. The court analyzed the *Dura* decision and observed that in *Dura* "the Supreme Court rejected the Ninth Circuit's 'inflated purchase price' theory of loss causation, which held that plaintiffs in a civil stock fraud case could establish loss causation simply by showing that the purchase price was inflated because of the defendants' misrepresentation." *Id.* Critically, the Second Circuit explained that the Government's contention that *Dura* should not apply in a criminal case was divorced from logic and the law, observing:

> The Government contends that the principles set forth in *Dura Pharmaceuticals*, a civil case, should not apply to loss calculation in a criminal case. The dicta in *Ebbers*

> strongly undermines that position. **Moreover, we see no reason why considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss caused by a fraud is a critical determinant of the length of a defendant's sentence.**

*Id.* (emphasis added).[1]

With this legal background, which was highlighted in the Amanat sentencing submission before the Government even proffered the report of Dr. Voetmann, it is stunning that the Government chose to base its theory of loss on this rejected analysis. In introducing Dr. Voetmann's analysis, the Government is leading the Court into error. Dr. Voetmann could not have been clearer in his testimony on this point – his analysis of loss looked *only* at the extent to which the stock price was purportedly improperly inflated, the *precise analysis the Supreme Court rejected in Dura:*

> Q. So stepping aside for a moment, okay, from *Dura*, your calculation here was based on the inflation of the value of the stock that you assumed occurred because of the market manipulation; correct?
> A. Correct.

---

[1] Notably, the Court of Appeals also took issue with the "thin market" theory, observing "[t]he Government contends that it satisfied whatever obligations *Dura Pharmaceuticals, Ebbers, and Olis* impose by showing that NetBet shares traded in a 'thin' market and that 'the scheme unraveled, and the price of NetBet stock plummeted.' However, a 'thin' market does not preclude the effect of market forces, although it may minimize them, and the Government's expert linked the low share price of his calculation to an arbitrary date representing the end of available blue sheet data, rather than the date of disclosure of the fraud. The Government provides no record citation to any particular date to support its generalized claim that the scheme 'unraveled.'" *Rukoske*, 506 F.3d at 180.

- 7 -

(Tr. 314).² Voetmann acknowledged that his analysis had failed to move on to the necessary second step of actually determining how much loss a theoretical victim investor had suffered:

> Q. So I'll just ask the same question again. Your analysis does not measure any stock price declines as a result of the market manipulation; correct?
> A. I only looked at the positive residuals. I did not look at negative residuals.

(Tr. 247-48). Voetmann further acknowledged that he was aware that the analysis of loss in a securities fraud case required an inquiry into shareholders' actual loss when an inflated share price dropped:

> Q. I'll ask you the same question again. For an innocent shareholder to experience loss, they would need to buy the stock at an inflated price and hold it while the inflation dissipates. Do you agree or disagree with that?
> A. In a traditional class action, that is definitely the definition we operate under when we calculate loss to an investor.

(Tr. 246-47). Thus, Voetmann conceded that the notion of calculating loss on the basis of mere inflation of stock price is a concept foreign to the typical principles applied in securities fraud cases. That the Government nonetheless chose to advance Voetmann's bunk is made all the more outrageous given the clear rejection of this thinking in *Rutkoske*. In explaining its rationale, the Second Circuit relied on the Fifth Circuit's analysis, observing that "[a]pplying the teaching of the Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo*, the Fifth Circuit stated that '**there is no loss attributable to a misrepresentation unless and until the truth is**

---

² "Tr." Refers to the transcript of the April 1-2, 2019 *Fatico* hearing.

**subsequently revealed and the price of the stock accordingly declines'** and that the portion of a price decline caused by other factors must be excluded from the loss calculation." *Rutkoske*, 506 F.3d at 179 (emphasis added) (quoting *United States v. Olis*, 429 F.3d 540, 546 (5th Cir. 2005)). While the Government's expert analysis in *Rutkoske* appears to have been more robust than in the instant case, the Second Circuit nevertheless adopted the Fifth Circuit's reading of *Dura* and threw out Rutkoske's sentence. *See id.* at 180.

The glaring problem with Dr. Voetmann's analysis is that he completely skipped over the first part of the test described in *Rutkoske* and *Olis*, which required an examination of the point at which "the truth is subsequently revealed and the price of the stock accordingly declines," instead moving directly into the second part of the test, using Professor Farrell's event study to purportedly figure out the "conservative estimate" of the days on which the stock price was inflated by Maiden's trading by excluding other factors from the calculation. Importantly, as explained in Section II of this submission, Dr. Voetmann failed in that analysis as well, but the success or the failure of his attempt to isolate the days on which Maiden's trading clearly impacted the stock price is ultimately a question the Court does not have to address. Dr. Voetmann's failure at that task is irrelevant because he failed to first identify a stock drop associated with the misrepresentation or fraudulent inflation being revealed or even simply ending. He could not do so, because there was no stock drop. This is damning evidence that undermines the idea that there even was any manipulation of the stock price pursuant to the

scheme theorized in Count Four, but we are not attempting to litigate that question in this submission. We are attempting only to emphasize for the Court the extent to which the Government abandoned any logical or legally cognizable path towards calculating loss in pursuit of an unfairly high loss calculation. The Government has introduced no evidence of actual loss associated with the market manipulation scheme because they cannot introduce any evidence of actual loss.

Moreover, Dr. Voetmann's answer to the innocent shareholder question posed to him, conceding the obvious point that no serious economist understands there to be loss in a securities fraud case simply where a stock price has been inflated, actually understated the extent of consensus on this point in the academic literature. When pressed, Dr. Voetmann was unable to identify *any* report, scholarly article or other source that supported his theory of loss calculation in a securities fraud suit. (Tr. 254-256). Indeed, a number of commentators have observed that *all* of the methodologies that seek to calculate loss on the basis of inflation of stock price are logically flawed in that they ignore the circularity problem inherent in these methods of loss calculation. *See, e.g.*, Joseph A. Grundfest,[3] *Letter to the Honorable Patti B. Saris Re: Comments to Proposed Amendments to the Sentencing Guidelines, Fraud on the Market and Related Offenses* (Mar. 16, 2015), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/20150318/Grundfest.pdf. Professor Grundfest writes:

> But putting aside for the moment the technical measurement challenges posed by all current methodologies used in aftermarket sentencing litigation,

---

[3] Stanford Law School W.A. Frankie Professor of Law and Business.

> the very notion that any of these measures can serve as a rational estimate of the loss caused by an aftermarket fraud is profoundly flawed, and has been broadly criticized by many scholars for many decades. The critical flaw with the application of the out-of-pocket damage measure in the context of aftermarket trading is that it overlooks the fact that for every innocent purchaser (seller) of a security who suffered a loss by buying (selling) at an artificially inflated (deflated) price, there exists an innocent seller (purchaser) of the very same security who earns a profit by selling (buying) at precisely the same artificially inflated (deflated) price.
>
> The academic literature describes this as the "circularity" problem: for every dollar of "loss" suffered by an innocent seller or purchaser, there must be an equal and offsetting dollar of gain captured by an equally innocent purchaser or seller. In this context, the out-of pocket measure estimates a wealth transfer among investors, and does not describe "damages" or "costs" as typically conceptualized in the law.
>
> The academic literature in support of this critique is substantial. Judge Frank Easterbrook of the United States Court of Appeals for the Seventh Circuit and Professor Daniel R. Fischel of the University of Chicago have called this phenomenon "the problem of matched gains and losses." They explain: "Damages computed on the basis of the loss of the investors who purchased [while the fraud was 'alive' in the market] would greatly exceed the optimal sanction…. An investor with a diversified portfolio will be the hidden gainer in a transaction like the example in this section as often as he will be a loser. Every losing buyer during [the period the fraud is 'alive'] is matched with a gaining seller.

*Id.* At 3-4. That is to say, even in a situation where you properly identified the theoretical victims of a fraudulent stock inflation scheme by identifying the parties that purchased at the top of the market and later sold at a loss after the scheme was terminated, the harm to those theoretical victims would still likely be grossly

overstated by this methodology, given the circularity problem. Regardless, they were not even identified here. There is no coherent information in the record supporting the notion that any investors suffered a loss as a result of the scheme charged in Count Four. Certainly Dr. Voetmann's analysis, which is in conflict with the controlling case law, does not establish such a loss.[4]

Other commentators have observed defects in traditional market loss calculation methods far more coherent and justifiable than the disconnected-from-logic theory advanced by Dr. Voetmann. *See, e.g.* John D. Esterhay, *Apples and Oranges: Securities Market Losses Should Be Treated Differently for Major White-Collar Criminal Sentencing Under the Federal Guidelines*, 76 Mo. L. Rev. 1134 (2011) ("In order to label the defendant as criminally responsible for conduct, the defendant should have *caused* the loss in a more concrete way than what fraud-on-the- market

---

[4] The extent to which Voetmann's concept of loss is in conflict with the law and logic was the subject of much of the oral argument in *Dura*:

> **Justice Ginsberg**: I thought your theory was, at least as I read your brief, that your loss occurs at the moment of purchase, not at some later time, that when you bought the stock, the price was inflated and that's when you suffered your loss, on the day of the purchase, not at a later time.
> **Patrick J. Coughlin:** That's absolutely correct. We believe that you suffer your loss and damages on the date you make the purchase. On the day---
> **Justice Scalia:** How can you reconcile that with your concession that if the person who, who buys it at an inflated price turns around two days later and sells it at that same inflated price, he cannot bring suit? You would not allow recovery in that situation . . . . . How can you reconcile that . . . . with the notion that the loss occurred at the time your purchased?

*Dura v. Broudo* January 12, 2005 Oral Argument, available at https://www.oyez.org/cases/2004/03-932. Almost the entirety of the discussion between the Justices and the attorney for the plaintiff focused on the disconnect between basic logic and his theory that a loss can occur in a securities fraud case at the moment a stock prices is inflated.  As discussed above, the Court in its opinion ultimately rejected the stock inflation theory of loss pressed by the plaintiffs.

allows."). Esterhay continues in making the points that (a) criminal securities fraud defendants should have at least the protections of civil securities defendants and (b) the types of losses courts typically calculate in market loss cases are not reasonably foreseeable to securities fraud defendants in the way that the criminal law typically understands reasonable foreseeability:

> The fraud Guideline, in commentary, states that, "'reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." In examining market loss for sentencing, courts occasionally cite this definition,163 but no court has attempted to explain how eventual fluctuations in securities markets can be reasonably foreseeable at the time the defendant is committing the fraud. The factors that complicate loss causation such as volatility in the markets, unpredictable investors, and unknowable underlying stock value contribute to the impossibility of foreseeing market price response. Thus, reasonable foreseeability is similar to loss causation but limited in application to sentencing under the Guidelines, further solidifying the notion that civil loss causation should provide only the starting point for examination at sentencing.

76 Mo. L. Rev. 1137.

Regardless, Dr. Voetmann's analysis falls beneath the standards of even the most permissive authorities and commentators. There is no legally cognizable justification for the use of a loss calculation methodology that does not even engage with the question of how much money was *actually lost* as a result of the fraud. The Court should reject Dr. Voetmann's analysis.

## II. Even If Voetmann's Methodology Could Be Used To Calculate Loss in a Market Manipulation Case Like This One, Voetmann Failed to Appropriately Deploy His Own Improper Methodology

Putting aside the fact that Dr. Voetmann's analysis was legally improper, Dr. Voetmann failed even to establish that his methodology succeeded in doing what it purported to do, *i.e.*, isolate the days on which one could conclude that the inflation in the stock price was solely attributable to Maiden's trading and calculate the extent to which a rise in the stock price on those days could constitute a loss to investors.

First, during cross-examination of Dr. Voetmann, he conceded that there were potentially confounding events that may not have been captured in the Factiva database he utilized. *See, e.g.*, Tr. 326 ("Q. It's fair to say, correct, that there could be other factors that impact the price of a stock beyond the information -- beyond the market manipulation that occurred and beyond the information in the databases that you are looking at; correct?  A. It's hypothetically possible, though Factiva is the most common database that covers the vast majority of articles that is available to investors and the public. **So is it possible? Yes.** But I believe that Factiva had the broadest range of covering all the news that came out.") (emphasis added). Voetmann also conceded that that during the time period of the alleged market manipulation scheme, there had been a significant rise in the stock market. (Tr. 326). Voetmann further conceded that there had been multiple days during the alleged manipulation period where the stock price of KIT digital rose significantly even where Maiden was doing no trading whatsoever. (Tr. 328) ("Q. No. My

question is, during the time period, the alleged manipulation period, there were a number of days you saw where the market cap of KIT Digital rose significantly, even when Maiden was doing no trading, correct? A. There was five days of what you're speaking of. Five days of the 22 when there was no buy volume, and there was a significant price increase, and I excluded those."). None of these factors is sufficiently accounted for in Voetmann's analysis.

Dr. Voetmann's analysis also failed to disaggregate any stock inflation "losses" suffered by Maiden himself or Kaleil Isaza Tuzman from the general inflation "losses" suffered by purchases of KIT Digital stock. In a telling exchange, Dr. Voetmann was asked about this problem and made clear that he had failed to take any steps to account for this issue:

> Q. Dr. Voetmann, did you take any steps to remove
> Maiden Capital's share of the losses from your loss
> amount estimate?
> A. I'm not sure I follow. You said Maiden Capital shares?
> Q. Maiden Capital's share of the losses.
> A. I calculated the overall losses or I tested the overall
> losses the government calculated, focusing entirely on the
> aggregate Maiden Capital volume that was produced and
> presented to me by Dr. Ferrell.

(Tr. 265). Later, Dr. Voetmann continued:

> Q. Are you aware that the public -- the company publicly
> disclosed that as of December 31, 2008, the first day in
> your conspiracy period, Kaleil and his investment entities
> held 57.82 percent of the company's total outstanding
> shares?
> A. I'm not aware of that, but I know they traded 61
> percent of the shares that day.
> Q. Are you aware that on August 18, 2009, an entity
> controlled by Kaleil purchased an additional $4 million
> worth of KIT Digital common stock?

**A. It is not part of the test I did, so I am not aware.**

(Tr. 268) (emphasis added).

It simply cannot be the case that the appropriate calculation of loss on Count Four can fail to take account of the fact that an enormous percentage of the purchases of the stock at issue during the purported manipulation period were made by one of the alleged coconspirators. These are not victims, and any "loss" mistakenly attributed to their share of the stock price is a serious error in the actual loss analysis the Government purports to have provided. Dr. Voetmann's failure to engage with this fact fundamentally negates his analysis and strips the term "actual loss" of all meaning as applied in this context.

As the Second Circuit emphasized in *United States v. Ebbers*, 458 F.3d 11, 127-28 (2d Cir. 2006), for loss calculation purposes under the Guidelines, "[t]he loss must be the result of the fraud." Dr. Voetmann's analysis, failing to take account of the factors described above, failed to connect the loss (even if we could accept simple stock price inflation to constitute loss) to the purported market manipulation.

Relatedly, although the Government has alleged that various individuals at KIT Digital, including cooperating witness Robin Smythe and others, engaged in accounting fraud with which Mr. Amanat was not charged, the Government made no attempt to have Dr. Voetmann disaggregate any rise in the stock price attributable to other criminal conduct from the rise in the stock price attributable to the purported market manipulation scheme. This is a fatal error that negates the

validity of Dr. Voetmann's entire analysis as it relates to Mr. Amanat. As the Second Circuit explained in *Ebbers*:

> Many factors causing a decline in a company's performance may become publicly known around the time of the fraud and be one cause in the difference in price between X-day and Y-day. *Id.* at 548 (explaining that numerous factors, not just defendant's fraud, contributed to stock price decline). For example, the dot-com bubble burst and its likely negative future effect on WorldCom's business was public knowledge. The effect of that knowledge would be a downward pressure on share price not attributable to the defendant. **Losses from causes other than the fraud must be excluded from the loss calculation.**

*Id.* Here, of course, as described above, there were no losses. Unlike in *Ebbers*, there was no drop in the stock price upon the termination of the manipulation scheme, which is analogous to the revelation of the fraudulent accounting in *Ebbers*.[5] But even accepting Voetmann's illogical theory of loss, pursuant to *Ebbers*, Voetmann was required at a minimum to exclude from the market manipulation analysis any rise in the stock price attributable to other criminal activity at KIT Digital. No doubt, this would have required some additional work on the part of Voetmann, but all of this information was in the possession of the Government and it failed to even make an effort. Where the Government is attempting to imprison a man for securities fraud for what could easily constitute the remainder of his natural life, more than a cursory effort to determine the correct loss amount was required.

---

[5] Also unlike in *Ebbers*, where the Court ultimately decided that there was a sort of harmless error in the loss calculation, *see Ebbers*, 458 F.3d at 28, given the multi-billion-dollar enormity of the fraud, here the impact of the failure to account for the factors described herein had an obviously material impact on any calculation.

### III. The Correct Loss Amount for Count Four is Zero

Importantly, Dr. Voetmann conceded that the loss amount in a market manipulation case could very well be zero:

> Q. I'm correct, aren't I, that in terms of market manipulation, there isn't necessarily a loss in every situation of market manipulation?
> A. As a general matter that could be the case

(Tr. 318). Voetmann also acknowledged that, following the end of the purported market manipulation period in this case, the price of KIT Digital stock did not collapse. (Tr. 249 ("Q. So I'll ask you again, in the three months following September 15th, 2011, there was no collapse in KIT Digital stock price, was there? A. Well, there was certainly an increase.")).

The loss-amount contortions the Government is suggesting reflect the fact that there was no legally-cognizable loss as a result of the market manipulation scheme. This is not some emergency requiring the use of bizarre and untested method as suggested by the Government. Section 2B1.1 of the Guidelines still provides a base offense level and other potentially applicable enhancements for a defendant whose offense level should not be enhanced on the basis of losses exceeding $6,500. Indeed, in this case there are other Counts of conviction for which Mr. Amanat will face sentencing, so there is no danger that Mr. Amanat will receive an improper windfall and escape punishment. Indeed, having already served nearly a year and a half in harsh conditions, Mr. Amanat by sentencing will have already

served more prison time than many defendants convicted of frauds with loss calculations that dwarf Mr. Amanat's.

With regard to the other Counts of conviction, it is important to note that Mr. Amanat's declining to request a *Fatico* hearing on Counts One through Three should in no way be construed as a concession that the Government's loss calculations for those Counts is correct. As set out in our prior submissions, the Government's loss calculations for those Counts is incorrect, but given the trial record there was no need for additional testimony or evidence to demonstrate the erroneous nature of the Government's loss calculations.

Here, considering the evidence the Government proffered on Count Four, it is clear that the Government failed to demonstrate that a loss enhancement is appropriate.

## **CONCLUSION**

For all of the reasons described above, the Court should reject Dr. Voetmann's analysis.