UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    :

   -v.-                                      :        S1 15 Cr. 536 (PGG)

KALEIL ISAZA TUZMAN and                     :
OMAR AMANT,
                                            :
               Defendants.
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


# THE GOVERNMENT'S POST-*FATICO* SENTENCING MEMORANDUM


GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Andrea M. Griswold
Joshua A. Naftalis
Assistant United States Attorneys
     - Of Counsel -

The Government respectfully submits this memorandum following the *Fatico* hearing held on April 1 and 2, 2019, regarding the appropriate loss amount under U.S.S.G. § 2B1.1 for Counts Four and Six.

## POINT I

## APPLICABLE LAW

Section 2B1.1 of the United States Sentencing Guidelines sets forth the relevant offense level calculations.  Loss is defined as "the greater of actual loss or intended loss," where "actual loss" is the "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. 3(A).  "Pecuniary harm" is the "harm that is monetary or that otherwise is readily measurable in money," and to be reasonably foreseeable, it must be "harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  *Id.* at § 2B1.1 cmt. 3(A)(i)-(iv).

A Court is not required to determine loss with "precision," but rather must "make a reasonable estimate of the loss . . . . based on available information."  U.S.S.G. § 2B1.1 cmt. 3(C); *United States* v. *Manas*, 272 F.3d 159, 165 (2d Cir. 2001).  Further, because the "sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence[,] . . .  the court's loss determination is entitled to appropriate deference."  U.S.S.G. § 2B1.1 cmt. 3(C).

The Second Circuit in *United States* v. *Ebbers* emphasized that "some estimate must be made for Guidelines' purposes, or perpetrators of fraud would get a windfall."  458 F.3d 110, 126 (2d Cir. 2006).  In *United States* v. *Rutkoske*, a market manipulation case, the Circuit explained that because "[d]etermining the extent to which a defendant's fraud, as distinguished from market or other forces, caused shareholders' losses inevitably cannot be an exact science[,

t]he Guidelines' allowance of a 'reasonable estimate' of loss remains pertinent."  506 F.3d 170, 179 (2d Cir. 2007).  "Normally, expert opinion and some consideration of the market in general and relevant segments in particular will enable a sentencing judge to approximate the extent of loss caused by a defendant's fraud."  *Id.*; *see also*, *e.g.*, *United States* v. *Kumar*, 617 F.3d 612, 632–33 (2d Cir. 2010) (accepting expert's calculation and noting that "courts frequently calculate loss in securities fraud cases 'by relying on the change of market capitalization as a result of the disclosure of the fraud,' . . . in order to prevent 'perpetrators of [the] fraud' from 'get[ting] a windfall'" (quoting *Ebbers*, 458 F.3d at 127)).

The Government bears the burden of proving the intended loss amount by a preponderance of the evidence.  *See United States* v. *Desimone*, 119 F.3d 217, 228 (2d Cir. 1997); *see also United States* v. *Martinez–Rios*, 143 F.3d 662, 677 (2d Cir. 1998) (once "the Government [has] met its burden of proving the tax losses caused by the scheme," the defendant assumes "the burden of proving that any particular elements of [the] conspiracy-related tax loss were not foreseeable by him"); *United States* v. *Geevers*, 226 F.3d 186, 193-94 (3d Cir. 2000) (defendant challenging the Government's loss figure has the burden of coming forward with "persuasive evidence" to the contrary).

## POINT II

### DR. NIDEN'S ANALYSIS PROVIDES A REASONABLE ESTIMATE OF LOSS FOR COUNT SIX

Although Tuzman was convicted of leading a multi-year and multi-million dollar accounting fraud, and although the PSR calculated a loss of $31.4 million "based on price declines that occurred in November 2012" (PSR ¶ 154), Tuzman nonetheless contended in his 2018 sentencing submission that the loss amount for Count Six should be *zero* (Tuzman Sentencing Br. 35-42).  Tuzman suggested that the proper way to measure Count Six losses was an event study,

but did not conduct one.  (*Id.* at 35-37; *id.* at 36 "(Any effective event study would address this issue in detail.").)  As a result, the Government asked Cathy M. Niden, Ph.D. to conduct an event study to estimate the losses associated with Count Six (the "Niden Report") and called Dr. Niden at the April 2019 *Fatico* hearing.  (GX F1 ¶ 10).  Tuzman called no witnesses at the hearing.

Tuzman contends in his post-hearing brief that Dr. Niden's analysis is "methodologically flawed" because (a) it "mistakenly" uses the November 2012 Form 8-K as "a proxy for the fraud"; (b) it "does not account for or disentangle confounding news"; (c) it "improperly assumes" that KITD's stock price was "inflated by the same amount throughout the conspiracy period"); and (d) it "overstates investor losses because it fails to account for recovery in bankruptcy."  (Tuzman Post-Hearing Br. 34-46).  As a result, Tuzman repeats his bold claim that the lost amount for Count Six should be zero.  (*Id.* at 46).

As set forth below, the Court should find that a reasonable estimate of harm to KITD shareholders from the fraud alleged in Count Six is at least $22.9 million.

A.      **Summary of Dr. Niden's Opinions and Testimony**

Dr. Niden is a Financial Economist with the Office of Litigation Economics in the Division of Economic and Risk Analysis of the Securities and Exchange Commission ("SEC"). She holds a Ph.D. and M.B.A. from the University of Chicago.  (GX F1 ¶¶ 1-2; *Fatico* Tr. 8-13). In summary, Dr. Niden concluded the following:

- KIT digital's $1.35 per share (65.4%) stock price decline, net of market and industry effects, on November 23, 2012 in response to the November 21, 2012 8-K disclosure was statistically significant;

- $1.35 per share (65.4%) is a reasonable estimate of the share price impact of the announcement of accounting errors and irregularities described in the November 21, 2012 8-K as related to Count Six; and

- Estimated harm to shareholders from the Count Six accounting errors and irregularities is at least $22.9 million.

4

(GX F1 ¶ 10; *Fatico* Tr. 18-19).  Dr. Niden's estimate of investor harm ($22.9 million) is more conservative than the PSR's estimate ($31.4 million).  (PSR ¶ 154).

## B.     Dr. Niden Properly Considered the November 21, 2012 Form 8-K

Tuzman first asserts that the November 21, 2012 Form 8-K cannot serve as a "proxy for the fraud" because disclosures in that Form 8-K were "different from, and far broader than, the offense of conviction."  (Tuzman Post-Hearing Br. 34).  He asserts that (a) the November 2012 Form 8-K "did not specifically identify the fraud of which Isaza Tuzman was convicted"; (b) "[a]t most, the government proved there were 12 'sham licenses' between 2010 and 2011, totaling approximately $26 million in improperly recognized revenues," which meant that "only" "approximately 8% of KIT Digital's revenue was over-reported"; and (c) therefore, the stock drop the next day, November 23, 2012, represented an "overcorrection in the market price."  (*Id.* at 34-36).  These arguments should be rejected.

The Niden Report and Dr. Niden's testimony clearly established that the $1.35 per share price decline following KITD's November 21, 2012 Form 8-K is a "reasonable estimate" of the share price impact of the fraud scheme charged in Count Six.  (GX F1 ¶¶ 12-28; *Fatico* Tr. 15-38); *see also Kumar*, 617 F.3d at 632–33 (2d Cir. 2010) (accepting expert's calculation and noting that "courts frequently calculate loss in securities fraud cases 'by relying on the change of market capitalization as a result of the disclosure of the fraud,' . . . in order to prevent 'perpetrators of [the] fraud' from 'get[ting] a windfall'" (quoting *Ebbers*, 458 F.3d at 127)).  Dr. Niden explained that in addition to conducting an event study — which the defendant does not challenge — she reviewed the November 2012 8-K itself and the "total mix of information" between the fourth quarter of 2010 and April 2013 for "confounding news."  (GX F1 ¶ 17; *Fatico* Tr. 26-31).  Dr. Niden testified:  "I concluded that all of the elements disclosed in the 8-K were either directly tied

to the Count Six accounting errors and irregularities, or were the consequences, the direct consequences of KIT Digital's needing to restate." (*Fatico* Tr. 29; *id.* at 77-78).  Indeed, Dr. Niden testified that "a full and complete disclosure by KIT Digital of the accounting errors and irregularities might have been worse than what was reported here in the 8-K, more negative." (*Fatico* Tr. 83).  She also ran a "sanity check" by analyzing KITD's stock after the company's November 9, 2011 disclosures.  (GX F1 ¶¶ 23-26; *Fatico* Tr. 35-37 ("The main purpose of that analysis was in consideration of whether a $1.35, the stock drop, the abnormal stock drop at the end for November 23 of 2012, was a reasonable estimate of the stock price change that would have happened if a full and complete disclosure of the Count Six wrongdoings had been made on earlier days.").

Tuzman's claim that the fraud he perpetrated "only" increased revenues by eight percent is misleading.  As Dr. Niden explained, these sham revenues enabled KITD to beat consensus revenue forecasts in the third and fourth quarters of 2011; were central to KITD's fraudulent narrative to investors of growth; and allowed the company to report positive GAAP net income in the third quarter of 2011.  (GX F1 ¶¶-26; *Fatico* Tr. 33-34 ("[A]ll of this is important because the revenue from the fake contracts enabled the company to give the market an impression of higher growth prospects, greater growth prospects going forward, and including particular estimates in the earnings call that calculated organic growth for the quarter using the 62.3 million of revenue that was recognized.").

Finally, there is no evidence that KITD's stock "overreacted" to the November 2012 8-K on November 23, 2012.  Indeed, there was no stock price rebound on the next trading day, November 26, 2012.  In fact, on November 26, 2012, KITD's stock continued to drop.  (GX F1, at Ex. 1).

### C.    Dr. Niden Properly Found There Was No Confounding News

Tuzman next argues that Dr. Niden made a "critical error" because KITD made "multiple disclosures of non-fraud related news that were confounding" and Dr. Niden did "not account for or disentangle such confounding news." (Tuzman Post-Hearing Br. 37). Tuzman is wrong.

As noted, Dr. Niden's analysis included a review of the total mix of information to determine whether there was confounding news. (GX F1 ¶ 17; *Fatico* Tr. 26-31). Dr. Niden found there was no confounding news on November 21, 2012:

> Q.    Did you analyze the November 21, 2012 8-K to determine if there was any confounding news on that day?
>
> A.    I did.
>
> Q.    What did you conclude?
>
> A.    I concluded that all of the elements disclosed in the 8-K were either directly tied to the Count Six accounting errors and irregularities, or were the consequences, the direct consequences of KIT Digital's needing to restate.

(*Fatico* Tr. 29). Because Dr. Niden found no confounding news, there was no news to "disentangle."

Tuzman first points to the fact that in connection with its Form 8-K, which included an Item 4.02 disclosure, KITD also disclosed that it would be filing its third quarter Form 10-Q late, a Form NT 10-Q. (Tuzman Br. 39). Dr. Niden testified that the Form NT 10-Q was not confounding news. (*Fatico* Tr. 156 ("In my opinion, no, not in this case.")). Of course, that makes sense. KITD has just said its financials had "accounting errors and irregularities" that would necessitate that they be "restated," and that "investors should no longer rely upon the company's

7

previously issued financial statements."  (GX F2).  A Form NT 10-Q is the direct result of the need to restate, not a separate and independent piece of news.

Next, Tuzman argues that his November 23, 2012 press release relating to his purported interest in acquiring the company was confounding news.  An offer to buy KITD would not be confounding news, in that it would not be expected to contribute to a price decline.  It would be perceived as at least neutral or positive news, if the market believed that there was a chance that his above-market offer of $3.75 would be successful.  Notably, the Dougherty & Co. report on which Tuzman relies stated that it was "extremely skeptical" about Tuzman's offer.  (DX F101).

Tuzman also points to KITD's disclosures about its "cash and cash equivalents," about its expectation that it would "continue to incur significant cash expenditures," and that it was "examin[ing] the reduction of working capital requirements to further conserve cash" as confounding news.  (Tuzman Post-Hearing Br. 39).  Of course, Dr. Niden included an analysis of these very issues in her report, concluding that they were not confounding news:  "[I]t is my opinion that concerns about KIT digital's cash position, described in the 8-K, were not independent of the company's accounting errors and irregularities, restatement and resulting event of default."  (GX F1 ¶¶ 20-22; *see also Fatico* Tr. 30-32 ("I thought it was important to include this discussion to demonstrate the consideration of these items as potentially confounding, and my conclusion that they were not confounding, but in fact were really part of, and flowed directly from, the fact that KIT Digital had to restate.").

Tuzman's further criticizes Dr. Niden for not disentangling confounding news on November 9, 2011.  (Tuzman Post-Hearing Br. 42-43).  In support of his position, Tuzman points to other "optimism" that was not "related to the Company's meeting revenue expectations," such as the company's announcement that it had hired an "advisory firm to look into maximizing value

for shareholders through a sale process." (*Id.* at 42). This was not "new" news. KITD had disclosed as early as a year earlier, November 2010, that it had retained advisory firm Allen & Co. to help it evaluate potential offers to purchase the company. (GX 826 (Nov. 22, 2010 conf. call) at 10 (Tuzman: "Part of recently hired Allen & Company's mandate is also to handle inbound strategic increase, which have accelerated over the last couple of quarters.").

### D. Dr. Niden Properly Found That KITD's Stock Was Inflated By At Least $1.35 Per Share

Tuzman next argues that Dr. Niden made the "fatal error" of assuming that KITD's stock price was "inflated by the same amount through the conspiracy period." (Tuzman Post-Hearing Br. 43-44). Tuzman mischaracterizes Dr. Niden's opinion. Dr. Niden concluded that KITD's stock was inflated by *at least* $1.35 per share, not that it was constant. (GX F1 ¶ 28 ("KIT digital's share price reflected artificial inflation of at least $1.35, and possibly a greater amount."); (*Fatico* Tr. 39 ("at least $1.35 of inflation in the price")). Dr. Niden based that conclusion in part on her analysis of KITD's stock price following the November 2011 announcement, when it went up by $3.33. (GX F1 ¶ 23-28). Between November 2011 and November 2012, some of the optimism in KITD's stock price had been eroded. The November 2012 announcement eliminated what was left of that optimism — approximately $1.35 per share.

### E. Dr. Niden Properly Did Not Consider KITD's Bankruptcy

Tuzman argues that Dr. Niden's analysis should have taken into account any purported "gains" that KITD shareholders realized in bankruptcy. Specifically, Tuzman argues that Dr. Niden should have considered the fact that KITD's plan of reorganization provided for "the issuance of warrants to prepetition shareholders," which they could exercise at a low strike price. (Tuzman Post-Hearing Br. 44-45). This argument fails before it starts. The question for the Court is to estimate the losses suffered by KITD's shareholders as a result of the fraud charged

in Count Six — which was revealed in November 2012.  The question is not to figure out what some universe of shareholders may or may not have recovered in a 2013 bankruptcy proceeding. *See* U.S.S.G. § 2B1.1 cmt. 3(E)(i) ("Losses shall be reduced by . . . money returned . . . to the victim before the offense was detected.").  Among other things, Tuzman ignores that investors who suffered losses on November 23, 2012 and sold prior to the bankruptcy announcement locked in their losses; that in order for KITD shareholders to have equity in the reorganized company, they had to buy warrants (KALEIL 0009172); and that the KITD shareholders who may have purchased these warrants were not necessarily the same as the shareholders in November 2012.

*　　*　　*　　*

For the above reasons, the Court should find that a reasonable estimate of harm to KITD shareholders from the fraud alleged in Count Six is at least $22.9 million.

**POINT III**

**DR. VOETMANN'S ANALYSIS PROVIDES<br>A REASONABLE ESTIMATE OF LOSS FOR COUNT FOUR**

Although the jury found that Tuzman and Amanat conspired with Stephen Maiden to manipulate KITD stock, although Maiden testified that he manipulated the stock for the better part of two years, and although the PSR calculated a loss of $25.24 million with respect to Count Four (Tuzman PSR ¶ 151-52), Tuzman and Amanat nonetheless contended in their sentencing submissions that there is no reasonable estimate of loss for Count Four, so the number must be *zero*.  (*See* Tuzman Sentencing Br. 43-47; Amanat Sentencing Br. 6-11).  Tuzman relies on Professor Allen Ferrell, whom he called as an expert witness at trial to testify about an event study he conducted related to the market manipulation scheme.  Professor Ferrell stated that the PSR's method of calculating losses relating to Count Four was "flawed because, among other things, it failed to account for the market, industry and company-specific factors that affected KIT digital's

10

price between December 2008 and September 2011."  (June 22, 2018 Ferrell Report ¶ 9).  In other words, Tuzman's critique was that the Government had not used an event study that accounted for confounding factors.

The Government thus retained Dr. Torben Voetmann to analyze Professor Ferrell's event study and expert report submitted in connection with sentencing.  The Voetmann Report took Professor Ferrell's "approach and results as given." (Voetmann Report (GX V1) ¶ 17).  Based on this analysis, Dr. Voetmann estimated the loss to investors from Maiden's manipulative trading to be in the range of $10.4 million to $82.0 million.  (*Id.* at ¶ 10).  Based on Dr. Voetmann's analysis, the Government asked the Court to use a reasonable estimate of loss for the market manipulation conspiracy at the conservative end of the range calculated by Dr. Voetmann — $10.4 million — in order to account for the potentially confounding factors in the market, which were identified by Ferrell and analyzed by Dr. Voetmann.  (Gov't Tuzman Sentencing Submissions 17).  The Government also called Dr. Voetmann at the *Fatico* hearing.  Neither Tuzman nor Amanat called any witnesses at the hearing.

Tuzman primarily contends in his post-hearing brief that Dr. Voetmann's analysis and conclusions should be entirely rejected because (a) the record does show that Maiden's manipulative trading was the cause of the statistically significant stock movement in KITD's stock price; (b) there may have been confounding news on particular days; and (c) Dr. Voetmann did not exclude losses or sales of KITD stock by participants in the market manipulation conspiracy.[1] (Tuzman Post-Hearing Br. 16-29).    Tuzman and Amanat also both argue that *Dura*

---

[1]      Tuzman also devotes several pages to arguing that the Court should not accept Dr. Voetmann's higher calculations that do not exclude all of the confounding events identified by Ferrell.  (Tuzman Post-Hearing Br. 31-33).  The Government is not asking the Court to adopt the higher calculations.

*Pharmaceuticals, Inc.* v. *Broudo* 544 U.S. 366 (2005), and its progeny require a finding that zero dollars should be attributed to the market manipulation scheme for Guidelines purposes.  (Tuzman Post-Hearing Br. 12-16; Amanat Post-Hearing Br. 19).[2]

As proven at the trial, Maiden spent the better part of two years working to manipulate the market in KITD shares as a result of his agreement with Tuzman and Amanat to do so.  (*See* GX 3036 (May 5, 2009 Amanat email to Tuzman:  "You wouldn't [sic] have had Maiden's $2.5 million in open market purchases which singlehandedly kept the stock up if I didnt spent [sic] the time.").  The market manipulation scheme created a false impression about the supply and demand of KITD stock, thus degrading market integrity as investors were unable to observe accurate prices and trading volume.  Thus, as set forth below, the Court should find that a reasonable estimate of harm to KITD shareholders from the fraud alleged in Count Four is at least between $3.41 million and $10.4 million.

### A.    Summary of Professor Ferrell's Event Study and Expert Report

Tuzman retained Professor Ferrell to assist in his defense of the market manipulation scheme charged in Count Four.  Professor Ferrell conducted an event study and testified as an expert in financial econometrics at trial.  (Tr. 6048-6228).  Professor Ferrell defined financial econometrics as the "rigorous analysis of financial data, such as stock prices."  (Tr. 6049).  Professor Ferrell explained that "[a]n event study is the standard way for an economist to determine what portion of a stock price movement, a stock price return, is due to" the following identifiable "buckets": (a) market going up or down; (b) industry-specific factors; (c) company specific factors;

---

[2]    Both Tuzman and Amanat devote additional time criticizing the methodology the Government articulated in first calculating an estimate of loss for the Probation Department.  For the avoidance of any doubt, the Government is seeking a loss amount of $10.4 million based supported by Dr. Voetmann's Report and analysis, including of the event study conducted by Professor Ferrell.

and (d) normal fluctuation or volatility in the market.  (Tr. 6115-16).  Any additional stock movement is referred to as the "residual, that's the portion of the stock return that was not explained by market, industry, random volatility."  (Tr. 6115).

Having conducted "hundreds of event studies" over his career, Professor Ferrell testified that he created one to study the movement of KITD during the time period of the charged market manipulation scheme.  (Tr. 6116).  Professor Ferrell analyzed each day for which there was testimony from Maiden that he had been working to manipulate the stock in KITD as part of the market manipulation scheme.  (Tr. 6129).  Professor Ferrell identified twenty-two days where the KITD stock price increased in a statistically significant way.  (Tr. 6139).  Of those days, Professor Ferrell identified eleven days where Maiden was a net purchaser of KITD stock.  (*Id.*).

Building on his event study, Professor Ferrell submitted an expert report in connection with sentencing.  Professor Ferrell stated that the PSR's method of calculating losses relating to Count Four was "flawed because, among other things, it fails to account for the market, industry and company-specific factors that affected KIT digital's price between December 2008 and September 2011."  (June 22, 2018 Ferrell Report ¶ 9).

B.      **Summary of Dr. Voetmann's Opinions and Testimony**

Dr. Voetmann is a principal at The Brattle Group, a financial and economic consulting firm, and an adjunct professor at the University of San Francisco's School of Management.  (GX V1 ¶ 1).  He holds a B.S. in business administration and an M.A. in finance from Aarhus School of Business, and a Ph.D. in finance from Copenhagen Business School.  (*Id.*).

The Government retained Dr. Voetmann, who has ample experience with event studies, to examine and consider Professor Ferrell's testimony and reports, and to prepare a report in connection with the defendants' sentencing.  The Voetmann Report took Professor Ferrell's

"approach and results as given."  (GX F1 ¶ 17).  Dr. Voetmann calculated the loss amount in three different ways, each designed to exclude market, industry, and firm-specific factors that may have contributed to an increase in stock price — as Professor Ferrell suggested in his report.  The most conservative approach focused on days Maiden traded where Professor Ferrell acknowledged there was both a "statistically significant positive abnormal return to the KITD stock price" and "potentially confounding positive news about KITD" could be excluded.  (*Id.* ¶ 30).  Dr. Voetmann examined the 22 trading days on which KITD's actual stock price return was higher than the predicted return by a statistically significant amount according to Professor Ferrell's event study. (*Id.* ¶ 28).  Dr. Voetmann then removed the 11 of these days on which there was a potential alternative explanation — other than Maiden's manipulative trading — for the statistically significant price increase.  Using this conservative approach, Dr. Voetmann was able to isolate approximately $10.4 million in actual loss to investors who purchased inflated KITD shares directly attributable to Maiden's trading.  The Voetmann Report also emphasized that his approach "likely understates the true magnitude of loss amount due to the manipulation scheme" because it eliminates any loss amount that is not both exclusively attributable to Maiden and statistically significant.  (*Id.* ¶ 30).

Dr. Voetmann provided testimony at the April 2019 *Fatico* hearing that was consistent with his report, again taking as correct Professor Ferrell's event study and results.

### C.   Tuzman's Criticisms of Dr. Voetmann During and After the *Fatico*

Tuzman advances a series of criticisms of Dr. Voetmann's analysis, arguing that it was "methodologically unsound and unreliable."  (Tuzman Post-Hearing Br. 10).  Tuzman's claims ring hollow.  Having relied heavily upon Professor Ferrell and his event study during trial, Tuzman cannot credibly argue that the Government's reliance on the same proof is "unsound and

unreliable."  The Government addresses each of Tuzman's claims in in turn.  None alter the conclusion that Dr. Voetmann provided a reasonable estimate of loss for Count Four.

### 1.    Causation

Tuzman argues that it is unreasonable to conclude that Maiden's manipulative trading was the cause of the statistically significant stock movement that occurred on the eleven days where Maiden was trading.  (Tuzman Post Hearing Br. 16-19).  Tuzman contends that such a conclusion cannot be drawn because it is based on the "mistaken belief that defense expert Allen Ferrell had concluded that the 'conspiracy scheme was intended to inflate the stock of KIT digital.'"  (Tuzman Post-Hearing Br. 11; *id.* at 16 ("Dr. Ferrell did not attribute causation to any abnormal stock returns because his event study could do no such thing.").  This misstates the inquiry.

It is true that Professor Ferrell's event study simply identified eleven days of statistically significant inflation that could not be attributed to a known factor and did not attempt to determine if Maiden was behind the inflation on those days.  The relevant question, however, is whether it is reasonable to conclude that Maiden was the cause of the inflation on those days.  This question need not be analyzed in a vacuum.  (*See Fatico* Tr. 305 (The Court:  "Is this really worthwhile?  I just really I have to ask whether this is worthwhile.  We had a trial here.  We had a man testify that he was manipulating.  So I'm just wondering whether this is useful or not.").

Maiden testified that his trading was intended to inflate both the volume and price of KITD during the relevant time period. (*See* Tr. 737-38 (Q: "Why did you execute the trades in this way?" / Maiden:  "The main purpose was to inflate the stock by showing volume, buying and selling both sides of the same trade.  And it generated 28,571 shares of volume."); Tr. 750 (Maiden: "I was trying to, at a minimum, maintain the price level."); Tr. 788 ("That's the famous blimp that

exploded.  So I'm just saying that the stock is continuing to act very heavy, very poor and going lower."); Tr. 921-22 (Maiden:  "I was laser focused on the stock and supporting or pumping the stock even with the limited assets I had at that point.").

This testimony was highly corroborated by documentary evidence, including text messages, emails, and trading records. (*See*, *e.g.*, GX 1517-A (Dec. 31, 2008 Tuzman, Amanat, and Maiden market manipulation agreement); GX 3036 (May 5, 2009 Amanat email to Tuzman: "You wouldnt [sic] have had Maiden's $2.5 million in open market purchases which singlehandedly kept the stock up if I didnt spent [sic] the time."); GX 1540 (Mar. 10, 2009 Tuzman email to Maiden:  "The steady trading action and market movement helps a lot."); GX 1574 (Apr. 3, 2009 Maiden email to Tuzman:  "Is there any amount you can send over in the meantime – another 200k?  I have 1.85mm kdgl and counting – once again yest I was the only buyer – for the 30th straight day it seems."); GX 1549 (May 17, 2009 Tuzman email to Maiden:  "This helping hugely."); GX 1597 (June 8, 2009 Maiden email to Tuzman:  "you need to find a friend with some deeper pockets to help the cause cuz I'm spent"); GX 1603 (June 22, 2009 Maiden email to Tuzman:  "I can't do more unfort."); GX 1614 (July 9, 2009 Tuzman email to Maiden:  "We desperately need the stock to stay strong during this process."); GX 1616 (July 9, 2009 Maiden email to Tuzman:  "kdgl hindenburg continues . . . i bought 1k at 6.75 late"); GX 411-B (Maiden trading records)).

Based on this evidence, the jury convicted Tuzman and Amanat of participating in a scheme to manipulate the market in KITD.  In sum, while it is true that an inference must be drawn to attribute causation to Maiden, that inference is amply supported by the trial record and entirely appropriate.

Tuzman relatedly argues that the $10.4 million loss amount cannot be relied upon because Dr. Voetmann "incorrectly presumes that all shares purchased by Maiden throughout the conspiracy period were trades within the scope of the market manipulation scheme." (Tuzman Post-Hearing Br. 19). This is a red herring. While Maiden testified that there were occasions when he manipulated KITD stock for purposes outside the market manipulation conspiracy, this has no impact on the $10.4 million loss amount. This figure is based on eleven days where there is evidence in the trial record indicating that Maiden's trading on those days was in furtherance of the market manipulation conspiracy charged in Count Four.

Tuzman also points out certain dates where Maiden's trading accounted for a smaller amount percentage of trading on that day. This argument ignores the fact that Maiden's share of the market volume on each of the eleven days is proportional to the amount of loss that Dr. Voetmann attributes to Maiden for those days.[3] For example, on December 31, 2008, Maiden's trading represented 61% of the volume of the day's share volume. (DX F113 (summarizing 11 trading days in GX V1, at App'x C and GX V3)). Dr. Voetmann attributes $2.82 million in losses due to Maiden's manipulative trading on that day. (*Id.*). In contrast, because Maiden is less than one percent of the market's buy volume on September 21, 2009 and June 10, 2010, there are almost no losses attributable to Maiden on that day. In fact, if only the days in which Maiden accounted for more than five percent of the share volume are considered, the calculation is based on just seven days and accounts for $9.94 million of the $10.4 million in losses. The seven days are:

---

[3]     Tuzman also criticizes Dr. Voetmann for "not . . . analyz[ing] the intraday timing of Maiden's trades and the intraday movement in the stock price." (Tuzman Post-Hearing Br. 19). Tuzman's argument makes no sense, given that Professor Ferrell did not so himself. (Tr. 6194-97 (Q: "You didn't look at stock prices throughout the day, correct? / Ferrell: "Correct." / Q: "That's called intraday data?" / Ferrell: "Fair enough." / Q: "And you didn't use it for your event study, did you?" / Ferrell: "I did not."

December 31, 2008, January 2, 2009, June 25, 2009, November 16, 2009, May 20, 2010, July 2, 2010, and April 29, 2011. (*Id.*).[4]

### 2.      Confounding News

Tuzman next argues that Dr. Voetmann "failed to rule out potentially confounding news" that may have influenced KITD's stock price. (Tuzman Post-Hearing Br. 11, 20-24). As a threshold matter, Tuzman's claims are inconsistent with Professor Ferrell's event study, which the defense offered at trial and which did *not* account for confounding news. (*See* Tr. 6193-94). In any event, Dr. Voetmann took a reasonable approach to identifying information that would have been available to investors on the particular dates in question. Specifically, Dr. Voetmann consulted Factiva, a Dow Jones & Company business information and research tool that is "a database of over 33,000 premium and reputable newspapers, magazines, trade publications and transcripts," whose "[c]overage is global and content is available is 22 languages." (GX V1 at 10 n. 22).[5]

Dr. Voetmann's approach of considering those articles that mentioned KITD in a headline or lead paragraph was a reasonable way to identify confounding events about KITD that may have impacted stock activity on a given day. Tuzman's criticisms that Dr. Voetmann did not additionally review the company's SEC files, investor calls, public appearances and other statements by the company is unpersuasive. As GX V5 (list of Factiva Articles) demonstrates,

---

[4]      September 17, 2009, September 21, 2009, June 10, 2010, and May 10, 2011 are excluded. The difference between including and excluding these three days does not change the offense level attributable to either Tuzman or Amanat.

[5]      According to its website, Factiva "aggregates content from both licensed and free sources, and provides organizations with search, alerting, dissemination, and other information management capabilities. Factiva products provide access to more than 32,000 sources from nearly every country worldwide in 28 languages, including more than 600 continuously updated newswires." https://www.dowjones.com/products/factiva/.

information contained in such sources was reported on in the articles reviewed by Dr. Voetmann. For example, entry number 32 references an article by Market News Publishing published on April 7, 2009, the Headline of which is "KDGL: Q4 Earnings Call."  The breadth of the list of articles — 403 in total — also demonstrates that Dr. Voetmann's methodology for searching for confounding events was reasonable designed to identify events of significance.[6]

Tuzman argues that Dr. Voetmann's resistance to efforts by counsel to impeach the credibility of his search for confounding news information "revealed his biased advocacy to support the loss amount (based on a flawed methodology) in the PSR."  (Tuzman Post-Hearing Br. 24).  Again, Dr. Voetmann did not endorse the methodology the Government initially used to estimate the loss amount.  Dr. Voetmann considered the event study conducted by Professor Ferrell and then engaged in the reasonable steps of seeking to control for confounding news events.  The fact that he may not have picked up every article ever written that made any reference to KITD does not mean Dr. Voetmann provided biased testimony.

The cases cited by Tuzman on this point involve situations distinguishable from the one here.  For example, Tuzman cites *Ohio Pub Emp's Ret. Sys.* v. *Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *7 (N.D. Ohio Aug. 14, 2018), a case in which a Court rejected an event study because the conductor of the study selected a particular day knowing that the analysis would produce a desired result.  In this case, Professor Ferrell designed the event study, including the particular trading days to analyze.  Dr. Voetmann began his analysis accepting Professor Ferrell's work as correct.

---

[6]     Two of the five days that Tuzman argues have cofounding news — June 10, 2010 and May 10, 2011 — are also days that Dr. Voetmann attributed almost no loss.  These were also days where Maiden was less than five percent of the trading volume.

What is more, Tuzman misleadingly argues the exhibits he introduced at the hearing and in his briefing are confounding news.  Many are blog posts, research notes, and filings that report on news that was otherwise captured in Dr. Voetmann's Factiva dataset or that is simply irrelevant.  In any event, even if the dates that Tuzman focused on are removed from consideration — June 25, 2009, September 21, 2009, June 10, 2010, July 2, 2010, and May 10, 2011 — the remaining six days still have a total loss of $8.36 million.  In other words, the five days that Tuzman claims have confounding news account for only $2.04 million of out of $10.4 million of loss at issue.

### 3.     Losses to Tuzman and Maiden

Tuzman next argues that Dr. Voetmann's loss calculation is overly inclusive because it includes losses to participants in the manipulation conspiracy, specifically to Tuzman and Maiden.  (Tuzman Post-Hearing Br. 24-27).  While the Government disagrees with Tuzman's arguments and believes that Dr. Voetmann's methodology properly used the proportion of Maiden Capital trading volume relative to all shares outstanding, to narrow the issues in dispute the Government does not dispute that Tuzman owned 57.82 percent of the company as of December 31, 2008 and that those shares should not be counted for purposes of loss.

*     *     *     *

For the above reasons, the Government believes that the $10.4 million in losses related to the 11 days for which there was a statistically significant positive abnormal return is proper loss amount for Count Four.  However, to help narrow the issues for the Court, the Government notes the following.  If the Court only considered the days where Maiden's trading was at least five percent of the volume, and did not consider the days where Tuzman alleges there was confounding information, there would still be five days on which Maiden's trading caused

statistically significant price increase:  December 31, 2018, January 2, 2009, November 16, 2009, May 20, 2010, and April 29, 2011.  On these five days alone, the loss based on Dr. Voetmann's calculations would be $8.08 million.  (*See* DX F113 (summarizing 11 trading days in GX V1, at App'x C and GX V3)).  If the Court then only considered the shares not owned by Tuzman, 42.18 percent, the loss amount would still be $3.41 million.  In other words, crediting every argument that Tuzman has advanced — which the Government does not believe that Court need do — the applicable loss amount is at least $3.41 million.  Not zero, as the defendants continue to argue.

### D.    The *Dura* Arguments

Tuzman and Amanat both argue that Dr. Voetmann's analysis applies an analysis that the Supreme Court rejected in *Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U.S. 336 (2005). (Tuzman Post-Hearing Br. 12-16; Amanat Post Hearing Br. 5-13).  Again, these arguments are inconsistent with the defendants' position at trial.  Having called Professor Ferrell as an expert witness at trial about his event study, Tuzman (and Amanat) cannot seriously argue that the methodology they put before the jury cannot be considered for purposes of sentencing.  In any event, the defendants are simply wrong on the law.

Amanat makes sweeping, and incorrect claims, about what the Second Circuit has held with respect to the applicability of *Dura* in the Sentencing Guidelines context.  It is true that the Second Circuit in *Rutkoske*, held:  "we see no reason why considerations relevant to loss causation in a civil fraud case [as set forth in *Dura*] should not apply, at least as strongly, to a sentencing regime in which the amount of loss caused by a fraud is a critical determinant of the length of a defendant's sentence." 506 F.3d at 179.  But Amanat ignores the next sentence in *Rutkoske*, where the Court went on to explain:

> Determining the extent to which a defendant's fraud, as distinguished from market or other forces, caused shareholders'

> losses inevitably cannot be an exact science. *See Ebbers*, 458 F.3d at 127 ('no easy task'). *The Guidelines' allowance of a "reasonable estimate" of loss remains pertinent.* And cases might arise where share price drops so quickly and so extensively immediately upon disclosure of a fraud that the difference between pre- and post-disclosure share prices is a reasonable estimate of loss caused by the fraud. Even there, however, a coincidentally precipitous decline in shares of comparable companies would merit consideration. For example, a fraud disclosed just as the dot-com bubble burst might cause most, but not necessarily all, of the decline in previously high-flying technology stocks. *Normally, expert opinion and some consideration of the market in general and relevant segments in particular will enable a sentencing judge to approximate the extent of loss caused by a defendant's fraud.*

*Id.* (emphasis added). Simply put, the Second Circuit made clear that because the Guidelines only require a "reasonable estimate of loss," the Government can meet its burden through expert opinion — what the Government did here.

Amanat and Tuzman also misunderstand the difference between a typical securities class action and the market manipulation scheme for which they were convicted. In *Dura*, and in the run-of-the-mill class action, the question of loss causation is generally an exercise in determining how much artificial price inflation was in a stock before the truth was revealed, *i.e.*, how much of the price drop after a corrective disclosure is attributable to the fraud. *See* Lucian C. Bebchuk & Allen Ferrell, *Rethinking* Basic, 69 *Bus. Law.* 671, 692 (2014) ("Another potential use of an event study would be to measure whether there was a price reaction when the market learned the truth about the misstatement — that is, at the time of a corrective disclosure. This could be relevant to the question of whether the misstatement at the time it was made resulted in fraudulent distortion (even if it was a confirmatory lie)."

In the market manipulation conspiracy charged in Count Four, there was no corrective disclosure. Instead, the defendants engaged in a long running effort to manipulate the market, which was not "revealed" until the indictment years after the market manipulation scheme

ended.  But the fact that there was no "corrective disclosure" does not mean that there was no loss to investors.  Dr. Voetmann's conservative analysis — based on the expert opinion of Professor Ferrell that is in evidence and was put before the jury — is a reasonable estimate of loss, accounting for market and company-specific factors.

## CONCLUSION

For the reasons set forth above, the Government respectfully submits the Government has more than met its burden in establishing the applicable loss amounts under the Guidelines.  The Court should find that a reasonable and conservative estimate of harm to KITD shareholders from the fraud alleged in (a) Count Six is at least $22.9 million, and (b) Count Four is between $3.41 million and $10.4 million.

Dated:   July 11, 2019
         New York, New York

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:  _____/s/_____

Andrea M. Griswold
Joshua A. Naftalis
Assistant United States Attorneys
212-637-1205/2310