**WILLKIE FARR & GALLAGHER** LLP

Randall W. Jackson
212 728 8216
rjackson@willkie.com

787 Seventh Avenue
New York, NY 10019-6099
Tel: 212 728 8000
Fax: 212 728 8111

July 26, 2019

**VIA ECF**

The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

Re:   *United States v. Tuzman & Amanat*, 15 Cr. 536 (PGG)

Dear Judge Gardephe:

    This letter is respectfully submitted on behalf of defendant Omar Amanat in reply to the Government's July 11, 2019 Post-Fatico Sentencing Submission ("Br."). Rather than seriously confront the logical and methodological problems highlighted in the Defendants' Post-Hearing submissions, the brief doubles down on the lawless theory that the Government has been inexplicably advancing since the PSR issued more than a year ago. The Government's theory, as now made even more blunt in their post-hearing brief, comes down to two absurd propositions. The first is that the Sentencing Guidelines' indication that a "reasonable estimate" of loss means that the Government need not even demonstrate that there was *any loss at all*. The second is that the concept of "reasonable estimate of loss" means that the Government, in the absence of a legally coherent theory,

can ask the Court to disregard the clear instructions of both the Second Circuit and the Supreme Court of the United States. Both of these concepts are inconsistent with the law and with the most basic concepts of fair and appropriate sentencing. For the reasons explained below, the Court should reject them.

A.     **The Government Has Failed To Offer Any Coherent Explanation of Why Professor Voetmann's Analysis Could Be Considered a "Reasonable Estimate of Loss"**

The Government argues that, "Although the jury found that Tuzman and Amanat conspired with Stephen Maiden to manipulate KITD stock . . . Tuzman and Amanat nonetheless contended in their sentencing submissions that there is no reasonable estimate of loss for Count Four." (Br. 10). This argument assumes, incorrectly, that the existence of a securities fraud scheme necessitates a finding that there was loss. This is, of course, wrong. It is axiomatic that for many fraud schemes, the appropriate loss amount will be zero. *See, e.g. United States v. Crummy*, 249 F.Supp.3d 475, 484 (D.D.C. 2017) (finding appropriate loss amount to be zero in fraud prosecution, and observing "even when the loss amount is zero . . . it is not necessarily troubling . . . after all, a defendant who commits procurement fraud of this nature . . . has committed a federal offense and on that basis alone is subject to a range of at least 0-to-6 months of imprisonment under the Guidelines."). One of the central points of *Dura* was the rejection of the notion that every securities fraud resulting in share price inflation would necessarily cause a loss. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 340 (2005) ("the logical link between the inflated share purchase price and any later economic loss is

Hon. Paul G. Gardephe
July 26, 2019
Page 3

not invariably strong. Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, **the misrepresentation will not have led to any loss**.") (emphasis added).

It is therefore impossible to understand how the Government argues that the Court should adopt even its modified suggested Count Four loss amount of $3.41 million. (Br. 21). The Government's brief does not contain one sentence that purports to explain how $3.41 million dollars was lost by victims of the Count Four fraud scheme. The brief merely reiterates the Government's incorrect argument that Professor Ferrell's trial testimony somehow means that both Mr. Tuzman and Mr. Amanat, who did not even call Professor Ferrell, are foreclosed from arguing that the Government's loss calculations do not make any sense. Professor Ferrell's trial testimony was clear and persuasive on the limited issue for which he was called at trial – nothing in that testimony indicated that loss amount could be calculated in this fashion. Putting aside the clear legal authority foreclosing the Government's theory of loss, as a matter of the most basic logic, the mere inflation of the value of a victim's assets does not cause them any economic harm. As explained in our opening brief, Dr. Voetmann did not purport to calculate anything beyond the mere inflation in the stock price. Thus, no matter how few the number of days shrinks to in the purportedly reliable part of Dr. Voetmann's analysis, he simply did not attempt to show economic loss and he admitted as much on the witness stand.

Hon. Paul G. Gardephe
July 26, 2019
Page 4

### B. The Government Has Again Ignored Controlling Supreme Court and Second Circuit Precedent With No Coherent Explanation

The most stunning feature of the Government's Sentencing submission is its decision to devote less than two pages of analysis, at the back of the brief, to what it frames as "the Dura Arguments." (Br. 21-22). As explained in our opening brief, this is an issue that was initially raised more than a year ago in Mr. Amanat's opening sentencing submission. Now, after multiple briefs on the issue, multiple expert reports, and an ever-shifting series of loss theories, the Government still has failed to explain how its theory of loss could possibly comport with *Dura* and *Rutkoske*.

In *Dura*, the Supreme Court could not have been clearer, writing unambiguously that "as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value." *Dura*, 544 U.S. at 342

Remarkably, the section of the Government's brief addressing *Dura* **fails to discuss *Dura* at all.  It also fails cite any additional cases**. This means that the Government could not find *even one* passage in *Dura* that it believes could support its theory, and the Government could not find *even one* case in the expanse of both civil and criminal cases addressing securities fraud where this theory of loss was endorsed. The reason that the Government has failed to find any authority supporting its position, even after a year of research, even after securing an extraordinary extension of time to respond to the Defendants' post-hearing briefs, is simple: **there are no cases**

30570323.1

**anywhere that support the theory of loss that the Government is attempting to convince the Court to adopt.**

In a bizarre portion of the "*Dura*" section of the Government's brief, the Government acknowledges that *Rutkoske* states unambiguously that *Dura*'s ruling prohibiting Voetmann-style loss calculation also applies in criminal cases. (Br. 21). But the Government bizarrely suggests that this defect is somehow cured by the "next sentence in *Rutkoske*," which indicates merely that reasonable estimates of loss are appropriate and that expert opinion may be considered. (Br. 22). Nothing in this "reasonable estimate" language, to which Government returns to again and again as though it is some form of incantation with the power to make the holdings of the Supreme Court disappear, demonstrates that the Court can ignore controlling precedent. Nothing in the language cited by the Government supports the notion that an appropriate loss calculation in a Securities Fraud case can be based merely on the inflation of stock prices. As explained in detail in our opening brief and in our 2018 sentencing submission, the holding of the Supreme Court is to the contrary.

The Government argues that "Amanat and Tuzman also misunderstand the difference between a typical securities class action and the market manipulation scheme for which they were convicted." (Br. 22). The Government bases this assertion on the idea that there is a meaningful distinction since, in this case, there was no "corrective disclosure." This is self-evident nonsense. It is the Government that fails to understand that this is precisely the situation that was addressed in *Dura* and that the lack of a

corrective disclosure in this case only underscores how far the Government's theory is from any applicable principles of loss calculation. The Government has failed to cite any authority supporting the notion that in a market manipulation case with no corrective disclosure, an appropriate loss calculation can be made in the manner suggested here. This is an attempt to lead the Court into error, and it should be rejected.

### C. The Government's Loss Calculations With Regard to Mr. Amanat Reflect a Disregard for Fairness in His Sentencing

The Government's insistence on utilizing a method of loss calculation that has been foreclosed by controlling precedent is only one component of a results-oriented approach to Mr. Amanat's sentencing that has persisted throughout the sentencing process. The Court should reject it. The Government has now repeatedly been forced to accept that significant components of its loss calculation theory are divorced from logic and the law. For example, with regard to Count Four, the Government has now essentially acknowledged that all of Dr. Voetmann's calculations were erroneous, at least to the extent that they included the 42.18 percent of the stock owned by Tuzman. The Government, however, frames this not as acknowledgement that they were in error, but rather as a concession that points to the "conservative" nature of their sentencing calculations.

The Government's sentencing calculations have been anything but conservative. With regard to this Count Four concession, even if Dr. Voetmann's methodology could be taken seriously, the Government has still failed to reduce its calculation of the Count

Hon. Paul G. Gardephe
July 26, 2019
Page 7

Four loss amount by the amount of stock owned by Maiden or Amanat. This is to say nothing of the other problems with Dr. Voetmann's methodology raised at the *Fatico* hearing and in the earlier briefs of Mr. Amanat and Mr. Tuzman.

Even with regard to Counts One through Three, as set out in Mr. Amanat's June 18, 2018 sentencing submission, the Government was forced to acknowledge that the original loss amount it advanced to the Probation Department overstated the actual loss by hundreds of thousands of dollars, by neglecting to credit Mr. Amanat for the money he put back into Maiden Capital, as required under the Guidelines. The Government nevertheless has still pushed a loss amount of several million dollars for Counts One through Three even though the trial record makes clear that the loss amount on these Counts cannot possibly be this high. In a manner similar to the Government's errors on Count Four, the Government neglected to analyze the impact of both Mr. Maiden's own acts bankrupting Maiden Capital through horrendous trading and Mr. Maiden's defrauding of Mr. Amanat in the Blue Earth solutions transactions.

This is not to rehash the arguments put forth in our earlier submissions, but only to underscore that the failure of the Government to acknowledge, where appropriate, that its loss calculations are simply wrong, threatens to undermine the fairness of Mr. Amanat's sentencing process. The Government advanced in the narrative it supplied for the PSR that the loss amount for Count Four was more than $25 million. It has now effectively acknowledged that this was more than $20 million too high, and that the loss amount it now believes should apply is actually $3.41 million. (Br. 21). Even that figure,

30570323.1

as explained above, is wrong. But if the Court were to utilize that figure, Mr. Amanat's sentencing range would in actuality be a level 22, not the level 35 that was suggest in the PSR.[1] Where, as here, the defendant has no criminal history, level 22 corresponds with a suggested sentence in the range of three and a half years, before good time credit adjustments. Mr. Amanat will soon have already served two years in pre-sentence detention in the MCC and the MDC, one of the harshest facilities in the Bureau of Prisons. When I last sat with Mr. Amanat at the MDC, his front tooth was visibly broken and he was nursing a head injury as a result of accident he sustained due to inadequate lighting in his cell. This is all to say, the Government's entire approach to Mr. Amanat's sentencing has reflected a lack proportionality and fair acknowledgement of the defects in their position.

At some point, the Court should say "enough is enough," and reject the very concept of a brief, such as this one, that suggests controlling Supreme Court precedent can be disregarded because "Tuzman (and Amanat)" called an expert witness on a topic that in no way validates Dr. Voetmann's broken analysis. (Br. 21). Again, Mr. Amanat did not even call Professor Ferrell, so this sentence's parenthetical attempt to include him in its nonsensical waiver argument does not even make sense. None of the logic of this argument makes sense. The Supreme Court has said that the Government cannot do this, and that is should, by all logic, be the end of the story. Mr. Amanat has been sitting

---

[1] As explained in Mr. Amanat's June 2018 Sentencing Submission, neither of the specific offence enhancements that the Government suggested in the PSR is even arguably applicable, as a matter of black letter law.

Hon. Paul G. Gardephe
July 26, 2019
Page 9

in jail for a long time, separated from his children and his parents as they go through extraordinary challenges. Mr. Amanat himself experienced extraordinary challenges while detained, suffering through a stroke, various physical injuries, and other challenges. This means that, whatever Mr. Amanat's crimes may have been, he cannot escape punishment in this case. He has already been severely punished and he faces more punishment with each passing day. There is no need or justification for unfarily expanding that punishment by ignoring the law.

## CONCLUSION

The Court should reject the Government's Count Four loss analysis and find that the loss amount is zero.

Respectfully submitted,

_____/s/_____

Randall W. Jackson
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
212-728-8216
rjackson@willkie.com

30570323.1