O'NEILL / HASSEN                                                             Attorneys at Law

November 15, 2019

<u>Via ECF and Email</u>
Honorable Paul G. Gardephe
United States District Judge
United States Courthouse
40 Foley Square
New York, NY 10007

    RE: *United States v. Omar Amanat,* 15 Cr. 536 (PGG)

Dear Judge Gardephe:

  We are the attorneys representing Omar Amanat in the above-captioned matter. We write to move the Court for an order requiring the government to turn over materials pursuant to Rule 16 and *Brady v. Maryland,* 373 U.S. (1963) and its progeny, including *Giglio v. United States,* 405 U.S. 150 (1972) and *Kyles v. Whitley,* 514 U.S. 419 (1995).

  **I. Procedural Posture**

  As the Court is aware, Omar Amanat was convicted by a jury on December 26, 2017. His brother, Irfan Amanat was tried and convicted in the same case on October 29, 2018. During Irfan Amanat's trial, the government advised the Court in a sealed *ex parte* letter that it intended to seek Irfan Amanat's remand based on "evidence that he has engaged in obstruction of justice." I.A.Tr. 900.[1]

---

[1] References to Irfan Amanat's trial transcript will be labeled with I.A.Tr. and the page number.

1 / P (646) 808-0997  4 / www.oandh.net
2 / F (212) 203-1858  5 / 25 Eighth Ave, Suite C, Brooklyn, NY 11217
3 / grainne@oandh.net  6 / 9213 2C82 E6F0 93EA D673 EA30 C7EB 7E03 1B1B 82FA

Immediately after the jury verdict in Irfan Amanat's trial, on October 29, 2018, the government requested a recess in order to bring a witness, Spyros Enotiades, from the U.S. Attorney's Office to the courtroom. During the recess, Enotiades had a medical emergency which required brief hospitalization, and he did not testify. Instead, the government called Special Agent Julie Amato, who had attended many of the government's meetings with Mr. Enotiades and was able to provide hearsay evidence about what Mr. Enotiades had said at meetings. The government also admitted portions of text messages that Mr. Enotiades had provided to it.

Agent Amato testified that she had personally first spoken to Enotiades in July of 2018 *I.A.Tr. 910*. This was subsequent to Omar Amanat's conviction, on December 26, 2017 but prior to Irfan Amanat's trial, which began on October 22, 2018. The government alleged that Omar Amanat and Irfan Amanat had both met with Enotiades many times during the pendency of their cases, including throughout Omar Amanat's trial. Enotiades knew Omar and Irfan Amanat were represented by counsel the entire time he was in communication with them. At the October 28, 2018 hearing, the government moved to remand Irfan Amanat, in part based upon the testimony of Agent Amato and the documents which were provided to the Court. Irfan Amanat was remanded pending sentencing.

On November 14, 2018, Counsel for Omar Amanat, Randall Jackson, moved to withdraw from the case, citing a conflict of interest with Spyros Enotiades,

O / H

largely stemming from their time working together at the United States Attorney's Office. There were a series of conferences regarding this potential conflict with counsel for the government present. Mr. Jackson also submitted a letter dated November 27, 2019 that was filed *ex parte* and under seal asserting that there were additional conflicts with his continued representation of Omar Amanat, including his new firm's representation of three creditors in the pending bankruptcy petition, *In Re Aman Resorts,* 16 Bk 10517(SCC).

On January 10, 2019 we were assigned, pursuant to the Criminal Justice Act, to assist Mr. Amanat with matters relating to Mr. Jackson's conflict. On January 25, 2019, the Court appointed us to represent Mr. Amanat for the remainder of the criminal case and allowed Mr. Jackson to continue to represent Mr. Amanat with respect to a loss amount issue that was the subject of *Fatico* litigation.

The government intends to show that both Omar Amanat and Irfan Amanat have committed obstruction of justice, and as a result, they should be assessed a two-level enhancement for obstruction of justice, pursuant to § 3C1.1. The Court scheduled a separate *Fatico* hearing to address the government's contention that Omar Amanat and Irfan Amanat asked Mr. Enotiades to create a fake bank account. After a series of adjournments, Irfan Amanat retained new counsel who requested that the government provide further discovery. On behalf of Omar Amanat, we submitted a separate letter, joining in the request for additional discovery relating to Mr. Enotiades and the government's allegations.

O / H

Honorable Paul G. Gardephe
*United States v. Omar Amanat,* 15 Cr. 536 (PGG)
Page 4 of 19

On September 11, 2019 we submitted a letter to the government, attached as Exhibit A, formally requesting additional discovery. The government agreed to comply with some demands and provided us with some discovery on October 8, 2019. On November 5, 2019, we submitted a second letter, attached as Exhibit B, requesting clarification about the materials we have received to date, and making further requests for discovery. The government responded with no new discovery but did clarify a few of our questions.

We submit this motion requesting that the Court order the government to provide the defense with the discovery requested by letter, and any other documents to which we are entitled, pursuant to Rule 16, *Brady* and its progeny, including *Giglio* and *Kyles.*

## II. Factual Background

### A. Enotiades' Work for the Government

Spyros Enotiades was the subject of an extensive profile in the New Yorker in 2018.[2] According to the article in the New Yorker, Mr. Enotiades has worked for the D.E.A. since 1988 and had previously worked as a spy for Cyprus. Enotiades specifically works for the Special Operations Division of the D.E.A. which was

---

[2] *See, Yudhijit Bhattacharjee,* The Man who Captures Criminals for the D.E.A. by Playing them. Available at: https://www.newyorker.com/magazine/2018/07/30/the-man-who-captures-criminals-for-the-dea-by-playing-them. Attached as Exhibit C.

O / H

Honorable Paul G. Gardephe
*United States v. Omar Amanat,* 15 Cr. 536 (PGG)
Page 5 of 19

started in 1994 and is comprised of two-dozen partner agencies, including the FBI.[3] According to the article, between 2003 and 2018, Mr. Enotiades received "more than six million dollars, including two million for" his work on *United States v. Chigbo Umeh,* 09 Cr. 524 (JSR), which was prosecuted by the SDNY and, among others, Assistant United States Attorney Randall Jackson.

During the trial, Mr. Enotiades claimed that he worked as a "*shareholder* in a corporation that specializes in interior design, interior architecture and furniture." *Umeh Tr.* 503.[4] But, in the New Yorker article, he stated that he closed his business in 1999 because he spent most of his time working for the D.E.A., adding, "if you want to do this job right, you have to do it full time." Prior to his creation of a 'consulting company', as discussed below, it appears that Enotiades' primary source of income is the Department of Justice.

Enotiades' work for the government is, by all accounts, unique. He has worked for various government agencies longer than some agents have been alive. He is paid more than a traditional government employee who receives a salary and health insurance. Enotiades is not merely paid small sums for his information, like

---

[3] *See, e.g.* John Shiffman, Kristina Cooke, *Exclusive: U.S. directs agents to cover up program used to investigate Americans,* Reuters, August 5, 2013, available at: https://www.reuters.com/article/us-dea-sod/exclusive-u-s-directs-agents-to-cover-up-program-used-to-investigate-americans-idUSBRE97409R20130805. Attached as Exhibit D.
[4] *Umeh Tr.* refers to the transcript of the trial in *United States v. Chigbo Umeh,* 09 Cr. 524 (JSR). Attached as Exhibit E.

O / H

a traditional informant, but rather he is paid to make cases, sometimes under the direction of a team of agents, and sometimes using his own research and ingenuity.

Enotiades's work with the D.E.A. Special Ops allows him to work for different agencies within the Department of Justice. The government has told us that Mr. Enotiades has worked with the FBI "squad" responsible for this case beginning in August 2011, shortly after his testimony in *Umeh*.[5] During this time, he continued to work for the D.E.A. Special Ops and the Southern District of New York on their cases.[6]

### B. Enotiades's Private Consulting Work

Mr. Enotiades started a private consulting business with attorneys Rutsel Martha and Jim Hackney called SLA.[7] Martha is a former INTERPOL General Counsel and is currently a Partner Fellow at the Lauterpacht Centre for International Law at Cambridge University and a principal at Lindeborg Counsellors at Law, a firm specializing in INTERPOL matters. Enotiades told the government that his first client was Kola Aluko.[8] As a consultant, Enotiades claims

---

[5] *See*, Agent Amato Dec'l ¶ 5.
[6] *See*, e.g. *United States v. Vincent Schifano,* 18 Mag. 2965, Complaint, attached as Exhibit F.
[7] *See*, e.g. USAO 3558-20, "At the beginning of CHS's engagement with OMAR, OMAR and CHS discussed signing a consulting agreement… between OMAR and SLA which was a consulting company... OMAR paid $15,000 to the consulting team at their engagement. This included CHS, Jim Hackney and Rutsel Martha."  See also, 3558-18 p.1 Omar Amanat: "Hi spyros this is Omar-friend [o]f Rutsel" … Enotiades: "Hello Omar Yes, Rutsel spoke to me about you…". 3558 materials are attached, under seal, as Exhibit G.
[8] 3558-02.

O / H

to sign individuals up to be 'sub sources' for the government, thus shielding them from prosecution, or assisting them in acquiring a cooperation agreement.

Mr. Aluko appears to have engaged Enotiades for a variety of reasons, including ascertaining whether there was an active law enforcement investigation of Mr. Aluko, aiding him in preventing forfeiture of his property, and eventually shepherding him towards a cooperation agreement.[9] Enotiades admits receiving payment from Aluko but claimed the payments were for assistance with Aluko's "troubles in Nigeria."[10] However, Enotiades repeatedly attempted to bring Aluko into the FBI and the DEA to "meet with the government."[11] Enotiades also mentions another person who had "just signed up to be a confidential source", presumably through Enotiades and his consulting firm.[12]

Rutsel Martha worked for Mr. Amanat in his litigation against Doronin over control of Aman resorts. When Omar Amanat was arrested in the instant case, he began interviewing lawyers to assist him in his defense. Martha introduced Mr. Amanat to his partner, Mr. Enotiades, and Omar retained their firm to guide him towards attaining a cooperation agreement or the outright dismissal of his case.

---

[9] 3558-02.
[10] 3558-02. "CHS received payments from ALUKO because ALUKO hired CHS as a consultant to help with his situation in Nigeria."
[11] *See,* 3558-21. "CHS later met ALUKO in the Dominican Republic and CHS's contact in the DEA told CHS that CHS had to get somewhere where he was arrestable." *See also,* 3558-05 "CHS talked about ALUKO often. CHS had a good relationship with ALUKO. ALUKO was willing to meet with the government in person and ALUKO was ready to meet with the government."
[12] 3558-02.

O / H

Enotiades is acting as a legal representative and taking money from 'clients' to either facilitate the dismissal of their cases or assist them in attaining a 5k agreement.

### III. Rule 16 Discovery Requested

The government has alleged that Mr. Amanat and his brother offered to pay Mr. Enotiades to create a 'fake bank account' to show that witnesses for the government had hidden money or had been bribed by one of Mr. Amanat's business associates.

We have requested discovery and particulars from the government, pursuant to Local Rule 26.4.[13]

The discovery we have received thus far is incomplete and inadequate.

#### A. 16(a)(1)(A) Defendant's Oral Statement

We request that the government disclose statements that Omar and Irfan Amanat made allegedly asking Spyros Enotiades to create fraudulent bank documents.

#### B. 16(a)(1)(B) Defendant's Written or Oral Statement

The government has provided us with text files that purportedly contain Mr. Amanat's statements. Text files are easily manipulated and as such, we request that the government provide the statements in the government's standard format

---

[13] *See,* Exhibit A, Exhibit B.

O / H

for cell phones – a Cellebrite report. We request that the government conduct a forensic analysis of Mr. Enotiades' cellular telephones, including phones which were wiped or deleted, and provide us with the results of that analysis. Alternately, we request that the government provide us with the phones themselves so that we can retain an expert to conduct a forensic analysis. Upon information and belief, the software required to conduct the analysis, Cellebrite, is available in the S.D.N.Y. United States Attorney's office.

### C. 16(a)(1)(E) Documents and Objects

1. **Forensic copies of cell phones and chats.** We request that the government provide us with forensic copies of Mr. Enotiades' cell phones, including cell phones that Mr. Enotiades wiped or deleted. In its letter on September 16, 2019, the Government "agreed to search mobile phones used by the CHS in connection with his work for the FBI Prosecution Squad for responsive documents." Instead, the government asked Mr. Enotiades, via telephone call, to tell them what was in his cell phones and then provide that to it.[14] Enotiades stated that he deleted data from his phone.[15] Deleted data can be recovered using the Cellebrite program. The government intends to use these statements in its case and chief and the statements are material to the defense's case. The text files are insufficient.

---

[14] *See,* 3558-31 "CHS stated CHS would do an exhaustive search of the phones and accounts in CHS's possession for the above referenced communications about OMAR."
[15] *3558-34.* "CHS never backed these phones up and wiped them out to give to BROTHER."

O / H

2. **Backup of hardware.** We similarly request the iCloud backup of Mr. Enotiades' devices.[16]

3. **Bank account numbers and statements.** The government has accused Mr. Amanat of attempting to pay Mr. Enotiades to create a fake bank account. Mr. Enotiades has admitted that Mr. Amanat did in fact pay him money, but it appears that he originally attempted to obscure the payments by either receiving the money in cash or having checks made out to his wife, Luann Porter. We request that the government provide us with bank records for all of Mr. Enotiades' accounts, or at least the account information so that we may subpoena those records. This is material to our defense. In its most recent letter, the government informed us that it was reviewing bank documents from a Santander account in Enotiades' wife's name. We are also aware of an account at Chase that the government had previously indicated it would be reviewing.

4. **Records of payment by the government.** We requested records of payment to Mr. Enotiades by the government, including from the Treasury department. Mr. Enotiades has reported receiving vastly different sums from the government at various times throughout his career. In *US v. Umeh* on April 4, 2011, he told the jury he received "1.7 million"; to the New Yorker, he

---

[16] *3558-34.* "CHS started using iCloud to back up CHS' phone in approximately July 2018, when CHS started using an iPhone X."

O / H

claimed more than 6 million, including 2 million for his work on *Umeh*; and in September of this year he told agents Rom and Amato that he made "approximately $3.5 million to $4 million from the US Government in connection with his work as a confidential source."[17] These discrepancies are material; the amount of money he has been paid is similarly material, as it goes to Enotiades' credibility and motive to lie to secure prosecutions.

5. **Records of communications with government agents.** We have requested communications between Mr. Enotiades and other agents of the government. This could be accomplished in part by providing us with forensic reports from Mr. Enotiades' cellular phones. We also request that the government consult with Mr. Enotiades' handlers from all government law enforcement agencies. The government has refused to search for communications between Enotiades and government handlers outside of the "prosecution team".[18] These items are material to the defense.

6. **Government reports regarding Enotiades.** Similarly, we request government reports assessing Mr. Enotiades' work for the Department of Justice. Enotiades has had a number of handlers at the DEA Special Ops where he has worked for 30 years. Their reports about his credibility are relevant and material to the defense. We request documentation of Mr.

---

[17] 3558-31.
[18] September 16, 2019 Joint letter to the Court Docket # 1031.

O / H

Enotiades' termination from the DEA in Cyprus.[19] The government is relying on Mr. Enotiades' credibility to substantiate their claim that Mr. Amanat hired him to create fraudulent bank documents. The government's records and reports regarding Mr. Enotiades' credibility are material to the defense.

7. **Communications between Enotiades and Kola Aluko.** We also requested communications between Mr. Enotiades and Kola Aluko. Aluko was a client of Enotiades; Enotiades tasked Mr. Amanat with helping Aluko as a part of his "sub source" arrangement. When Mr. Amanat was unsuccessful, it appears that Enotiades went to the government with these allegations, perhaps as a means of securing revenge or forcing Mr. Amanat's hand in their business dealings. The government has provided us with a tiny portion of the communications between Aluko and Enotiades, again in a format that is not forensically sound. We request that the government produce all communications between Enotiades and Aluko to show Enotiades' motivation and that the information come in a format that does not allow Mr. Enotiades to delete or withhold information.

8. **Communications with other parties about Omar Amanat.** Similarly, we requested communications between Mr. Enotiades and other 'clients' or parties about Omar Amanat, naming specific individuals including Johnny

---

[19] 3558-31. "CHS's relationship as a confidential source with one DEA office was temporarily suspended. This was related to an office in Cyprus, specifically former DEA Agent Artemis Papadakis."

O / H

Quaicoe, Vincent Schifano, Marlin Merin, Ricardo Czestopalek, and the Russian oligarch, Vladislav Doronin. Additionally, we now request communications about Mr. Amanat between Mr. Enotiades and the parties referenced in 3558-29 who include: Lakis, Jim Hackney, Jose Agostino, Jason, Jim Rogers, Cristian, Johnie, Dino, Israel, Mezey, Roar, Anly, as well as communications with the phone numbers written in the notes.[20] The government had agreed to search Mr. Enotiades' phones for responsive communications, but instead asked Enotiades to provide them with the information. In a subsequent letter, the government objected to our request that they themselves search Enotiades' phones. These items are material to the defense.

9. **Communications with Doronin.** We have requested communications between the government and Kasowitz Benson Torres regarding Mr. Amanat, and between Enotiades and Doronin regarding Mr. Amanat. Mr. Doronin was a business partner of Mr. Amanat's whose relationship soured. Doronin is represented by Kasowitz Benson Torres in his civil litigation against Mr. Amanat. Upon information and belief, Mr. Doronin's lawyer, Mark Kasowitz, has bragged that he is responsible for Mr. Amanat's incarceration. Doronin and Enotiades are in communication.[21]

---

[20] These names may be spelled wrong, we received pictures of notes and have attempted to figure out the names as well as we can.
[21] 3558-02 "CHS had access to Doronin."

O / H

Honorable Paul G. Gardephe
*United States v. Omar Amanat,* 15 Cr. 536 (PGG)
Page 14 of 19

10. **Documents or notes of communications with Enotiades about Mr. Amanat.** We have requested any documents or notes of communication between Enotiades and other government employees regarding Mr. Amanat. Enotiades stated several times that he was meeting various government employees, prior to Mr. Amanat's trial.[22] The government has admitted that Enotiades spoke with agents who work for the DEA about Mr. Amanat prior to his trial. The government has not provided us with notes of those meetings or any documents about those meetings and any statements Enotiades has previously made about Mr. Amanat. These documents comprise notes of Enotiades' prior statements that are relevant to this case and are material to our defense.

11. **Enotiades' travel.** We requested any notes or documents about Enotiades' trip to Thailand and Australia. It is clear from the text messages provided by the government that Enotiades travelled to Thailand to work on a 'case' for the government.[23] Enotiades told Mr. Amanat that Amanat's funding of Enotiades' trip to Thailand was part of Mr. Amanat's "substantial assistance", for the purposes of attaining a 5K agreement. The government

---

[22] *See, e.g.,* USAO_TUZMAN_0350086: 3/21/17 3:52:00 PM. "I will know if your case is part of the agenda or your name is mentioned... will update you when I know." *See also, Id.* at 8/7/17, 10:13:22 PM El Griego: I had to come to Long Island to see John re you and K cases because now I feel the pressure and must rush…"

[23] USAO_TUZMAN_0350086. "[4/5/17, 11:34:18 AM] El Griego: Hi Just arrived in Bangkok Will be meeting one last time with the target tonight. Everything is very good so far. I will know if 100% after this." *See also,* 3558-16.

O / H

has claimed that they are "unaware of any additional communications with the CHS concerning a trip to Thailand or Australia in the spring of 2017," but has refused to inquire of Enotiades' handlers at the DEA who oversaw the trip."[24] These documents are material to our defense.

12. **Enotiades' role in signing up cooperators.** We request procedures and documentation about the process Enotiades uses to sign up 'sources' or 'sub sources' for the federal government. The government has responded, "the CHS was never directed to open any FBI 'sub sources'." We are asking for documents and information about how the Department of Justice guides Enotiades or people like Enotiades in their work. Enotiades has worked for the government for three decades and appears to sell his ability to turn people in to sub sources for the federal government. We are requesting information about how the government navigates this obviously fraught ethical tightrope. Is Enotiades free to sign up anyone as a source or sub source? When and why does he decide to disclose his actions to the government? Is he allowed to take any amount of money from people looking to avoid prosecution, receive a deferred prosecution agreement or cooperation agreement? How many sub sources has Mr. Enotiades signed up? What is the procedure he follows for signing up sub-sources?

---

[24] *See,* Gov Letter Sep 16, Dkt. 1031

O / H

13. **Payments for consulting work.** We request any bank account records or methods of payment that Mr. Enotiades has received for payment from sub sources.

IV. **Scope of prosecution team**

In our initial discovery letter, we requested a variety of records concerning Mr. Enotiades' history of work for the government and any information about Enotiades which could be used to impeach his credibility. The government agreed to provide any such information, but it refused to provide information that was outside the personal possession of the individual FBI agents, postal inspectors, and prosecutors assigned to the underlying case, *United States v. Tuzman*. This narrow understanding of its responsibility is inappropriate in this case.

Enotiades has been working with this particular FBI squad for the past eight years. During this time, Enotiades has continued to work for the DEA as he has done for thirty years. Enotiades works for the DEA Special Ops Division, an elite group tasked with coordinating multi agency investigations, including the FBI.

Enotiades has been handsomely rewarded for his work for the government. Mr. Amanat's constitutional right to a fair trial does not turn on whether Enotiades is paid via 1099 or W2 - on whether he is classified as an agent or a confidential human source. A career informant should be bound by the same ethical constraints that bind other members of law enforcement. He is a member of this prosecution

O / H

team, he has an eight-year history with the other members of the team, and he has worked with this FBI squad for almost a decade.

This case turns on Enotiades' credibility. It is not in dispute that Mr. Amanat hired Enotiades to assist him in his defense. The issue in dispute is whether Mr. Amanat tasked Enotiades with creating a fake bank account that would show that Robyn Smyth had hidden money from the government. The government will rely on Enotiades's testimony, and there are significant questions about his credibility and his motivation in making these allegations at this late date.

"The prosecution's affirmative duty to disclose evidence favorable to a defendant can trace its origins to early 20th-century strictures against misrepresentation." *Kyles v. Whitley,* 514 U.S. 419, 432 (1995). "The individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id.* At 437.

Enotiades is now clearly acting on the government's behalf in this case and the government has a duty to learn of any favorable evidence known to him, regardless of whether he personally shares that knowledge with the individual prosecutors assigned to this case. In other words, the government cannot rely on Enotiades' word alone. It has a duty to uncover information that he knows, even if Enotiades does not disclose that information when initially questioned by the other members of the trial team. The government cannot shield itself from its obligations pursuant to *Brady,* and *Giglio,* by pretending that Enotiades is the equivalent of a

O / H

one-time street level narcotics informant. Mr. Amanat's right to a fair trial does not turn on the Department of Justice's internal determination of the appropriate employment status of the people who work for it. It cannot use the employment status of the people on its own team to limit the scope of discovery, including materials which should be produced pursuant to *Brady* and *Giglio.*

Of course, the government is not in all cases required to consult with the entirety of the federal government. *See, e.g. United States v. Avellino*, 136 F.3d 249 (3d.Cir. 1998). But as here, where the government is aware that Enotiades has worked under the guidance and direction of the Special Ops Division of the DEA for thirty years and knows the identities of its handlers, Enotiades prior statements to members of law enforcement about Mr. Amanat are material and appropriate for discovery. There are questions about Enotiades' credibility and instead of acquiring and providing records, the government has blithely asked Enotiades to essentially provide them with information which would serve to undermine his own credibility. His motive to minimize his own misconduct is obvious.

Mr. Enotiades' responses to the government, translated from agents to 302s, are at times bizarre. For example, the government agreed, in our joint letter to the Court to ask Enotiades about "All cases in which the CHS has been instructed by Government agencies to create fake bank accounts." In response, the 302 reads like a middle school logic puzzle: "CHS never created a fake bank account in CHS's true name. CHS never went into a bank to create a fictitious account." *3558-33*. The

O / H

intimation being that Enotiades has created fake bank accounts in names other than his true name and that he created these accounts in some manner other than going into a bank.

Enotiades admitted to the government that he was "temporarily suspended" from work with the DEA, but the government never asked any follow-up questions.[25] The government has not provided any further information about this suspension. We request any documents relating to this suspension.

### V. Conclusion

For the foregoing reasons, we request that the Court order the government to expand its search for documents and materials beyond its narrow definition of 'prosecution team' and provide Mr. Amanat with the discovery he needs to defend these allegations.

Kind regards,

/s/

Grainne E. O'Neill
Abraham J. Hassen
*Attorneys for Omar Amanat*

cc: AUSAs via ECF and Email

---

[25] 3558-31.