*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 11, 2019

BY CM/ECF

The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    United States v. Omar Amanat & Irfan Amanat
                    S8 15 Cr. 536 (PGG)

Dear Judge Gardephe:

        The Government respectfully submits this letter in response and opposition to the discovery motions of defendants Omar Amanat ("Omar") and Irfan Amanat ("Irfan"). (Dkt. 1041, 1042). The motions relate to the Government's allegation that the defendants committed obstruction of justice by, among other things, attempting to present falsified evidence to the Court to falsely show that certain cooperating witnesses had been paid to testify against them (the "Obstruction Conduct"). The issue before the Court is a narrow one: whether the Government has complied with its discovery obligations in advance of a *Fatico* hearing related to whether the Obstruction Conduct has been proven by a preponderance of the evidence and may be considered by the Court in sentencing the defendants, either in imposing a Guidelines enhancement pursuant to U.S.S.G. § 3C1.1 and/or under 18 U.S.C. § 3553. As set forth below, the Government has fully complied with and exceeded its discovery obligations, taking substantial additional and voluntary steps to provide the defendants with much of the additional information they seek. The defendants should not be permitted to turn this post-conviction hearing about their own alleged obstruction — intended to mislead the Court — into a fishing expedition about speculative and meritless claims against the Government, and what investigations, if any, the Government may have into the defendants' other criminal activity. As set forth below, the Government respectfully submits that the Court should deny the defendants' motions for additional discovery and proceed with scheduling the *Fatico* hearing on the Obstruction Conduct.[1]

---

[1] The Government notes that the outcome of this *Fatico* hearing has no bearing on the applicability of an obstruction-of-justice enhancement, pursuant to U.S.S.G. § 3C1.1, for Omar because that enhancement independently applies in light of the defendant's introduction of fabricated evidence at his own trial in 2017. The outcome is relevant at Omar's sentencing under 18 U.S.C § 3553.

## Background

A.   Procedural History

The background and procedural history to the defendants' motions make clear that the Government has fully complied with its disclosure obligations. The defendants' discovery demands were first made in late-August 2019 — on the eve of the *Fatico* hearing scheduled for September 5, 2019. These demands were made more than ten months after the Government first produced discovery in October 2018 relating to Spyros Enotiades, an FBI confidential human source (the "CHS" or "Enotiades") in connection with its motion to remand Irfan after his conviction. These discovery demands were also made approximately two years after Randall Jackson appeared as counsel for Omar at trial, after being introduced to Omar by Enotadies — a fact the Government only learned in the summer of 2018 (well after Omar was convicted).

1.   The Defendants' Convictions and Remand, and the Government's October 2018 Disclosures Related to the CHS

As the Court is aware, both Omar and Irfan were convicted following jury trials. On December 26, 2017, Omar was convicted of (a) conspiracy to commit wire fraud, (b) wire fraud, (c) aiding and abetting investment advisor fraud, and (d) conspiracy to commit securities fraud. After trial, Omar was remanded based on, among other things, his risk of flight and his "disregard and disdain for the Court and for legal process," as evidenced by his fabrication of evidence at trial. (Omar Tr. 7328). On October 29, 2018, Irfan was convicted of (a) conspiracy to commit wire fraud, (b) wire fraud, (c) aiding and abetting investment advisor fraud, and (d) conspiracy to commit securities fraud, to make false statements in SEC reports, and to make false statements to auditors. After the jury's verdict, the Government moved for Irfan's remand based on the Obstruction Conduct, specifically the fact that, prior to the trial, Irfan (along with Omar) had attempted to fabricate evidence by creating a fraudulent affidavit for submission to this Court falsely reflecting that cooperating witnesses Stephen Maiden and Robin Smyth had been paid by a business rival of Omar to testify falsely against Omar at trial.

The Government had intended to present evidence of the Obstruction Conduct in support of its motion to remand Irfan primarily through the testimony of Enotiades, who was a percipient witness to Irfan's and Omar's attempt to create the false affidavit concerning these purported payments. Accordingly, on October 25, 2018, before Irfan's trial concluded and in advance of an anticipated post-verdict bail revocation hearing, the Government submitted an *ex parte* letter under seal informing the Court that that it was in possession of evidence establishing Irfan's engagement in the Obstruction Conduct, but that it did not intend to disclose such evidence to Irfan until after the verdict because of "concerns that [Irfan] would flee if he learned that the Government had evidence of his obstruction (particularly, evidence obtained from the [CHS]) and intended to seek his remand based on such evidence." In other words, the Government advised the Court that it would not be disclosing the Obstruction Conduct to Irfan during trial because of the heightened risk of flight it would create. Once Irfan was convicted and in advance of the anticipated remand hearing, the Government immediately provided Irfan with approximately ten hearing exhibits and the § 3500 materials for the CHS, including approximately 17 recorded prior statements of the CHS that were relevant to the Obstruction Conduct.

Shortly before the post-verdict hearing was set to occur, however, the CHS began to exhibit symptoms consistent with a heart attack. Accordingly, he was taken to the hospital by FBI agents and was unable to testify. The Government proceeded to introduce evidence of the Obstruction Conduct through the hearsay testimony of Special Agent Julie Amato, the FBI's case agent for this matter, as well as documents, including a draft of the false affidavit that was sent to the CHS. (*See, e.g.,* Irfan Tr. 921-30; GX 4001). At the close of the hearing, the Court remanded Irfan based on his risk of flight, particularly in light of the "overwhelming" evidence presented against him at trial. (Irfan Tr. 948-51). In making that determination, the Court did not take into account the evidence of the Obstruction Conduct admitted through Special Agent Amato, but instead adjourned the hearing to a future date at which the Government could present its obstruction-related evidence to the extent that it was relevant to bail and/or an obstruction enhancement at sentencing. The Court then set the *Fatico* hearing for April 5, 2019.

## 2. The Defendants' 2019 Discovery Requests and Information Provided by the Government

In March 2019, Grainne O'Neill, Esq., whom the Court had previously appointed to represent Omar with respect to, among other things, the Government's allegations regarding the Obstruction Conduct, informed the Government that Omar wanted to participate in any *Fatico* hearing related to the Obstruction Conduct. Thus, on April 3, 2019, the Court adjourned the April 5, 2019 *Fatico* hearing until July 25, 2019 in order to allow Omar to participate in the proceedings. (Dkt. 943). The Government then produced to Omar the Obstruction Conduct discovery that had previously been produced to Irfan in October 2018.

On August 15, 2019 and August 28, 2019, Irfan and Omar each filed letters with the Court, respectively, requesting broad categories of discovery from the Government about the CHS and alleged "due process" violations based on claimed prosecutorial misconduct. (Dkt. 1020, 1027). Before filing these motions with the Court, the defendants had never raised any concerns with the Government about the disclosures that the Government had made ten months earlier relating to the CHS (in October 2018), nor had the defendants raised any issues alleging prosecutorial misconduct relating to the CHS. On August 29, 2019, the Government responded to the defendants' letter motions and suggested that the parties confer in the first instance about any discovery disputes. (Dkt. 1021). In response to the allegations made by the defendants, the Government appended an affidavit from Special Agent Amato detailing the FBI's relationship with the CHS. (Dkt. 1021, Ex. 1).[2] On August 30, 2019, the Court adjourned the *Fatico* hearing *sine die* and directed the parties to submit a joint status letter by September 16, 2019. (Dkt. 1029).

In advance of submitting a joint letter to the Court, the Government requested that the defendants set forth their discovery requests in letters; the defendants' joint requests are attached as Exhibits 1 and 2 hereto. On September 16, 2019, the parties submitted a joint status letter regarding the defendants' discovery requests. (Dkt. 1031). In the letter, the parties divided the defendants' requests into three broad categories: First, the Government agreed to search the

---

[2] On September 4, 2019, the Government filed an *ex parte* letter with the Court that supplemented the August 29, 2019 letter and provided additional facts of a sensitive and confidential nature.

files of the U.S. Attorney's Office for the Southern District of New York (the "USAO-SDNY"), the files of the FBI squad involved in the prosecution of the above-captioned case (the "FBI Prosecution Squad"), and the files of the U.S. Postal Inspection Service involved in the above-captioned case (collectively, the "Prosecution Team"). Second, the Government agreed to ask the CHS for certain information that the defendants had requested. Third, the Government objected to the defendants' requests for documents and information not known by, or in the possession of, the Prosecution Team, and other documents whose relevance the Government disputed. The parties advised the Court that they would update the Court about the status of the discovery disputes by October 16, 2019.

On October 8, 2019, the Government produced additional discovery to the defendants from the files of the USAO-SDNY and the FBI Prosecution Team, as it had committed to doing in the September 16, 2019 letter. This discovery included WhatsApp chats between Enotiades and the Amanats, and between Enotiades and other individuals concerning the Amanats that had been retrieved from cellphones used by Enotiades. (USAO_TUZMAN_0350080-89). The Government also produced the FBI reports documenting efforts made by the Government to identify certain materials that the defendants had requested, including through the CHS. For example, in one FBI report dated October 3, 2019 (3558-33), Special Agent Amato memorialized the details of a phone identified by Enotiades as containing conversations with the Amanats, as well as the process undertaken to identify responsive communications. In another FBI report dated October 7, 2019 (3558-35), Special Agent Amato memorialized a meeting between the FBI and the CHS at which he was questioned about whether there were additional cellphones (in addition to the ones on which the produced chats were found) he may have used during the time period of his communications concerning the Amanats.

Omar's counsel sent a further letter to the Government on November 5, 2019 (Ex. 3 hereto), which the Government responded to on November 13, 2019 (Ex. 4 hereto).

### 3. The Defendants' Additional Requests

The defendants filed their discovery motions on November 15, 2019. Exhibit E to Irfan's discovery motion summarized his nine remaining discovery requests, with a column indicating Irfan's view of what remained outstanding. Omar's Motion seeks 13 categories of discovery, as detailed on pages 13 through 19 of his motion.

The Government has satisfied its discovery obligations with regard to the contemplated *Fatico* hearing on the Obstruction Conduct. These efforts have included producing the Rule 16 and § 3500 material relevant to a hearing on the Obstruction Conduct. In addition, the Government has voluntarily produced FBI reports that detail the Government's efforts to question the CHS to gather all responsive information, including the identification of cellphones that may have been used by the CHS during the time period of his communications with the Amanats. The Government went beyond simply making a request that the CHS provide certain types of communications on his phones. After identifying such phones, an FBI agent sat with the CHS while relevant communications were exported. In addition, the Government has also voluntarily elected to pursue additional efforts to identify certain requested information beyond information in the possession, custody, and control of the Prosecution Team. For example, the Government

has made substantial efforts to contact the DEA agents and handlers for the CHS, including to confirm that the CHS' work for the DEA had no connection to the Amanats or this case.

On December 10, 2019, after obtaining additional information, the Government sent a letter to counsel providing additional information requested by Irfan and Omar, including: (a) information concerning various phones used by the CHS during the time period of communications with Amanats; (b) confirmation of the instances of testimony by the CHS; (c) additional information concerning the CHS's use as a source in SDNY investigations; (d) information gleaned from communications between the FBI Prosecution Squad and the CHS's DEA handlers; and (e) evidence of payments Enotiades received from the Amanats. The Government's letter is attached as Exhibit 5.

For ease of reference, the Government has included below charts summarizing the requests made by Irfan and Omar in their motions, and included a column indicating the Government's response.

Irfan Outstanding Requests (Exhibit E to Irfan Motion)

|   | Items Requested By Irfan Amanat | Has The Government Agreed To Provide These Items? | Is Irfan Amanat Requesting Additional Items? | Government Response |
|---|---|---|---|---|
| 1. | Communications between Irfan Amanat and Enotiades | Yes | No, if the Government has provided all communications. | N/A |
| 2. | Communications between Omar Amanat and Enotiades | Yes | No, if the Government has provided all communications. | N/A |
| 3. | A list of all Enotiades' government handlers | No | Yes | *The Government has contacted DEA agents and handlers to confirm work unrelated to Amanats. See Exhibit 5.* |
| 4. | A list of all payments Enotiades has received as a government informant | No, the Government has only agreed to question Enotiades regarding payments and not provide an accounting. | Yes and the Government should conduct an independent review. | *The Government has previously provided information about amounts paid to CHS by FBI and DEA. This information was based on both information from Enotiades and the FBI, including that neither the FBI nor the DEA has ever paid the CHS for any work related to the Amanats.* |

| | | | | |
|---|---|---|---|---|
| 5. | A list of all cases Enotiades has testified as a government informant/witness | No, the Government has only agreed to question Enotiades regarding prior testimony. | Yes and the Government should conduct an independent review. | *The Government took additional steps to confirm that Enotiades has only testified in the one disclosed case. See Exhibit 5.* |
| 6. | All communications between Enotiades and any government handler regarding the Amanats | No, the Government has only agreed to provide communications with the FBI prosecution squad regarding the Amanats. | Yes, all notes and reports from Enotiades DEA handlers regarding the Amanats. | *The Government took additional steps to confirm and disclose the limited extent of the CHS' communications with DEA handlers regarding the Amanats. See Exhibit 5.* |
| 7. | Any notes taken by Enotiades concerning the Amanats | Yes | No, if the Government has provided all notes. | *N/A* |
| 8. | Evidence of payments Enotiades received from the Amanats | No, the Government has only agreed to question Enotiades regarding payments from the Amanats. | Yes and the Government should conduct an independent review. | *The Government has provided bank records for the one bank account used to receive money from Omar. See Exhibit 5.* |
| 9. | Any reports concerning Enotiades drafted by any government handler concerning Enotiades' credibility | No. The Government has only stated that one time Enotiades was "deactivated" as a source by an agent in Cyprus. No reports have been provided. | Yes and the Government should conduct an independent review. | *The Government has voluntarily provided additional information on this point. See Exhibit 5.* |

## Omar Outstanding Requests

| | **Omar Request** | **Government Response** |
|---|---|---|
| 1. | Forensic copies of CHS's cell phones and chats | *As reflected in the produced FBI reports, the FBI has sat with the CHS while responsive information was exported from his phones. At a Fatico hearing, both the CHS and the FBI case agent will be able to authenticate this information.* |
| 2. | Backup of hardware used by the CHS | *Again, the FBI has worked with the CHS to identify and gather information from the CHS's electronic devices, such as the iCloud. No information relevant to the Amanats has been identified.* |
| 3. | Bank account numbers and statements for accounts used by the CHS for accounts that received money from Omar | *Produced. See Exhibit 5.* |
| 4. | Records of payment by the government | *Produced for payments related to the Amanats. See Exhibit 5.* |
| 5. | Records of communications with government agents | *The Government voluntarily asked Special Agent Amato to speak with the DEA handlers who dealt with Enotiades to confirm if there was relevant information related to the Amanats. There is not. See Exhibit 5.* |
| 6. | Government reports regarding Enotiades | *All FBI reports in the possession of the prosecution team have been produced, 35 in total. The Government voluntarily asked Special Agent Amato to speak with the DEA handlers that dealt with Enotiades to confirm if there who relevant information related to the Amanats. There is not. See Exhibit 5.* |
| 7. | Communications between Enotiades and Kola Aluko | *The Government has identified and produced communications between Enotiades and Aluko relating to the Amanats. Enotiades and Aluko had a pre-existing and separate relationship apart from the Amanats. Unrelated communications of this nature were not exported.* |
| 8. | Communications with certain other parties about Omar Amanat | *Omar provided the Government with a list of individuals with whom it believed the CHS spoke about Amanat. The Government has searched for and produced relevant communications in this category. See Exhibit 5.* |

| 9. | Communications between Enotiades and Doronin | *As the Government has indicated, no communications between Enotiades and Doronin have been identified, and the CHS has indicated there are none. Communications between the Government and a law firm representing Dorinin in a separate matter are not relevant to the CHS's testimony at the Fatico hearing on Obstruction Conduct.* |
|---|---|---|
| 10. | Notes of communications with Enotiades about Omar | *Produced.* |
| 11. | Notes or documents concerning Enotiades' travel | *As previously disclosed, all relevant information has been disclosed concerning the CHS's travel to Thailand and Australia.* |
| 12. | Enotiades' role in signing up cooperators | *The Government has previously provided information concerning sub-sources. The Government is not aware of Enotiades utilizing sub-sources with respect to the Amanats.* |
| 13. | Payments for consulting work | *Bank account records reflecting payments from the Amanats have been produced.* |

## Discussion

As set forth below, the Government has met and exceeded its discovery obligations. Before turning to the defendants' discovery requests and the Government's responses to them, the Government addresses the Prosecution Team's relationship with the CHS — as that informs the scope of the Government's disclosure obligations. As set forth below, the CHS is not part of the Prosecution Team, and the Prosecution Team has never tasked the CHS with investigating the Amanats. That said, the Government has made disclosures that exceed those that are required, which should largely moot the defendants' motion. The defendants' remaining discovery requests, particularly Omar's requests for communications between the Government and a law firm representing Doronin, are apparent attempts to fish through the Government's files to seek to determine what other frauds the defendants have committed that the Government may be investigating.

### A. The CHS Was Not Part of the Prosecution Team

#### 1. Applicable Law

Under Rule 16 of the Federal Rules of Criminal Procedure, the Government is required to produce documents that are in its "possession, custody, or control" and are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E). "Courts have typically required the prosecution to disclose under Rule 16 documents material to the defense that (1) it has actually reviewed, or (2) are in the possession, custody, or control of a government agency so closely aligned with the prosecution so as to be considered part of the prosecution team." *United States* v. *Finnerty*, 411 F. Supp. 28 428, 432-33 (S.D.N.Y. 2006) (citing *United States* v. *Chalmers*, 410 F. Supp. 2d 278, 290 (S.D.N.Y. 2006) (same); *United States* v. *Volpe*, 42 F. Supp. 2d 204, 211

(E.D.N.Y. 1999) ("Courts have construed the term 'government' in this rule narrowly to mean the prosecutors in the particular case or *the governmental agencies jointly involved in the prosecution* of the defendant, and not the 'government' in general.") (emphasis added); *United States* v. *Holihan*, 236 F. Supp. 2d 255, 260 (W.D.N.Y. 2002) ("[T]he prosecution alone is responsible for ensuring that Defendant is provided with information discoverable under Rule 16, including information that is in possession of other government agencies participating in the investigation.") (emphasis added); *United States* v. *Upton*, 856 F. Supp. 727, 749-50 (E.D.N.Y.1994) ("The key to the analysis . . . is the level of involvement between the United States Attorney's Office and the other agencies. . . . The inquiry is not whether the United States Attorney's Office physically possesses the discovery material; the inquiry is the extent to which there was a 'joint investigation' with another agency.") (emphasis added))).

Under *Brady*, the "prosecutor is presumed to have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to [ ] others acting on the government's behalf in the case, including the police.'" *United States* v. *Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (quoting *Kyles* v. *Whitley*, 514 U.S. 419, 437-38 (1995)); *see also United States* v. *Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995). "Nonetheless, knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt "a monolithic view of government" that would "condemn the prosecution of criminal cases to a state of paralysis." *Avellino*, 136 F.3d at 256 (internal quotation marks omitted) (citing *United States* v. *Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (declining to impute to the AUSAs prosecuting that action knowledge of reports prepared by FBI agents who were "uninvolved in the investigation or trial of the defendants-appellants"); *United States* v. *Quinn*, 455 F.2d 940, 944 (2d Cir. 1971) (declining to impute the knowledge of a Florida prosecutor to an AUSA in New York; rejecting as "completely untenable [the] position that knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor" (internal quotation marks omitted))). "A prosecutor is deemed to have constructive knowledge of information known to persons who are a part of the 'prosecution team.'" *United States* v. *Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015) (quoting *United States* v. *Stewart*, 433 F.3d 273, 298 (2d Cir. 2006)). "'[T]he relevant inquiry [for determining whether a person is a member of the prosecution team] is what the person did, not who the person is.'" *Barcelo*, 628 F. App'x at 38 (quoting *Stewart*, 433 F.3d at 298)). "Individuals who perform investigative duties or make strategic decisions about the prosecution of the case are considered members of the prosecution team, as are police officers and federal agents who submit to the direction of the prosecutor and participate in the investigation." *Barcelo*, 628 F. App'x at 38 (citing *United States* v. *Meregildo*, 920 F. Supp. 2d 434, 441 (S.D.N.Y. 2013)); *see also United States* v. *Abu Ghayth*, No. 98 Cr. 1023 (LAK) (Dkt. 1383) (S.D.N.Y. Nov. 26, 2013) ("The government is not obligated to search the files of other agencies not involved in this prosecution") (citing *United States* v. *Ghailani*, 687 F. Supp. 2d at 365, 70-72 (S.D.N.Y. 2010)); *United States* v. *Stein*, 424 F. Supp. 2d 720, 723 (S.D.N.Y. 2006).

2. <u>Discussion</u>

Largely ignoring this authority, the defendants argue that the Department of Justice as a whole is the "prosecution team," and that the Government's discovery encompass the entire Department of Justice. (Omar Br. 16-10; Irfan Br. 16-17). They are wrong. The relevant prosecution team is not the entire Department of Justice, but the lawyers and agents involved in the above-captioned case. *See, e.g., Avellino*, 136 F.3d at 255-56 (rejecting "a monolithic view of government"); *Barcelo*, 628 F. App'x at 38. The Prosecution Team consisted of the prosecutors at the USAO-SDNY involved in the above-captioned case (primarily AUSAs Damian Williams, Andrea Griswold, Joshua Naftalis, and Daniel Tracer), the Special Agents from the FBI Prosecution Squad involved in the above-captioned case (primarily Julie Amato), and the U.S. Postal Inspectors involved in the above-captioned case (primarily Melissa Atkin). No members of the Prosecution Team ever directed the CHS to contact or investigate the Amanats. (Amato Decl. ¶¶ 6, 13). Nor did the Handling Agent, who was not involved in the investigation of the above-captioned matter. (Amato Decl. ¶¶ 6-7, 13). Moreover, the DEA, while part of the Department of Justice, was never part of the Prosecution Team and never directed the CHS to contact or investigate the Amanats. (Amato Decl. ¶ 8). Simply put, the CHS was never part of the Prosecution Team.

What is more, the Prosecution Team first became aware that the CHS had been in contact with the Amanats in or about the summer of 2018 — months after Omar was convicted at trial. (Amato Decl. ¶ 9). Between approximately July and October 2018, the Prosecution Team debriefed the CHS about historical information that he had about the Amanats and their Obstruction Conduct, and subsequently made the appropriate disclosures to defense counsel. (Amato Decl. ¶¶ 10-16). Special Agent Amato "instructed [the CHS] that the FBI was specifically not asking or directing him to take any action with regard to the Amanats." (Amato Decl. ¶¶ 13).

Finally, there is no basis for the defendants' due process allegations — that the Prosecution Team, or any member of the Government, was attempting to interfere with the defendants' right to counsel or their decisions about whether to plead guilty or proceed to trial. The above chronology speaks for itself. The Prosecution Team did not even learn about the CHS's contacts with the Amanats until July 2018 — approximately six months after Omar was convicted. Indeed, the Prosecution Team did not learn that the CHS had introduced Omar to his trial counsel, Randall Jackson, until the summer of 2018. And it appears self-evident that the Amanats understood that Mr. Enotiades was a CHS because that is how Mr. Jackson knew him. Nor is there any basis for the defendant's claim that some other part of the Government — separate and apart from the Prosecution Team — directed the CHS to contact the Amanats or attempt to interfere with their right to counsel. The defendants' claims are speculation — claims made when faced with evidence that they attempted to obstruct justice by falsely creating evidence, again, to try to show that Government witnesses had been paid for their testimony.

B. <u>The Government Has Complied With and Gone Beyond Its Discovery Obligations</u>

The Government has complied with its discovery obligations in advance of the *Fatico* hearing on the Obstruction Conduct, and, indeed, has made productions that exceed the Prosecution Team's disclosure obligations.

As set forth above, following Irfan's conviction in October 2018, the Government provided Irfan with ten hearing exhibits relating to the Obstruction Conduct, along with § 3500 material for Enotiades, which consisted of notes and memoranda memorializing approximately 17 statements by the CHS to members of the Prosecution Team relating to the Obstruction Conduct. The same information was subsequently provided to Omar.

Since August 2019, when counsel for Omar and Irfan first requested broader discovery relating to the Obstruction Conduct, the Government has made additional disclosures, including the following. First, the Government has produced numerous WhatsApp messages between Enotiades and the Amanats, and between Enotiades and others about the Amanats. Second, the Government has also produced newly generated § 3500 material for Enotiades, as he has continued to meet with and make statements to members of the Prosecution Team. This 3500 has included FBI reports summarizing the FBI Prosecution Squad's efforts to identify responsive information, such as the identification of cellphones used by Enotiades during the relevant time period, and bank records reflecting payments from the Amanats. Third, in addition to its efforts to gather responsive information from the Prosecution Team, the Government has also voluntarily gathered and provided additional information regarding and about Enotadies, as detailed above, including asking members of the FBI Prosecution Squad to speak with DEA handlers to confirm that Enotiades' work for the DEA did not relate to the Amanats, gathering information to confirm the limited nature of the CHS's prior testimony as a Government witness and use as an informant in other SDNY cases, as outlined in Exhibit 5 hereto. The remaining requests, particularly the request for communications between the Government and a law firm representing to Doronin, have no nexus to the Obstruction Conduct, and should be denied.

## Conclusion

For the above reasons, the Court should deny the defendants' request for additional discovery and schedule a *Fatico* hearing on the Obstruction Conduct.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: /s/ _____
Andrea M. Griswold
Joshua A. Naftalis
Daniel M. Tracer
Assistant United States Attorney
(212) 637-1205/2310/2329