O'NEILL / HASSEN                                                          Attorneys at Law

March 13, 2020

<u>VIA ECF and Email</u>
Honorable Paul G. Gardephe
United States District Judge
United States Courthouse
40 Foley Square
New York, NY 10007

          RE:    *United States v. Omar Amanat,* 15 Cr. 536 (PGG)
                   Emergency Bail Application

Dear Judge Gardephe:

      We are writing to move the Court to grant Omar Amanat release pending his sentence. Mr. Amanat is within the group of people the Centers for Disease Control and Prevention ("CDC") has categorized as most-at-risk for dying from COVID-19, a dangerous illness spreading rapidly across the world, through New York State and within New York City. We have learned that a security officer at the United States Attorneys Office has tested positive and now the Bureau of Prisons has suspended all visits to the MDC. 18 U.S.C. § 3143 of The Bail Reform Act provides for the release of a defendant pending sentence. Mr. Amanat is not a flight risk and does not pose a danger to the community. Mr. Amanat has a history of strokes and his carotid artery is blocked. People with underlying heart and stroke conditions are at serious risk of serious illness and even death if they contract COVID-19. Mr. Amanat was hospitalized for a stroke while incarcerated in MCC. After a two-week period of quarantine he will be living at his parents' home in New Jersey. We asked the government for its position on this request

1 / P (646) 808-0997    4 / www.oandh.net
2 / F (212) 203-1858    5 / 25 Eighth Ave, Suite C, Brooklyn, NY 11217
3 / grainne@oandh.net    6 / 9213 2C82 E6F0 93EA D673 EA30 C7EB 7E03 1B1B 82FA

Hon. Paul G. Gardephe
Page 2 of 11

for bail and it has not responded. We move the Court to urgently grant Mr. Amanat bail, placing him on home detention and granting him time to find 3 financially responsible cosigners.

## I. Factual Background

### *Changed Circumstances: COVID-19 Outbreak*

As of March 12, 2020, the new strain of coronavirus which causes COVID-19, has infected over 132,300 people, leading to at least 4,954 deaths worldwide.[1] On March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic.[2] Governor Cuomo declared a State of Emergency on March 7, 2020.[3] Mayor DiBlasio declared a State of Emergency in New York City on March 12. 2020, and banned gatherings of over 500 people.[4]

As of March 12, 2020, there are 325 positive cases in New York State[5]; there are 95 positive cases in New York City.[6]

---

[1] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (March 12, 2020), *at* https://nyti.ms/2U4kmud (updating regularly).
[2] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020) *at* https://bit.ly/2W8dwpS.
[3] *At Novel Coronavirus Briefing, Governmor Cuomo Declares State of Emergency to Contain Spread of Virus*, New York State (March 11, 2020) *at* https://on.ny.gov/2TKzIoz.
[4] *DeBlasio Declares State of Emergency in NYC, and Large Gatherings Are Banned*, New York Times (March 12, 2020)
[5] *Novel Coronavirus (COVID-19),* New York State Department of Health (March 12, 2020) *at* https://on.ny.gov/2vfFQvy (updating regularly).
[6] *Coronavirus*, New York City Health (March 12, 2020) *at* https://on.nyc.gov/39ME7wU (updating regularly).

O / H

The CDC has issued guidance that individuals at higher risk of contracting COVID-19—adults over 60 years old and people with chronic medical conditions such as lung disease, heart disease, and diabetes—take immediate preventative actions, including avoiding crowded areas and staying home as much as possible.[7]  With confirmed cases in New York City that indicate community spread, we must take every necessary action to protect vulnerable populations and the community at large.

### *Conditions of Confinement and Spread of Coronavirus*

Prisons create the ideal environment for the transmission of contagious disease.[8]  Inmates cycle in and out of BOP facilities from all over the world and the country, and people who work in the facilities leave and return daily, without screening.  Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in federal pretrial detention centers.[9]  Many people who are incarcerated also have chronic conditions, like diabetes or HIV, which makes them vulnerable to severe forms of COVID-19.  According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[10]  Outbreaks of the flu regularly occur

---

[7] *People at Risk for Serious Illness from COVID-19*, CDC (March 12, 2020) at https://bit.ly/2vgUt1P.
[8] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.
[9] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf
[10] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-

O / H

in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[11] In China, officials have confirmed the coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases.[12] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[13] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[14] Brooklyn District Attorney Eric Gonzalez, joined by public health experts, has asked Governor Cuomo to grant emergency clemencies to elderly and sick prisoners.[15]

### Specific Conditions at the MDC

MDC Brooklyn and MCC New York have proven—recently and repeatedly—that they are unable to protect the health and safety of defendants in their custody. The MCC and MDC are massive pretrial detention facilities: the MDC houses approximately 1,600

---

President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.
[11] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY.
[12] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020) *at* https://bit.ly/2vSzSRT.
[13] Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020) *at* https://cnn.it/2W4OpV7.
[14] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020) *at* https://apnews.com/af98b0a38aaabedbcb059092db356697.
[15] *Coronavirus: Sentenced to COVID-19*, The Daily Appeal (Mar. 12, 2020) at https://theappeal.com

O / H

people. The majority of the people detained are housed in small two-man cells with a shared toilet and sink; they eat meals and have recreation in groups of 70 or more. Other units are open dormitories that house 70 or more inmates without the ability to separate. The medical care at MDC has repeatedly failed to adequately address even routine medical conditions such as diabetes, pregnancy, and anemia.[16] In times of crisis, the medical care has halted entirely.

For an entire week in January and February 2019, during the sub-zero temperatures of the "Polar Vortex," MDC Brooklyn went without power and heat, and inmates were locked down for days at a time.[17] Inmates were denied hot food or additional blankets or warm clothing, despite the frigid air inside the facility. Inmates with serious pre-existing physical and mental illnesses received no care.[18] Even the most basic efforts, such as moving inmates requiring sleep apnea machines to breathe to the available floors with electricity, were not taken.[19]

In granting downward sentencing variances in a series of cases after the blackout, Judge Chen noted that inmates at the MDC were "subjected to very cruel conditions," and that "there was a reluctance of the part of the officials [at MDC Brooklyn] to correct

---

[16] *E.g., National Association of Women Judges (NAWJ) Women in Prison Committee (WIP) Second Visit to BOP's Metropolitan Detention Center (MDC), Brooklyn, New York, June 3, 2016*, at https://bit.ly/39JRhdW.

[17] *See* Annie Correal, *No Heat for Days at a Jail in Brooklyn Where Hundreds of Inmates Are Sick and "Frantic,"* N.Y. Times (Feb. 1, 2019), *at* https://nyti.ms/2sXCIQg; Complaint, *Scott v. Quay*, 19-CV-1075 (MKB) (E.D.N.Y. Feb. 22, 2019), ECF No. 1.

[18] Complaint, *Scott v. Quay*, 19-CV-1075 (MKB) (E.D.N.Y. Feb. 22, 2019), ECF No. 1.

[19] *Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impacts on Inmates*, Office of the Inspector General, U.S. Department of Justice at 29 (September 2019) *at* https://oig.justice.gov/reports/2019/e1904.pdf.

O / H

the conditions or even to disclose them timely."[20]  Judge Furman reached the same conclusion: "It's pretty clear to me . . . that steps could have been taken, and taken more quickly, to address the problems [at the MDC].  And the bottom line is, the conditions that I read about are the conditions that one associates with a third world country and not a country like this, and nobody in detention . . . should have to endure that as the detainees did at the MDC."[21]

MCC New York demonstrated a similar inability to appropriately care for defendants just last week.  For eight days, every inmate endured a full lockdown, without access to family members or attorneys, while law enforcement searched for a loaded gun brought into the facility by a correctional officer.[22]  Federal Defenders of New York clients reported to attorneys that mice and water bugs ran through the units as guards unblocked holes in walls and vents that inmates had stuffed with clothing to prevent pests.  Inmates on one unit were forced to share one toilet among twenty-six people, and prevented from washing their clothing: prime conditions for the spread, rather than containment, of infectious disease.  On other units, toilets overflowed in two-man cells, spreading raw sewage.  Inmates with serious medical conditions, including AIDS and anemia, were denied medications or medical care.  Female inmates were denied feminine

---

[20] Tr. of Sent. Hr'g. at 12, *United States v. Acosta De La Rosa*, 18-CR-667 (PKC) (E.D.N.Y. Jun. 4, 2019) (ECF No. 16).  *See United States v. Bruney*, 18-CR-542 (PKC) (E.D.N.Y. 2019); *United States v. Douglas*, 18-CR-554 (PKC) (E.D.N.Y. 2019).
[21] Tr. of Sent. Hr'g at 31, *United States v. Ozols*, No. 16-CR-692 (JMF) (S.D.N.Y. Feb. 12, 2019) (ECF No. 31).
[22] *See* Stephen Rex Brown, *Strip Searches, Frozen Bologna Sandwiches and Wrecked Cells: MCC Inmates Detail Lockdown Due to Smuggled Gun*, N.Y. Daily News, Mar. 6, 2020, *at* https://bit.ly/2xqbgjw.

O / H

Hon. Paul G. Gardephe
Page 7 of 11

hygiene supplies.  No clean drinking water was provided; inmates were forced to drink from their bathroom sinks, from which brown water often ran.

To date, the MCC and MDC have not met even the most basic recommendations of the CDC for preventing the spread of the coronavirus.  Because of this, counsel has begun to encounter difficulties finding interpreters and experts willing to enter these facilities, and the many lawyers who are at high risk because of age or underlying medical condition have also been advised not to enter.  Both facilities are still waiting for guidance from the BOP on screening and treatment.  In the meantime, neither facility has a screening mechanism in place for staff or visitors, other than self-reporting.  The MCC lacks even a basic sign advising people who have traveled to the highest-risk countries not to enter.  Staff are not wearing face masks or gloves.  Neither facility has hand sanitizer available.[23]  MDC does not have has any testing for COVID-19 available, and does not know when, if ever, it will have tests.  There is no medical ward or facility in place at either institution.  At MDC, the only stated plan, should an inmate become symptomatic for COVID-19, is to confine that inmate to the SHU, where the cells are cold, rife with black mold, and the ceiling leaks directly onto the beds.

As additional people are arrested who have been out in the community as the coronavirus spreads, if they are not symptomatic, they will be brought into the MCC and MDC, and held with the existing population, potentially bringing COVID-19 into this

---

[23] On March 12, 2020, the Warden of the MCC advised that they are seeking to order hand sanitizer, and that the BOP has relaxed its strictures on hand sanitizer during this period.  The Warden had no information as to when hand sanitizer might arrive at the facility.

O / H

population held in large numbers, close quarters, and low sanitary conditions. On March 12, 2020, Magistrate Judge Orenstein decided that detaining a pre-trial defendant who was using drugs while on supervision would present too great a risk to the staff and inmates at MDC Brooklyn, ruling that part of the "danger to the community" calculus had to include the risk of a new inmate bringing the virus into the facility. *United States v. Raihan*, 20 Cr. 68 (BMC) (Mar. 12, 2020).

### Conditions Specific to Mr. Amanat's Unit in MDC

An inmate on Mr. Amanat's unit recently visited with family from Europe. That inmate has flulike symptoms, including a cough and fever. He has not been tested for COVID-19, and staff at the prison has indicated that he will not be tested.

Mr. Amanat shares a unit with 100 other prisoners. There is no soap at all in the showers and prisoners are bathing with just warm water. There is no hand sanitizer available and the staff indicate that it is not allowed because of its alcohol content. Mr. Amanat's unit also does not have any toilet paper available to inmates.

Investigator Katherine Carter visited Mr. Amanat at MDC this morning and reports that 1) there was no hand sanitizer anywhere on the facility. 2) BOP guards did not allow her to bring in hand sanitizer or wipes with disinfectant.

## II. **The Bail Reform Act Requires Omar Amanat Release**

A "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of

O / H

the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). The circumstances that existed when Omar Amanat was ordered detained have now changed. There is a pandemic that poses a direct risk to Omar Amanat that is far greater if he continues to be detained during this public health crisis.

Omar Amanat is uniquely vulnerable because he suffers from a serious heart condition - hyperlipidemia. This is a hereditary condition; two of Mr. Amanat's maternal uncles died in their late 40s of heart attacks. Mr. Amanat's right carotid artery is estimated to be between 50-70% blocked, and this has caused repeated Transitory Ischemic Attacks (TIA). When Mr. Amanat was housed in MCC, he was hospitalized for a stroke. The CDC has alerted us that stroke is one of the underlying medical conditions that may increase the risk for Covid-19 in individuals of **any age**.[24]

### III. Additional Factors for the Court's Consideration

**Parents illness:** Mr. Amanat's parents have been extremely ill for the past several months. Mr. Amanat's father, Sharif Amanat has metastatic prostate cancer that has spread to his brain. Mr. Amanat's parents are unable to visit Mr. Amanat in prison and after a period of quarantine, he would like to be able to care for his father in what may be his last days.

**Children.** Mr. Amanat has struggled to maintain contact with his children. His elder children were turned away from MDC on their most recent visits for wearing pants that closely resembled sweat pants. If he was released pending his sentence he would be

---

[24] *See,* "Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission" available at: https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf

O / H

able to heal the relationship with his eldest children and parent his younger children. Once sentenced, Mr. Amanat will likely be designated to a low security facility or to a camp where visitation will be more conducive to maintaining a traditional parent relationship. He has been primary caregiver to all six children and they have been financially devastated by his incarceration. The harm his incarceration has caused to his children has been incalculable.

**Nonviolent Crime.** Mr. Amanat is incarcerated for a non-violent crime. He is being housed in a maximum-security prison with deplorable conditions.

**Ramadan.** Ramadan begins on April 23 and Mr. Amanat will be fasting for a whole month while COVID-19 likely ravages the prison.

### Mr. Amanat's Advisory Guidelines Range will Likely Be Much Less than That which was calculated by the PSR

The PSR calculated Mr. Amanat's guideline range to be based on a loss amount of between $25,000,000 and $65,000,000. Mr. Amanat received a 22-point enhancement for this loss amount. On Counts 1-3 the PSR reports a loss amount of 7.3M, however the actual loss amount is under $6,500.[25] The loss amount for Court 4 was fully briefed and the subject of a *Fatico* hearing; we maintain that the loss amount for Count 4 should be zero.[26] . The record does not sustain a loss amount of  trial record does not support the $25,000,000 loss amount. The government has conceded that the losses are significantly lower. And other enhancements the probation office assessed for Mr. Amanat are likely

---

[25] *See,* #792, R. Jackson, Omar Amanat Sentencing Submission, p. 3 -6.
[26] *See.* #970, R. Jackson Supplemental Sentencing Submission

O / H

inapplicable.[27]  It suffices to say that Mr. Amanat's guideline range is sufficiently lower than was initially calculated in the PSR and he may have already served all or a majority of his sentence in the MCC and MDC.

## Conclusion

Mr. Amanat is not a flight risk – his entire family is in the New York/New Jersey area. He is not a danger to the community. His parents are elderly and ill. There is no reason to risk his health and possible life to detain him pretrial. After a quarantine period Mr. Amanat will be staying with his parents in what may prove to be their final moments.

We request that Mr. Amanat be released to home detention on his own recognizance with a condition that he must secure 3 financially responsible people to sign a $1,000,000 bond within a week of his release.

Kind regards,

Grainne E. O'Neill
Abraham J. Hassen
*Attorneys for Omar Amanat*

---

[27] *See,* #792 at 11.  The PSR has improperly included an enhancement for a substantial part of the scheme being committed outside the United States.  Omar Amanat Sentencing Submission, R. Jackson; id at 13. The PSR incorrectly imposes a four level enhancement for the defendant being a person associated with an investment advisor.

O / H