UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- against -<br><br>KALEIL ISAZA TUZMAN, and OMAR AMANAT,<br><br>        Defendant. | **MEMORANDUM<br><u>OPINION & ORDER</u>**<br><br>15 Cr. 536 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

    Defendants Kaleil Isaza Tuzman and Omar Amanat are charged with participating

in fraudulent schemes involving Maiden Capital – a North Carolina-based hedge fund operated

by Stephen Maiden – and KIT Digital, Inc. – a software management company based in Prague

and New York City.  ((S8) Indictment (Dkt. No. 198))  The (S8) Indictment charges

    Amanat with conspiring to commit wire fraud in connection with a scheme to defraud Maiden Capital investors between March 2009 and June 2012 (Count One);

    Amanat with substantive wire fraud in connection with that scheme (Count Two);

    Amanat with aiding and abetting investment adviser fraud carried out by Stephen Maiden – who operated Maiden Capital – between March 2009 and June 2012 (Count Three);

    Amanat and Tuzman with conspiring to commit securities fraud by manipulating the market for KIT Digital stock between December 2008 and September 2011 (Count Four);

    Tuzman with conspiring to commit wire fraud between March 2009 and March 2011 by participating in a scheme to defraud KIT Digital shareholders by failing to disclose that KIT Digital's investments in Maiden Capital were not part of an arms-length relationship but instead were related-party transactions entered into for an improper purpose (Count Five); and

    Tuzman with conspiring to commit securities fraud between 2009 and 2012 by making false statements to auditors and in U.S. Securities and Exchange Commission ("SEC") filings to conceal KIT Digital's true operating and financial performance.  (Count Six)

(Id.)

    Tuzman and Amanat proceeded to trial on October 23, 2017.  (Oct. 23, 2017

minute entry)  On December 26, 2017, the jury returned a verdict finding the Defendants guilty

on all counts.  (Verdict (Dkt. No. 627); Trial Transcript at 7280-82)  The Defendants await

sentencing.

               The parties dispute the Sentencing Guidelines loss amount for purposes of all six

counts of conviction.  On April 1 and 2, 2019, the Court conducted a <u>Fatico</u> hearing concerning

loss amount (Apr. 1, 2019 <u>Fatico</u> Hearing Tr. (Dkt. No. 953); Apr. 2, 2019 <u>Fatico</u> Hearing Tr.

(Dkt. No. 955)), and the parties have filed numerous and voluminous submissions addressing this

issue.  (<u>See</u> Amanat Sent. Br. (Dkt. No. 792); Tuzman Sent. Br. (Dkt. No. 793); Young Decl.

(Dkt. No. 794); Weitzman Decl. (Dkt. No. 795); Govt. Sent. Br. (Amanat) (Dkt. No. 807); Govt.

Sent. Br. (Tuzman) (Dkt. No. 808); Apr. 8, 2019 Joint Def. Ltr. (Dkt. No. 947); Tuzman Post-

Hearing Sent. Br. (Dkt. No. 965); Weitzman Supp. Decl. (Dkt. No. 966); Amanat Post-Hearing

Sent. Br. (Dkt. No. 970); Govt. Post-Hearing Sent. Br. (Dkt. No. 993); Tuzman Post-Hearing

Reply Br. (Dkt. No. 1012); Weitzman Reply Decl. (Dkt. No. 1013); Amanat Post-Hearing Reply

Ltr. (Dkt. No. 1014))

               For the reasons stated below, this Court concludes that (1) the loss amount for

Counts 1 through 3 (defrauding Maiden Capital investors) is $7.75 million; (2) the Government

has not demonstrated a loss amount for Count Four (market manipulation) with reasonable

certainty; (3) $1.15 million is a reasonable loss estimate for Count Five (wire fraud conspiracy in

which Tuzman caused KIT Digital to make improper investments in Maiden Capital); and (4)

$22.9 million is a reasonable loss estimate for Count Six (KIT Digital accounting fraud).

## BACKGROUND[1]

I. **THE PRESENTENCE REPORTS AND
PRE-*FATICO* HEARING SUBMISSIONS**[2]

A. **Presentence Investigation Reports**

The Sentencing Guidelines calculations set forth in the Probation Department's Presentence Investigation Report ("PSR") for Tuzman are premised on the fraud Guidelines provision (U.S.S.G. § 2B1.1) and begin with a base offense level of 7. (Tuzman PSR (Dkt. No. 774) ¶ 161) The Probation Department then imposes a 22-level enhancement because the loss amount was more than $25 million but less than $65 million. (Id. ¶ 162) The 22-level enhancement is premised on the Probation Department's conclusion that the loss amount for Count Four is $25.2 million;[3] the loss amount for Count Five is $1.15 million; and the loss amount for Count Six is $31.4 million. (Id. ¶ 160)[4]

A two-level enhancement is imposed because many of the acts constituting the fraud scheme were committed outside of the United States. (Id. ¶ 163) The Probation Department imposed a four-level enhancement because the offense substantially endangered the solvency or financial security of an organization – KIT Digital – and a further four-level

---

[1] Page citations in this opinion refer to the page numbers designated by this District's Electronic Case Files ("ECF") system. Citations to transcripts correspond to the pagination generated by the court reporter.

[2] This Court's May 3, 2021 Memorandum Opinion & Order ("May 3, 2021 Opinion") denying Defendants' post-trial motions summarizes the evidence at trial. (May 3, 2021 Opinion (Dkt. No. 1145)) Familiarity with the May 3, 2021 Opinion is assumed.

[3] The Probation Department notes that should "the methodology derived from the defendant's expert, Professor Ferrell, [be used,] the loss amount of Count Four is $11.5 million. Therefore, the total loss amount attributed to Tuzman is calculated as $44.1 million. However, under either calculation, Tuzman's total loss is still between $25 million and $65 million." (Tuzman PSR (Dkt. No. 774) at 60)

[4] Pursuant to U.S.S.G. § 3D1.2, the Probation Department grouped Counts Four, Five and Six. (PSR ¶ 160)

enhancement because Tuzman was an officer or director of a publicly-traded company.  (Id. ¶¶ 164-65)  The Probation Department concludes that Tuzman's total offense level is 39 and that his Criminal History Category is I, resulting in a Guidelines range of 262 to 327 months' imprisonment.  (Id. ¶¶ 172, 218)

The Sentencing Guidelines calculations set forth in the Probation Department's PSR for Amanat are likewise premised on U.S.S.G. § 2B1.1, and begin with a base offense level of 7.  (Amanat PSR (Dkt. No. 773) ¶ 160)  A 22-level enhancement is imposed because the loss amount is more than $25 million but less than $65 million.  (Id. ¶ 161)  The 22-level enhancement is premised on the Probation Department's conclusion that the loss amount on Counts One, Two and Three is $7.3 million,[5] and the loss amount on Count Four is $25.2 million.  (Id. ¶¶ 150-51)

A two-level enhancement is imposed because many of the acts committed as part of the charged fraud schemes were committed outside of the United States and/or involved the use of sophisticated means.  (Id. ¶ 162)  A four-level enhancement is imposed because Amanat was a person associated with an investment advisor – namely, he was associated with Maiden, and Amanat himself took control of Maiden Capital for a period of time.  (Id. ¶ 163; see also PSR at 47)  The Probation Department concludes that Amanat's total offense level is 35 and that his Criminal History Category is I, resulting in a Guidelines range of 168 to 210 months' imprisonment.  (Id. ¶¶ 170, 229)[6]

---

[5]  Pursuant to U.S.S.G. § 3D1.2, the Probation Department grouped Counts One through Four. (Amanat PSR (Dkt. No. 773) ¶ 160)

[6]  The Probation Department notes that, "using the methodology derived from the defendant's expert, Professor Ferrell, the total loss is estimated to have been $18.8 million.  If the Court finds the alternative estimation to be the correct loss amount, then the total offense level would be 33, with an advisory guideline imprisonment range of 135 to 168 months."  (Id. at 28 n.3)

B.    **Government Pre-Hearing Submission**
      **Regarding the Loss Caused by Tuzman**

According to the Government, the evidence at trial demonstrates that Tuzman "spearheaded three [fraudulent] schemes":  (1) a scheme to manipulate KIT Digital's stock (Count Four); (2) a scheme to fraudulently induce KIT Digital to invest money in Maiden Capital to facilitate the market manipulation scheme (Count Five); and (3) a scheme to inject tens of millions of dollars of fake revenue into KIT Digital (Count Six).  (Govt. Sent. Br. (Tuzman) (Dkt. No. 808) at 5, 7-16)  The Government endorses the PSR's determination of base offense level, all enhancements, and the PSR's Guidelines range of 262 to 327 months' imprisonment.  (Id. at 6, 17)

Although the Government agrees in its pre-hearing submission that a 22-level enhancement for loss amount is appropriate, the Government disagrees with the Probation Department as to the components of the loss amount.  The Government asserts that a "$10.4 million [loss is] attributable to Count Four; [a] $1.15 million [loss is] attributable to Count Five; and [a] $22.9 million [loss is] attributable to Count Six."  (Id. at 18)

According to the Government, the PSR's Count Four loss calculation – $25.2 million – relies on "U.S.S.G. § 2B1.1, application note 3(F)(ix) as a starting point for quantifying the loss amount from Maiden's manipulative trading."[7]  (Id.)

---

[7]  Application note 3(F)(ix) to U.S.S.G. § 2B1.1 provides:

> (ix) Fraudulent Inflation or Deflation in Value of Securities or Commodities. – In a case involving the fraudulent inflation or deflation in the value of a publicly traded security or commodity, the court in determining loss may use any method that is appropriate and practicable under the circumstances.  One such method the court may consider is a method under which the actual loss attributable to the change in value of the security or commodity is the amount determined by –

> (I) calculating the difference between the average price of the security or commodity during the period that the fraud occurred and the average price of the

According to the Government,

> the PSR began by calculating the increase in market capitalization during the manipulation period, . . . [and] next estimated how much of that increase was reasonably attributable to trading by Maiden Capital in furtherance of the conspiracy.  The calculation adjusted for consistency due to the 1:35 reverse split that occurred in March 2009.  This calculation results in a reasonable estimate of $25.2 million in inflated market capitalization attributable to Maiden Capital's manipulative trading in [KIT Digital] during the charged conspiracy.

(Id. at 18-19 (citations omitted))

The Government notes that Defendants' market manipulation expert, Professor Ferrell, testified at trial to a different stock split calculation.  (Id. at 19)  According to the Government, "[s]ubstituting Professor Ferrell's stock split figures would reduce the loss estimate to $11.5 million attributable to Maiden Capital. The above methodology results in a loss amount for Count Four of between $11.5 million and $25.2 million, depending on the stock-split methodology."  (Id.)

Acknowledging that Tuzman argues that "any apparent loss to investors from Maiden's trading is explained by other forces and the loss should be zero," the Government contends that it is possible to "segregate the impact of other potentially confounding forces" on

---

security or commodity during the 90-day period after the fraud was disclosed to the market, and

(II) multiplying the difference in average price by the number of shares outstanding.

In determining whether the amount so determined is a reasonable estimate of the actual loss attributable to the change in value of the security or commodity, the court may consider, among other factors, the extent to which the amount so determined includes significant changes in value not resulting from the offense (e.g., changes caused by external market forces, such as changed economic circumstances, changed investor expectations, and new industry-specific or firm-specific facts, conditions, or events).

U.S.S.G. § 2B1.1(b)(1), cmt. n. 3(F)(ix).

KIT Digital's stock price.  (Id.)  In this regard, the Government cites to a report prepared by its

market manipulation expert, Torben Voetmann, Ph.D.  (Govt. Sent Br. (Tuzman), Ex. A (Dkt.

No. 808-1) (the "Voetmann Report")))

        Relying on Professor Ferrell's event study, Dr. Voetmann "estimate[d] losses

related to Count 4 to be between $10.4 million and $82.0 million."  (Voetmann Report (Dkt. No.

808-1) ¶ 7, 17; see also Govt. Sent. Br. (Tuzman) (Dkt. No. 808) at 19-20; see id. at 20

(summarizing the three ways by which Dr. Voetmann calculated the loss amount to exclude

market, industry and firm-specific factors that could have potentially contributed to an increase

in stock price beyond Maiden's manipulative trading))  Voetmann's most conservative approach

yields a loss amount estimate for Count Four – the market manipulation count – of $10.4 million.

(Voetmann Report (Dkt. No. 808-1) ¶¶ 10, 28-30; see also Govt. Sent. Br. (Tuzman) (Dkt. No.

808) at 20)  As explained by the Government

> [t]he most conservative approach focused on days Maiden traded where Dr.
> Ferrell acknowledged there was both a "statistically significant positive abnormal
> return to the [Kit Digital] stock price" and "potentially confounding positive news
> about [Kit Digital]" could be excluded.  (Voetmann Report ¶ 30.)  Dr. Voetmann
> identified 22 trading days on which [Kit Digital's] actual stock price return was
> higher than the predicted return by a statistically significant amount according to
> Dr. Ferrell's event study.  (Voetmann Report ¶ 28.)  Dr. Voetmann then removed
> the 11 of these days on which there was a potential alternative explanation – other
> than Maiden's manipulative trading – for the statistically significant price
> increase.  Using this conservative approach, Dr. Voetmann was able to isolate
> approximately $10.4 million in actual loss to investors who purchased inflated
> [Kit Digital] shares directly attributable to Maiden's trading.

(Govt. Sent. Br. (Tuzman) (Dkt. No. 808) at 20)[8]

        The Government submits that the $10.4 million figure is the appropriate loss

amount for Count Four, the market manipulation count.  (Id. at 22)

---

[8]  Dr. Voetmann's highest loss estimate for Count Four is $82 million.  (Voetmann Report (Dkt.
No. 808-1) ¶¶ 7, 23; see also Govt. Sent. Br. (Tuzman) (Dkt. No. 808) at 20)

As to Count Five – which charges Tuzman with defrauding KIT Digital shareholders by causing KIT Digital to improperly invest in Maiden Capital – the Government argues that the PSR loss amount of $1.15 million for Count Five is appropriate, because that amount was a "'reasonably foreseeable pecuniary harm that resulted from'" Tuzman's offense. (Id. (quoting U.S.S.G. § 2B1.1, cmt. n. 3(A)(i)); see id. at 22-23 (asserting that Tuzman caused Kit Digital to wire $1.15 million in Maiden Capital despite knowing that Maiden Capital was in a "precarious financial position," "knee-deep in fraud and on the brink of collapse"))

As to Count Six – which charges Tuzman with conspiring to commit securities fraud based on accounting fraud at KIT Digital – the PSR calculates a loss estimate of $31.4 million, which is premised on a stock price decline that occurred in November 2012 after KIT Digital's issuance of a Form 8-K announcing errors and irregularities in its financial statements from prior years:

> After controlling for other market effects, the KIT digital stock price declined by $1.47 per share.  This price decline was used as a measure of inflation to estimate which investors purchased the stock at inflated prices and then sold shares subsequent to the disclosure.  The inflation period was pegged as starting on March 17, 2011, when the company started reporting revenue from fake contracts. This estimate only captures 75% of the shares outstanding:  therefore, the ultimate loss amount could be higher.

(Tuzman PSR (Dkt. No. 774) ¶ 154))

In its pre-hearing submission, the Government contends that the proper loss estimate for Count Six is $22.9 million.  (Govt. Sent. Br. (Tuzman) (Dkt. No. 808) at 24-26)  The Government's loss estimate is premised on an event study prepared by Cathy M. Niden, Ph.D. (Id. at 24-26; see also Govt. Sent. Br. (Tuzman), Ex. B (Dkt. No. 808-2) (the "Niden Report"))

In her report, Dr. Niden concludes that

• KIT digital's $1.35 per share (65.4%) stock price decline, net of market and industry effects, on November 23, 2012 in response to the November 21, 2012 8-

8

K disclosure was statistically significant;

• $1.35 per share (65.4%) is a reasonable estimate of the share price impact of the announcement of accounting errors and irregularities described in the November 21, 2012 8-K as related to Count Six; and,

• Estimated harm to shareholders from the Count Six accounting errors and irregularities is at least $22.9 million.

(Niden Report (Dkt. No. 808-2) ¶ 10)  In reaching these conclusions, Dr. Niden considered, <u>inter alia</u>, (1) the dates of the beginning and end of the period in which KIT Digital's share price was artificially inflated (the "inflation period"); (2) information concerning shareholders' transactions in KIT Digital stock during the inflation period; and (3) the amount of artificial inflation in share price, <u>i.e.</u>, the amount by which market participants who purchased during the inflation period overpaid for their shares.  (<u>Id.</u> ¶ 29)

C.    <u>**Tuzman's Pre-Hearing Submission Concerning Loss**</u>

Tuzman contends that the 22-level "loss amount enhancement should be substantially reduced, if not entirely eliminated, given that the government has not met its burden to show proximate cause, as well as the many factual distinctions between this case and those in which changes in market capitalization truly approximate the amount lost or gained in connection with the fraud."  (Tuzman Sent. Br. (Dkt. No. 793) at 13)[9]

In contending that no loss enhancement is appropriate, Tuzman makes the following arguments:

(1) the Government has not established that the offenses of conviction proximately caused the proffered loss amounts, and did not account for numerous confounding factors

---

[9]  Tuzman further argues that the four-level enhancement "for jeopardizing the solvency of a public company similarly should not apply, as the offenses of conviction are causally untethered from the Company's later voluntary bankruptcy."  (Tuzman Sent. Br. (Dkt. No. 793) at 13)  Based on his arguments that the loss and insolvency enhancements should be eliminated, Tuzman contends that his total offense level is 17, and that the applicable Guidelines range is 24 to 30 months' imprisonment.  (<u>Id.</u> at 14, 40, 66)

(id. at 40-51);

(2) the PSR's calculation of a $25.2 million loss for the market manipulation offense charged in Count Four is contradicted by the evidence and the Government's theory at trial (id. at 52-56); and

(3) the PSR's calculation of a $1.15 million loss for Count Five is flawed, because the loss resulting from the alleged wire fraud conspiracy – in which Tuzman improperly invested $1.15 million of KIT Digital funds in Maiden Capital – was not foreseeable to Tuzman.  (Id. at 56-58)

### D.    Government Pre-Hearing Submission Regarding the Loss Caused by Amanat

According to the Government, the evidence at trial demonstrates that Amanat "participated in two schemes, one targeting Maiden Capital investors [i.e., Counts One through Three] and the other targeting [KIT Digital] shareholders [i.e., Count Four]."  (Govt. Sent. Br. (Amanat) (Dkt. No. 807) at 6)  With regard to Counts One through Three, the scheme arose after Stephen Maiden invested millions of Maiden Capital's funds in Enable Invest ("Enable"), an investment fund operated by Amanat and his brother, Irfan Amanat.  (Id. at 7-8)  Maiden Capital's investment was lost, however, and Amanat, Irfan Amanat, and Maiden then "joined forces" to conceal Maiden Capital's losses in Enable, thereby defrauding Maiden Capital's investors.  (Id. at 11-13)  Moreover, after Enable lost Maiden Capital's initial investment, and then used Maiden Capital funds to redeem a portion of an investment KIT Digital had made in Enable, Amanat, Maiden, and Tuzman participated in a scheme to manipulate the market for KIT Digital stock, as charged in Count Four.  (Id. at 8-10)

In its pre-hearing submission, the Government endorses the PSR's determination of a base offense level of seven and a Guidelines range of 168 to 210 months' imprisonment. (Id. at 16-17)  The Government departs from the Probation Department's loss analysis, however.

The Government contends that "while the facts support a loss amount increase of

22 levels for Counts One through Four, as calculated in the PSR, a lower increase of 20 levels is also reasonable and reflects the low-end of the Count Four actual loss calculation" as set forth in the Voetmann Report.  (Id. at 17 (citing Voetmann Report (Dkt. No. 807-2) ¶ 30))  The Government thus "requests that the Court apply the more conservative increase of 20 levels" (id.), which correlates with a loss amount of at least $9.5 million.  See U.S.S.G. § 2B1.1(b)(1)(k).[10]

As to the components of the total loss amount, the Government contends – as to Counts One through Three – that "[t]he evidence established [that] Maiden Capital's investment in Enable was more than $3.5 million," that "Maiden testified that the particular amount of losses sustained by Maiden Capital investors was $7.75 million," and that "evidence also established that Maiden Capital's investors sustained a total loss of nearly $8 million when the firm imploded once the Enable losses were revealed."  (Govt. Sent. Br. (Amanat) (Dkt. No. 807) at 18)  The Government further argues that the "$7.75 million in losses sustained by Maiden Capital investors following Enable's collapse" was "'reasonably foreseeable pecuniary harm that resulted from'" the offenses charged in Counts One through Three.  (Id. (quoting U.S.S.G. § 2B1.1, cmt. n. 3(A)(i)))  Acknowledging that Amanat contends that he wired money to Maiden, however, the "Government does not object to offsetting the amount of the calculated loss by $500,000, resulting in a loss amount of $7.3 million for Counts One through Three."  (Id. at 20)

As to Count Four, the Government largely repeats the analysis it set forth in connection with Tuzman.  The Government again relies on Dr. Voetmann's analysis and his low-end loss estimate of $10.4 million.  (Id. at 20-25; see also Voetmann Report (Dkt. No. 807-2) ¶¶

---

[10]  The Government also seeks a two-point obstruction of justice enhancement due to Amanat's introduction of fabricated emails at trial.  (Govt. Sent. Br. (Amanat) (Dkt. No. 807) at 17)

30, 36)

The $7.3 million in losses caused by the offenses charged in Counts One through Three, and the $10.4 million loss resulting from the market manipulation charged in Count Four, result in a total loss of $17.7 million, which correlates with a 20-level increase under the Sentencing Guidelines.  (Id. at 25)

E.     **Amanat Pre-Hearing Submission Concerning Loss**

With regard to the Government's loss amount for Counts One through Three – $7.3 million – Amanat contends that the Government has not "offer[ed] any coherent explanation of how [it] arrived at [that] figure."  (Amanat Sent. Br. (Dkt. No. 792) at 3-4)  Amanat contends that the loss amount for Counts One through Three should be $3.5 million at most, representing "all of the [Maiden Capital] investor money that actually went to Enable."  (Id.)  Amanat later contends that "[a]t the very worst, [he] should be held responsible for the alleged amount that went out [of] Maiden Capital, reduced by the approximately $700,000 that the Government concedes [he] sent to Maiden Capital investors, which would amount to approximately $2.8 million."  (Id. at 6)  Amanat further contends that the Government has not "demonstrate[ed] that the actual loss at issue was reasonably foreseeable to [him] and that there [was] a causal link between [his] conduct and the loss amount."  (Id. at 4)

With regard to the loss amount for Count Four (market manipulation), Amanat complains that the Government did not "timely proffer a loss calculation and methodology."  (Id. at 7)  Amanat further contends that while purporting to adopt the methodology suggested in U.S.S.G. § 2B1.1, application note 3(F)(ix), the PSR and the Government ignore the application note's disclosure requirement.  (Id. at 7-10)  Amanat argues that here "the market manipulation scheme was never disclosed to the market while the stock was actively being traded," such that

the "entire metric is useless."  (Id. at 8)  Finally, Amanat contends that the alleged market

manipulation scheme did not lead to any actual loss.  (Id. at 10-12)

## II.     *FATICO* HEARING

On April 1 and 2, 2019, the Court conducted a Fatico hearing concerning loss

amount.  The Government called its two expert witnesses, Dr. Voetmann and Dr. Niden.  The

Defendants called no witnesses.

### A.     **The Government's Evidence**

#### 1.     **Dr. Voetmann's Testimony**

Dr. Voetmann has a B.S. in business administration and an M.S. in finance from

the Aarhus School of Business, and a Ph.D. in finance from the Copenhagen Business School.

(Apr. 1, 2019 Fatico Hearing Tr. (Dkt. No. 953) at 187; see also Voetmann Report (Dkt. No.

808-1) ¶ 1)  His academic focus has been on "the relationship between stock prices and financial

disclosures," and on "understanding how the capital market[s] respond[] to corporate events."

(Apr. 1, 2019 Fatico Hearing Tr. (Dkt. No. 953) at 188; see id. at 192 (Voetmann describing his

focus on econometrics))  Dr. Voetmann is a partner in the Brattle Group, a financial and

economic consulting firm, and is an adjunct professor at the University of San Francisco School

of Management.  (Id. at 188, 190)  He has also taught at the University of Pennsylvania's

Wharton School. (Id. 191-92)

Dr. Voetmann was retained by the Government to review the Government's loss

calculations regarding Count Four (market manipulation), to determine whether the

Government's calculations were reasonable, and to review a report prepared by the defense

expert, Dr. Ferrell, that "raised concerns with the methodology the [G]overnment had used to

calculate the losses."  (Id. at 194-96)  Dr. Voetmann also prepared a report concerning his

analysis.  (Id. at 196 (citing GX V1, the Voetmann Report))

Dr. Voetmann testified that "Dr. Ferrell had introduced an event study at trial," and prepared a report in which he expressed "concerns . . . about the presentenc[e] report and the [G]overnment's [loss] calculation, stat[ing] that the [G]overnment in its calculation failed to account for market movements, industry movements, and company-specific information."  (Id. at 199)  Dr. Voetmann further testified that Professor Ferrell's event study was a "tool that one could use to account for those factors."  (Id. at 199-200)

According to Dr. Voetmann, "[t]he purpose of an event study is to separately identify the individual impact of a specific event of interest relative to changes in the overall market and industry."  (Id. at 200)  "Dr. Ferrell's event study sought to go beyond simply how much the [KIT Digital] stock price went up and how much Maiden Capital is trading, but sought to look to remove other things that may have been impacting the stock price on those days." (Id.)  Dr. Voetmann explained that "Dr. Ferrell had constructed an index of ten companies in his event study.  And then he used those ten companies that he deemed to be comparable to KIT Digital. . . . He wanted to get a better understanding for exactly how did KIT Digital stock price move on a given day relative to its peer companies."  (Id. at 203)

Dr. Voetmann did not conduct his own event study; he instead "relied on Dr. Ferrell's event study for [his] analysis."  (Id. at 204)  Dr. Voetmann

> did several tests to see if the range that the [G]overnment calculated, the amount of losses they calculated, was reasonable.  And [he] applied some analyses and tests by accounting for the factors that Dr. Ferrell was concerned with. . . . [T]he market index, the industry index, company-specific information, as well as [Dr. Ferrell] was also concerned with that the [G]overnment, in its calculation, included days when Maiden Capital did not trade.
>
> So when [Dr. Voetmann] accounted for those four factors in [his] analysis, [he] came up with a range where – within 10.4 and 82 million.  And the [G]overnment's number, the calculation they came up with was within that range.

> So in [Dr. Voetmann's] opinion, the number that the [G]overnment calculated
> was reasonable.

(Id. at 205-06; see id. at 206-07 (Voetmann discussing the three steps of his methodology to test

the Government's loss calculation); id. at 207-14 (Voetmann explaining that his analysis yielded

various separate loss estimates, ranging from $10.4 million to $82 million))

> Dr. Voetmann arrived at his $82 million loss estimate by

> [l]ook[ing] at every day [during the conspiracy period] when the actual return was
> greater than the predicted return.  Now, "predicted return," . . . is the return
> adjusted for market and industry.  So the difference between that is what we call
> the residual return.

> So when you have on every single day during the conspiracy period where the
> actual return is greater than the predicted return, that's 242 days.  So just looking
> at those 242 days, accounting for the market and the industry and days when
> Maiden Capital did not trade, I get the first number, this is 82 million.

(Id. at 208; see id. at 209 (Voetmann explaining that, in this analysis, he "account[ed] for three of

the four concerns that Dr. Ferrell had . . . the market movements, . . . industry movements . . .

[and] days when Maiden Capital did not trade"; this analysis "did not account for . . . company-

specific information"))

> Dr. Voetmann arrived at his second loss estimate of $68.2 million by

> look[ing] only at the 242 days where there was an actual stock return that was
> greater than the predicted return.  But then [he] did an analysis of all the news
> articles that came out on every single day in the conspiracy period, these 694
> days.  And [he] identified days where there might have been a potential for
> confounding information.

(Id. at 209; 212; see id. at 209-210 (explaining that "confounding information" – or company-

specific information – includes events such as when a "company . . . announce[s] earnings," such

that "the return [potentially] went up because of the earnings," and not because of "the

manipulation"))  To account for confounding events, Dr. Voetmann searched Factiva – a public

database – to find news articles concerning KIT Digital.  (Id. at 210)

In connection with his third loss estimate – which involves two sub-estimates of $15.4 million and $10.4 million – Dr. Voetmann focused

> only on days where there was a statistically significant price movement.  So Dr. Ferrell introduced an exhibit . . . where he listed out 22 days with statistically significant price movements during the conspiracy period. . . . [Dr. Voetmann] . . . then focused on those 22 days to see, well, if [he, Dr. Voetmann] just focused on those [days], even though there was 242 days that had positive residuals, what would be the number, what would be the damages if we only included those 22 days.
>
> So [Dr. Voetmann] . . . look[ed] at these 22 days.  And those 22 days, because it's statistically significant, parses out the market and the industry.  [He] also removed the days that had no trading from Maiden Capital.  So out of the 22, there's only 17 left.
>
> So in that first calculation . . . [Dr. Voetmann] end[ed] up at 15.4 [million].  So that's the number you get on the low end, if you only included these 22 days that Ferrell pointed to as having – as statistically significant price movement.
>
> . . . .
>
> [Because Dr. Ferrell] raised a concern that . . . the [G]overnment should have control[led] for company-specific information . . . [Dr. Voetmann] looked at the 22 days and [he] removed the days where there was company-specific information[.]
>
> . . . . And again, to be conservative, to assume that any day where there is an article or news about KIT Digital that could have a positive impact, [Dr. Voetmann] just removed that to be conservative, as opposed to trying to parse out how much of that would be damages.  So that leaves us just with 11 days. And out of these 11 days, the damages would be 10.4 million.

(Id. at 212-14; see id. at 221-22 (testifying that $10.4 million is a conservative loss estimate))  In sum, Dr. Voetmann's most conservative analysis concerning Count Four yields a loss estimate of $10.4 million.  (Id.)

2.      **Dr. Niden's Testimony**

Dr. Niden holds an M.B.A. and a Ph.D. from the University of Chicago in finance.  (Id. at 8-9)  Dr. Niden is a financial economist for the SEC, where she is part of the "office of litigation economics."  (Id. at 9)  As part of her work, she analyzes "stock price movements."  (Id.)

The Government asked Dr. Niden to prepare a report "estimat[ing] [the] harm, if any, to KIT Digital investors stemming from the wrongdoings outlined in Count Six," the KIT Digital accounting fraud conspiracy.  (Id. at 13; see also GX F1 (Niden Report); GX F2 (KIT Digital's Form 8-K issued on November 21, 2012))

Dr. Niden testified that on November 21, 2012, KIT Digital issued a Form 8-K that "disclosed a revenue recognition accounting misstatement," such that "it would need to restate its financial statements . . . its filings with the SEC for [the years] 2009, 2010, and 2011, including interim quarters, and also the interim quarters that had been filed for 2012."  (Apr. 1, 2019 Fatico Hearing Tr. (Dkt. No. 953) at 15)  In the Form 8-K, KIT Digital "disclosed that prior financial statements should not be relied on."  (Id.)

November 23, 2012 was the next trading day after the Form 8-K was issued.  (Id. at 16-17)  That day, KIT Digital's stock price declined by 64 percent, amounting to $1.33 per share.  (Id. at 17)  Dr. Niden conducted an "event study" designed to determine "how much of KIT Digital's stock price decline on November 23 was attributable to KIT Digital specific information as opposed to other factors, such as market movements and industry movements. . . . [And she] review[ed] the total mix of public information[] in order to figure out if that stock price decline can be tied to specific disclosures."  (Id. at 17-18)  "[A]fter controlling for other factors, after controlling for the market and the industry, [Dr. Niden determined that] the stock

price decline which we referred to as an abnormal return or an abnormal price decline was . . . $1.35, and that decline was statistically significant." (Id. at 18)  She "conclude[d] that this measure of KIT Digital['s] . . . specific price decline is a reasonable estimate of the price impact of the accounting errors and irregularities it disclosed on November 21, and summarized in the 8-K as related to Count Six."  (Id. at 18-19)  Dr. Niden "opined that [the] estimated harm to KIT Digital shareholders was $22.9 million."  (Id. at 19; see also id. at 25 (Niden testifying that on November 23, 2012, KIT Digital's stock dropped 64%, or $1.33 per share, such that the abnormal return was 65.4% or $1.35 per share); id. at 20 (explaining that the difference between the actual return and the predicted return is the "abnormal return," which "reflects the impact of firm specific information disclosed on that day and other random fluctuations"); id. at 18-19, 26 (testifying that the "abnormal return" of $1.35 per share or 65.4% "is a reasonable estimate of the share price impact . . . of accounting errors and irregularities . . . described in the November 21, 2012 8-K as related to Count Six"); id. at 19, 38, 45 (testifying that the estimated harm to KIT Digital shareholders was at least $22.9 million).

## III.   POST-HEARING SUBMISSIONS

After the Fatico hearing, the parties filed another full set of briefing concerning loss amount.  Defendants attacked the Government experts' reports and analyses, while the Government defended its experts.  (See Tuzman Post-Hearing Sent. Br. (Dkt. No. 965); Weitzman Supp. Decl. (Dkt. No. 966); Amanat Post-Hearing Sent. Br. (Dkt. No. 970); Govt. Post-Hearing Sent. Br. (Dkt. No. 993); Tuzman Post-Hearing Reply Br. (Dkt. No. 1012); Weitzman Reply Decl. (Dkt. No. 1013); Amanat Post-Hearing Reply Ltr. (Dkt. No. 1014))

### A.   Tuzman's Post-Hearing Arguments

Tuzman presents a variety of arguments as to why Dr. Voetmann's "loss amount

18

estimates are methodologically unsound and unreliable." (Tuzman Post-Hearing Sent. Br. (Dkt. No. 965) at 18)

Tuzman first argues that Dr. Voetmann improperly equates stock price inflation with alleged losses to investors, in violation of Supreme Court and Second Circuit case law. (Id. at 20-24 (citing, inter alia, Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005); United States v. Rutkoske, 506 F.3d 170 (2d Cir. 2007); Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189 (2d Cir. 2003); United States v. Gushlak, 728 F.3d 184 (2d Cir. 2013)); see id. at 22 n.4 (collecting cases; stating that "[i]n civil securities fraud cases, courts routinely reject calculations that measure inflation rather than actual shareholder loss")) Tuzman notes that, at the Fatico hearing, Dr. Voetmann conceded that he used stock price inflation as a proxy for shareholder loss; he did not seek to measure any stock price decline caused by the market manipulation offense charged in Count Four. (Id. at 20, 23 (citing Apr. 2, 2019 Fatico Hearing Tr. (Dkt. No. 955) at 244)); see also Apr. 2, 2019 Fatico Hearing Tr. (Dkt. No. 955) at 247-48) Tuzman also cites Professor Ferrell's trial testimony that when the market manipulation conspiracy ended, there was no drastic drop in the price of KIT Digital stock. (Id. at 22 (citing Trial Tr. 6141-42))

Because Dr. Voetmann did not measure price declines in connection with Count Four and estimated only inflation, he did not "identify any person or class of person who lost any money trading in KIT Digital as a result of the charged scheme." (Id. at 23-24 (citing Apr. 2, 2019 Fatico Hearing Tr. (Dkt. No. 955) at 247-49, 263)))

Tuzman next argues that Dr. Voetmann's assumptions regarding causation are not supported by the evidence. (Id. at 24-28) Noting Professor Ferrell's testimony that his event study cannot determine cause – i.e., cannot be used to determine why KIT Digital's stock price

moved abnormally at various points (id. at 25 (citing Trial Tr. 6193)), Tuzman contends that "Dr. Voetmann incorrectly assumed that Professor Ferrell's event study was intended to, and did in fact, measure the effect the charged market manipulation conspiracy had on KIT Digital stock movements."  (Id. (citing Voetmann Report ¶ 14); see id. at 26 ("Professor Ferrell merely critiqued the Count Four loss amount calculation in the PSR for its failure to control for market, industry, and firm-specific factors that may cause stock price movements.  Professor Ferrell did not say that, after controlling for those market, industry, and firm-specific factors, the only remaining explanation for stock price movement is Maiden's market manipulation." (emphasis omitted)))

Tuzman also asserts that Dr. Voetmann erred "[i]n presuming that any positive residuals were . . . caused by Maiden's manipulative trading," contending that Dr. Voetmann "illogically ascribes to Maiden the ability to artificially inflate the price of KIT Digital stock, even where [Maiden's] trading activity [was] a miniscule amount compared to the daily volume."  (Id. at 26; see id. at 26-27 (noting that on two of the eleven days in Dr. Voetmann's "conservative" $10.4 million loss estimate, "Maiden was responsible for less than 0.5% of buy volume, a result rounded down to 0% in Dr. Voetmann's results," and that on another one of the eleven days, "Maiden was responsible for only 1% of volume"))  Dr. Voetmann offered "no analysis or economic literature that could explain how and whether Maiden in fact inflated the price of KIT Digital stock on days when he was such a small purchaser."  (Id. at 27 (citing Apr. 2, 2019 Fatico Hearing Tr. (Dkt. No. 955) at 339))  Tuzman also complains that Dr. Voetmann did not properly consider Maiden trades that were outside the scope of the market manipulation scheme.  (Id. at 27-28)

Tuzman further argues that Dr. Voetmann did not eliminate all potentially

20

confounding news reports, even from his most conservative loss estimate.  (Id. at 28-32)  Dr. Voetmann relied on Factiva, and that database did not capture all potentially relevant articles. (Id. at 29)  Tuzman lists five days – all of which are included in the 11 days that Dr. Voetmann uses to derive his most conservative loss estimate – on which confounding news article appeared. (Id. at 30-31; see id. at 31-32 (citing Dr. Voetmann's testimony that – if he had had access to a June 10, 2010 article reporting on Tuzman's filing of an SEC Form 4 – "'it's possible [that he] would have changed' his analysis and concluded that June 10 was a confounding date that should [not be included among the 11 days considered in his conservative loss estimate analysis]" (quoting Apr. 2, 2019 Fatico Hearing Tr. (Dkt. No. 955) at 359)))[11]

Tuzman further complains that "Dr. Voetmann presumes [that] any 'loss' on a given day was felt by the entire shareholder base.  This presumption is flawed."  (Id. at 33)  Only "shareholders who purchased at inflated peaks and held through to inflated troughs could have even arguably suffered any loss."  (Id.)  He also argues that Dr. Voetmann incorrectly included in his loss estimate KIT Digital shares held by Tuzman and Maiden.  (Id. 33-35)

Finally, Tuzman complains that Dr. Voetmann ignored (1) days on which KIT Digital's stock price decreased more than expected; and (2) Maiden's sales of KIT Digital stock. (Id. at 35-41)  Dr. Voetmann assumed that Maiden's buys were inflationary but did not consider Maiden's sales as deflationary.  (Id. at 37)  Tuzman also asserts that Dr. Voetmann's larger loss estimates (i.e., those greater than $10.4 million) should be summarily rejected for failing to (1) account for confounding news reports; and (2) confine results to those that are statistically significant.  (Id. at 39-41)

---

[11]  Although Dr. Voetmann testified as set forth above, he added that "if you look at that exhibit, again, with 11 days, I believe that day had a very minor if almost no impact on the 10.4 million." (Apr. 2, 2019 Fatico Hearing Tr. (Dkt. No. 955) at 359)

As to Dr. Niden, Tuzman presents multiple reasons why her opinions should be discounted.

Tuzman first argues that Dr. Niden "failed to account for the fact that the November 21, 2012 8-K was overbroad and insufficiently detailed and thus cannot serve as a proxy for the fraud of which . . . Tuzman was convicted." (Id. at 11; see also id. at 42-45)  The Government proved at trial "that there were 12 'sham [software] licenses' between 2010 and 2011, totaling approximately $26 million in improperly-recognized revenue," and that "approximately 8% of KIT Digital's revenue was over-reported." (Id. at 42-43)  According to Tuzman, these dozen fraudulent transactions involving tens of millions of dollars in phony revenue are "far less significant than the broad (and unquantified) 'accounting errors and irregularities' investors were led by the November 2012 8-K to believe [had] occurred." (Id. at 43)  The Government has thus not demonstrated the necessary causal link between the KIT Digital accounting fraud alleged in Count Six and the stock price decline that occurred after the November 21, 2012 Form 8-K was released. (Id. at 44-45)

Tuzman next argues that Dr. Niden "failed to exclude the effect of confounding news on the stock price." (Id. at 11; see also id. at 45-51)  According to Tuzman, "on the same day that KIT Digital filed the November 2012 8-K, it also submitted a notification of late filing of a quarterly report." (Id. at 47)  Dr. Niden did not "attempt to disentangle the stock price effect resulting from the notice of late filing." (Id.)  Similarly, Dr. Niden did not attempt to disentangle the effect of a press release issued by Tuzman on November 23, 2012, in which he complained that KIT Digital's new management was not engaging with him and private equity firms "'regarding a strategic transaction for the Company.'" (Id. (quoting Weitzman Supp. Decl., Ex. 28 (Dkt. No. 966-28) and citing Apr. 1, 2019 Fatico Hearing Tr. (Dkt. No. 953) at 138-39))

Tuzman further contends that Dr. Niden did not attempt to disentangle confounding news contained in the November 21, 2012 Form 8-K itself.  (Id. at 47-48; see id. at 49 (arguing that "analyst reports, published in the days following the November 2012 8-K, suggest that investors reacted to the confounding news incorporated in the Form 8-K disclosure – not just 'errors and irregularities'"))

Tuzman also contends that Dr. Niden "overestimated the loss amount by improperly assuming that the price of the stock was inflated by the same amount from November 9, 2011 through the November 2012 8-K."  (Id. at 11; see id. at 51-52 ("[E]ven assuming the November 21, 2012 8-K is an appropriate corrective disclosure for purposes of loss amount calculation (it is not), shareholders who had purchased KIT Digital stock at different times would have experienced a different amount of deflation after November 21, 2012.  They could not all have uniformly experienced the same $1.35 per share loss."))

Finally, Tuzman argues that the Count Six loss estimate "failed to accurately measure the losses resulting from the charged offenses that investors actually realized and offset by any realized gains in bankruptcy."  (Id. at 52 (emphasis in original); see also id. at 52-53)

In sum, Tuzman contends that the Government has not "reasonably determined a loss amount," and that accordingly "the Court should decline to apply any loss enhancement."  (Id. at 54)

## B.  Amanat's Post-Hearing Arguments

Amanat argues that (1) the Supreme Court and Second Circuit have rejected Dr. Voetmann's methodology for determining loss in a market manipulation case, which is premised on a theory of inflated stock price (Amanat Post-Hearing Sent. Br. (Dkt. No. 970) at 6-14); (2) even if Dr. Voetmann's methodology could be used to calculate loss in a market manipulation

case such as this, Dr. Voetmann did not properly apply his methodology (id. at 14-18); and (3) the correct loss amount for the market manipulation offense charged in Count Four is zero. (Id. at 18)

Citing Dura Pharmaceuticals, 544 U.S. at 342, and Rutkoske, 506 F.3d at 179, Amanat contends that an inflated stock price, standing alone, does not establish loss. (Id. at 6-14) According to Amanat, Dr. Voetmann's "analysis of loss looked only at the extent to which the stock price was purportedly improperly inflated, the precise analysis the Supreme Court rejected in Dura [Pharmaceuticals]." (Id. at 8 (emphasis omitted)) Dr. Voetmann did not determine "how much loss a theoretical victim investor had suffered" (id. at 8), and did not "identify a stock drop associated with the misrepresentation or fraudulent inflation being revealed or even simply ending. He could not do so, because there was no stock drop." (Id. at 10; see also id. at 8-10) According to Amanat, "[t]he Government has introduced no evidence of actual loss associated with the market manipulation scheme because they cannot introduce any evidence of actual loss." (Id. at 10-11)

Amanat next argues that even if Dr. Voetmann's methodology could be used to calculate loss in a market manipulation case, Dr. Voetmann did not properly apply his own methodology. (Id. at 14-18) Dr. Voetmann did not "isolate the days on which one could conclude that the inflation in the [KIT Digital] stock price was solely attributable to Maiden's trading and calculate the extent to which a rise in the stock price on those days could constitute a loss to investors." (Id. at 14-15) According to Amanat, Dr. Voetmann conceded that (1) "there were potentially confounding events that may not have been captured in the Factiva database he utilized"; (2) there was a significant rise in the overall stock market during the market manipulation conspiracy; and (3) there were multiple days during the alleged market

manipulation conspiracy in which KIT Digital's stock price rose significantly, but Maiden had not traded in KIT Digital stock.  (Id. at 15 (citing Apr. 2, 2019 Fatico Hearing Tr. (Dkt. No. 955) at 326, 328))

Amanat also complains that Dr. Voetmann did not disaggregate any stock inflation losses suffered by Amanat, Maiden, or Tuzman from losses suffered by other purchasers of KIT Digital stock.  (Id. at 16 (citing Apr. 2, 2019 Fatico Hearing Tr. (Dkt. No. 955) at 265, 268); see id. at 16-17)

Amanat also complains that Dr. Voetmann did not "disaggregate any rise in the stock price attributable to other criminal conduct" at KIT Digital, such as the accounting fraud at the company.  (Id. at 17-18 (citing United States v. Ebbers, 458 F.3d 110, 127-28 (2d Cir. 2006)))

Finally, Amanat emphasizes that "there was no drop in the stock price upon the termination of the manipulation scheme."  (Id. at 18)

Amanat concludes that the correct loss amount for the market manipulation offense charged in Count Four is zero.  (Id. at 18-20)

C.    **The Government's Post-Hearing Arguments**

As to the market manipulation offense charged in Count Four, the Government explains that Tuzman's expert, Professor Ferrell, criticized the PSR's method of calculating loss because of the absence of an event study that accounted for confounding factors.  (Govt. Post-Hearing Br. (Dkt. No. 993) at 10-11)  Accordingly, the Government retained Dr. Voetmann to "analyze Professor Ferrell's event study and [to prepare an] expert report [estimating loss]."  (Id. at 11; see also id. at 13 ("Professor Ferrell stated that the PSR's method of calculating losses relating to Count Four was 'flawed because, among other things, it fails to account for the

market, industry and company-specific factors that affected KIT digital's price between December 2008 and September 2011.'" (citation omitted); id. at 14 (stating that "[t]he Voetmann Report took Professor Ferrell's 'approach and results as a given,'" and that "Dr. Voetmann calculated the loss amount in three different ways, each designed to exclude market, industry, and firm-specific factors that may have contributed to an increase in stock price – as Professor Ferrell suggested in his report." (citation omitted)))  While Dr. Voetmann's loss estimates range from $10.4 million to $82 million, the Government asks the Court to rely on the $10.4 million figure.  (Id. at 11)

As to causation, the Government asserts that "Maiden testified that his trading was intended to inflate both the volume and price" of KIT Digital stock, and that "while it is true that an inference must be drawn to attribute causation to Maiden, that inference is amply supported by the trial record."  (Id. at 15-16)  The Government further contends that Tuzman's argument regarding Maiden's non-conspiracy related trading is a "red herring," because the $10.4 million loss amount is premised on the "eleven days where there is evidence in the trial record indicating that Maiden's trading on those days was in furtherance of the market manipulation conspiracy charged in Count Four."  (Id. at 17)  And while Tuzman argues that on certain days Maiden's trading accounted for a small percentage of the trading in KIT Digital stock that day, Tuzman "ignores the fact that Maiden's share of the market volume on each of the eleven days is proportional to the amount of loss that Dr. Voetmann attributes to Maiden for those days."  (Id.)

As to confounding news, the Government argues that Dr. Voetmann's use of Factiva was a "reasonable approach to identify[] information that would have been available to investors on the particular dates in question."  (Id. at 18)  And while Tuzman criticizes Dr.

Voetmann for not reviewing KIT Digital's "SEC files, investors calls, public appearances and other statements by the company," that information was contained in the sources Dr. Voetmann reviewed from the Factiva database.  (Id. at 18-19)  The Government also points out that "[t]wo of the five days that Tuzman argues have cofounding news – June 10, 2010 and May 10, 2011 – are also days that Dr. Voetmann attributed almost no loss [to Maiden's trading].  The[y] were also days where Maiden was less than five percent of the trading volume."  (Id. at 19 n.6)  The Government further argues that "even if the dates that Tuzman focused on are removed from consideration[,] . . . the remaining six days still have a total loss of $8.36 million.  In other words, the five days that Tuzman claims have confounding news account for only $2.04 million of out of $10.4 million of loss at issue."  (Id. at 20)

As to Tuzman's argument that Dr. Voetmann's loss estimate is "overly inclusive because it includes losses to participants in the manipulation conspiracy, specifically to Tuzman and Maiden" (id. at 20), "to narrow the issues . . . the Government does not dispute that Tuzman owned 57.82 percent of the company as of December 31, 2008 and that those shares should not be counted for purposes of loss."  (Id.)  Should the Court only consider (1) days in which "Maiden's trading was at least five percent of the volume" and (2) days as to which Tuzman has not alleged confounding news, the Government contends the loss amount would be $8.08 million.  (Id. at 20-21)  And should the Court "then only consider[] the shares not owned by Tuzman, 42.18 percent, the loss amount would still be $3.41 million."  (Id. at 21)  According to the Government, "crediting" all of Tuzman's arguments, "the applicable loss amount [for Count Four] is at least $3.41 million."  (Id.)

As to Defendants' arguments that Dr. Voetmann improperly relied on stock price inflation to determine investors' loss, the Government asserts that Defendants' "arguments are

inconsistent with [their] position at trial.  Having called Professor Ferrell as an expert witness at trial about his event study, Tuzman (and Amanat) cannot seriously argue that the methodology they put before the jury cannot be considered for purposes of sentencing." (Id. at 21)  The Government further argues that the Second Circuit has "made clear" that "the Government can meets it burden through expert opinion," and that the Defendants "misunderstand the difference between a typical securities class action and the market manipulation scheme for which they were convicted." (Id. at 21-22; see id. at 23 ("the fact that there was no 'corrective disclosure' does not mean that there was no loss to investors"))

As to the KIT Digital accounting fraud alleged in Count Six, the Government reasserts that a reasonable loss estimate is $22.9 million. (Id. at 4)  The Government contends that Dr. Niden (1) properly considered the effect of the November 21, 2012 Form 8-K, which is a "'reasonable estimate' of the share price impact of the fraud scheme charged in Count Six" (id. at 5 (citations omitted); see also id. at 5-6 (noting that Dr. Niden "'concluded that all of the elements disclosed in the 8-K were either directly tied to the Count Six accounting errors and irregularities, or were the consequences, the direct consequences of KIT Digital's needing to restate'" (quoting Apr. 1, 2019 Fatico Hearing Tr. (Dkt. No. 953) at 29)); id. at 6 ("Indeed, Dr. Niden testified that 'a full and complete disclosure by KIT Digital of the accounting errors and irregularities might have been worse than what was reported here in the 8-K, more negative.'" (quoting Apr. 1, 2019 Fatico Hearing Tr. (Dkt. No. 953) at 83)); id. at 7-8)); (2) found that there was no confounding news (id. at 7-9); (3) determined the KIT Digital stock was inflated by "at least" $1.35 per share (id. at 9); and (4) properly did not consider investor recovery resulting from KIT Digital's bankruptcy proceeding. (Id.)

As to Tuzman's argument "that the fraud he perpetrated 'only' increased revenues

by eight percent," the Government points out that the "sham revenues" associated with the phony software licenses "enabled [KIT Digital] to beat consensus revenue forecasts in the third and fourth quarters of 2011; were central to [KIT Digital's] fraudulent narrative to investors of growth; and allowed the company to report positive GAAP net income in the third quarter of 2011."  (Id. at 6)  As to Tuzman's argument that investors "overreacted" to the November 21, 2012 Form 8-K disclosures, the Government notes that KIT Digital's stock price continued to drop on the next trading day.  (Id.)

As to Tuzman's arguments that Dr. Niden improperly assumed that KIT Digital's stock price was inflated by the same amount throughout the conspiracy period and that Dr. Niden should have considered KIT Digital investors' recovery in bankruptcy, the Government contends that (1) Tuzman mischaracterizes Dr. Niden's opinion; and (2) investor recovery in bankruptcy is irrelevant.  (Id. at 9-10)

## DISCUSSION

## I.    LEGAL STANDARDS

Section 2B1.1(b)(1) of the Sentencing Guidelines provides enhancements for fraud offenses based on loss amount.  See U.S.S.G. § 2B1.1(b)(1).  For Sentencing Guidelines purposes, loss amount "is the greater of actual loss or intended loss."  Id. § 2B1.1, cmt. n. 3(A). "Actual Loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense."  Id. § 2B.1.1, cmt. n. 3(A)(i).  "Intended Loss" is defined as "the pecuniary harm that the defendant purposely sought to inflict," "includ[ing] intended pecuniary harm that would have been impossible or unlikely to occur. . . ."  Id. § 2B1.1, cmt. n. 3(A)(ii).  "Pecuniary Harm" is defined as "harm that is monetary or that otherwise is readily measurable in money."  Id. § 2B1.1, cmt. n. 3(A)(iii).   And "Reasonably Foreseeable Pecuniary Harm" is defined as the

"pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  Id. § 2B1.1, cmt. n. 3(A)(iv).

"[F]or purposes of calculating the offense level associated with theft and fraud offenses, '[t]he court need only make a reasonable estimate of the loss' resulting from the defendant's crime."  United States v. Abiodun, 536 F.3d 162, 167 (2d Cir. 2008) (quoting U.S.S.G. § 2B1.1, cmt. n. 3(C)) (emphasis in Abiodun).  Guidelines commentary instructs that "[t]he estimate of the loss shall be based on available information, . . .  such as . . . [t]he approximate number of victims multiplied by the average loss to each victim . . . [or] [t]he reduction that resulted from the offense in the value of equity securities or other corporate assets."  U.S.S.G. § 2B1.1, cmt. n. 3(c).

The Sentencing Guidelines contain "special rules" to "assist in determining loss" in cases involving fraudulent inflation or deflation in the value of securities or commodities:

> In a case involving the fraudulent inflation or deflation in the value of a publicly traded security or commodity, the court in determining loss may use any method that is appropriate and practicable under the circumstances.  One such method the court may consider is a method under which the actual loss attributable to the change in value of the security or commodity is the amount determined by –
>
> (I) calculating the difference between the average price of the security or commodity during the period that the fraud occurred and the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market, and
>
> (II) multiplying the difference in average price by the number of shares outstanding.
>
> In determining whether the amount so determined is a reasonable estimate of the actual loss attributable to the change in value of the security or commodity, the court may consider, among other factors, the extent to which the amount so determined includes significant changes in value not resulting from the offense (e.g., changes caused by external market forces, such as changed economic circumstances, changed investor expectations, and new industry-specific or firm-specific facts, conditions, or events).

Id. § 2B1.1, cmt. n. 3(F)(ix).

"While losses from causes other than the fraud must be excluded from the loss calculation, courts frequently calculate loss in securities fraud cases by relying on the change of market capitalization as a result of the disclosure of the fraud."  United States v. Kumar, 617 F.3d 612, 632 (2d Cir. 2010) (citations, quotation marks, and alteration marks omitted).

The Government bears the burden of proving loss by a preponderance of the evidence.  United States v. Desimone, 119 F.3d 217, 228 (2d Cir. 1997).

## II.   ANALYSIS

### A.   Counts One, Two, and Three Loss Amount

As discussed above, Counts One, Two, and Three charge Amanat with defrauding Maiden Capital investors.  (Indictment (Dkt. No. 198))  The PSR calculates the loss amount for Counts One through Three as $7.3 million.  (Amanat PSR (Dkt. No. 773) ¶ 150)

Although Amanat did not request a Fatico hearing as to Counts One through Three (see Amanat Post-Hearing Sent. Br. (Dkt. No. 970) at 19-20), he contends that neither the Probation Department nor Government has offered "any coherent explanation" as to why the $7.3 million figure is appropriate.  (Amanat Sent. Br. (Dkt. No. 792) at 3-4)  According to Amanat, "[e]ven the most aggressive view of the evidence, taking into account all of the investor money that actually went to Enable, could not support any conclusion that the loss was more than $3.5 million."  (Id. at 4)

Amanat asserts that by the time the charged scheme to defraud Maiden Capital investors began, "the bulk" of Maiden Capital investors' money had already been lost due to "bad trading," and the rest of the money was lost through "reckless and negligent trading activities."  (Id. at 4-6 (citing Trial Tr. 1089, 1091-92, 1094, 1118-20))  Amanat further argues that, "in the period leading up to the charged scheme, [Maiden] had defrauded Omar Amanat of

many millions of dollars, a figure that dwarfed the amount of money that Omar Amanat purportedly extracted improperly from Maiden Capital."  (Id. at 6 (citing Trial Tr. 1166 (Maiden testimony regarding Amanat's investment in Blue Earth Solutions))  According to Amanat, to the extent money "improperly went out of Maiden Capital to Enable, there is no reasonable way to conclude that these funds represented investor funds rather than funds that were improperly obtained by Maiden Capital" – through Maiden – as the result of a separate scheme he undertook to defraud Amanat.  (Id.)

In sum, Amanat argues that – as to Counts One through Three – there should be no enhancement for loss amount.  (Id.)  In the alternative, Amanat argues that the correct loss amount for these counts is $2.8 million, which is "the alleged amount that went out of Maiden Capital, reduced by the approximately $700,000 that the Government concedes [Amanat] sent to Maiden Capital investors."  (Id. (citing Tr. 1124))

The Government counters that the evidence at trial demonstrates that Maiden Capital's investment in Enable was greater than $3.5 million; that Maiden Capital investors sustained a total loss of $7.75 million when Maiden Capital collapsed following the disclosure that Maiden Capital's investment in Enable was lost; and that the losses sustained by Maiden Capital investors were reasonably foreseeable to Amanat, who "knew Maiden Capital's relative size and . . . the importance to Maiden Capital of the funds Maiden invested in Enable."  (Govt Sent. Br. (Amanat) (Dkt. No. 807) at 18)

Amanat's argument that Maiden Capital's investment in Enable had been lost before the charged fraud scheme began is not persuasive.  As discussed in this Court's May 3, 2021 Memorandum Opinion & Order, a reasonable jury could have found that in March 2009, Omar Amanat, his brother Irfan Amanat, and Maiden agreed among themselves to cover-up the

loss of Maiden Capital's investment, and took steps to mislead Maiden Capital investors about the loss of their money over the next two years.  (See May 3, 2021 Opinion (Dkt. No. 1145) at 9-14 (detailing Maiden's discovery that the Maiden Capital investment in Enable had been lost and the events that transpired afterwards))  Amanat's argument that Maiden defrauded Amanat in connection with a separate investment does not excuse or justify the fraud that the Amanat brothers and Maiden perpetrated on Maiden Capital investors.

Moreover, the evidence at trial showed that Maiden Capital invested more than $3 million in Enable and lost more than $3.5 million.  (See Trial Tr. 997-98 (Maiden testifying that he "lost over three-and-a-half million dollars of approximately a ten-million-dollar fund"); see also id. at 661 (Maiden testifying that Irfan Amanat told him that he "couldn't redeem any money of [his] Enable investment which by then was over $3 million"); see also May 3, 2021 Opinion (Dkt. No. 1145) at 4-9 (discussing Maiden's investments in Enable))  The evidence also demonstrated that Maiden Capital investors sustained a total loss of at least $7.75 million.  (See Trial Tr. 1168 (Maiden testifying that he owed defrauded Maiden Capital investors $7.75 million))

It is reasonable to hold Amanat responsible for the collapse of Maiden Capital, because the evidence showed that he was aware that Maiden Capital was a small fund, and that Maiden's investment in Enable represented a significant portion of Maiden Capital's total assets. (See Trial Tr. 626 (Maiden testifying about how he told Amanat that $2 million was "big percentage . . . of [his] fund," that he needed these funds to trade); see also May 3, 2021 Opinion (Dkt. No. 1145) at 4-15)

In the May 3, 2021 Opinion, this Court noted that at various points in 2011 Enable wired a total of $570,000 to Maiden.  (See May 3, 2021 Opinion (Dkt. No. 1145) at 11-

12, 14)  Approximately $510,000 of this amount was used to satisfy investor redemption requests.  (Id.)[12]  Acknowledging that U.S.S.G. § 2B1.1(b)(1), cmt. n. 3(E)(i) provides that the loss amount shall be reduced by "[t]he money returned . . .  by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected," this $510,000 was paid out to investors in 2011, and Maiden testified that – when Maiden Capital collapsed in the summer of 2012 – he owed his investors $7.75 million.  (Trial Tr. 1168)

        The Court concludes that the loss amount for Counts 1 through 3 is $7.75 million.

### B.    <u>Count Four Loss Amount</u>

        Both Tuzman and Amanat are charged in the market manipulation scheme alleged in Count Four (Indictment (Dkt. No. 198)), and their PSRs calculate the loss amount for Count Four as $25.2 million.  (Amanat PSR (Dkt. No. 773) at ¶¶ 151-52; Tuzman PSR (Dkt. No. 774) at ¶¶ 151-52)  As discussed above, both Defendants contend that the Government has not demonstrated any loss as to Count Four.  (See Tuzman Post-Hearing Sent. Br. (Dkt. No. 965) at 18; Amanat Post-Hearing Sent. Br. (Dkt. No. 970) at 18; Tuzman Post-Hearing Reply (Dkt. No. 1012) at 8; Amanat Post-Hearing Reply (Dkt. No. 1014) at 9)

        As to the Government, its estimates as to the loss flowing from Count Four have varied widely over time.  As noted above, the Defendants' PSRs – which presumably reflect the Government's loss analysis at that time – contain a loss estimate of $25.2 million for Count Four. (Amanat PSR (Dkt. No. 773) at ¶¶ 151-52; Tuzman PSR (Dkt. No. 774) at ¶¶ 151-52)

        After defense expert Ferrell submitted a report asserting that the PSR's method of calculating loss for Count Four was flawed, the Government retained Dr. Voetmann.  (See Govt.

---

[12]  With Amanat's knowledge, Maiden used approximately $60,000 of the $570,000 for living expenses.  (May 3, 2021 Opinion (Dkt. No. 1145) at 14)

Post-Hearing Br. (Dkt. No. 993) at 10-11)  Dr. Voetmann concluded that  the loss for Count Four

was between $10.4 million and $82 million.  (See Voetmann Report (Dkt. No. 807-2) ¶ 10)  In

light of Dr. Voetmann's analysis, "the Government asked the Court to use a reasonable estimate

of loss for the market manipulation conspiracy at the conservative end of the range calculated by

Dr. Voetmann – $ 10.4 million. . . ."  (Govt. Post-Hearing Br. (Dkt. No. 993) at 11)

        But after Tuzman pointed out that Dr. Voetmann had included in his loss estimate

losses sustained (1) by Tuzman and Maiden, participants in the alleged market manipulation; and

(2) on days in which confounding news articles were released, the Government argued that –

excluding Tuzman's holdings in KIT Digital stock and days in which confounding news articles

were released – "the loss amount would still be $3.41 million."  (Id. at 20-21; see id. at 23 ("The

Court should find that a reasonable and conservative estimate of harm to [KIT Digital]

shareholders from the fraud alleged in . . . Count Four is between $3.41 million and $10.4

million."))

        In sum, the Government has presented wildly different lost estimates for Count

Four.  Acknowledging that the Court "need not establish the loss with precision," and "need only

make a reasonable estimate of the loss, given the available information," United States v. Uddin,

551 F.3d 176, 180 (2d Cir. 2009) (citation and quotation marks omitted), the shifting estimates of

the loss associated with Count Four undermine the Government's argument that loss can be

reliably determined.  See United States v. Olis, Crim. No. H-03-217-01, 2006 WL 2716048, at

*9 (S.D. Tex. Sept. 22, 2006) (concluding that "it [was] not possible to estimate with reasonable

certainty the actual loss to shareholders"; while the government's expert "attempted to narrow

his estimates as much as accepted methodologies would allow, . . . the over four-fold difference

between his low estimate of $161 [million] and his high estimate of $714 million, persuade the

court that the government has not shown to a reasonable degree of certainty the actual loss to shareholders").

Moreover, the Second Circuit has emphasized that caution must be exercised in determining loss where the loss calculation is premised on a decline in stock price.  In United States v. Ebbers, for example, the court stressed that "loss must be the result of the fraud," that "[m]any factors" can cause a company's stock price decline, and that "[l]osses from causes other than the fraud must be excluded from the loss calculation."  458 F.3d 110, 128 (2d Cir. 2006).  There are reasons here to question even the Government's lowest estimate of loss.

For example, while the Government's lowest loss estimate of $3.41 million excludes Tuzman's holdings in KIT Digital stock – which as of December 31, 2008, amounted to 57.82 percent of the company – the Government does not address Maiden's holdings in KIT Digital stock.  Accordingly, the Government's lowest loss estimate still includes alleged losses sustained by a participant in the alleged market manipulation scheme.

There is also reason to believe that Dr. Voetmann's most conservative loss estimate – $10.4 million – does not account for all potentially confounding news.  When confronted at the Fatico hearing with a news article that Tuzman's counsel asserted was confounding news, Dr. Voetmann conceded that it is possible his analysis might have changed had he seen the article before issuing his report.  (Apr. 2, 2019 Fatico Hearing Tr. (Dkt. No. 955) at 359)

Finally, Dr. Voetmann's analysis uses a measure of stock price inflation as an estimate of loss.  (Id. at 244, 314)  Dr. Voetmann "did not look at the buy and sell of the[] individual investors" (id. at 247), and he did not attempt to measure any stock price decline

resulting from the alleged market manipulation.  Instead, he "only looked at the positive

residuals."  (Id. at 247-48)

              In Dura Pharmaceuticals, the Supreme Court stated that "[n]ormally, in . . . fraud-

on-the-market cases . . . an inflated purchase price will not itself constitute or proximately cause

the relevant economic loss":

> For one thing, as a matter of pure logic, at the moment the transaction takes place,
> the plaintiff has suffered no loss; the inflated purchase payment is offset by
> ownership of a share that at that instant possesses equivalent value.  Moreover,
> the logical link between the inflated share purchase price and any later economic
> loss is not invariably strong.  Shares are normally purchased with an eye toward a
> later sale.  But if, say, the purchaser sells the shares quickly before the relevant
> truth begins to leak out, the misrepresentation will not have led to any loss.  If the
> purchaser sells later after the truth makes its way into the marketplace, an initially
> inflated purchase price might mean a later loss.  But that is far from inevitably so.
> When the purchaser subsequently resells such shares, even at a lower price, that
> lower price may reflect, not the earlier misrepresentation, but changed economic
> circumstances, changed investor expectations, new industry-specific or firm-
> specific facts, conditions, or other events, which taken separately or together
> account for some or all of that lower price.  (The same is true in respect to a claim
> that a share's higher price is lower than it would otherwise have been – a claim
> we do not consider here.)  Other things being equal, the longer the time between
> purchase and sale, the more likely that this is so, i.e., the more likely that other
> factors caused the loss.

544 U.S. at 342-43 (emphasis in original).

              The Second Circuit has acknowledged that in Dura Pharmaceuticals "the Supreme

Court rejected [an] . . . 'inflated purchase price' theory of loss causation, which held that

plaintiffs in a civil stock fraud case could establish loss causation simply by showing that the

purchase price was inflated because of the defendants' misrepresentation."  Rutkoske, 506 F.3d

at 179.  Moreover, the Circuit has stated that Dura Pharmaceuticals provides "useful guidance"

for loss determinations in criminal cases.  Id.  Indeed, in Rutkoske, the Second Circuit said that it

saw "no reason why considerations relevant to loss causation in a civil fraud case should not

apply, at least as strongly, to a sentencing regime in which the amount of loss caused by a fraud is a critical determinant of the length of a defendant's sentence."  Id.

The logic of Dura Pharmaceuticals applies here.  Even assuming arguendo that (1) the market manipulation scheme charged in Count Four was successful in inflating the price of KIT Digital stock; and (2) Dr. Voetmann correctly excluded other potential causes, such as confounding news, the Government has not shown – for purposes of the market manipulation conspiracy – a decline in KIT Digital's stock price.  Nor has the Government offered any evidence as to the ownership of KIT Digital stock.  As in Dura Pharmaceuticals, there may be KIT Digital stockholders who suffered a loss as a result of the market manipulation, but there may also be KIT Digital stockholders who bought and sold and who suffered no loss.

Rutkoske does not demonstrate that the Government's various loss estimates are sufficient here.  (See Govt. Post-Hearing Br. (Dkt. No. 993) at 21-22)  In Rutkoske, the Second Circuit reiterated that the Guidelines permit a "reasonable estimate" of loss; that courts may rely on expert opinion in determining loss; and that "cases might arises where share price drops so quickly and so extensively immediately upon disclosure of a fraud that the difference between pre- and post-disclosure share prices is a reasonable estimate of loss caused by the fraud."  506 F.3d at 179-80.  But these points do not address the uncertainty here as to whether the market manipulation scheme charged in Count Four actually caused KIT Digital shareholders to suffer a loss.

Given the Government's shifting estimates of loss, the issues present in even the most conservative estimates of Dr. Voetmann and the Government, and the fact that Dr. Voetmann's analysis is premised on an inflated purchase price theory with no showing that any

KIT Digital investor suffered a loss as a result of the alleged market manipulation, the Court concludes that no loss enhancement as to Count Four is appropriate.

        **C.**    <u>**Count Five Loss Amount**</u>

        As discussed above, Count Five charges that Tuzman conspired to commit wire fraud by participating in a scheme to defraud KIT Digital shareholders by failing to disclose that KIT Digital's investments in Maiden Capital were not part of an arms-length relationship but instead were related-party transactions entered into for an improper purpose.  ((S8) Indictment (Dkt. No. 198))  Tuzman's PSR reflects a $1.15 million loss amount for Count Five.  (Tuzman PSR (Dkt. No. 774) ¶ 160)

        Tuzman objects to this loss estimate for Count Five, arguing that the Maiden Capital investor losses resulting from the charged wire fraud conspiracy were not foreseeable to him.  (Tuzman Sent. Br. (Dkt. No. 793) at 56-57)  Tuzman notes that the $1.15 million represents "the total amount of KIT Digital's investments in Maiden Capital" (<u>id.</u> at 56), and he contends that "the government did not allege and never proved that [he] knew that . . . KIT Digital's investments in Maiden Capital would be lost.  Rather, the evidence at trial amply demonstrated that . . . Tuzman was informed and believed that Maiden Capital was earning favorable returns for its investors, including KIT Digital."  (<u>Id.</u> at 57)

        Contrary to Tuzman's arguments, the evidence at trial demonstrated that he was well aware that Maiden Capital was in dire financial straits at the time he caused KIT Digital to wire money to Maiden Capital.  As discussed in this Court's May 3, 2021 Opinion, Tuzman was a participant in the March 8, 2009 telephone call during which Maiden was told that Maiden Capital's $3 million investment in Enable had been lost.  (May 3, 2021 Opinion (Dkt. No. 1145) at 9 (citing Trial Tr. 660-61))  At trial, Maiden testified that, on this call, he "was clear that it was

a complete disaster for [his] fund." (Trial Tr. 1952)  In response, the Amanat brothers and

Tuzman developed a plan to keep Maiden Capital afloat.  (May 3, 2021 Opinion (Dkt. No. 1145)

at 9-10)  As part of that plan, "[o]n March 10, 2009, Tuzman arranged for KIT Digital to wire

Maiden a $200,000 investment, which was designed – in part – to assist Maiden in satisfying

pending redemption requests," as well as to "manipulate KIT Digital's stock price."  (Id. at 10

(citing Trial Tr. 664, 675, 739, 1893, 1952))  And over the next three years, Tuzman, the Amanat

brothers, and Maiden conspired to cover up what they referred to as the "Enable hole," with

Tuzman and the Amanats transmitting funds to Maiden to satisfy investor redemptions – without

which the Defendants' fraudulent schemes would have come to light much earlier than 2012.

      In the May 3, 2021 Opinion, this Court noted that "[t]he conspiracy to defraud

Maiden Capital investors was closely related to a second conspiracy charged in Count Four," and

that "evidence at trial showed that Amanat, Tuzman, and Maiden all participated in the charged

conspiracy to manipulate the market for KIT Digital stock by inflating its value, in order to

position the company to be sold to private equity investors," such that "proceeds from the sale of

the company would be used to resolve the 'Enable  hole.'"  (Id. at 15 (citations omitted))  The

May 3, 2021 Opinion also recounts how "[i]n July or August 2009, Maiden told Tuzman that he

was 'desperate for cash' – such that he 'couldn't even purchase [KIT Digital] stock,'" and that

Tuzman then "made a personal investment of $250,000 in Maiden Capital."  (Id. at 18 (citing

Trial Tr. 1951, 1953, 1787-89, 1951); see also id. 17, 19 (discussing infusions of KIT Digital

funds into Maiden Capital))  In February 2011, "Tuzman sought to redeem his personal $250,000

investment in Maiden Capital," but "Maiden Capital did not have sufficient liquid assets to

satisfy Tuzman's redemption request."  (Id. at 19 (citations omitted))  Accordingly, "[t]o make

the redemption possible, Tuzman arranged for KIT Digital to invest an additional $250,000 into

Maiden Capital.  In causing KIT Digital to make this investment, Tuzman did not disclose his personal interest in the investment, and did not disclose Maiden Capital's liquidity problems." (Id. (citing Trial Tr. 1969, 2280-82))  And in July 2011, "Tuzman, Omar Amanat, and Maiden met at KIT Digital's offices in Manhattan for the purpose of agreeing on how to 'save Maiden Capital.'"  (Id. at 13 (citing Trial Tr. 886))

In sum, there was ample evidence that Tuzman was well aware of Maiden Capital's precarious financial condition at the time he caused KIT Digital to wire funds to Maiden Capital.  Accordingly, it was foreseeable to Tuzman that KIT Digital's $1.15 million investment in Maiden Capital would be lost.

The Court concludes that the proper loss amount for Count Five is $1.15 million.

### D.     Count Six Loss Amount

Count Six is premised on Tuzman's involvement in accounting fraud at KIT Digital.  Tuzman's PSR reflects a loss amount of $31.4 million for Count Six.  (Tuzman PSR (Dkt. No. 774) ¶ 160)  The PSR explains that this loss calculation

> is based on price declines that occurred in November 2012, once KIT Digital announced to the market that there were errors and irregularities in its historical financial statements. After controlling for other market effects, the KIT digital stock price declined by $1.47 per share.  This price decline was used as a measure of inflation to estimate which investors purchased the stock at inflated prices and then sold shares subsequent to the disclosure.  The inflation period was pegged as starting on March 17, 2011, when the company started reporting revenue from fake contracts.

(Id. ¶ 154)

After Tuzman objected to this loss estimate, the Government retained Dr. Niden to conduct an event study to estimate the losses associated with Count Six.  (Govt. Sent. Br. (Tuzman) (Dkt. No. 808) at 24; see also id., Ex. B (Dkt. No. 808-2) (Niden Report))

As discussed above, Dr. Niden concluded that KIT Digital's November 21, 2012 Form 8-K disclosure caused a statistically significant stock price decline on November 23, 2021, the next trading day:

- KIT digital's $1.35 per share (65.4%) stock price decline, net of market and industry effects, on November 23, 2012 in response to the November 21, 2012 8-K disclosure was statistically significant;

- $1.35 per share (65.4%) is a reasonable estimate of the share price impact of the announcement of accounting errors and irregularities described in the November 21, 2012 8-K as related to Count Six; and,

- Estimated harm to shareholders from the Count Six accounting errors and irregularities is at least $22.9 million.

(Niden Report (Dkt. No. 808-2) ¶¶ 9-10; see also id. ¶¶ 12-14 (explaining the event study methodology utilized); id. ¶ 17 (accounting for confounding news); id. ¶¶ 21-22 (explaining that the implications of KIT Digital's disclosures regarding its cash position "cannot be viewed separately from the accounting restatement which was necessitated as a result of the fraudulent conduct described in Count Six"); id. ¶¶ 27-28 (explaining that "[t]here is reason to believe Kit [D]igital's stock price contained artificial inflation by at least March 17, 2011," given that the company included "revenue from fake contracts in its reported financial results," thus enabling the company to "beat analysts' consensus forecasts"; concluding that after the company's 2011 third quarter disclosure of financial results, Kit Digital's "share price reflected artificial inflation of at least $1.35, and possibly a greater amount"; explaining why "November 9, 2011 [was selected] as the start of the inflation period for the purpose of estimating investor harm"))

Tuzman now complains that Dr. Niden improperly "assumed . . . that the stock price decline following" the November 21, 2012 Form 8-K disclosure "was an appropriate measure of the stock price inflation resulting from the offenses of conviction."  (Tuzman Post-Hearing Sent. Br. (Dkt. No. 965) at 11)  According to Tuzman, Dr. Niden did not account for the

fact that the November 21, 2012 Form 8-K is "overbroad and insufficiently detailed"; did not exclude confounding news; "overestimated the loss amount by improperly assuming that the price of the stock was inflated by the same amount from November 9, 2011, through the November 2012 8-K"; and did not account for certain investors' recovery in bankruptcy.  (Id. at 11, 52)

            As an initial matter, Dr. Niden's expert opinion that the November 21, 2012 Form 8-K correctional disclosure caused a statistically significant stock price decline is the type of evidence often relied on to demonstrate loss.  See Kumar, 617 F.3d at 632 ("courts frequently calculate loss in securities fraud cases by relying on the change of market capitalization as a result of the disclosure of the fraud" (citation and quotation marks omitted)); Rutkoske, 506 F. 3d at 179-80 ("'there is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines'"; "[n]ormally, expert opinion and some consideration of the market in general and relevant segments in particular will enable a sentencing judge to approximate the extent of the loss caused by a defendant's fraud" (quoting with approval United States v. Olis, 429 F.3d 540, 546 (5th Cir. 2005)))

            Dr. Niden testified that, via the November 21, 2012 Form 8-K, "KIT Digital disclosed a revenue recognition accounting misstatement" and "that it would need to restate its financial statements, . . . its filings with the SEC for . . . 2009, 2010, and 2011, including interim quarters, and also the interim quarters that had been filed for 2012.  It particularly disclosed that prior financial statements should not be relied on."  (Apr. 1, 2019 Fatico Hearing Tr. (Dkt. No. 953) at 15; see id. at 16 (Niden testifying that the November 21, 2012 8-K states in part: "'Accordingly [due to the errors and irregularities], investors should no longer rely upon the company's previously issued statements. . . . The accounting errors and irregularities relate

primarily to recognition of revenue related to certain perpetual software license agreements entered into by the prior management team in 2010 and 2011.'"))

Dr. Niden further testified that, on the next trading day after the Form 8-K was issued, KIT Digital's stock suffered a significant decline.  (Id. at 17)  Dr. Niden explained that her event study was designed to determine (1) "how much of KIT Digital's stock price decline [on the next trading day after the Form 8-K was issued] was attributable to KIT Digital specific information as opposed to other factors, such as market movements and industry movements"; and (2) "to review the total mix of public information, in order to figure out if that stock price decline can be tied to specific disclosures."  (Id. at 18)  After "controlling for other factors," Dr. Niden concluded that the statistically significant price decline that she found was "a reasonable estimate of the price impact of the accounting errors and irregularities . . . disclosed on November 21, and summarized in the 8-K as related to Count Six."  (Id. at 18-19)

At the Fatico hearing, Dr. Niden testified that, "absent firm specific information about KIT Digital, KIT Digital's stock price . . . would have been expected to go up [on November 23, 2012]."  (Id. at 24)  Instead, KIT Digital's stock price dropped significantly.  (Id. at 25)  In determining that $1.35 per share was a "reasonable estimate of the share price impact of the announcement of accounting errors and irregularities described in the November 21, 2012 8-K as related to Count Six," Dr. Niden "reviewed the total mix of public information as of November 23 of 2012.  And also going back in time to earlier periods for the year."  (Id. at 26; see id. (Dr. Niden testifying that "[t]he total mix of public information is a large body of materials, but it includes analyst reports, SEC filings by KIT Digital, news stories, conference call transcripts played a big role in these. So all of these comprised the total mix."))  Dr. Niden reviewed the "total mix of information" because she was trying to determine "what was

announced on November 23 that was new to the market.  Were there any elements of the

November 23 announcement that were already known.  And [she was] also evaluating, to an

extent, how much of a surprise an earlier announcement of this same information would have

been."  (Id. at 27)

         In sum, and contrary to Tuzman's arguments, Dr. Niden considered and rejected

the notion that the decline in KIT Digital stock price could have been caused by confounding

news.  Moreover, she determined "that all of the elements disclosed in the 8-K were either

directly tied to the Count Six accounting errors and irregularities, or were the consequences, the

direct consequences of KIT Digital's needing to restate."  (Id. at 29; see id. at 30-31

(acknowledging that the Form 8-K's discussions of  KIT Digital's "available cash in relation to

the amount of debt on [its] balance sheet" was "potentially confounding," but concluding that

this information was "not confounding" because this disclosure was "part of, and flowed directly

from, the fact that KIT Digital had to restate. . . . KIT Digital was only in a position of reporting

about its cash position because of the restatement itself."); see id. at 77-78 (testifying as to her

analysis of "how closely the 8-K tracks with what was described in the presentencing

investigation report as elements of Count Six"))  Dr. Niden also opined that, given the

circumstances, KIT Digital's late filing of its 10-Q would not constitute confounding news.  (Id.

at 155-56)

         In determining the effect of the Form 8-K disclosure, Dr. Niden considered the

"total mix of public information" concerning KIT Digital released over more than a year.  She

testified that she "looked at about every day extending back to at least November 9 of 2011,"

when KIT Digital had "issued a 10-Q . . . and held an earnings call.  And at that time, both the

company's commentary and analyst reaction to the company's commentary was very optimistic

about future performance." (Id. at 32)[13]  Dr. Niden testified that, in conducting an analysis that

went back to November 9, 2011, she was adopting a "conservative" approach.  In choosing to

begin the inflation period on November 9, 2011, Dr. Niden selected a date on which she "was

confident [that] there was at least $1.35 of inflation in the [KIT Digital stock] price."  (Id. at 39)

        Tuzman also complains that Dr. Niden concluded that KIT Digital's stock price

was inflated by the same amount throughout the conspiracy period (see Tuzman Post-Hearing

Sent. Br. (Dkt. No. 965) at 51-52), but this mischaracterizes Dr. Niden's testimony.  Although

Dr. Niden agreed with defense counsel's suggestion that her "analysis assumes that the price of

the stock was inflated by the same amount during the entire period prior to the fraud's

disclosure" (see Apr. 1, 2019 Fatico Hearing Tr. (Dkt. No. 953) at 64), Dr. Niden made clear that

she was saying that the inflation was "at least $1.35" during the conspiracy period.  (Id. at 39;

see also id. at 64 (testifying that an investor who purchased KIT Digital stock in February 2012

would have "paid at least $1.35 more than they should have"))  Dr. Niden did not testify that the

stock inflation remained at a constant $1.35 during the conspiracy period.

        Tuzman also contends that Dr. Niden's loss estimate does not account for KIT

Digital shareholders' potential recovery in bankruptcy, and that accordingly her loss estimate

---

[13]  In her report, Dr. Niden states:  "Prior to the open of trading on November 9, 2011, KIT digital announced its financial results for 2011 Q3, reflecting record quarterly revenue of $62.3 million, including $4.45 million from fake contracts that enabled the company to exceed the average analyst estimate of $61.3 million."  (Niden Report (Dkt. No. 808-2) ¶ 23)  Dr. Niden testified that KIT Digital "would not have been able to meet analysts' consensus forecast of revenue of 61.3 [million] if they hadn't had the extra revenue from the fake contracts."  (Apr. 1, 2019 Fatico Hearing Tr. (Dkt. No. 953) at 33)  "And all of this was important because the revenue from the fake contracts enabled the company to give the market an impression of higher growth prospects . . . including particular estimates in the earnings call that calculated organic growth for the quarter using the 62.3 million of revenue that was recognized."  (Id.; see id. at 35 (testifying that "the price of KIT Digital at the end of the day on November 9 . . . the stock price went up a lot."))

overstates investor losses. The Guidelines provide, however, that losses "shall be reduced by . . . money returned . . . by the defendant or other persons acting jointly with the defendant, to the victim <u>before the offense was detected</u>." U.S.S.G. § 2B1.1, cmt. n. 3(E)(i) (emphasis added). Tuzman is not entitled to a reduction in the loss amount based on a possible recovery by investors in bankruptcy court. <u>See</u> <u>United States v. Shkreli</u>, 15-CR-637 (KAM), 2018 WL 9539774, at *18 (E.D.N.Y. Feb. 26, 2018), <u>aff'd</u>, 779 F. App'x 38 (2d Cir. 2019) ("The Second Circuit repeatedly has held that loss in fraud cases includes the amount of property taken, even if all or part has been returned." (citations and quotation marks omitted))

The Court concludes that a loss estimate of $22.9 million for Count Six is a reasonable estimate.

## <u>CONCLUSION</u>

At sentencing, this Court will apply the loss estimates determined above for each count of conviction.

Dated: New York, New York
July 29, 2021

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge