UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
 UNITED STATES OF AMERICA,

                                        **15-CR-536 (PGG)**

            v.


 OMAR AMANAT,


            Defendant.
-------------------------------------X




<u>**SENTENCING MEMORANDUM**</u>
<u>**SUBMITTED ON BEHALF OF OMAR AMANAT**</u>




John Meringolo, Esq.
Meringolo & Associates, P.C.
375 Greenwich Street
New York, NY 10013

*Attorney for Omar Amanat*

## INTRODUCTION

This memorandum is respectfully submitted to assist the Court in determining an appropriate sentence for Omar Amanat, who was convicted, following a jury trial, of Conspiracy to Commit Wire Fraud (violation of 18 U.S.C. § 1349), Wire Fraud (violation of 18 U.S.C. § 1343), Aiding and Abetting Investment Advisor Fraud (violation of 15 U.S.C. §§ 80b-6 and 80b-17), and Conspiracy to Commit Securities Fraud (violation of 18 U.S.C. § 371).

Mr. Amanat has been imprisoned since his conviction on December 26, 2017—almost forty-four months ago. Mr. Amanat's long imprisonment at both the Metropolitan Detention Center (MDC) and Metropolitan Correctional Center (MCC) has been uniquely harsh due to the restrictive nature of pretrial facilities and the devastating impact of the COVID-19 pandemic in particular. Ultimately, it cannot be overstated that Mr. Amanat's long and harsh imprisonment during the COVID-19 pandemic militates greatly in favor of leniency, especially considering the serious consequences already endured by Mr. Amanat and his entire family.

For nearly 18 months, Mr. Amanat had no social visiting and limited communications with his six young children and his 81-year-old mother, who suffers from a multitude of medical ailments. Mr. Amanat was also unable to be present for his ailing father, who passed away during this time. By any measure, Mr. Amanat's 44-months of imprisonment,

overlapping with the COVID-19 pandemic, has been sufficiently punitive to achieve the aims of sentencing.

To be sure, notwithstanding the harsh circumstances of his confinement, Mr. Amanat has remained positive, and he has used his time in prison to strive towards self-improvement. As reflected by the many commendations of prison staff, Mr. Amanat has already demonstrated full rehabilitation: serving as a model inmate and providing aid to other inmates who are in need. In this regard, prison officials have noted that Mr. Amanat has been a "positive model for other inmates" (Letter of Rev. Steve Munn (Exhibit 1) and he "is very proactive, dependable, works hard, shows a great eleven of dedication and is looked up to amongst his peers" (Work Performance Rating Report, dated 7-27-18 (Exhibit 2)).

Perhaps most remarkable, Mr. Amanat has also worked tirelessly to help other inmates rehabilitate themselves through education. To date, he has assisted at least 27 inmates obtain their GED (*See* Positive Decision Report, dated July 31, 2018 (Exhibit 3)), and he has had a positive impact on the prison community generally (*See* Letter of Maalik Jones (Exhibit 4)).[1]

---

[1] Mr. Amanat has also taught a financial literacy re-entry course called "Moneysmart" to over 60 inmates, which helped inmates develop a re-entry plan to prevent recidivism. (*See* Exhibit 3). He also worked in the Chapel as an usher and giving sermons in religious services on themes such as tolerance and non-violence. (*See* Exhibit 1).

While the Defense recognizes the seriousness of Mr. Amanat's conviction, we respectfully urge the Court to conclude that no further term of incarceration is necessary under the circumstances. Indeed, Mr. Amanat has already served a considerable term of imprisonment and his personal circumstances, including his overwhelming familial support, employment history, charitable works, rehabilitative efforts while imprisoned, and his deteriorating health—made all the worse by his long and harsh imprisonment throughout the COVID-19 pandemic—favors a sentence tempered with great mercy under 18 U.S.C. § 3553(a). To this end, Mr. Amanat's long imprisonment and his demonstrated rehabilitation presents the precise example of hope and redemption deserving of a second chance.

Accordingly, we respectfully submit that a sentence of time served would be "sufficient, but not greater than necessary" to serve the goals of sentencing.

## HISTORY AND CHARACTERISTICS OF OMAR AMANAT

### 1. Early Life, Work History & Charity

Born on August 15th, 1972, in Queens, Omar Amanat is the second son of a working-class immigrant family. His mother grew up in Mumbai, India in a family where education was paramount. She attended a Catholic school and five sisters, including herself, were accepted into American universities on Fulbright and other academic scholarships; a feat rare for

women in India of the 1950's/60's. Mr. Amanat's father, just as hardworking, was accepted into a PhD program at Columbia University on scholarship and then opened his own medical laboratory business. Since both parents worked around the clock, Mr. Amanat's main caregiver was his father's 25-year-old sister who lived in their house and helped raise him.

Following his parent's good example, Mr. Amanat was also a hard worker by nature and driven to education. As a young adult, Mr. Amanat matriculated at the University of Pennsylvania, where he studied political science. PSR at ¶ 200. Later, he earned his Series 7 and Series 24 licenses. PSR at ¶ 203. As soon as he was old enough to work, Mr. Amanat did so, starting with odd jobs during high school and college, and going on to work as a trader at Citibank and founding several start-up companies thereafter, including a financial technology company called Tradescape. *See*, generally, PSR at ¶¶205-213. Once he began his professional career, Mr. Amanat was known for being the first person in the office each morning and the last to leave, trying to live up to the work ethics that his parents had instilled in him.

In addition to his professional successes, Mr. Amanat was also determined to use his understanding of western and eastern cultures in philanthropic ventures (see PSR at ¶ 207) and he sought to harness his entrepreneurial skills to help those less fortunate. As the vice president of

the Acumen Fund, a non-profit organization that "uses entrepreneurial approaches to solve the problems of poverty" (PSR at ¶ 208), Mr. Amanat used his entrepreneurial abilities to assist with the creation and distribution of bed nets for people living in rural communities in Pakistan, Indonesia, Egypt, Jordan, and other countries in the Middle East.

Concerning his first philanthropic venture, Mr. Amanat entered a partnership with the Harlem Youth Development Foundation, which focused on teaching disadvantaged minority teenagers and college students how to trade the stock market and code on Wall Street via a program Tradescape had developed.    Unfortunately, however, Mr. Amanat's plan to utilize Tradescape as a vehicle of charity was briefly upended due to the tragic terrorist attack of 9/11. As result of that terrorist attack, many of Mr. Amanat's friends and colleagues who had worked for the company were killed. As Chaplain Paul Sladkus explains:

> One morning at 8am, I was interviewing him on my radio "good news" broadcast with Dr. Enid Gortz who then headed HYDF. Our interview ran over and as a result he was late to a planned speech he was to give at 930am downtown. He received a call at the end of my interview informing him that the speech was cancelled because of an accident at the building. The building where he was scheduled to be that morning was the World Trade Center-the speech was in its Windows in the World top floor and the day was September 11th, 2001. He had 60 employees on the 82nd floor trapped by the flames. His close friends-including someone I had met at Tradescape's offices, Doug lrgang-died that day.

> He told me later that "I saved his life" because of the interview, but in truth he saved his own life--he was saved by the good he was doing for the community and for the world. Good deeds

merge and connect in intersecting circles like that as "Good Karma" has its own infinite reward.

After the events of September 11th, I recall in a recorded interview Omar telling me how he had "stopped asking himself questions like 'What's the value of his stock worth?' and started asking "More fundamental questions of life and death." After contemplating how he was just "minutes from perishing" in the planned speech and how he was saved by a single good deed, I recall him telling me that he as a 29 year old decided to dedicate the rest of his second life on service to others and began to quietly donate substantially all of his money to charity in order to begin fighting the "real war on terrorism" by strengthening moderate hands and fighting extremism head on in the Muslim world. These were more than just words. As with everything Omar does he manifests them into world changing action.

Letter of Chaplain Paul Sladkus (Exhibit 5).

While Mr. Amanat was devastated by this occurrence and the fact that he had narrowly escaped death on 9/11, he did not lose sight of his eagerness to provide charity to others. In fact, the physical loss of his company's office and the tragic passing of many of his many friends was a calling for Mr. Amanat to proceed further in his charitable endeavors and which sparked his quest to help heal his community from the confusion and unrest caused by the 9/11 attacks. In this regard, Dr. T. Nichole Argo, who embarked with Mr. Amanat on a scientific study at Harvard and MIT to investigate the intersection of religious/racial violence and the media, recounts for the Court her first meeting with Mr. Amanat and his unwavering dedication to assist his community after the attacks of 9/11:

When I first came to know Omar, he was impassioned about how to heal Muslim-American relations in the world, and in particular, in the United States. I remember his emotional

recounting of how he'd survived the attack on the World Trade Center where most of his employees were trapped. His life had taken on new meaning, and it seemed to emanate from him. You could not have imagined a more inspirational, authentic, honest speaker, or someone more capable of putting his words into action.

As our ideas for a study program grew into reality, I watched in admiration as Omar drew others to the cause, linking media and political personalities to the nuts and bolts science of intergroup dynamics, including Omar's partners at the Alliance of Civilizations which included several founders and early employees of EBay, Google and You Tube....

Our subsequent research project spanned approximately three years from start to finish and produced novel scientific contributions on the subjects of humiliation, the importance of one's power status when implementing conflict reduction exercises, and the ways that individuals are impacted by imagery of intergroup aggression. Our research project also made this issue a priority for script-writers and producers in Hollywood. None of this would have happened without Omar's ability to envision and implement what was, truly, a scientific dream.

Letter of Dr. T. Nichole Argo (Exhibit 6).

In addition to this noble quest, Mr. Amanat also decided to donate a substantial portion of his time and wealth to charity. Speaking to Mr. Amanat's charitable contributions, Chaplain Paul Sladkus explains,

I can personally vouch for Omar as an unqualified positive force in the community. Benjamin Franklin once wrote "Your net worth to the world is usually determined by what remains after your bad habits are subtracted from your good ones." In this sense Omar's net worth to the world -whatever his mistakes may have been in this case-- make him a true billionaire- because he impacts close to a billion people for good. Those who know him as long as I have know he quietly donated most of his wealth long ago and lives modestly as a "renunciate," but I recently added up all the people his charity projects have touched and they impact close to 1 billion lives. 500 million Africans suffer from Malaria, Acumen touches 125 million people annually and Human Rights Watch helps

> citizens all over the world from over 100 countries. From the
> slums of Nairobi, to refugee camps in Ramallah to the streets
> of Harlem, Omar has changed the world -for the better.

Letter of Chaplain Paul Sladkus (Exhibit 5).

In addition, while serving as Vice President and Vice Chair of The Acumen Fund (a non-profit organization), as discussed *supra* at p. 3, Mr. Amanat raised the Fund's profile and increased its impact until Acumen was named one of the 5 Charities "changing the face of philanthropy". Remarkably, after being subject to numerous Harvard Business School case studies, Acumen has proven to have had a positive impact on the lives of over 309 million people who live on less than $1 a day. *See* Case study: Acumen, *Classifiying a fund's impacts using the IMP+ACT Classification System* (July 2020), *available at* https://acumen.org/wp-content/uploads/IMP-ACT-Acumen-Case-Study.pdf.

Notably, Mr. Amanat also went on to join the Global Board of <u>Human Rights Watch,</u> leading its efforts to shine a light on some of the most oppressive Muslim regimes in the Middle East; and he became a founding board member of <u>Malaria No More</u>, which, in its 14 years of existence, has made amazing progress toward its goal to eradicate the disease: deaths of children under five years of age in Africa have decreased by 50% and 6.8 million lives have been saved. Mr. Amanat also expanded <u>Sunflower Children</u> with his ex-wife Helena to provide basic resources for over 10,000 orphans in eight different countries, including Cambodia, India,

Nicaragua, Brazil and the Philippines. *See, e.g.*, Letter of Helena Houdova (Exhibit 7); Photos of Omar Amanat (Exhibit 8); *Sunflower Children Statement* by Helena Houdova, *available at* https://www.youtube.com/watch?v=XmgBIyIWYOY;.

As exhibited above and outlined in the letters from Mr. Amamnt's friends, family, and colleagues, it cannot be overstated that Mr. Amanat's humanitarian and charitable efforts are both extraordinary and exemplary. By any measure, Mr. Amanat's history presents an exceptional record of civic, community and global philanthropic engagements.[2] Indeed, as result of his many good works, Georgetown University listed Mr. Amanat as one of the "Top 500 Most Influential Muslims in the World" in 2016. *See* The Muslims 500, *The World's 500 Most Influential Muslims* (2016).[3] Speaking to this meritorious acknowledgment by Georgetown University, Professor Cynthia P Schneider notes,

> The citation for Omar Amanat in the "Muslim 500" perfectly captures his important contributions to the post 9/11 and his dedication to peace building, "connects the western world with the Muslim world in a way few can claim and does so by promoting peaceful reconciliation between even the most bitter of enemies."

Letter of Professor Cynthia P Schneider (Exhibit 9).

---

[2] Georgetown University also listed Mr. Amanat as one of the "Top 500 Most Influential Muslims in the World" in 2016. *See* The Muslims 500, *The World's 500 Most Influential Muslims* (2016), at 161 (available at: https://themuslim500.com/wp-content/uploads/2018/05/TheMuslim500-2016-low.pdf).

[3] https://themuslim500.com/wp-content/uploads/2018/05/TheMuslim500-2016-low.pdf

Aside from Mr. Amanat's many charitable contributions and good works generally, he has also directly impacted the lives of many of his friends and family members in other meaningful ways. In their letters to the Court, many of Mr. Amanat's family, friends, and colleagues provide a detailed accounting of Mr. Amanat's many positive character traits and his ability to be a positive contributor to his community. Indeed, as cited directly below, many of the stories told about Mr. Amanat by those who know him personally are truly remarkable:

> After graduating from high school, I joined the United States Marine Corps on the eve of the Persian Gulf War. After training in Okinawa and being injured on duty in a difficult experience, I got an early honorable discharge and came back to our hometown a changed man, suffering from PTSD and depression....He took me under his wing and helped nurture me back to normalcy. It took time and alot of patience and perseverance. During one particularly difficult evening after Hurricane Sandy had devastated our little neighborhood in New Jersey, Omi organized cleanup and rescue efforts with friends and family and tasked me with leading the team. I remember the moment I felt I had returned back to being myself again. I recall whatever equanimity I'd managed to display--perhaps most of it--had really been his. With him I'd been strong and able to cope again. He was the first man I'd spent time with since the marines who'd had that effect on me. I recognized in him qualities I'd only seen in a few Marines. He was the kind of man that tough marines call a *hundred-percenter*. The kind of man who'll put his life on the line if he calls you his friend. The kind who'll put his shoulder beside yours, without question or complaint and stand with you against any odds.

Letter of Kamran Chaudhri (Exhibit 10).

> I used to volunteer with the local Doctors Without Borders/Médecins Sans Frontières (MSF) chapter in Mumbai

which along with a few other local organizations provided first aid and Health care clinics to many slums in India and Pakistan. When Omi visited on this particular trip he stayed with me for 2 weeks living in the luxurious Taj Hotel on the condition that he spend one week living inside the Colaba slum itself in a 12x10 foot cardboard "home" which was what most slum dwellers stayed in. Here he saw with his own eyes near where his own mother grew up, near the splendor and squalor of life-juxtaposed to each other in all of Mumbai's stark contradictions. He would help me administer first aid and help distribute medicine.

***

When Omi grew older and became among other things a board member of Human Rights Watch and founded the UN's Alliance of Civilizations he used this innate skillset of fearlessness and wisdom beyond his years to help him face down extremism in the Muslim community head on with a forceful but wise approach wherever he goes—including I am not surprised to learn, in prison.

Letter of Akbar Khadri (Exhibit 11).

I have known Omar (or "Omi") for over 13 years after he married my sister Helena in 2007. In addition to knowing him as a brother-in-law, I also worked closely with him on a charity project: Sunflower Children AIDS orphanage/ Clinic supporting Magna Children in Phnom Penh, Cambodia. After speaking with Omi in Prague where he stayed with our family for the first time in summer 2008, I decided to fly out and visit one of the AIDS orphanage clinics in Phnom Penh in early 2009. Omi had spoken about how Sunflower Children and Magna were helping to stop child slavery and trafficking in Cambodia and I became very passionate about this topic. My sister had long tried to enlist me to help her with Sunflower but it took Omi's passionate persuasive arguments to convince me to come…. When I arrived later at the AIDS orphanage, I learned he and my sister were sleeping inside the orphanage itself —on a bamboo mat in a corner of the ground floor. Their bags and belongings huddled near where their bamboo mattress lay. He told me he'd re-organized his philosophy around my sister's. Her philosophy has always been best summarized as "big house = small life; small house = big life" an old Czech aphorism, and they had taken that to heart

11

wherever they went as a couple. They made a pact to donate 100% of their earnings to charity while they were together as a couple.

Letter of Jakub Houda (Exhibit 12).

Overall, Mr. Amanat's history reflects his strong work ethic and an unwavering commitment to self-betterment through labor, education, and philanthropy. [4] The positive history and good works of Mr. Amanat are important points for the Court's consideration at sentencing. They illustrate that the transgressions for which he awaits sentencing do not truly define his character nor capture his ability to lead a productive life. To the contrary, Mr. Amanat's history reflects a man of good will and someone who can positively contribute to his family and community upon release from prison.

## 2. **Family Life—Children**

While Mr. Amanat's good works and charity continue to have an impact locally and globally (positively affecting thousands of lives directly and millions indirectly), his greatest impact has undoubtedly been on his six young children who adore him and look up to him. He is not only their protector, their provider but he is their baseball and basketball coach, their spiritual guide, and their friend.  He is the loving father of Aadam, D███, and R████ with his first wife Sabiya with whom he had an arranged

---

[4] In addition to the letters of support cited directly herein, numerous other family members and friends of Mr. Amanat have also written to the Court to express their positive interactions with Mr. Amanat and a similar accounting of his prior good works (*See* Exhibit 13, Compilation of Support Letters (2018/2021)).

marriage; and D████, D████, and D██ with his second wife Helena Houdova. His children range in age from college to elementary school. As Ms. Houdova explains:

> Omi is an especially devoted son, brother, friend, neighbor and most of all, father. Our 3 young children…love and absolutely adore him..
>
> ***
>
> In Galatians 5, verse 22, the Apostle Paul writes about the "fruits of the spirit."  These qualities are Love, Joy, Peace, Patience, Kindness, Goodness, Gentleness, Faithfulness, & Self-Control. As anyone who has ever spent time with Omi in a non-business setting[,] at home, at church or at school, and especially at the baseball field or basketball court where he coaches his young kids and their classmates, can tell you that Omi shows these qualities or fruits in abundance.

Letter of Helena Houdova (Exhibit 7).

Because of his strong relationships with his children and the positive influence that Mr. Amanat has had on their development, both he and his children have greatly suffered from being apart during his 44-month imprisonment, especially during the COVID-19 pandemic which resulted in the BOP's suspension of social visiting. As Mr. Amanat's 12-year-old son, D████, explains:

> Losing my dad has been the most painful experience in my life. My dad means the world to me so you can imagine when I heard that he was going away I basically cried my eyes out for weeks and you have to understand that not having a father figure for 4 years-not having a dad to teach you everything. It hurts a lot. Words can't describe how much I miss him, he means so much to me, and to not have him here with me it kills me. A few years back I was probably at the lowest point I've ever been in my life because A part of me blamed myself for what happened. I was depressed so I ate away my emotions and escaping from my reality.

Letter of D███ Amanat (Exhibit 14).

Omar's 19-year-old son D██ also recounts the pain associated

with his father's absence and the many family milestones that Mr.

Amanat has missed in the past four years:

> In the past three and a half years, my father has been unable
> to guide, support, and encourage me through pivotal points in
> my life. I remember that he could not be there to give me a final
> piece of fatherly advice when I reported to my first job; he could
> not be there to cheer me on as I received my high school
> diploma; he could not be there to hug me goodbye when I
> moved across the country for college. I point out these
> instances without any contempt or disdain—I understand that
> criminal convictions carry with them the forfeiture of liberties
> such as those listed above. Instead, it is my hope that you can
> take from these moments an understanding of the hole that
> the absence of our father has left in me and my brothers' lives.

Letter of D██ Amanat (Exhibit 15).

Perhaps most significant, several of Mr. Amanat's children have

suffered from health conditions requiring medical intervention and

ongoing therapeutic treatment during his imprisonment, which has been

a devastating circumstance for him to deal with while in restrictive

lockdowns. D██, who was four years old when he had a tumor in his ear

removed, suffers from cholesteatoma in his right ear, and, as a result, has

limited hearing. D███ fractured his skull during the pendency of this

case and remains under medical care, attending physical and cognitive

therapy every day. D██ has limited verbal skills, as he sometimes slurs

his speech.

14

Furthermore, Mr. Amanat's ex-wife has recently been forced to move out of the country due to financial difficulties and an inability to support her children adequately. Mr. Amanat blames himself for this development, recognizing that his imprisonment and inability to earn an income to pay child support has caused his family to suffer greatly. Mr. Amanat is reminded daily about his children's struggles and the lost opportunity to be a consistent presence in their lives during these important times.

Indeed, Mr. Amanat's biggest regret is the people and family members that he unintentionally hurt as a result this process. He realizes that "one of the great paradoxes of life is that you only have good judgment after you've had bad judgment." Mr. Amanat is truly resolved to use his best judgment going forward and to focus on leading a positive life upon his release from prison to be the best possible father for his children when given a second chance.[5]

### 3. **Family Life - Parents**

As a loving son, Mr. Amanat also knows that his arrest, prosecution, and incarceration has been an overwhelming burden for his parents. *See, e.g.,* Letter of Syeda Bhatti (Exhibit 16) (explaining Mr. Amanat's extraordinarily close relationship with his parents and his care for them).

---

[5] Given the restrictions on mail and the limited access that counsel has to Mr. Amanat due to his conditions of confinement, undersigned counsel has chosen to memorialize herein and present for consideration Mr. Amanat's statements to the Court that were orally conveyed to counsel during legal calls, rather than trying to coordinate a written letter to the Court from Mr. Amanat himself.

When he was initially released on house arrest in this case, Mr. Amanat chose to stay with his mother and father to care for them considering their many medical issues. At the time, his father had spine and brain cancer and in 2017, his mother underwent double bypass surgery. After her surgery, Mr. Amanat was her primary caretaker until he was incarcerated.

While he was incarcerated, Mr. Amanat's father tragically passed away. Obviously, the pain of such a loss was exponentially greater to Mr. Amanat under the circumstances, since he was unable to be by his father's side before he passed. His mother, now 81 years of age, is on her own without her husband and without the son on whom she had come to rely. As Mr. Amanat's mother explains in her most recent letter to the Court:

> Since my last letter to you our family has been shattered into pieces. My husband of 55 years, Omar and Irfan's father, passed away last September 14th, 2021 from cancer he developed after working at Ground Zero after September 11th, 2001.
>
> My departed husband was unable to see Omar and his brother Irfan the previous two years before he passed because of his health and Covid. Both sons were unable to attend his funeral, help bury him and pay their final respects. It is a deep wound for my departed husband and the boys who were very close to each other. The costs of medical care and the funeral were overwhelming for me. I had to have an emergency bypass surgery for my heart. Normally I counted on my sons to support me but they were not able to because of their lengthy detention prior to sentencing which made it hard to even communicate much less visit.

Letter of Hamida Amanat (Ex. A in sealed submission).

Upon his release from prison, Mr. Amanat intends to return to taking care of his mother and assisting his other siblings, who have struggled to meet their mother's needs as her condition has worsened. As Mr. Amanat also explained to undersigned counsel in recent communications:

> I have always known but now I truly in my heart believe that my family is the most important thing in my life. My choices have hurt my children, brother and mother, so if given another chance in life I just want to get a job work and be with my family. My father passing away while I was in isolation has been one of the most difficult things that I've ever gone through. I want him to know that I'm going to be a good person and I'm sorry that I could not be there for him. My mom's health is not good and I know this situation has been harder on her than anyone. My heart breaks for her, having her two sons in the situation that we are in could not be described in words. I always tried to be there for her and my dad but being in here I know that I let them down. I will never let either of them down again. That I can promise.

### 4. Mr. Amanat's Health Conditions

While Mr. Amanat longs to be home to care for his family, parents, and children, he has experienced his own health battles since his incarceration in 2017. As documented by Mr. Amanat's sister, there is a family history of cardiac arrest. PSR at ¶¶ 188, 192. Mr. Amanat was diagnosed with congenital heart disease at the age of 26 (PSR at ¶ 192) and now suffers from multiple manifestations of cardiovascular disease,[6] diabetes, vision issues, a blocked coronary artery, and peripheral

---

[6]Heart disease is the leading cause of death for men in the United States. https://www.cdc.gov/heartdisease/men.htm

neuropathy, the latter of which he developed over the last year.[7] He has suffered from transient ischemic attacks in 2016, 2018, and 2019 because of his right carotid artery being 70% blocked.

On January 6, 2018, Mr. Amanat suffered a stroke while at the Metropolitan Correctional Center. PSR at ¶ 194. He is currently prescribed Statin, Lexorin, and baby aspirin but is unable to engage in any meaningful medical rehabilitation while incarcerated. To manage his diabetes and resulting diabetic neuropathy, he is currently placed on duloxetine to treat the painful nerve damage. His conditions also place him at a heightened risk of contracting and dying from COVID-19.[8]

Disturbingly, notwithstanding his serious medical conditions, there have been many times during his incarceration when prison staff failed to give Mr. Amanat his medication. As Mr. Amanat recounts:

> During the daily strip searches I'd be forced to stand there—-naked and freezing—-in a concrete cell. I was convinced I would die of cardiac arrest and became frantic. I'd already had a stroke two months earlier in 5 South—the guards knew this—and I beseeched them to get me my heart medication; statins, baby aspirin and nitroglycerin--because I was concerned I'd have another stroke or worse. I pleaded with them that my uncles had heart attacks in their mid 40's and early 50's—and

---

[7] Peripheral neuropathy, a result of damage to the nerves located outside of the brain and spinal cord (peripheral nerves), often causes weakness, numbness and pain, usually in the hands and feet. It can also affect other areas and body functions including digestion, urination and circulation.

[8] *See* Centers for Disease Control and Prevention, "COVID-19: People with Certain Medical Conditions," (May 13, 2021), available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

I just turned 46. 'I don't see you turning purple?' the guard said...it took 22 days for my heart medication to be delivered.

Mr. Amanat's health conditions have long been documented before this Court, with former defense counsel seeking emergency bail at the beginning of the pandemic. *See* Emergency Bail Applications dated March 13, 2020 (Dkt No. 1057); March 18, 2020, (Dkt No. 1063); and March 27, 2020, (Dkt No. 1070). The March 18, 2020 submission also includes a letter from Mr. Amanat's physician that corroborates his serious medical conditions, including his history of stroke, heart disease risk and acephalgic ocular migraines. At the time, his physician expressed concern about Mr. Amanat's condition and was "very concerned he will become a victim of a heart attack or stroke within the next few months." *See* March 18, 2020 Letter, Exhibit A, Dkt. #1063. His doctor strongly suggested that Mr. Amanat should be under the full-time medical care of a cardiologist. In addition, defense counsel's March 27, 2020 submission included an affidavit from Matthew Sexter, M.D., who concluded that, after a review of Mr. Amanat's medical records, Mr. Amanat is at a significantly increased risk of death if he contracts COVID-19 and will be unable to take measures to protect himself while incarcerated. Dkt No. 1070, at 8.

Mr. Amanat's expressed desire (as reflected during the January 30, 2018, Presentence Interview) to live an "ordinary life," "to spend more time with his children and perform more charity work" has only grown stronger in light of his ailing health and current circumstances. Indeed, Mr. Amanat

made those compelling statements to Probation years ago, prior to his stroke, his father dying, and the pandemic-related suspension of all social visits that precluded Mr. Amanat from seeing his children and mother for an extended period. Now, as he thinks about the possibility of an additional extended period away from home, without adequate medical care, Mr. Amanat is increasingly concerned that he will die in jail. He has expressed to undersigned counsel that, "Over the last few years I am well aware on how priceless life is. Facing mortality has made me more spiritual and I am aware that my children and family are the most important thing to me. I'm of the hope that I can take care of myself in order to be there for them."

## OFFENSE CONDUCT, GUIDELINES CALCULATIONS, AND OBJECTIONS

Mr. Amanat was convicted of four counts at trial, all of which are grouped for Guidelines calculation purposes. Mr. Amanat is in Criminal History Category I and has no prior criminal convictions. As indicated below, the PSR calculated Mr. Amanat's advisory sentencing guidelines range based on a loss amount of between $25,000,000 and $65,000,000.

| | |
|---|---|
| Base offense level (USSG § 2B1.1(a)(1)) | 7 |
| Increase for loss between $25 million and $65 million (USSG § 2B1.1(b)(1)(L)) | +22 |
| Increase for sophisticated means (USSG § 2B1.1(b)(10)(B)) | +2 |

| | |
|---|---|
| Increase for association with an investment advisor (USSG § 2B1.1(b)(19)(A)(iii)) | +4 |
| Total offense level | 35 |

PSR at ¶ 161.

However, by an Order dated July 29, 2021, the Court concluded that the loss amount for Counts One through Three is $7.75 million and that no loss enhancement as to Count Four is appropriate. Moreover, the Government has also recently agreed, in related filings, that it is not "appropriate to include a four-level enhancement for the association with a broker or dealer or investment advisor pursuant to U.S.S.G. § 2B1.1(b)(2)(20)(A)(ii) & (iii)." Dkt No. 1181, at 5.

Based on these findings, the Defense respectfully submits that the advisory range provided by Probation should be reduced by at least 8 levels; i.e., lessening by 4 levels for loss calculation purposes (i.e, +18 rather than +22) and removing the 4-point enhancement under U.S.S.G. § 2B1.1(b)(2)(20)(A)(ii) & (iii).

Accordingly, Mr. Amanat's offense level is 27 and he is in criminal history category I, yielding an applicable range of 70 to 87 months' imprisonment:

| | |
|---|---|
| Base offense level (USSG § 2B1.1(a)(1)) | 7 |
| Increase for loss between $3.5 million and $9.5 million | +18 |

(USSG § 2B1.1(b)(1)(J))

Increase for sophisticated means     +2
(USSG § 2B1.1(b)(10)(B))

Total offense level                          27

To preserve the record, the defense maintains by reference Mr. Amanat's prior objections to the foregoing calculations and loss amounts generally as fully detailed in his 2018 sentencing submission at Dkt No. 792. It is the defense's position that the loss amount is not supported by the trial record. The defense also joins in the objections raised by co-defendant Irfan Amanat regarding the same loss calculations. *See* Dkt No. 1162, at p. 53-64.

Further, the defense respectfully requests that the Court impose a sentence that is not driven by the alleged loss amount, recognizing that loss is a poor proxy for culpability. The loss table contained within USSG §2B1.1(b) provides a series of two-level increases to the base offense level of 7, depending on the amount of loss caused by the wrongful conduct. While calculation of the loss attributable to the offense of conviction is, therefore, an integral step in the Guidelines calculation that a sentencing judge is required to perform (*see United States v. Crosby*, 397 F.3d 103, 111-12 (2d Cir. 2005)), USSG §2B1.1(b)'s loss table has been repeatedly criticized for its unfair aggravation of the guidelines range and failure to provide an accurate picture of the defendant's culpability.

Indeed, the loss table was not based on pre-Guidelines practice, nor does it have an empirical basis. *See* U.S. Sentencing Commission, "Supplementary Report on the Initial Sentencing Guidelines and Policy Statements," (1987) ("Supplementary Report") (discussing disagreement concerning an underlying philosophy for the Guidelines). Instead, "the Commission, either on its own initiative or in response to congressional actions, established guideline ranges that were significantly more severe than past practice" for the most frequently sentenced offenses in the federal courts, including white collar offenses. *See* U.S. Sentencing Commission, "Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform," at 47 (2004) (citation omitted).

Unsurprisingly, the loss guideline has been widely criticized for its substantive failings and unfairness. *See e.g. United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004); *United States v. Gupta*, 904 F.Supp.3d 349, 351 (S.D.N.Y. 2012); Derek R. Vollrath, "Losing the Loss Calculation: Toward a More Just Sentence Regime in White-Collar Criminal Case," 59 Duke L.J. 1001, 1025 (2010); Frank O. Bowman III, "Sentencing High-Loss Corporate Insider Frauds after Booker," 20 Fed. Sent. R. 167, 169, 2008 WL 2201039 at *4 (Feb. 2008).

In *United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016), the Second Circuit discussed the loss guideline and noted that the Commission, "could have started the Guidelines calculation for fraud offenses by selecting a base level that realistically reflected the seriousness of a typical fraud offense and then permitted adjustments up or down to reflect especially large or small amounts of loss." *Algahaim*, 842 F.3d at 800. Instead, adding to a low base offense level by amount of loss makes the "amount of loss" "the principal determinant of the adjusted offense level and hence the corresponding sentencing range." *Id.* The Court remanded the case "to permit the sentencing judge to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence." *Id.* We urge this Court to similarly consider whether the loss amount unwarrantedly drives the offense level far higher than is warranted here.

Accordingly, even considering a loss of 7.75 million with an advisory sentencing range of 70-87 months, the Defense respectfully requests that the Court impose a sentence of time served given that the loss-driven advisory guidelines range does not truly capture the offense conduct or provide adequate guidance for sentencing here, especially in light of the history and characteristics of Mr. Amanat, his already long and harsh imprisonment during the COVID-19 pandemic, and the many other noted mitigating factors compelling leniency under 18 U.S.C. § 3553(a).

## APPLICABLE SENTENCING LAW

A sentence should (A) reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense, (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed education or vocational training, [and] medical care. 18 U.S.C. § 3553(a)(2). The statute requires the Court to impose a sentence sufficient to meet the objectives of sentencing, but at the same time requires the sentence imposed not be greater than necessary to meet these same objectives. *Ibid.* The "sufficient, but not greater than necessary" requirement is often referred to as the "parsimony provision." The parsimony provision is not simply another factor to be considered along with the others set forth in § 3553(a); it actually imposes a separate and independent limit on the sentence a court may impose. *See United States v. Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J., concurring in part, dissenting in part) (since § 3553(a) requires the sentence to be no greater than necessary to meet four purposes of sentencing, imposition of sentence greater than necessary to meet those purposes is reversible, even if within the guideline range).

In imposing a sentence that is " 'sufficient, but not greater than necessary' to accomplish the sentencing goals advanced in § 3553(a)(2)," a sentencing court should consider: (1) the guideline range; (2) the policy

25

statements of the Sentencing Commission; (3) the nature and circumstances of the offense, and a history of the defendant; (4) any need for sentence to further purposes of deterrence, protective or rehabilitative functions; (5) the kinds of sentences available; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records and conduct; and (7) the need to provide restitution to the victims. 18 U.S.C.§ 3553(a); *see Kimbrough v. United States*, 552 U.S. 85, 110 (2007).

Procedurally, sentencing courts must (1) properly calculate the Guidelines range; (2) rule on any departure motions made under the Guidelines; and (3) exercise post-*Booker* discretion by choosing a sentence in light of all relevant sentencing factors under 18 U.S.C. § 3553(a). *See United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008).

The touchstone for sentencing is the need for the sentencing judge to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487–88, (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)); *see also United States v. Salinas-Cortez*, 660 F.3d 695, 698 (3d Cir. 2011) ("It is only by ensuring that the individual circumstances of the defendant are not obliterated by the offense that an individual's potential to successfully rejoin society is

maximized and the interest of public safety advanced.").

## DISCUSSION

## A SENTENCE OF TIME SERVED WOULD SATISFY ALL OF THE GOALS OF SENTENCING

### 1. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense (18 U.S.C. § 3553(a)(2)(A))

The purposes set forth in § 3553(a)(2)(A) are generally referred to, collectively, as "retribution." The degree of blameworthiness of an offense is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent, motives, role in the offense, and mental illness or other diminished capacity.[9] Thus, the seriousness of the offense is lessened if the crime was victimless or was not violent. *See* 28 U.S.C. § 994(j).

In considering the appropriate sentence for an offender with Mr. Amanat's criminal history and characteristics, we note that the United States Sentencing Commission's Interactive Data Analyzer reports that, of the 274 cases reported to the Sentencing Commission for offenders sentenced under § 2B1.1 in CHC I in 2020, 76.6% received sentences of

---

[9] *See* Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: Proportionality Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005).

between 0 and 24 months of imprisonment.[10] Nationwide, according to the statistical tables maintained by the Sentencing Commission, in 2020, of the 4,353 sentences imposed under USSG § 2B1.1, less than half (1,930) were within the Guidelines range, and 1,749 represented a variance from the range. An additional 151 received a downward departure.[11] It would not be disproportionate for the Court to vary downward to impose the requested sentence of time served in this case.

## 2. <u>The need for the sentence imposed to afford adequate deterrence to criminal conduct (18 U.S.C. § 3553(a)(2)(B))</u>

Deterrence is both general and specific. *See Furman v. Georgia*, 408 U.S. 238, 343, 92 S. Ct. 2726, 2779, 33 L. Ed. 2d 346 (1972) ("Our jurisprudence has always accepted deterrence in general, deterrence of individual recidivism, isolation of dangerous persons, and rehabilitation as proper goals of punishment.").

There is a general consensus that the extraordinary growth over the last two decades in the use of incarceration as a sanction for criminal

---

[10]   *See*   USSG,   Interactive   Data   Analyzer   (available   at https://ida.ussc.gov/analytics/saw.dll?Dashboard) (last accessed July 15, 2021)

[11] *See* USSC, *2020 Sourcebook of Federal Sentencing Statistics*, at Table 32: Sentence Imposed Relative to the Guideline Range by Primary Sentencing Guideline   Fiscal   Year   2020   (available   at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/Table32.pdf)   (last accessed July 15, 2021)

conduct has failed to serve as a general deterrent.[12] There is little evidence that long prison sentences have a sufficient general deterrent effect to "justify their social and economic costs."[13] Rather, the general deterrent effect of the certainty of punishment is far more consistent than that of the severity of punishment. *See also United States v. Francis*, 2013 U.S. Dist. LEXIS 138603, * 6 (E.D.N.Y. 2013) ("General deterrence is satisfied by the felony conviction and its collateral consequences").

Moreover, even assuming some general deterrent effect could be measured from sentences imposed on other offenders, no long term of imprisonment would send a message any clearer than that sent by Mr. Amanat's conviction and imprisonment pending sentencing during the COVID-19 pandemic. There can also be no legitimate doubt that a reasonable person, considering the harsh and lengthy term of imprisonment that Mr. Amanat has already endured, would not already be deterred from committing the same offense at issue here. Mr. Amanat has not only lost his freedom and possessions; he has also suffered extremely harsh conditions of confinement. Mr. Amanat must also live with the fact that he could not be present for his parents, wife, and six children during

---

[12] *See, e.g., The Sentencing Project, Incarceration and Crime: A Complex Relationship* 7 (2005) (available at: http://www.sentencingproject.org/doc/publicatins/inc-inadc-complex.pdf).

[13] Daniel Nagin, "Deterrence in the 21st Century, Crime and Justice in America: 1975-2005," at 201 (ed. Michael Tonry, University of Chicago Press, 2013).

the raging pandemic and at other important stages of their lives, including his father's death. Since "general deterrence depends on potential offenders' rational assessment of the likely costs and benefits of crime," there can be little doubt but that general deterrence is already achieved here. *United States v. Bannister*, 786 F. Supp. 2d 617, 660 (E.D.N.Y. 2011). A further prison sentence for Mr. Amanat cannot, therefore, be justified on the concept of general deterrence.

Nor does specific deterrence justify an additional term of imprisonment here. Mr. Amanat has no prior convictions. The offense represents a deviation from his otherwise law-abiding, generous, and hardworking life, to which he hopes one day to return with new dedication. The indictment alleges that the offenses of conviction occurred between 2008 and 2012. Since his incarceration in 2017, Mr. Amanat has learned the hardest way possible that the cost of criminal conduct is too high. Mr. Amanat had never been imprisoned before. Now, both he and his family have learned the devastating pains of imprisonment. *See United States v. Lenagh*, 2009 WL 296999, at *6, 2009 U.S. Dist. LEXIS 9226 (D. Neb. Feb. 6, 2009) ("A sentence of 24 months is a significant sentence, especially to an offender who has never been incarcerated at all.").

Indeed, even if the Court sentences Mr. Amanat to time served with supervised release (or to a term of probation), such a sentence would still be sufficient punishment (especially given Mr. Amanat's already harsh and

long imprisonment to date). The continued collateral impact of a non-jail sentence with supervised release is also not *de minimis* and would provide more adequate incapacitation at this juncture. "[P]robation, rather than 'an act of leniency,' is a 'substantial restriction of freedom.'" *Gall v. United States*, 552 U.S. 38, 44, 128 S. Ct. 586, 593, 169 L. Ed. 2d 445 (2007) (quoting district court's opinion with approval). During a term of supervised release or probation, Mr. Amanat would be under the strict supervision of the Probation Department. His movement would be restricted, and his actions would be monitored and carefully controlled.

Beyond the punishment of having a felony conviction for the remainder of his life and already serving a uniquely harsh term of imprisonment that has already devastated Mr. Amanat and his family, Mr. Amanat will also have to overcome the stain of his conviction once released (in both social and professional settings) and he will remain ineligible for a variety of social service benefits such as federal health care benefits, government loans, education grants, and work assistance programs. *See, e.g.*, *United States v. Nesbeth*, 188 F.Supp.3d 179, 184-85 (EDNY 2016) (Court concluded that federal low alone imposes nearly 1,200 disabilities and disadvantages on convicted felons).

By any measure, the actual and collateral consequences presented here constitute specific and general deterrence. *Nesbeth*, 188 F.Supp.3d at 80 (finding "collateral consequences serve no useful function other than

to further punish criminal defendants" after serving the imposed sentence). *See also* National Inventory of Collateral Consequences of Conviction (noting the "rapid proliferation of collateral consequences and the increase in the number of people affected by them"), available at https://niccc.nationalreentryresourcecenter.org.

### 3. The need for the sentence imposed to protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(2)(C))

Section 3553(a)(2)(C) requires the Court to consider "the need for the sentence imposed. . . to protect the public from further crimes of the defendant." This purpose has to do with both the defendant's risk of recidivism and the danger posed by the defendant, if any. It "is particularly important for those offenders whose criminal histories show repeated serious violations of the law." S. Rep. No. 98-225 at 76 (1983). It is not so important for those who have little risk of recidivism, for those whose prior offenses are relatively minor or non-violent, or for those who have a strong potential for rehabilitation.[14]

Here, Mr. Amanat is a first-time offender. He has a life full of good and charitable works. He also has support system in place and strong potential for full rehabilitation. Indeed, all factors (i.e., medical history, age, education) indicate that Mr. Amanat will not reoffend, especially given

---

[14] Baron Evans, Amy. *Sentencing By the Statute* April 27, 2009 (revised 12/21/10).

that he now knows the true pains of imprisonment and he has been devastated because of his past transgressions.

Research has shown that increased age correlates with lower recidivism.[15] The Congressional Research Service's most recent report states that, "Research indicates that most offenders 'age out' of crime; that is, the older offenders get, the less likely they are to commit new crimes."[16] Mr. Amanat is now 49 years old. The offense conduct occurred between 2008 and 2012—between 13 and 9 years ago. Mr. Amanat is older now, and wiser. He has learned that the price for wrongdoing is far too high.

Mr. Amanat's prison record is exemplary, and he has a support system in place that will assist his positive reentry into his community once he is released. Mr. Amanat has demonstrated a great maturation and a desire to lead a law-abiding life. Notwithstanding the harshness of his confinement, Mr. Amanat has remained positive and is motivated to return to his community and family as a positive and law-abiding contributor.

---

[15] *See* USSC, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* ("Measuring Recidivism")(May 2004), at 12 & Exhibits 9-11; *see also id* at 15-16 ("[r]ecidivism rates decline relatively consistently as age increases.").

[16] Congressional Research Service, *The Federal Prison Population Buildup: Overview, Policy Changes, Issues and Options* (March 2013) ("CRS Report") (available at www.fas.org/sgp/crs/misc/RA293.pdf) at 48.

4. **The need for the sentence imposed to provide needed educational, vocational, and medical care (18 U.S.C. § 3553(a)(2)(D))**

Mr. Amanat is not in need of educational or vocational training. He has worked all his life and he has the skills and the entrepreneurial talent to find his footing whenever he is released from prison. More importantly, here, however, is the fact that Mr. Amanat needs medical care that the Bureau of Prisons simply cannot provide.

As detailed above and as corroborated by past submissions, affidavits, and medical records to this Court, Mr. Amanat suffers from serious medical conditions and there have been worrisome lapses by the BOP in providing necessary treatment. He also remains at a heightened risk of contracting a fatal case of COVID-19. His medical circumstances should be considered as a mitigating factor, as they have been in other cases in this Circuit. *See United States v. Jimenez*, 212 F.Supp.2d 214 (S.D.N.Y. 2002) (Since the time the crime was committed, the defendant suffered a brain aneurism. The sentencing judge found that this injury left Jimenez physically and mentally weaker and less likely to recidivate and concluded that a long-term imprisonment would not be necessary to protect the public and would be "wasteful and unnecessary." *Id.* at 219.); *United States v. Rioux,* 95 F.3d 648 (2d. Cir. 1996) (Court upheld a downward departure in consideration of defendant's kidney disease). Further, recent studies have shown that incarceration reduces the average

person's lifespan by up to two years per each year in prison.[17]
"Incarceration not only compounds existing health issues and heightens
the risk of future health problems, but – most alarmingly – has a
deteriorating effect on the bodies of incarcerated people, causing them to
physically age at a much faster rate than the public at large."[18]

Of course, COVID-19 has drastically changed what it means to be
incarcerated during the last 18 months and has led to sentencing
variances and reductions since the beginning of the pandemic. *See United
States v. Benitez*, No. 18-CR-390 (PAE), 2020 WL 4226590, at *3 (S.D.N.Y.
July 23, 2020) (finding that defendant's asthma constituted an
extraordinary and compelling reason for release); *United States v. Butler*,
NO. 18-CR-834 (PAE), 2020 WL 4004175, at *2 (S.D.N.Y. July 15,
2020) (finding that defendant's asthma and obesity constituted an
extraordinary and compelling reason for release); *United States v.
Hernandez*, No. 18 Cr. 834-04 (PAE), 2020 WL 1684062, at *3 (S.D.N.Y.
Apr. 2, 2020) (finding extraordinary and compelling reasons for release of
inmate at high risk of serious illness from COVID-19 because of his
asthma and acknowledging difficulties that high-risk inmate would face in
caring for himself if he contracted COVID-19 in detention); *United States*

---

[17] *The Dose-Response of Time Served in Prison on Mortality: New York State, 1989-
2003,* Am. J. Pub. Health 103:3 (March 2013)

[18] *The High Cost of Low Risk: The Crisis of America's Aging Prison Population,"*
The Osborne Association (2014).

*v. Park*, No. 16-CR-473, 2020 WL 1970603, at *1 (S.D.N.Y. Apr. 24, 2020) (granting release where defendant had CDC-identified risk factors, including asthma and a compromised immune system).

As the Honorable J. Paul Oetken recently held in sentencing the defendant in *United States v. Gonzalez*, 18-CR-669 (JPO) (S.D.N.Y.) on April 2, 2021 to time served for conspiracy to distribute crack cocaine and heroin: "I do believe that because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served…So I think having served 24 months is equivalent to having served three years."[19] *See also United v. DeShawn Smalls*, 19-CR-232 (VB). (sentenced to 36 months' imprisonment, below the suggested 70-87 month range, for a firearms offense when taking into account the harsh conditions at Westchester County Jail); *United States v. Abigail Baez*, 19-CR-271 (CS) (sentenced to a mandatory minimum of 60 months, below the 108-135 month range, for a drug offense).

It is guaranteed that any period of incarceration will disproportionately and adversely affect Mr. Amanat's health, a factor that should be considered under 18 U.S.C. § 3553(a) as well as a factor warranting a downward departure under §5H1.4 of the United States

---

[19] *Available at*: https://www.nydailynews.com/new-york/ny-mcc-mdc-hard-time-20210524-cwatz2asojglhm4cvjldbdx33e-story.html

Sentencing Guidelines or, at minimum, a variance from the applicable Guidelines range. Although the BOP tries its best, it simply cannot provide the same level of care as a private physician. For an individual in Mr. Amanat's shoes—a stroke victim with diabetes and multiple additional health complications—the BOP's healthcare is inadequate.

Not having the ability to go outside for long walks, being in isolation during the pandemic, having his shoulder dislocated, breaking his foot, not having the ability to get sun for Vitamin D nor being giving Vitamin D supplements has had an effect on both his physical and mental well-being. His blood sugar is consistently unregulated due to poor monitoring, and inadequate dietary supplementation. Without the appropriate diet since being incarcerated he is at continued risk for dangerous spikes in his blood sugar. These conditions ultimately can affect the heart muscle and further cause irreparable harm. The dietary regimen at the MCC, which consists nearly entirely of sugar and carbohydrates, dangerously exacerbates his condition. Further, because he is unable to self-regulate by checking his glucose levels on his own, each time he is given a dose of insulin places his life at risk.

In *United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996), the defendant was convicted of a fraudulent scheme to commit extortion in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1952. Even though his kidney functions were stable, he required "regular blood tests and prescription medicines."

37

*Id.* at 663. Due to his medical condition and his charitable acts, the District Court reduced his total offense level from 20 to 10 and sentenced Rioux to three years probation, six months' home confinement, and 500 hours of community service. The Second Circuit ruled that the District Court did not abuse its discretion. Similar consideration, and a similar sentence of time served or, in the alternative, a period of probation with home confinement, is warranted here.

5. **The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct (18 U.S.C. § 3553(a)(6))**

Courts have imposed significantly below-Guidelines sentences in cases with fraudulent conduct more severe than that at issue in Mr. Amanat's case. For example:

- In *United States v. Lumiere,* No. 16-cr-483 (S.D.N.Y.), a former portfolio manager at Visium Asset Management was convicted of securities and wire fraud for orchestrating a complex scheme to overvalue securities to inflate the value of the fund. The government argued that the scheme caused a $9.5 to $25 million in loss to investors. Sentencing Tr., June 14, 2017, Dkt. 117 at 2. Judge Rakoff varied from the Guidelines range of 87 to 108 months despite the defendant's "highly significant" role in the scheme for months and his "attempt at blackmail" to conceal his crimes, imposing after trial a sentence of **18 months of imprisonment**. *Id.* at 29;

- In *United States v. Block,* No. 16-cr-595 (S.D.N.Y), the former CFO of a publicly traded real estate investment trust was convicted of being the mastermind of a fraud to manipulate the company's financial results by fraudulently inflating a key metric used by investors. Former Chief Financial Officer of American Realty Capital Partners Sentenced For Accounting Fraud, Dep't of Justice Press Release (Nov. 8, 2017) The Court accepted the Government's calculation of **roughly $300 million in shareholder loss** and stated that the defendant had "brazenly" falsified key accounting numbers, but rejected the Government's proposed sentence of at least seven years' imprisonment and imposed a sentence of **18 months of imprisonment** in light of, *inter alia*, the defendant's clean criminal record prior to the offense and his "personal history" as a good father and friend. *See* <u>Brian Block</u> <u>Sentenced To 18 Months In Prison</u>, Investment News (Nov. 8, 2017), http://www.investmentnews.com/article/20171108/FREE/17110 9929/brian -block-sentenced-to-18-months-in-prison;

- In *United States v. Cervino,* No. 15-cr-00171 (S.D.N.Y.), following his conviction at a three-week jury trial, Judge Carter **sentenced Cervino to one year and a day** for his role in a complex scheme to profit from the manipulation of the price of securities, through which the defendant received cash payments and large commissions while

clients lost their entire investment. Judgment, No. 15-cr-00171, Dkt. 367 at 3. Cervino also lied to the SEC during the course of its investigation. Gov't Sentencing Mem., No. 15-cr-00171, Dkt. 362 at 3-7. Cervino's Guidelines range was 135-168 months (*id.* at 8), and thus his sentence represented a 91% reduction, after trial, from the bottom end of the Guidelines;

- In *United States v. Ghavami,* No. 10-cr-1217 (S.D.N.Y.), defendant Ghavami was the supervisor of a desk at UBS engaged in conduct that the court described as a "very serious" bid-rigging fraud scheme that "spanned years" and "victimized many municipalities as well as other bond issuers across the United States and the IRS and the U.S. Treasury." Sentencing Tr., July 24, 2013, Dkt. 426 at 123:11-17. The Government sought a Guidelines sentence of at least 210 months' imprisonment, but the Court rejected much of the government's claimed loss, calculated a Guidelines range of 41 to 51 months' imprisonment, and varied to a **sentence of 18 months' imprisonment.** *Id.* at 109:8-11, 158:19-22;

- In *United States v. Collins,* No. 07-cr-1170 (S.D.N.Y.), the defendant lawyer had prepared "legal documents over years for the transactions planned by company insiders to effect the fraud." Sentencing Tr., July 15, 2013, Dkt. 244 at 21:8-14. The Government contended that there were thousands of victims, billions of dollars in losses, and that

40

the defendant's participation in the scheme was longstanding. *Id.* at 17:7-9, 20:6-12. Although the Guidelines called for life imprisonment. *Id.* at 20:23-21:1, Judge Preska imposed **a sentence of one year and one day in prison.** *Id.* at 36:1-2;

- In *United States v. Bonventre, et al.*, No. 10-cr-228 (S.D.N.Y.), the defendants were convicted at trial and faced Guidelines ranges of life imprisonment for orchestrating the Madoff Securities fraud – the largest, longest-running, and most damaging Ponzi scheme in history. The court imposed far below-Guidelines sentences for each of the several defendants, **sentencing two of the defendants to just thirty months' imprisonment and two others to terms of six years' imprisonment**, after literally decades of complex, fraudulent conduct facilitating the Madoff scheme. Dkts. 1225, 1232, 1233, 1243. **One of the six-year sentences was for Annette Bongiorno, one of the earliest employees at Madoff, who personally reaped many millions of dollars from the fraud and perjured herself at trial**. Gov. Sentencing Mem., Dkt. 1082 at 18-22, Dkt. 1225;

- In *United States v. Litvak*, No. 13-cr-19 (D. Conn.), the court rejected the government's request after trial for a Guidelines sentence of 108 months' imprisonment and **imposed a sentence of two years for sophisticated fraudulent conduct affecting numerous victims, and causing millions of dollars in loss**, in over 55 securities

transactions over the course of three years. Sentencing Tr., July 25, 2014, Dkt. 273 at 61:13-17, 158:15-19;

- In *United States v. Graham*, No. 06-cr-137 (D. Conn.), the defendant, an in-house lawyer, was convicted of conspiracy and fraud charges for his role in a fraudulent reinsurance transaction. Judge Droney determined that the fraud caused a loss of over $500 million and that the defendant affirmatively concealed the fraudulent nature of the transaction. Order of Oct. 31, 2008, No. 06-cr-137, Dkt. 1164 at 15. **The court varied from a Guidelines sentence of life imprisonment and imposed a sentence of one year and one day**, along with two years of supervised release. Judgment, No. 06-cr-137, Dkt. 1269 at 1.

In addition, even defendants who were convicted after trial in the Southern District of New York have received sentences far below their advisory guidelines ranges. For instance:

- In *United States v. Ng Lap Seng*, 15 Cr. 706 (VSB), the defendant received a **sentence of 48 months**, notwithstanding his guideline range of 235–293 months; Ng was a real estate developer who paid more than $1 million in bribes to senior United Nations ambassadors in exchange for their endorsement of a prospective luxury real estate development project in Macau.

- In *United States v. Dean Skelos,* 15-CR-317 (KMW), the defendant received a **sentence of 51 months**, notwithstanding his guideline range of 151–188. Skelos was the New York State Senate Majority Leader who leveraged his political position to obtain over $300,000, often in the form of commissions for his son, from companies seeking legislative endorsements and bidding advantages.

- In *United States v. Louis Ciminelli,* 16 Cr 776 (VEC), the defendant, whose guidelines were 108–135, was **sentenced to 28 months**. Mr. Ciminelli was the owner of a Buffalo construction company, LPCiminelli, who rigged the bidding process for upstate development contracts by working with program-administrator Alain Kalyeros to steer $750 million in contracts to LPCiminelli, retaining $26.25 million as a management fee.

- In *United States v. Jeremy Reichberg,* 16 Cr. 468 (GHW) the defendant was **sentenced to 48 months** after losing all counts after an eight week trial. Probation calculated a guideline range of 121-151. Mr. Reichberg was convicted of bribing high-ranking police officers, accuse of bribing Mayor de Blasio and participating in a scheme to defraud union members.

- In *United States v. Alain Kaloyeros*, the defendant, whose guidelines were 135–168, was **sentenced to 42 months.** He was the SUNY

college president who steered more than $850 million in upstate development contracts to contractors favored by his lobbyist.

Notably, none of the above-cited defendants who received the below-Guidelines sentences were sentenced during COVID, nor did they spend time in a Bureau of Prisons facility during the COVID-19 pandemic before their sentencing. And, although it is acknowledged that no two individual circumstances can be easily compared, it is readily apparent that Mr. Amanat's case is just as compelling as those presented in the cited cases, especially considering that those defendants were arguably convicted of far more serious conduct and did not have the history of good works and rehabilitation as presented by Mr. Amanat's case.

### 6. **The Conditions that Mr. Amanat Suffered in Bureau of Prisons Facilities During COVID-19 Support a Non-Guidelines Sentence**

As the Court is aware, Mr. Amanat was imprisoned during the entire COVID-19 pandemic (and he remains so). This is no trivial experience, especially since Mr. Amanat has a multitude of medical risk factors that elevate his risk for the worst effects of COVID-19.

During his 44-month stay at the MCC and MDC, Mr. Amanat has been subjected to horrible prison conditions, exacerbated by continuous lockdowns and a complete lack of social/family visiting. He also suffered physical challenges in prison beyond the threat of the COVID-19 virus, dislocating his shoulder, breaking his foot, and having a stroke, all of

which have imposed severe punishment, pain, and trauma. While prison is supposed to serve as a form of punishment, it is not supposed to be a mechanism of trauma to the degree that Mr. Amanat and his family endured. *See, e.g., United States v. De Jesus*, 20-cr-19 (PAE) (S.D.N.Y., July 1, 2020) (considering at sentencing the harsh prison conditions suffered by the defendant as a result of the COVID-19 pandemic, explaining that "[a]ny mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that [the defendant] experienced.").

Indeed, it cannot be overstated that the conditions at the MCC and MDC were far beyond any appropriate, civilized punishment. Mr. Amanat was subjected to continuous lockdowns, unsanitary conditions, and inhumane liberty constraints for more than fourteen months. He had no social visits with his wife and children and no in-person legal visit during the same timeframe.  At various times, Mr. Amanat was locked inside his cell between 21 and 24 hours per day and was not permitted to shower or contact his family for days or even weeks at a time.

By all accounts, Mr. Amanat's harsh imprisonment during the COVID-19 pandemic was overwhelmingly severe and should be accounted for in connection with his sentence here. *See, e.g., United States v. Garcia*, 2020 WL 7212962, at *3 (S.D.N.Y. Dec. 8, 2020) (Prison sentences served during the pandemic "mak[e] the conditions of confinement harsher, both

physically and psychologically, than they would normally be," given the constant lockdowns and other restrictions, and perhaps "enhance the deterrent effect of prison."); *United States v. Romero*, 2021 WL 1518622, at *4 (S.D.N.Y. Apr. 16, 2021) (finding that a "day spent in prison under extreme lockdown and in fear of contracting a deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. Although not intended as punishment, incarceration in such conditions is, unavoidably, more punishing."). *See also United States v. Rodriguez*, No. 00 Cr. 761 (JSR), 2020 U.S. Dist. LEXIS 181004, 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020) ("The pandemic, aside from posing a threat to [defendant's] health, has made [defendant's] incarceration harsher and more punitive than would otherwise have been the case. This is because the federal prisons, as 'prime candidates' for the spread of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal.").

Ultimately, the Court's imposition of a sentence of time served would be appropriate, serving as a sufficient punishment and deterrent given the harshness of the pre-sentencing confinement that Mr. Amanat has already endured in connection with this case. *See, e.g., United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001); *United States v. Behr*, 2006 WL 1586563, at *5 (S.D.N.Y. 2006); *see also United States v. Spano*, 476 F.3d 476, 479 (7th Cir. 2007) ("in effect [the defendant] is arguing that the severity of a prison

sentence has two dimensions: its length, and the harshness of the conditions, and that the harsher the conditions the shorter the sentence should be. There is enough merit to the argument to allow a sentencing judge to take it into account . . ."); *United States v. Farouil*, 124 F.3d 838, 847 (7th Cir.1997) (harsh conditions of confinement constitute valid ground for departure); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n. 2 (2d Cir. 1996) (remanding for a further explanation of the sentencing court's sentencing calculations and noting that the court had granted a downward departure due to "harsher incarceration" due to unavailability of programs); *United States v. Mateo*, 299 F. Supp.2d 201, 212 (S.D.N.Y. 2004) (granting a nine-level downward departure because "the extraordinary trauma Mateo has already suffered during the time she has served in custody, the full effects of which can never be comprehensively gauged, has inflicted forms of pain and suffering that have effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced by inmates in the typical case during the period of incarceration prescribed by the Guidelines for Mateo's offense"); *United States v. Francis*, 129 F. Supp.2d 612, 616 (S.D.N.Y. 2001) (granting a downward departure for a defendant kept at an inferior facility and noting that "[a]lthough departures based on conditions of confinement are not encouraged by the Guidelines, they also are not

discouraged; in fact, conditions of confinement is an unmentioned factor.").

### 7. **The Hardship that His Incarceration Poses to Mr. Amanat's Family Should Be Considered at Sentencing**

Although "family ties and responsibilities are not ordinarily relevant," to a sentencing decision, U.S.S.G. § 5H1.6 Policy Statement, "'[n]ot ordinarily relevant' is not synonymous with 'never relevant' or 'not relevant.'" *United States v. Monaco*, 23 F.3d 793, 801 (3d Cir. 1994). It is well settled that the federal courts have imposed non-incarceration sentences on individuals whose imprisonment would create exceptional and devastating consequences for their families. *United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997). Furthermore, "a defendant's family circumstances are part of [his] history and characteristics." *United States v. Roberts*, 2005 WL 1153757 at *5 (S.D.N.Y. 2005) (granting time served in consideration of defendant's role as the sole care-taker for his chronically ill and disabled life partner).

In determining whether a downward departure is warranted based on family ties and responsibilities, the Court shall consider the following non-exhaustive list of circumstances: "(i) the seriousness of the offense; (ii) the involvement in the offense, if any, of members of the defendant's family; (iii) the danger, if any, to members of the defendant's family as a result of the offense." U.S.S.G. § 5H1.6 Policy Statement, Application Note 1(A).

48

Mr. Amanat's case best illustrates that no man is an island. While Mr. Amanat has personally suffered for his mistakes by virtue of his harsh experience while incarcerated, so, too, did his parents, siblings, wife and children. They, too, have felt the emotional, economic, and social impact of Mr. Amanat's imprisonment, exacerbated by the restrictive barriers caused by the pandemic. Thus, while it is acknowledged that all imprisonment has a collateral impact on offenders and their families, it cannot be said that such a reality is always evenhanded especially for those imprisoned during the pandemic.

The collateral impact and hardships suffered by Mr. Amanat's family warrant consideration by the Court in mitigation of punishment. *Cf., United States v. Milikowsky*, 65 F.3d 4, 9 (2d Cir. 1995) (The Sentencing Guidelines "do not require a judge to leave compassion and common sense at the door to the courtroom.") (*citing United States v. Johnson*, 964 F.2d 124, 125 (2d Cir. 1992)). *See also United States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017) ("Additional months in prison are not simply numbers. Those months have exceptionally severe consequences for the incarcerated individual. They also have consequences both for society which bears the direct and indirect costs of incarceration and for the administration of justice which must be at its best when, as here, the stakes are at their highest.").

8. **<u>Mr. Amanat's Charitable Works Should Be Considered at Sentencing</u>**

Though charitable service and other good works "are not ordinarily relevant in determining whether a departure is warranted," U.S.S.G. § 5H1.11, the Defense respectfully requests that the Court consider Mr. Amanat's extraordinary track record of charitable work as a basis to downwardly depart from the advisory range (or as a significant factor under 18 U.S.C. § 3553(a) to compel leniency). *See supra* at pp. 3-8 (detailing Mr. Amanat's history of good works and charity); *see also* Letters of Support, *passim.*

Notwithstanding his current transgression, the history of Mr. Amanat demonstrates a person of good will with a remarkable effort to change the lives of those less fortunate than himself through local and global philanthropic endeavors. As Mr. Amanat's friend Chaplain Paul Sladkus writes, "Benjamin Franklin said that a person's net worth is defined as his positive contributions to the world minus his negative ones. In that sense, for better not worse, Omar has had a net positive effect on the world." Notwithstanding many personal setbacks and tragedies, Mr. Amanat has remained unwavering in his pursuits to bring charity and aid to others in need, as evidenced by his helping dozens of inmates in their educational pursuits and rehabilitation generally. Even while imprisoned, Mr. Amanat has remained unrelenting in the commendable task of bringing aid to others in need.

In this regard, Mr. Amanat is so much more than his offense. He is a well-meaning, charitable man; a loving father and son; and a person who strives to do good in the world. He has been chastened by his arrest, prosecution, and conviction. He understands the importance of maintaining a fully law-abiding life, and he asks the Court for great mercy so that he can soon be, once again, a positive contributor to his community.

Accordingly, we respectfully ask the Court to take into consideration the significant humanitarian difference Mr. Amanat has made by donating his time, effort, and financial resources to the well-being of others, his community, and the world at large, all of which is well documented in the compendium of support letters provided to the Court by his colleagues, friends and family.

## **CONCLUSION**

For the foregoing reasons, and considering the history and characteristics of Mr. Amanat, we respectfully submit that a non-Guidelines sentence of time served would be "sufficient, but not greater than necessary" to meet the goals of 18 U.S.C. § 3553(a).

The Court's consideration of this submission is greatly appreciated.

Respectfully submitted,

*/s/ John Meringolo*
John Meringolo, Esq.

Cc. All counsel (via ECF)

51